# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FATMA MAROUF, *et al.*,

               Plaintiffs,

      v.

ALEX AZAR, in his official capacity as
Secretary of the United States Department of
Health and Human Services, *et al.*,

               Defendants.

Case No. 18-cv-378 (APM)

## FEDERAL DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

   I.   Unaccompanied Alien Children ............................................................................ 2

   II.   Unaccompanied Refugee Minors .......................................................................... 4

   III.  Appropriations for UAC and URM Programs ..................................................... 5

   IV. Plaintiffs' Allegations ............................................................................................ 6

ARGUMENT ..................................................................................................................... 7

   I.   Plaintiffs Cannot Demonstrate Taxpayer Standing to Challenge HHS's
       Management of Grants Under the UAC and URM Programs ............................... 8

     A.  Taxpayers Generally Lack Standing to Contest Expenditure of Federal Funds. ............ 9

     B.  Plaintiffs Do Not Meet the Taxpayer Standing Exception Because They Do Not
        Challenge Congressional Action, Only Discretionary Executive Spending. ................. 12

   II.  The Individual Plaintiffs Lack Standing to Sue the Federal Defendants for
       CCFW's Alleged Refusal to Consider Their Applications to be Foster Parents ............... 15

   III. Plaintiffs' Claim for Nominal Damages Against the United States is
       Barred by the  Doctrine of Sovereign Immunity. ............................................... 20

CONCLUSION .................................................................................................................. 21

# TABLE OF AUTHORITIES

## Cases

*Albuquerque Indian Rights v. Lujan*,
    930 F.2d 49 (D.C. Cir. 1991) ............................................................... 18

*Allen v. Wright*,
    468 U.S. 737 (1984) .......................................................................... 16

*Am. Jewish Cong. v. Corp. for Nat'l and Cmty. Serv.*,
    399 F.3d 351 (D.C. Cir. 2005) ............................................................. 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................ 6

*Bowen v. Kendrick*,
    487 U.S. 589 (1988) .......................................................... 1, 9, 10, 13

*Calzone v. Hawley*,
    866 F.3d 866 (8th Cir. 2017) ............................................................... 16

*Cierco v. Mnuchin*,
    857 F.3d 407 (D.C. Cir. 2017) .......................................................... 16, 17

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .......................................................................... 17

*Clark v. Library of Cong.*,
    750 F.2d 89 (D.C. Cir. 1984) ............................................................... 21

*Cohen v. United States*,
    650 F.3d 717 (D.C. Cir. 2011) ............................................................. 21

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ............................................................................ 8

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008) .......................................................................... 14

*Doremus v. Bd. of Educ. of Hawthorne*,
    342 U.S. 429 (1952) ............................................................................ 9

*FAA v. Cooper*,
    566 U.S. 284 (2012) .......................................................................... 20

*FDIC v. Meyer*,
    510 U.S. 471 (1994) ...................................................................... 20, 21

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ................................................................. 16

*Flast v. Cohen*,
  392 U.S. 83 (1968) ........................................................................... 9, 10

*Frank Krasner Enters., Ltd. v. Montgomery Cty.*,
  401 F.3d 230 (4th Cir. 2005) ................................................................. 17

*Freedom From Religion Found., Inc. v. Nicholson*,
  536 F.3d 730 (7th Cir. 2008) ................................................................. 12

*\*Freedom Republicans, Inc. v. Fed. Election Comm'n*,
  13 F.3d 412 (D.C. Cir. 1994) ................................................................. 18

*Frothingham v. Mellon*,
  262 U.S. 447 (1923) ............................................................................ 9

*\*Hein v. Freedom From Religion Foundation, Inc.*,
  551 U.S. 587 (2007) .................................................................... *passim*

*\*In re Navy Chaplaincy*,
  534 F.3d 756 (D.C. Cir. 2008) ...................................................... *passim*

*Jackson v. Bush*,
  448 F. Supp. 2d 198 (D.D.C. 2006) ......................................................... 21

*Lane v. Peña*,
  518 U.S. 187 (1996) ........................................................................... 20

*Lewis v. Casey*,
  518 U.S. 343 (1996) ........................................................................... 14

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................... 8, 9, 15, 16

*Marks v. United States*,
  430 U.S. 188 (1977) ............................................................................ 2

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ............................................................................ 9

*Murray v. U.S. Dep't of Treasury*,
  681 F.3d 744 (6th Cir. 2012) ................................................................. 12

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ................................................................... 9

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004) ............................................................... 15, 16

*Pedreira v. Ky. Baptist Homes for Children*,
579 F.3d 722 (6th Cir. 2009) .................................................................. 12

*Perry Capital LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) ............................................................... 15

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
489 F.3d 1267 (D.C. Cir. 2007) ............................................................. 16, 18

*Sherman v. Illinois*,
682 F.3d 643 (7th Cir. 2012) .................................................................. 12

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ................................................................................. 17

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ........................................................................... 8

*Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ........................................................................... 14

*United States v. Mitchell*,
445 U.S. 535 (1980) ............................................................................... 20

*United States v. Sherwood*,
312 U.S. 584 (1941) ............................................................................... 20

*US Ecology, Inc. v. U.S. Dep't of Interior*,
231 F.3d 20 (D.C. Cir. 2000) ................................................................. 19

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................................... 8

*West v. Lynch*,
845 F.3d 1228 (D.C. Cir. 2017) ............................................................. 8, 16

