## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FATMA MAROUF, *et al.*, | ) ) ) |
| Plaintiffs | ) ) |
| v. | Civil Action No. 1:18-cv-00378 APM ) ) |
| ALEX AZAR, *et al.*, | ) ) ) |
| Defendants. | ) ) ) |

## DEFENDANT U.S. CONFERENCE OF CATHOLIC BISHOPS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii
INTRODUCTION ............................................................................................................... 1
BACKGROUND ................................................................................................................ 2
    A.    The Grant Programs for Refugee and Immigrant Children .................................. 2
    B.    USCCB Receives Funding Under the Grant Programs ........................................ 4
    C.    USCCB and Catholic Charities FW Provide Foster Care While Avoiding Actions That Would Violate Their Religious Beliefs ........................................... 4
STANDARD OF REVIEW ................................................................................................. 5
ARGUMENT ...................................................................................................................... 6
I.    THE INDIVIDUAL PLAINTIFFS LACK STANDING BECAUSE THEIR ALLEGED INJURY IS NOT FAIRLY TRACEABLE TO THE GOVERNMENT'S CHALLENGED CONDUCT .......................................................... 7
II.    THE INDIVIDUAL PLAINTIFFS LACK STANDING BECAUSE THEIR ALLEGED INJURY IS NOT REDRESSABLE BY A FAVORABLE DECISION ............................................................................................................ 9
III.    PLAINTIFFS DO NOT HAVE TAXPAYER STANDING ......................................... 11
CONCLUSION ................................................................................................................. 14

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ansley v. Warren*,
 861 F.3d 512 (4th Cir. 2017) ...................................................................................12

*Arpaio v. Obama*,
 797 F.3d 11 (D.C. Cir. 2015) .....................................................................................5

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ...................................................................................................5

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ...................................................................................................6

*Flast v. Cohen*,
 392 U.S. 83 (1968) ...................................................................................................13

*Freedom From Religion Found., Inc. v. Nicholson*,
 536 F.3d 730 (7th Cir. 2008) ...................................................................................12

*\*Freedom Republicans, Inc. v. FEC*,
 13 F.3d 412 (D.C. Cir. 1994) .....................................................................................8

*Hein v. Freedom From Religion Found., Inc.*,
 551 U.S. 587 (2007) ...................................................................................................4

*Humane Soc'y v. Vilsack*,
 797 F.3d 4 (D.C. Cir. 2015) .......................................................................................5

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977) .................................................................................................12

*Hurd v. D.C., Gov't*,
 864 F.3d 671 (D.C. Cir. 2017) ...................................................................................5

*\*In re Navy Chaplaincy*,
 534 F.3d 756 (D.C. Cir. 2008) .....................................................................12, 13, 14

*\*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ........................................................................................7, 9, 10

*Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*,
 792 F.2d 1172 (D.C. Cir. 1986) .................................................................................8

*Murray v. U.S. Dep't of Treasury*,
 681 F.3d 744 (6th Cir. 2012) ..............................................................................12, 13

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
 366 F.3d 930 (D.C. Cir. 2004) .................................................................................11

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
 489 F.3d 1267 (D.C. Cir. 2007) ...............................................................................10

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Simon v. East Kentucky Welfare Rights Organization*,
 426 U.S. 26 (1976) ........................................................................................................... 8, 9

*Town of Chester v. Laroe Estates, Inc.*,
 137 S. Ct. 1645 (2017) ..................................................................................................... 6, 14

*United Transp. Union v. ICC*,
 891 F.2d 908 (D.C. Cir. 1989) ............................................................................................ 11

*Valley Forge Christian Coll. v. Ams. United for Separation of Church
 & State, Inc.*,
 454 U.S. 464 (1982) ............................................................................................................ 13

*Warth v. Seldin*,
 422 U.S. 490 (1975) ............................................................................................................ 11

*Zorach v. Clauson*,
 343 U.S. 306 (1952) .............................................................................................................. 1

**STATUTES**

6 U.S.C. § 279 ............................................................................................................................. 2