## **Statutes**

5 U.S.C. § 702 ............................................................................................ 20

6 U.S.C. § 279 ............................................................................................ 3

8 U.S.C. § 1232 .......................................................................................... 3, 4

8 U.S.C. § 1522 .......................................................................................... 4

20 U.S.C. § 821 ................................................................................................................... 10

Consolidated Appropriations Act, 2018,
    Pub. L. No. 115-141, 132 Stat. 348 (Mar. 23, 2018) ................................................. 5

Consolidated Appropriations Act, 2017,
    Pub. L. No. 115-31, 131 Stat. 135 (May 5, 2017) ..................................................... 5

Consolidated Appropriations Act, 2016,
    Pub. L. No. 114-113, 129 Stat. 2242 (Dec. 18, 2015) ............................................. 5

Consolidated and Further Continuing Appropriations Act, 2015,
    Pub. L. No. 113-235, 128 Stat. 2130 (Dec. 16, 2014) ............................................. 5

## **Rules**

Fed. R. Civ. P. 8(a)(1) ...................................................................................................... 20

Fed. R. Civ. P. 12(b)(1) ............................................................................................... 20, 21

## **Other Authorities**

Office of Refugee Resettlement, *About Unaccompanied Alien Children's
    Services: Background*, https://www.acf.hhs.gov/orr/programs/ucs/about
    (updated May 15, 2018) ............................................................................................... 3

Office of Refugee Resettlement, *About Unaccompanied Refugee Minors*,
    https://www.acf.hhs.gov/orr/programs/urm/about (updated May 14, 2018) ...................... 5, 19

Office of Refugee Resettlement, *Unaccompanied Alien Children Frequently Asked Questions*,
    https://www.acf.hhs.gov/orr/unaccompanied-children-frequently-asked-questions
    (updated June 29, 2017) ................................................................................................ 4

Office of Refugee Resettlement, *Facts and Data*,
    https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (updated May 8, 2018) ......................... 3

# INTRODUCTION

This case arises from Catholic Charities of Fort Worth's ("CCFW's") provision of foster care placement services to vulnerable children who lack a parent or guardian in the United States to care for them.  CCFW, a private entity not before this Court, indirectly receives federal funding to carry out these critical support services for unaccompanied alien children ("UAC") and unaccompanied refugee minors ("URM") as a sub-recipient of grants made to the United States Conference of Catholic Bishops ("USCCB"), a grantee of the U.S. Department of Health and Human Services ("HHS").  Plaintiffs seek to put these essential services at risk—not only those provided by CCFW, but all services to unaccompanied youths administered by USCCB and funded by HHS—by asking the Court to end all UAC and URM grants to USCCB.  They do so on the basis of USCCB's intent to adhere to its sincerely held religious beliefs while receiving federal funding, even though it is well settled that the government may contract with faith-based organizations to provide social service programs.  *See, e.g.*, *Bowen v. Kendrick*, 487 U.S. 589, 613 (1988).

But as a threshold matter, the Court lacks jurisdiction to consider the merits of Plaintiffs' claims because the Amended Complaint fails to establish Plaintiffs' standing to sue the Federal Defendants.  For those claims that Plaintiffs base on their status as taxpayers, the Supreme Court has long rejected such status as sufficient to constitute the "concrete and particularized" injury required for Article III standing.  And Plaintiffs cannot avail themselves of the exceedingly narrow exception for taxpayer standing in certain Establishment Clause cases because that exception does not extend to discretionary Executive Branch expenditures like those at issue here.  *See Hein v.*

*Freedom From Religion Foundation, Inc.*, 551 U.S. 587 (2007).[1]  As to other claims by Plaintiffs Fatma Marouf and Bryn Esplin (collectively, the "individual Plaintiffs") based on an alleged denial by CCFW of their application to become foster parents of a UAC or URM, those claims are neither traceable to the Federal Defendants, nor likely to be redressed by the relief requested against them.

Beyond these dispositive defects, an additional one is presented on the face of the Amended Complaint: Plaintiffs' request for nominal damages should be dismissed on sovereign immunity grounds.  The United States, its agencies, and its officers may be sued only to the extent provided by an express and unambiguous statutory waiver of sovereign immunity.  Plaintiffs' Amended Complaint does not identify any waiver of sovereign immunity permitting nominal monetary damages against the United States for constitutional claims—and no such waiver exists.  For these reasons, the Government is immune from Plaintiffs' claims for damages, and Plaintiffs lack standing to pursue their claims against the Government.

The Amended Complaint should accordingly be dismissed for lack of subject matter jurisdiction.

## BACKGROUND

### I.  Unaccompanied Alien Children

Plaintiffs challenge the administration of grants as part of the UAC program.  The UAC program concerns the care and placement of the majority of unaccompanied alien children, who are persons under age 18, who lack lawful immigration status, and who do not have a parent or

---

[1] Throughout this brief, the Government cites Justice Alito's opinion in *Hein* announcing the Judgment of the Court, which the D.C. Circuit treats as binding.  *See In re Navy Chaplaincy*, 534 F.3d 756, 760 n.2 (D.C. Cir. 2008) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)); *see also Marks*, 430 U.S. at 193 (explaining that when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds" (citation omitted)).

legal guardian in the United States available to provide care and physical custody.[2]  *See* 6 U.S.C. § 279(g)(2).  The Office of Refugee Resettlement ("ORR"), an office of HHS's Administration for Children and Families, coordinates and implements the care and placement of unaccompanied alien children in federal custody.  *See* 6 U.S.C. § 279(b); *see also* 8 U.S.C. § 1232(b)(1).  ORR cares for tens of thousands of unaccompanied children each year; for example, ORR received 40,810 referrals from DHS in Fiscal Year 2017 and 59,170 referrals in Fiscal Year 2016.  *See* Office of Refugee Resettlement, *Facts and Data*, https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (updated May 8, 2018).  The majority of UACs are "cared for through a network of state licensed ORR-funded care providers," which "must meet ORR requirements to ensure a high level of quality of care."  Office of Refugee Resettlement, *About Unaccompanied Alien Children's Services: Background*, https://www.acf.hhs.gov/orr/programs/ucs/about (updated May 15, 2018).