8 U.S.C. § 1232 ..................................................................................................................... 2, 13

8 U.S.C. § 1522 ..................................................................................................................... 2, 13

Consolidated Appropriations Act, 2018,
 Pub. L. No. 115-141, Div. H, Tit. II, 132 Stat. 348, 728 (Mar. 23, 2018) ......................... 3, 13

Consolidated and Further Continuing Appropriations Act, 2015,
 Pub. L. No. 113-235, div. G, Title II, 128 Stat. 2130 (Dec. 16, 2014) .............................. 3, 13

Consolidated Appropriations Act, 2016,
 Pub. L. No. 114-113, div. H, tit. II, 129 Stat. 2242 (Dec. 18, 2015) ................................. 3, 13

Consolidated Appropriations Act, 2017,
 Pub. L. No. 115-31, div. H, Title II, 131 Stat. 135 (May 5, 2017) ................................... 3, 13

**OTHER AUTHORITIES**

45 C.F.R. § 87.3 ...................................................................................................................... 3, 4

82 Fed. Reg. 26806-01 (June 9, 2017) ........................................................................................ 3

82 Fed. Reg. 28659-04 (June 23, 2017) ...................................................................................... 3

## INTRODUCTION

This case involves federal grants to Catholic charitable organizations that play a critical role in providing foster care to immigrant and refugee children at a time of desperate need. These grants fall within a long tradition of religious groups receiving government funds to provide social services in their communities. As long as the government does not engage in religious favoritism, and allows secular and religious groups to receive grants on an equal footing, this tradition is wholly consistent with the Constitution. At the same time, the Constitution permits religious accommodations that allow grant recipients to provide secular services while refraining from activities that would violate their religious conscience. Such accommodations are an essential part of American pluralism and "follow[] the best of our traditions." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).

Despite these long-settled principles, Plaintiffs contend that the Constitution requires the government to cut off federal aid to Catholic foster-care organizations, solely because their religion forbids them from providing certain services that violate Catholic teaching. Plaintiffs concede that Defendant U.S. Conference of Catholic Bishops ("USCCB") is only one of several organizations that receive federal grants to provide foster care to unaccompanied minors. Nonetheless, Plaintiffs claim that, by allowing Catholic entities to receive such grants, the government has violated the Establishment Clause, as well as the equal-protection and due-process components of the Fifth Amendment.

Although Plaintiffs' constitutional claims lack merit, there is no need to resolve them because Plaintiffs do not have standing to sue the government for its allegedly "unlawful funding" activity. 1st Amend. Compl. (FAC) ¶ 1. They do not have taxpayer standing because they do not allege that there is any statute that directs taxpayer funds to be spent in the ways that they claim violate the Constitution. Nor can they establish personal standing for two basic reasons. *First*, they

do not allege any personal injury that is fairly traceable to the government itself. The only injury they allege is that a third party not before this Court—a sub-grantee of USCCB—denied their foster application based on its religious beliefs. That injury is traceable to the actions of a private party, not to the government. *Second*, Plaintiffs also cannot show that their alleged injury could be redressed by any of the judicial relief they seek against the government. If they prevailed, they could effectively cut off funds to all Catholic organizations that provide foster care for immigrant and refugee children. That would dramatically decrease the resources available to provide foster care for thousands of the nation's most vulnerable children, but would have only a speculative impact on the Individual Plaintiffs' opportunity to become foster parents.

## BACKGROUND[1]

### A.     The Grant Programs for Refugee and Immigrant Children

This case involves the Unaccompanied Alien Children Program and the Unaccompanied Refugee Minor Program, which are run by the Department of Health and Human Services through the Office of Refugee Resettlement. In the Unaccompanied Alien Children Program, the Office provides for the care of children who arrive in the United States unaccompanied by a parent or legal guardian, and who lack lawful immigration status. *See* 6 U.S.C. § 279(g); FAC ¶ 18. In the Unaccompanied Refugee Minor Program, the Office provides for the care of children who are under the age of 18, unaccompanied by an adult, and qualify as refugees, entrants, asylees, victims of trafficking, etc. FAC ¶ 17. Under both programs, the Office may provide "grants to . . . public and private nonprofit agencies, for the provision of child welfare services." 8 U.S.C. § 1522(d)(2)(A); *see also* 8 U.S.C. § 1232(i); FAC ¶ 19. In recent years, the Office has relied