To carry out this function, ORR has awarded grants, in the form of cooperative agreements, to organizations to provide various services for unaccompanied alien children until they either are released from federal custody (often to a family member), turn 18 years of age, or gain lawful immigration status.  *See* 8 U.S.C. § 1232(i) (authorizing grants and contracts); *see also* Unaccompanied Children's Program, *Fact Sheet*, at 2 (Jan. 2016) www.acf.hhs.gov/sites/default/files/orr/orr_uc_updated_fact_sheet_1416.pdf.  ORR provides grants to USCCB to carry out these functions.  *See* Am. Compl. ¶ 28, ECF No. 21.  USCCB has "provided foster care to unaccompanied refugee and immigrant children for many years."  *See* Office of Refugee Resettlement, *Unaccompanied Alien Children Frequently Asked Questions*,

---

[2] Some UAC from contiguous countries, such as Mexico, will not be referred to ORR for custody.  *See* 8 U.S.C. § 1232(a)(2).

https://www.acf.hhs.gov/orr/unaccompanied-children-frequently-asked-questions (updated June 29, 2017).  In carrying out these services, USCCB often relies on sub-grantees like CCFW here.

The statute authorizing ORR to make these grants says that "the Secretary of Health and Human Services may award grants to, and enter into contracts with, voluntary agencies" to carry out the UAC program.  *See* 8 U.S.C. § 1232(i).  Congress thus did not require the issuance of grants but, instead, left the decision whether to make such grants, and to what specific "voluntary agencies," to executive discretion.

## II.     Unaccompanied Refugee Minors

Plaintiffs also challenge the administration of ORR grants made under the URM program.  That program arises from the Refugee Act of 1980, under which ORR is authorized to issue grants to, and contract with, State and local governments and private non-profit agencies to manage the initial resettlement of, and provide resettlement assistance to, refugees admitted to the United States.  8 U.S.C. § 1522.  Under this program, in relevant part, the Director of ORR is authorized to issue "grants to and contracts with public and private nonprofit agencies, for the provision of child welfare services, including foster care maintenance payments and services and health care" to refugee children.  *Id.* § 1522(d)(2)(A).  For those refugee children "unaccompanied by a parent or other close adult relative," the Director generally may fund services provided "until the month after the child attains eighteen years of age."  *Id.* § 1522(d)(2)(B)(i).  As with the UAC program, Congress left the decisions of whether to issue grants and to which grantees to executive discretion. *See id.* § 1522(d)(2)(A).

ORR has exercised that discretion to provide these services through a "network of caretakers" that "help[] unaccompanied refugee minors develop appropriate skills to enter adulthood and to achieve social self-sufficiency."  *See* Office of Refugee Resettlement, *About*

*Unaccompanied Refugee Minors*, https://www.acf.hhs.gov/orr/programs/urm/about (updated May 14, 2018).  USCCB is one member of this network.  *See* Am. Compl. ¶ 28.  As with the UAC program, USCCB works with sub-grantees like CCFW to provide foster care placement services for the URM program.

## III.    Appropriations for UAC and URM Programs

The current funding for ORR grants pursuant to the URM and UAC programs comes from four separate lump-sum congressional appropriations—those from 2015, 2016, 2017, and 2018. In each of those four years, Congress appropriated an approximate average of $1.69 billion to the Administration for Children and Families ("ACF")—the component of HHS in which ORR is located—to provide refugee and entrant assistance activities.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, Div. H, Tit. II, 132 Stat. 348, 728 (Mar. 23, 2018) (appropriating approximately $1.86 billion); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. H, Tit. II, 131 Stat. 135, 531 (May 5, 2017) (appropriating approximately $1.67 billion); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. H, Tit. II, 129 Stat. 2242, 2612–13 (Dec. 18, 2015) (appropriating approximately $1.67 billion); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, Div. G. Tit. II, 128 Stat. 2130, 2479 (Dec. 16, 2014) (appropriating approximately $1.56 billion).

Those lump-sum appropriations are not earmarked for any particular program, expense, or component of ACF; instead, through nearly identical language, they provide ACF with funding to carry out the broad purposes announced by several statutes (including those authorizing grants under the UAC and URM programs):

> For necessary expenses for refugee and entrant assistance activities authorized by section 414 of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980, and for carrying out section 462 of the Homeland Security Act of 2002, section 235 of the William Wilberforce

> Trafficking Victims Protection Reauthorization Act of 2008, the Trafficking Victims Protection Act of 2000 ("TVPA"), and the Torture Victims Relief Act of 1998[, appropriating funds] ….