---

[1] Discussion of facts in this Memorandum are based on the allegations in Plaintiffs' Complaint.

on this authority to award grants to many different organizations, including USCCB. *See, e.g.*, 82 Fed. Reg. 28659-04 (June 23, 2017) (announcing the award of 43 grants); 82 Fed. Reg. 26806-01 (June 9, 2017) (announcing the award of 48 grants); FAC ¶¶ 21, 27.

The funding for these programs currently comes from four different congressional appropriations. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, tit. II, 132 Stat. 348, 728 (Mar. 23, 2018); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, tit. II, 131 Stat. 135, 531 (May 5, 2017); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, tit. II, 129 Stat. 2242, 2612–13 (Dec. 18, 2015); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. G, tit. II, 128 Stat. 2130, 2479 (Dec. 16, 2014). These funds are not earmarked for any particular program or grant recipient; instead, they are earmarked for "refugee and entrant assistance activities authorized by" several different statutes. Consolidated Appropriations Act, 2018, 132 Stat. at 728; Consolidated Appropriations Act, 2017, 131 Stat. at 351; Consolidated Appropriations Act, 2016, 129 Stat. at 2612; Consolidated and Further Continuing Appropriations Act, 2015, 128 Stat. at 2479.

Under U.S. Department of Health and Human Services ("HHS") regulations, "[f]aith-based or religious organizations are eligible, on the same basis as any other organization, to participate in any HHS awarding agency program for which they are otherwise eligible." 45 C.F.R. § 87.3(a). As a result, religious organizations are eligible to participate in both the Unaccompanied Alien Children Program and the Unaccompanied Refugee Minor Program, and the Office has awarded grants to such organizations. FAC ¶ 21. Religious organizations may not, however, use grant funds to "support or engage in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization), as part of the programs

or services funded with direct financial assistance from the HHS awarding agency, or in any other manner prohibited by law." 45 C.F.R. § 87.3(b); *see also* FAC ¶ 21.

### B.  USCCB Receives Funding Under the Grant Programs

For many years, USCCB has participated in both programs described above. FAC ¶¶ 27–39. As a Catholic organization, however, USCCB cannot provide services that would violate its religious beliefs. USCCB has long made the government aware of this fact. FAC ¶ 34. Thus, in its most recent grant applications, USCCB informed the Office that "USCCB must ensure that services provided under this application are not contrary to the authentic teaching of the Catholic Church, its moral convictions, and religious beliefs." FAC ¶ 30–32.

During several different presidential administrations, the Office of Refugee Resettlement has awarded grants to USCCB under both programs to help provide child-welfare services for refugee and immigrant children. FAC ¶ 28. In turn, USCCB has awarded sub-grants to multiple organizations, including Catholic Charities of Fort Worth ("Catholic Charities FW"). *Id.* Under these sub-grants, Catholic Charities FW is responsible for providing foster services in the area of Fort Worth, Texas. FAC ¶ 27.

### C.  USCCB and Catholic Charities FW Provide Foster Care While Avoiding Actions That Would Violate Their Religious Beliefs

In February 2017, the Individual Plaintiffs informed Catholic Charities FW that they wanted to submit an application to become foster parents. FAC ¶ 46. According to its view of Catholic teaching, however, Catholic Charities FW cannot place foster children with anyone other than "a mother and a father who are married." FAC ¶ 35. Because the Individual Plaintiffs do not meet that description, Catholic Charities FW could not accept their application. FAC ¶ 48.