Consolidated Appropriations Act, 2018, 132 Stat. at 728; Consolidated Appropriations Act, 2017, 131 Stat. at 531; *see* Consolidated Appropriations Act, 2016, 129 Stat. at 2612–13 (providing the same authorization as to the URM and UAC programs); Consolidated and Further Continuing Appropriations Act, 2015, 128 Stat. at 2479 (same). The 2015, 2016, 2017, and 2018 appropriations to ACF each last for three fiscal years and expire on September 30 of 2017, 2018, 2019, and 2020, respectively. *See* Consolidated Appropriations Act, 2018, 132 Stat. at 728; Consolidated Appropriations Act, 2017, 131 Stat. at 531; Consolidated Appropriations Act, 2016, 129 Stat. at 2612–13; Consolidated and Further Continuing Appropriations Act, 2015, 128 Stat. at 2479. These lump-sum appropriations do not mandate any expenditure, but only appropriate funds for those expenses and activities authorized by other statutes.

## IV. Plaintiffs' Allegations

The Amended Complaint seeks to hold the Government responsible for an alleged discriminatory action by a private organization that receives funding to carry out UAC and URM foster care functions through USCCB. Individual Plaintiffs are a married lesbian couple living in Fort Worth, Texas. Am. Compl. ¶¶ 5, 46.[3] They allege that they sought information about foster care of unaccompanied alien and refugee youths from CCFW, but that a representative of CCFW informed them that the organization would not consider them to be foster parents for religious reasons. *Id.* ¶¶ 46–48. The individual Plaintiffs assert violations of the Establishment Clause and the Due Process Clause of the Fifth Amendment arising out of this action, *id.* ¶¶ 58–91, and they

---

[3] As it must at this stage, the government assumes the truth of the Amended Complaint's factual allegations for purposes of this motion, but not those allegations pleaded in only conclusory fashion or that state legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–81 (2009).

seek declaratory and injunctive relief to ensure that they may apply to be foster-care parents to a child in the URM or UAC programs through USCCB.  Prayer for Relief ¶¶ A, C.

In combination with Plaintiff National LGBT Bar Association ("the Bar Association"), the individual Plaintiffs also seek broader remedies based on their status as taxpayers.  The individual Plaintiffs allege that, as federal taxpayers, they "object to paying for federally funded child welfare services" provided in a manner they deem contrary to law.  *See id.* ¶ 5.  The Bar Association makes a similar objection on behalf of its members "who are federal taxpayers."  *See id.* ¶ 8.[4]  Seemingly on the basis of these taxpayer standing allegations alone, Plaintiffs seek nationwide and program-wide permanent injunctive relief as to the "administration of the URM Program and the [UAC] Program," which could include "as necessary, prohibiting Federal Defendants from awarding URM or [UAC] grants to USCCB."  *See id.* Prayer For Relief ¶ D.  This request for relief appears to be based on various allegations about USCCB's beliefs and views, unrelated to the particular views or practices of sub-grantee CCFW.  *See id.* ¶¶ 30–39.

At the conclusion of their Amended Complaint, Plaintiffs also seek nominal monetary damages against the Defendants for these alleged injuries.  *See id.* Prayer For Relief ¶ E.

## ARGUMENT

Plaintiffs' Amended Complaint should be dismissed for three independent reasons.  First, this Court lacks subject matter jurisdiction to consider Plaintiffs' nationwide programmatic challenges to HHS's management of grants under the UAC and URM programs based on taxpayer standing.  Second, the Court lacks subject matter jurisdiction to consider individual Plaintiffs' challenges to CCFW's alleged denial of an opportunity to apply to be foster parents because

---

[4] The Amended Complaint indicates that the Bar Association is only pursuing an Establishment Clause claim on the basis of this taxpayer standing allegation, not the equal protection or due process claims pursued by the individual Plaintiffs.  *See* Am. Compl. ¶ 72.

Plaintiffs have not shown that their alleged injury is traceable to the Federal Defendants, nor likely to be redressed by the relief requested against them. Finally, Plaintiffs' claims for nominal monetary damages against the United States should be dismissed because Plaintiffs have not and cannot identify any relevant waiver of sovereign immunity that would permit a claim for damages.

## I. Plaintiffs Cannot Demonstrate Taxpayer Standing to Challenge HHS's Management of Grants Under the UAC and URM Programs.

Plaintiffs' broad challenge to HHS's administration of the UAC and URM programs should be dismissed for lack of standing. As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)—namely, that each has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Standing is necessary for parties to establish the existence of an Article III case or controversy and, thus, to invoke the jurisdiction of the federal courts. *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). And plaintiffs must establish standing separately for each form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

These rules apply to individuals and organizations alike. But an organization may also pursue "representational standing" on behalf of its members. The organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).

Plaintiffs lack standing to seek nationwide or programmatic relief unconnected to the individual Plaintiffs' experience with CCFW.  The Bar Association alleges standing only on behalf of its members and only on the basis that those members have been injured as taxpayers by a purported unlawful expenditure of federal funds.  Am. Compl. ¶ 8.  The individual Plaintiffs also allege standing to seek programmatic relief based on their status as taxpayers.  *Id.* ¶ 5.  Plaintiffs cannot invoke the Court's jurisdiction on this basis.