On February 20, 2018, Plaintiffs filed a complaint challenging the denial of their application to become foster parents, followed by an amended complaint on March 22. Plaintiffs allege that the government violated the Constitution by awarding a grant to USCCB, which in turn awarded a sub-grant to Catholic Charities FW, which in turn denied Plaintiffs' foster application. *See, e.g.*, FAC ¶ 56. In Plaintiffs' view, the government's failure to require Catholic Charities FW to make foster placements in violation of its religious beliefs was itself a violation of the Establishment Clause, along with the equal-protection and due-process components of the Fifth Amendment. FAC ¶¶ 74, 83, 91.

## STANDARD OF REVIEW

"[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [of standing] that is plausible on its face.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (second alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Humane Soc'y v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015) ("To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits."). The Court must "accept all the well-pleaded factual allegations of the complaint as true." *Hurd v. D.C., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017). But "threadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice." *Arpaio*, 797 F.3d at 19. The Court cannot assume the truth of "legal conclusions" or "formulaic recitation[s]," *Iqbal*, 556 U.S. at 678, nor can it "'accept inferences that are unsupported by the facts set out in the complaint,'" *Arpaio*, 797 F.3d at 22 n.2 (citation omitted).

# ARGUMENT

To establish Article III standing, Plaintiffs must allege facts demonstrating that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). This inquiry is "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government [i]s unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Plaintiffs bear the burden to establish standing "for each claim . . . and for each form of relief that is sought." 137 S. Ct. at 1650. They cannot carry that burden here.

Plaintiffs assert standing to bring three different claims against the government's alleged "unlawful funding" activity, FAC ¶ 1, but the only personal injury they allege is that the Individual Plaintiffs' application to serve as foster parents was denied by Catholic Charities FW, a private organization that is a sub-grantee of defendant USCCB. That alleged injury is not fairly traceable to the challenged conduct of the government, which plays no role in approving or denying foster applications. Nor is the alleged injury redressable by a court decision in Plaintiffs' favor, which would accomplish nothing more than pushing Catholic organizations out of the business of providing government-assisted aid to immigrant and refugee children. While that would have a devastating impact on thousands of vulnerable children, it would provide no benefit to Plaintiffs in their efforts to serve as foster parents. Although Plaintiffs try to get around these problems by asserting standing in their capacity as "taxpayers"—and indeed their real interest appears to be a generic concern with how "taxpayer dollars contribute to the administration of federal welfare programs," FAC ¶ 5—they cannot satisfy the exceedingly narrow test for taxpayer standing.

I.  **THE INDIVIDUAL PLAINTIFFS LACK STANDING BECAUSE THEIR ALLEGED INJURY IS NOT FAIRLY TRACEABLE TO THE GOVERNMENT'S CHALLENGED CONDUCT**

The Individual Plaintiffs maintain that they have standing to sue the government because they suffered a personal injury when "organizations receiving federal funds denied them the opportunity to be foster parents." FAC ¶ 6.[2] As a threshold matter, Plaintiffs correctly note that unaccompanied minors are the beneficiaries of the "federal child welfare programs" at issue. *E.g.*, FAC ¶¶ 5, 20. But even assuming that putative foster parents can assert a cognizable personal injury based on a funding program designed to benefit disadvantaged children, the injury alleged here is not "fairly traceable" to the challenged conduct of the government.

To establish standing, a plaintiff must show a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). When a plaintiff challenges "the legality of government action," the ability to "establish standing depends considerably upon whether the plaintiff is himself an object of the [government] action" alleged be to unlawful. *Id.* at 561. "Thus, when the plaintiff is not himself the object of the government action," standing is "substantially more difficult to establish" due to the attenuated causal link between the government's action and the plaintiff's injury. *Id.* at 562. "[T]he presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing

---

[2] Plaintiff National LGBT Bar Association does not assert a personal injury for purposes of Article III standing, and thus cannot, as an organization, satisfy the injury in fact requirement. Instead, it "brings this action on behalf of its members" in their capacity as "federal taxpayers." FAC ¶ 8. But its theory of taxpayer standing fails for the reasons discussed below. *See infra* Part III.

should be denied." *Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986).