## A. Taxpayers Generally Lack Standing to Contest Expenditure of Federal Funds.

The long-established general rule is that one's status as a federal taxpayer does not confer Article III standing to challenge actions by the federal government.  *See Frothingham v. Mellon, decided with Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).  Except for one circumstance discussed below, a plaintiff may not use his or her status as a federal taxpayer to raise only a "generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large."  *See Lujan*, 504 U.S. at 573–74.  "[T]he interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure."  *Hein*, 551 U.S. at 600 (quoting *Doremus v. Bd. of Educ. of Hawthorne*, 342 U.S. 429, 433 (1952)).

The Supreme Court has recognized only a "narrow exception . . . to the general rule against taxpayer standing" in certain cases raising claims under the Establishment Clause.  *Bowen v. Kendrick*, 487 U.S. 589, 618 (1988); *see also Flast v. Cohen*, 392 U.S. 83, 105–06 (1968).  This

exception allows taxpayers to challenge expenditures "funded by a specific congressional appropriation . . . disbursed . . . pursuant to a direct and unambiguous congressional mandate" under the Taxing and Spending Clause. *Hein*, 551 U.S. at 604. But this exception has rarely been satisfied. *See id.* at 608 (declining to find taxpayer standing due to the limited nature of the exception); *Navy Chaplaincy*, 534 F.3d at 761 (recognizing only a "very narrow exception to the general bar against taxpayer standing").

Indeed, the Supreme Court has found this exception applicable in only two instances. First, in *Flast*, taxpayers were permitted to challenge a statute that provided grants for educational materials in "public and private elementary and secondary schools," 392 U.S. at 86–87 (quoting the Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, Tit. II, § 201(a), 79 Stat. 27, 36 (previously codified at 20 U.S.C. § 821)), because that statute was plainly understood as authorizing federal funding of religiously affiliated schools. *See Hein*, 551 U.S. at 604 n.3 (recognizing that at the time of the *Flast* decision, "the great majority of nonpublic elementary and secondary schools in the United States were associated with a church"). And for that reason, *Flast* held that taxpayers had Article III standing to challenge such "*congressional action* under the taxing and spending clause" that was alleged to be "in derogation" of the Establishment Clause. *Flast*, 392 U.S. at 105–06 (emphasis added); *see also Hein*, 551 U.S. at 604 ("The expenditures challenged in *Flast* . . . were funded by a specific congressional appropriation and were disbursed to private schools (including religiously affiliated schools) pursuant to a direct and unambiguous congressional mandate.").

Second, in *Bowen v. Kendrick*, 487 U.S. 589 (1988), the Court permitted taxpayers to challenge a statute that expressly contemplated the involvement of "religious and charitable organizations" in a federal grant program designed to address adolescent premarital sexual

relations, pregnancy, and parenthood.  *See id*. at 595–96; *see also Hein*, 551 U.S. at 607 (explaining that taxpayers had standing in *Kendrick* because Congress, in appropriating funds, had "expressly contemplated that some of those moneys might go to projects involving religious groups").  As the Supreme Court recently explained, "in the four decades since its creation, the *Flast* exception has largely been confined to its facts."  *Hein*, 551 U.S. at 609–10.

Importantly, the Supreme Court has made clear that the *Flast* exception does not extend to Establishment Clause challenges to grants funded by lump-sum appropriations.  *Hein*, 551 U.S. at 595.  In *Hein*, taxpayers sought to challenge the use of "Congressional taxpayer appropriations" to pay for conferences at which the President promoted federal grant-making to faith-based organizations.  *Id*. at 592.  The Supreme Court denied taxpayer standing because the relevant appropriations did not "*specifically authorize* the use of federal funds to pay for the conferences or speeches that the plaintiffs challenged."  *Hein*, 551 U.S. at 593 (emphasis added).  Unlike *Kendrick*, there was no statute that "expressly contemplated that [federal funds] might go to projects involving religious groups."  *Id.* at 607.  The *Flast* exception did not apply "[b]ecause the expenditures that respondents challenge were not expressly authorized or mandated by any specific congressional enactment" and thus, "respondents' lawsuit is not directed at an exercise of congressional power."  *Id.* at 608.

The D.C. Circuit has confirmed that *Hein* "forcefully emphasized" the "extremely limited contours" of *Flast*'s exception to the bar on taxpayer standing.  *Navy Chaplaincy*, 534 F.3d at 762.  The taxpayer standing exception does not "encompass [challenges to] discretionary Executive Branch spending."  *Id.*  Thus, in *Navy Chaplaincy*, the D.C. Circuit rejected a taxpayer's standing to sue the Navy for allegedly operating its chaplaincy program in a religiously discriminatory manner because "[n]o legislative enactment expressly authorizes or appropriates funds for the

Navy *to favor Catholic chaplains* in its retirement system." *Id.* at 762 (emphasis added); *see also id.* (statute made "no reference to denominational category, only to chaplains generally"). Absent a statute that expressly contemplates the specific objectionable expenditures at issue, the *Flast* exception does not apply.