In particular, when the government provides funding to a grant recipient that subsequently makes an independent decision that allegedly injures a third party, that third party does not have standing to challenge the legality of the government funding. For example, in *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412 (D.C. Cir. 1994), the plaintiffs sought to challenge the FEC's provision of federal funds to a political party's nominating process, which they alleged to be racially discriminatory. Just like Plaintiffs in the present case, the plaintiffs there argued that the government needed to take steps to prevent the funding recipient from discriminating, or else cut off federal funds. The court held that the plaintiffs lacked standing to sue the government because "the injury alleged in [the] complaint is not fairly traceable to any encouragement on the part of the government, but appears instead to be the result of decisions made by the Party without regard to funding implications." *Id*. at 419–20. In other words, the alleged discrimination was directly attributable to the actions of the political party that was receiving federal funds, not any action of the government itself. For that reason, "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury [were] far too weak for the chain as a whole to sustain [the plaintiffs'] standing." *Id*. at 420 (quoting *Allen v. Wright*, 468 U.S. 737, 759 (1984)).

The Supreme Court recognized the same point in *Simon v. East Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), which held that a group of plaintiffs lacked standing to challenge IRS tax rules that allegedly "encouraged" nonprofit hospitals to deny service to the plaintiffs. *Id*. at 42. Although the plaintiffs adequately alleged that they were personally injured by the hospitals' denial of service, the Court held that they did not have standing to challenge the

IRS's tax treatment of the hospitals. As the Court explained, "the denials of service" by the hospital could not "fairly . . . be traced to [the IRS's action]," but instead "result[ed] from decisions made by the hospitals without regard to the tax implications." *Id.* at 42–43.

*Simon* and *Freedom Republicans* show that the Individual Plaintiffs lack standing to sue the government for its alleged "unlawful funding" activity. FAC ¶ 1. They assert claims solely against the government, but the only personal injury they allege is that Catholic Charities FW denied their application to serve as foster parents. FAC ¶ 6. That alleged injury is fairly traceable to the religious beliefs of *a private party*, not to any action of the government. The Individual Plaintiffs do not allege that they themselves are the "object of [any] government action," *Lujan*, 504 U.S. at 561, or that the government in any way encouraged or directed Catholic Charities FW to do anything that injured them. Nor do they allege that Catholic organizations would conduct foster services any differently with respect to same-sex couples if they did not receive federal funds. Indeed, the Individual Plaintiffs do not even allege that the government provided funds directly to Catholic Charities FW. Instead they allege that the government provided funds to USCCB, which in turn provided funds to Catholic Charities FW, which in turn decided to deny the Individual Plaintiffs' foster application for its own religious reasons. That attenuated causal chain is not remotely sufficient to make the Individual Plaintiffs' injury "fairly traceable" to the government's challenged conduct.

## II. THE INDIVIDUAL PLAINTIFFS LACK STANDING BECAUSE THEIR ALLEGED INJURY IS NOT REDRESSABLE BY A FAVORABLE DECISION

The Individual Plaintiffs also lack standing because their alleged personal injury is not redressable by any judicial relief that could be ordered against the government. As described in the Complaint, Plaintiffs' injury is that they were "denied . . . the opportunity to be foster parents" when Catholic Charities FW rejected their foster application. FAC ¶ 6. As the Supreme Court

has made clear, however, Plaintiffs must show that it is "likely, as opposed to merely speculative, that [this] injury will be redressed by a favorable decision" in court. *Lujan*, 504 U.S. at 561. That showing is impossible to make where, as here, the plaintiffs seek relief solely against the government, but the redressability of their injury "hinge[s] on the response of" a "third party" like Catholic Charities FW that is not the target of judicial relief, and whose response the Court "cannot presume either to control or to predict." *Id*. at 562; *see also Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1274 (D.C. Cir. 2007) ("[S]tanding to challenge a government policy cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling.").