The D.C. Circuit's understanding of *Hein* is in accord with the holding of numerous other courts that have interpreted *Hein* to mean that taxpayer standing suits do not encompass discretionary Executive Branch spending. *See Sherman v. Illinois*, 682 F.3d 643, 646 (7th Cir. 2012) (explaining that following *Hein*, federal taxpayer standing extends only to "suits against 'specific congressional enactments,' [and] expressly exclude[es] 'discretionary Executive Branch expenditures'" (quoting *Hein*, 551 U.S. at 608–10)); *Pedreira v. Ky. Baptist Homes for Children*, 579 F.3d 722, 731 (6th Cir. 2009) (denying taxpayer standing to challenge "general funding provisions for childcare [that] do not contemplate religious indoctrination"); *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 751 (6th Cir. 2012) (rejecting taxpayer standing where the relevant statute "d[id] not contemplate the disbursement of congressional appropriations to support religious activities"); *Freedom From Religion Found., Inc. v. Nicholson*, 536 F.3d 730, 744–45 (7th Cir. 2008) (denying taxpayer standing where there was "an absence of any direction, guidance or indication on the part of Congress as to how the [Veterans Health Administration] should expend the funds appropriated for medical care").

**B.      Plaintiffs Do Not Meet the Taxpayer Standing Exception Because They Do Not Challenge Congressional Action, Only Discretionary Executive Spending.**

There is no taxpayer standing here because Plaintiffs' challenge is to "executive discretion, not congressional action." *Hein*, 551 U.S. at 605. As *Hein* made clear, Plaintiffs cannot rely on taxpayer standing to challenge executive branch spending unless a statute "not only expressly authorized and appropriated specific funds for [the] grantmaking" but "also expressly

contemplated that some of those moneys might go to projects involving religious groups." *Hein*, 551 U.S. at 607 (citing *Kendrick*, 487 U.S. at 595–96, 619–20, 623); *id.* at 607 n.6 (providing examples from the statute at issue in *Kendrick* stating that "religious and charitable organizations" should be involved in dealing with problems of adolescent premarital sex and pregnancy and mandating that federally provided services should "emphasize the provision of support by . . . religious . . . organizations"); *Navy Chaplaincy*, 534 F.3d at 762 (discussing that no statute "expressly authorizes or appropriates funds for the Navy *to favor Catholic chaplains* in its retirement system" (emphasis added)).  Plaintiffs have not made this showing.

Plaintiffs have not identified any act of Congress appropriating funds specifically for faith-based organizations under the URM and UAC programs, nor any act of Congress that expressly contemplates, let alone requires, the involvement of such organizations in providing care and shelter to children under the URM and UAC programs.  Nor could they.  As explained above, *see supra* Background Parts I–III, the statutes authorizing the issuance of grants under the URM and UAC programs leave the decisions of whether to issue grants, and to which organizations, to the discretion of the Executive.  Plaintiffs seem to recognize that they challenge only discretionary executive decisions when they allege, for instance, that Federal Defendants—and not acts of Congress—"have disbursed and continue to disburse federal taxpayer funds in a manner" that violates the Establishment Clause.  *See* Am. Compl. ¶¶ 66–67; *see also id.* ¶ 72 (Plaintiffs "are harmed by *Federal Defendants' use* of federal taxpayer funds") (emphasis added).  And Plaintiffs' request for an injunction as to grant awards made *by ORR*, not by any federal statute, confirms the point.  *See id.* Prayer for Relief ¶ D.  For all of these reasons, it is clear that Congress did not "*specifically authorize* the use of federal funds" on grants to faith-based organizations, and

Plaintiffs accordingly cannot rely on taxpayer standing for their claims.  *Hein*, 551 U.S. at 593 (emphasis added); *Navy Chaplaincy*, 534 F.3d at 762.

The D.C. Circuit's decision in *American Jewish Congress v. Corporation for National and Community Service*, 399 F.3d 351 (D.C. Cir. 2005), cannot salvage Plaintiffs' claim.  Although the court there permitted a challenge to executive administration of a statute authorizing grants, *id.* at 355, that decision predated *Hein* and was based on the erroneous assumption that the *Flast* exception could apply to claims regarding the "manner in which the Executive Branch is administering the statute."  *Compare id. with Hein*, 551 U.S. at 608–09; *see also Navy Chaplaincy*, 534 F.3d at 762 (interpreting *Hein*).  Such reasoning was abrogated by *Hein*.  Because the Amended Complaint challenges the exercise of executive discretion—and not congressional action—the narrow exception for taxpayer standing is inapplicable here.

The lack of taxpayer standing necessitates dismissal of Plaintiffs' claims for declaratory and injunctive relief with respect to the administration of the URM and UAC program as a whole. *See, e.g.*, Am. Compl., Prayer for Relief ¶¶ B, D.  The Supreme Court has repeatedly held that "standing is not dispensed in gross" and that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  A plaintiff may not invoke injury resulting from one transaction to justify pursuing relief as to separate transactions.  *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  "If the right to complain of *one* administrative deficiency automatically conferred the right to complaint of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review.  That is of course not the law."  *Id.*  Plaintiffs' alleged injury from CCFW's denial of an opportunity to apply to be foster-care parents cannot

establish standing to challenge all funds disbursed to USCCB for the URM and UAC programs, nor the administration of the programs as a whole.  And the only other basis plaintiffs rely on to establish standing for these claims is their status as taxpayers.  *See* Am. Compl. ¶¶ 72–73 (distinguishing between harms to the individual Plaintiffs and the Bar Association arising from the use of federal funds on the basis of their status as taxpayers and harms to the individual Plaintiffs as a couple "who wish to become foster or adoptive parents").  Because Plaintiffs' taxpayer status does not give rise to Article III standing, these claims for relief must be dismissed.

## II.    The Individual Plaintiffs Lack Standing to Sue the Federal Defendants for CCFW's Alleged Refusal to Consider Their Applications to be Foster Parents.