Here, it is not only speculative but highly doubtful that granting Plaintiffs relief against the government would have any impact on their "opportunity to be foster parents." FAC ¶ 6. Catholic organizations are conscience-bound to uphold their belief in traditional marriage. Thus, if Plaintiffs were to prevail, Catholic Charities FW and many similar groups would be cut off from government aid. They would continue to provide foster services in accordance with their religious beliefs, but the scale of services they provide would be greatly diminished. This would reduce the availability of care for refugee and immigrant children, but would not remedy Plaintiffs' injury because it would have no impact on their "opportunity to be foster parents." FAC ¶ 6. The only aspect of Catholic Charities FW's behavior that affects Plaintiffs—i.e., its practice of placing foster children only with traditional married couples—would remain unchanged.

While Plaintiffs may speculate that their "opportunity to be foster parents" would improve due to other organizations that might step in as replacements if USCCB were cut off from federal funding and if Catholic Charities FW were not able to participate as a sub-grantee, that type of "merely speculative" hypothesis cannot satisfy the redressability prong of Article III standing.

...

*Lujan*, 504 U.S. at 561. "When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989); *see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004) (stating that the "causal relationship between the government policy and the third-party conduct" must, "leav[e] little doubt as to . . . the likelihood of redress.").

Plaintiffs admit in their Complaint that USCCB and Catholic Charities FW are currently only "one of" several organizations that are responsible for placing foster children while receiving federal funds under the government programs at issue. FAC ¶ 27; *see also id*. at ¶ 21 ("Religiously affiliated organizations are *among* the providers of federally funded care for children under the URM Program and the UC Program." (emphasis added)). Thus, the appropriate remedy for Plaintiffs' asserted injury would be to foster a child through one of the other participating organizations, or through an alternative arrangement with the government that would not require Catholic Charities FW to violate its religious beliefs. That type of solution would have the advantage of allowing Plaintiffs *and* Catholic service providers to participate in the federal programs at issue. By contrast, the relief requested by Plaintiffs in the present case would simply force Catholic service providers out of the grant program altogether, which would provide no tangible benefit to anyone—not to Plaintiffs, not to Catholic organizations, and not to the immigrant and refugee children they serve. *Cf. Warth v. Seldin*, 422 U.S. 490, 508 (1975) (to establish standing, plaintiffs must show that they "personally would benefit in a tangible way from the court's intervention").

### III. PLAINTIFFS DO NOT HAVE TAXPAYER STANDING

As an alternative to personal standing, the Individual Plaintiffs try to establish "taxpayer standing" to assert an Establishment Clause claim. They allege that, "[a]s federal taxpayers, [they]

are harmed by Federal Defendants' use of federal taxpayer funds to underwrite and endorse religious beliefs to which they do not subscribe." FAC ¶¶ 5, 72. Plaintiff National LGBT Bar Association sets forth similar allegations in order to "bring[] this action on behalf of its members who are federal taxpayers." FAC ¶ 8; *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (explaining that to sue on behalf of its members, an association must establish that at least one of its members has standing to sue in her own right). Neither claim, however, "fit[s] within the narrow confines of Establishment Clause taxpayer standing." *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008).

"As the Supreme Court has repeatedly held, a taxpayer's interest in ensuring that appropriated funds are spent in accordance with the Constitution does not suffice to confer Article III standing." *Id.* at 761. Although "the general bar against taxpayer standing" is subject to a "very narrow exception" under the Establishment Clause, that exception does not encompass "discretionary" action by the Executive Branch. *Id*. Instead, taxpayers can establish standing only if they allege that Congress itself has violated the Establishment Clause through an expenditure that is "expressly authorized or mandated by [a] specific congressional enactment." *Id*. at 762 (quoting *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 608 (2007) (plurality op.)); *see also Ansley v. Warren*, 861 F.3d 512, 520 (4th Cir. 2017) (denying taxpayer standing where the plaintiffs "cannot point to any specific appropriation by the legislature to implement the [challenged] scheme"); *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 751 (6th Cir. 2012) (denying taxpayer standing where the statute itself "d[id] not contemplate" the conduct that allegedly violated the Constitution); *Freedom From Religion Found., Inc. v. Nicholson*, 536 F.3d 730, 742 (7th Cir. 2008) (denying taxpayer standing where the alleged violation did not result from "express congressional action but rather resulted from executive discretion"). In other words,

taxpayers have standing only if they can "link[] the appropriations at issue . . . to congressional intention that the funds . . . be disbursed to religious groups" in a way that violates the Constitution. *Murray*, 681 F.3d at 750.