The individual Plaintiffs' claims arising from CCFW's alleged denial of an opportunity to apply to serve as foster parents fare no better than their claims as taxpayers.  First, CCFW's denial of an opportunity to apply to be a foster parent of a URM or UAC is not fairly traceable to the Federal Defendants because CCFW caused the alleged injury by application of its own criteria for foster parents.  Second, and relatedly, the individual Plaintiffs have not shown that a favorable decision on the merits is likely to redress their asserted injury rather than to lead CCFW to cease providing services under the URM and UAC programs.

To establish Article III standing, plaintiffs must demonstrate that the injury of which they complain is "fairly traceable to the defendant's allegedly unlawful conduct" and "likely to be redressed by the requested relief."  *Lujan*, 504 U.S. at 590.  Where an alleged injury "hinge[s] on the independent choices" of a third party not before the court, it is "'substantially more difficult' to establish standing."  *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562) (abrogation on other grounds recognized in *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620–21 (D.C. Cir. 2017)).  "In such cases, the plaintiff must offer 'substantial evidence of a causal relationship between the government policy and the

third-party conduct, leaving little doubt as to causation and the likelihood of redress.'" *Cierco v. Mnuchin*, 857 F.3d 407, 418–19 (D.C. Cir. 2017) (quoting *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007)).[5]  This burden exists even at the pleading stage, and "it is not enough simply to plead this causative link" without adequate factual allegations.  *Renal Physicians Ass'n*, 489 F.3d at 1276.  The redressability requirement "focuses on the 'connection between the alleged injury and the judicial relief requested.'"  *West*, 845 F.3d at 1236 (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)).  A plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (citation omitted).  Because plaintiffs must demonstrate Article III standing as to each defendant, they must show that "an order of the court against each defendant could redress the injury."  *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (citing *Lujan*, 504 U.S. at 560–61).

The individual Plaintiffs have not established the requisite causation.  Causation, or traceability, "examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party," are the cause of the plaintiff's injury.  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citations omitted).  In this case, it was CCFW,

---

[5] Redressability may also be found where government action "permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action."  *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940–41.  Thus, where a third party engages in conduct permitted by a challenged government rule, an order setting aside the rule would redress the plaintiff's injury because the government authorization of the conduct would be ended and the third party would no longer be able to engage in the injurious conduct without violating the law. *See id.* (reasoning that causation and redressability are met because "the intervening choices of third parties are not truly independent of government policy" and the conduct would only continue "if those third parties took the extraordinary measure of continuing their injurious conduct in violation of law").  The Amended Complaint does not plead any such permission or authorization by the Government of CCFW's alleged conduct, so this element of the redressability analysis does not apply here.

not the Federal Defendants, that allegedly denied the individual Plaintiffs the opportunity to apply to be foster parents.  Plaintiffs seek to escape that fact with allegations that Federal Defendants were "on notice" of and failed to prevent this action, but those allegations only confirm the lack of causal connection to actions by the Federal Defendants.  *See, e.g.*, Am. Compl. ¶¶ 38, 56. Plaintiffs' asserted injury is too dependent on the decisions of independent third parties to satisfy Article III standing requirements.  *See, e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42– 43 (1976); *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 235 (4th Cir. 2005) ("[T]hird parties . . . broke the chain of causation by independently charging higher prices.").

Second, the individual Plaintiffs cannot show that their alleged injury is likely to be redressed by the relief requested against the Government.  The Supreme Court has cautioned against "endors[ing] standing theories that rest on speculation about the decisions of independent actors" and the individual Plaintiffs' theories rest on precisely that.  *Cierco*, 857 F.3d at 418 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)).  The individual Plaintiffs ask this Court to enter a permanent injunction ensuring that they can apply to be foster or adoptive parents "through Federal Defendants' grantee USCCB," Am. Compl., Prayer for Relief ¶ C, but the Federal Defendants cannot force USCCB or CCFW to continue to participate in these programs.  The Court is thus left to sheer speculation as to whether any such injunction would actually lead CCFW to afford individual Plaintiffs the requested opportunity, rather than withdraw from providing services under the programs.  *See, e.g.*, *Cierco*, 857 F.3d at 419 ("Their claim thus 'depends on the unforeseeable actions' of [an independent non-party], which is not enough to support redressability.  Appellants offer no evidence that the [independent non-party] would respond as they suggest." (citation omitted)).

Plaintiffs' own allegations undermine their claims of redressability.  They seek to connect CCFW's action to the sincerely-held religious beliefs of CCFW and USCCB, through which it obtains its funds.  *See, e.g.*, Am. Compl. ¶¶ 31, 32.  Those allegations suggest that CCFW is more likely to withdraw from providing services under the URM and UAC programs than to operate them in the specific manner Plaintiffs demand.  It is thus entirely speculative that Plaintiffs' requested injunction will remedy their injury, and they accordingly cannot establish Article III standing.  *See, e.g.*, *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 56 (D.C. Cir. 1991) (holding that plaintiffs lack standing where there is no "realistic possibility" that those asserting a lost opportunity will receive relief "once the supposed illegality is corrected"); *Renal Physicians Ass'n*, 489 F.3d at 1277 (concluding that plaintiffs lack standing where "it is 'speculative,' rather than 'likely,' that invalidating the [challenged agency action] will somehow cause" third parties to take action).