Here, Plaintiffs do not have taxpayer standing because the violation they allege results from discretionary *Executive Branch* action, not from any "*congressional* action under the taxing and spending clause." *Flast v. Cohen*, 392 U.S. 83, 106 (1968) (emphasis added); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 479 (1982) (explaining that taxpayer standing is limited to challenges to the "'exercise[] of congressional power'" (quoting *Flast*, 392 U.S. at 102)). The programs at issue were authorized by two specific congressional enactments: The first is the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, which authorizes the Office of Refugee Resettlement to "award grants to, and enter into contracts with, voluntary agencies to carry out [the Unaccompanied Alien Children Program]." 8 U.S.C. § 1232(i). The second is the Refugee Act of 1980, which authorizes the Office "to provide assistance, reimbursement to States, and grants to and contracts with public and private nonprofit agencies" to carry out the Unaccompanied Minor Program. 8 U.S.C. § 1522(d)(2)(A). Both programs are funded by general appropriations for "refugee and entrant assistance activities." Consolidated Appropriations Act, 2018, 132 Stat. at 728; Consolidated Appropriations Act, 2017, 131 Stat. at 351; Consolidated Appropriations Act, 2016, 129 Stat. at 2612; Consolidated and Further Continuing Appropriations Act, 2015, 128 Stat. at 2479.

None of these enactments, however, "expressly authorize[] or appropriate[] funds for" the conduct that Plaintiffs allege violates the Establishment Clause—i.e., allowing religious organizations to receive grant funds even if they have a conscientious objection to making foster placements with same-sex couples. *See In re Navy Chaplaincy*, 534 F.3d at 762 (no standing where

the statutes "establishing the Navy Chaplain Corps" did not "authorize[] or appropriate[] funds for the Navy to favor Catholic Chaplains in its retirement system"); *see also Hein*, 551 U.S. at 593 (no standing where "Congress did not specifically authorize the use of federal funds to pay for the conferences or speeches that the plaintiffs challenged"). Instead, Congress authorized and appropriated funds to provide foster care for immigrant and refugee children, and the Executive Branch has exercised its discretion to allow religious social-services organizations to lend their considerable resources to assist with this task. Plaintiffs' attempt to establish taxpayer standing thus fails under the clear rule of *Hein* and *Navy Chaplaincy*.[3]

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed for lack of standing.

---

[3] Plaintiffs do not try to establish taxpayer standing for their equal-protection and due-process claims. And even if they had tried, the Supreme Court has "declined to lower the taxpayer standing bar in suits alleging violations of any constitutional provision apart from the Establishment Clause." *Hein*, 551 U.S. at 609–10. Thus, these claims should be dismissed even if this Court concludes that Plaintiffs can fulfill the narrow exception for taxpayer standing. *See Town of Chester*, 137 S. Ct. at 1650 (stating that plaintiffs must establish standing "for each claim" asserted).

Dated: May 21, 2018

Respectfully submitted,

*/s/ David T. Raimer.*
David T. Raimer (DC ID #994558)
Anthony J. Dick (DC ID #1015585)
JONES DAY
51 Louisiana Ave. NW
Washington, DC, 20001-2113
Tel.: 202-879-3939
Fax: 202-626-1700
dtraimer@jonesday.com
ajdick@jonesday.com

*Leon F. DeJulius, Jr. (PA ID #90383)
*John D. Goetz (PA ID #47759)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Tel.: 412-391-3939
Fax: 412-394-7959
lfdejulius@jonesday.com
jdgoetz@jonesday.com

*Counsel for Defendant United States Conference of Catholic Bishops*

*\*Admitted pro hac vice*