The D.C. Circuit's decision in *Freedom Republicans, Inc. v. Federal Election Commission*, 13 F.3d 412, 419 (D.C. Cir. 1994), is instructive on these points.  *Freedom Republicans* involved a political organization that filed suit against the Federal Election Commission seeking to enjoin the Commission's funding of the Republican National Convention.  *Id.* at 413.  The plaintiff "alleged that the Republican Party's delegate-selection processes and system of minority 'auxiliaries' combine to discriminate against minority groups, and that the FEC's continued funding of party activities therefore violates Title VI of the Civil Rights Act of 1964."  *Id.*  The D.C. Circuit concluded that the organization lacked standing to seek this relief because, *inter alia*, the court could not "confidently predict any causal connection between a possible judicial response" resulting in the withdrawal of funding and the "redress of appellee's injury," *i.e.*, through a change to the Republican Party's delegation-allocation method.  *Id.* at 419.  The court

so held despite the fact that "current levels of public funding are substantial, and the Republican Party would inevitably face a problem if its funding, but not that of the Democrats, were to be withdrawn." *Id.*  Likewise here, even assuming that "USCCB is the sole or primary source of funding for CCFW's services for children under the" URM and UAC programs, Am. Compl. ¶ 29, there is no way to "confidently predict" whether equitable relief against the Federal Defendants would cause CCFW to redress the asserted injury and work with the individual Plaintiffs.

Neither can the Plaintiffs infer redressability by speculating that if CCFW were to cease providing services pursuant to a sub-grant, a new provider would be brought on board in the Dallas-Fort Worth area to replace CCFW.[6]  There is no legal requirement that URM and UAC services be provided in any particular city and, indeed, the URM program only operates in 20 cities across the country, including Fort Worth, Texas.  *See* Office of Refugee Resettlement, *About Unaccompanied Refugee Minors*, https://www.acf.hhs.gov/orr/programs/urm/about (updated May 14, 2018).  Thus, a Court order causing the end of USCCB's or CCFW's participation in providing services under the URM and UAC programs would not necessarily result in any replacement provider coming into the Dallas-Fort Worth area.  The Federal Defendants would have discretion to decide whether to seek another grantee and, based on applications received from independent third parties, to decide whether to issue any such awards.  *See US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) ("Courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials.").  The individual Plaintiffs' have pleaded no more than a speculative chance that the requested relief against the

---

[6] The Government does not express a view about whether it will or will not ultimately seek out additional service providers in any particular location, including in Dallas-Fort Worth.  The point instead is that the choice of locations of providers is within the Government's policy discretion, and this provides no basis for the Court to find a likelihood of redressability.

Federal Defendants would redress their asserted injury.

### III.    Plaintiffs' Claim for Nominal Damages Against the United States is Barred by the Doctrine of Sovereign Immunity.

Plaintiffs' claim for nominal monetary damages against the United States is equally meritless because they have not and cannot identify any applicable waiver of the Government's sovereign immunity.  Am. Compl., Prayer for Relief ¶ E; *see also id.* ¶ 1.  "It is elementary that '[t]he United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (ellipses omitted) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Thus, a party may not obtain relief against the United States, its agencies, or its officers, unless Congress has expressly and unequivocally waived sovereign immunity through statute.  *See FAA v. Cooper*, 566 U.S. 284, 290 (2012); *Lane v. Peña*, 518 U.S. 187, 192 (1996).  Nothing in the Amended Complaint's "short and plain statement of the grounds for the court's jurisdiction," identifies any such waiver of sovereign immunity, much less one that would permit Plaintiffs to sue for nominal damages.  Fed. R. Civ. P. 8(a)(1); *see also* Am. Compl. ¶¶ 2–3.  Plaintiffs have thus failed to satisfy their burden of establishing this Court's jurisdiction as to their claim for damages and this claim should be dismissed under Rule 12(b)(1).

That pleading defect is not curable through amendment because no waiver of sovereign immunity permits nominal damages here, and accordingly, Plaintiffs' claim for damages against the United States should be dismissed with prejudice.  The Administrative Procedure Act's waiver of sovereign immunity permits suits against federal agencies for "relief other than money damages" in specific circumstances, 5 U.S.C. § 702, but plainly does not allow recovery of monetary damages.  *See Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) (holding the

APA's waiver of sovereign immunity concerns "actions not seeking money damages").  The Federal Tort Claims Act likewise does not help Plaintiffs, as it does not permit claims for violations of federal constitutional rights.  *See FDIC v. Meyer*, 510 U.S. at 478 ("[T]he United States simply has not rendered itself liable under [the FTCA] for constitutional tort claims.").  It is no surprise then that the "[D.C.] Circuit has found that Congress has not waived immunity for suits seeking monetary damages that arise under the Constitution."  *Jackson v. Bush*, 448 F. Supp. 2d 198, 201 (D.D.C. 2006) (citing *Clark v. Library of Cong.*, 750 F.2d 89, 102–03 (D.C. Cir. 1984)).

In sum, the Court lacks jurisdiction to award nominal damages against the Federal Defendants because Plaintiffs do not—and indeed cannot—identify a waiver of sovereign immunity that would permit such relief.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court dismiss the Amended Complaint for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).

Dated:  May 21, 2018

Respectfully submitted,

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOEL McELVAIN
Assistant Branch Director

/s/ *James Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW
Washington, DC 20530
Telephone:  (202) 353-0543
Email:  james.r.powers@usdoj.gov

*Counsel for Federal Defendants*