## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
                                                  )
**FATMA MAROUF, et al.,**                         )
                                                  )
    **Plaintiffs,**            )
                                                  )
      **v.**          )     **Case No. 18-cv-00378 (APM)**
                                                  )
**ALEX AZAR, in his official capacity as**        )
**Secretary of the UNITED STATES**                )
**DEPARTMENT OF HEALTH AND HUMAN**                )
**SERVICES, et al.,**                             )
                                                  )
    **Defendants.**            )
—————————————————————— )

## MEMORANDUM OPINION

### I.    INTRODUCTION

The U.S. Department of Health and Human Services ("HHS") awards grant money and enters into cooperative agreements with various child welfare organizations to perform services for unaccompanied refugee children who have entered the United States. HHS grantees include religiously affiliated organizations, such as Defendant U.S. Conference of Catholic Bishops ("USCCB"). The child welfare services that HHS grantees provide include foster care, residential placement, and adoption services.

Plaintiffs Fatma Marouf and Bryn Esplin live in Fort Worth, Texas. They wish to become foster parents for an unaccompanied refugee child. In February 2017, they sought out information about foster care programs from Catholic Charities of Fort Worth, a sub-grantee of USCCB. Plaintiffs quickly learned that they would not be approved as foster parents. The reason: they are a married lesbian couple. Catholic Charities of Fort Worth would not qualify them as foster

parents because of its religious beliefs regarding same-sex marriage and raising a child within a traditional family structure.

Plaintiffs then brought this action.  They assert violations of the Establishment Clause and the Equal Protection Clause and a deprivation of Substantive Due Process.  Plaintiffs allege that HHS unconstitutionally awarded grant money to USCCB, despite knowing that USCCB and its sub-grantees, due to their religious beliefs, would use taxpayer funds in a manner that discriminates against same-sex couples.

The merits of Plaintiffs' case are not yet before the court.  Instead, Defendants challenge Plaintiffs' standing to bring suit.  For the reasons that follow, the court grants Defendants' Motions to Dismiss in part.  The court agrees with Defendants that no Plaintiff has taxpayer standing to assert a violation of the Establishment Clause.  Because the sole cause of action brought by Plaintiff National LGBT Bar Association is the Establishment Clause claim, it is dismissed from this case.  On the other hand, the court finds that Plaintiffs Marouf and Esplin have sufficiently pleaded individual standing to pursue all three causes of action.  The court therefore denies the remainder of Defendants' Motions.

## II.      BACKGROUND

### A.      Factual Background

#### 1.      *The Unaccompanied Refugee Minor Program and the Unaccompanied Alien Children Program*

At issue in this case are two federal programs whose purpose is to provide support for the "thousands of unaccompanied refugee children" under the care of the federal government: (1) the Unaccompanied Refugee Minor Program ("URM Program") and (2) the Unaccompanied Alien Children Program ("UC Program").  Am. Compl., ECF No. 21 [hereinafter Am. Compl.] ¶¶ 16–

18.  These programs are administered through the Office of Refugee Resettlement ("ORR"), which is housed within HHS.  *See id.* ¶ 10.

Two pieces of legislation authorize the URM and UC Programs:  the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") and the Refugee Act of 1980.  The TVPRA authorizes ORR to "award grants to, and enter into contracts with, voluntary agencies to carry out [the UC Program]."  8 U.S.C. § 1232(i).  The Refugee Act authorizes ORR "to provide assistance, reimbursement to States, and grants to and contracts with public and private nonprofit agencies" to carry out the URM Program.  *Id.* § 1522(d)(2)(A).  Neither Act expressly mandates that ORR contract with or award grants to religiously affiliated organizations, or even requires ORR to engage with private entities at all.  Nevertheless, ORR has chosen to administer the Programs by awarding grants to, and signing cooperative agreements with, various child welfare organizations.  Such organizations are tasked with, among other things, "matching children in their care with qualified families" for fostering and adoption.  Am. Compl. ¶ 20.  "Religiously affiliated organizations are among the providers of federally funded care for children under the URM Program and the UC Program."  *Id.* ¶ 21.

Though Congress established these programs by statute, it has not funded them through specific line items.  Instead, for the last four years, Congress simply has appropriated a lump-sum amount to the Administration for Children and Families—the component of HHS in which ORR is located—to carry out refugee and entrant assistance activities.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, Div. H, Tit. II, 132 Stat. 348, 728 (Mar. 23, 2018) (appropriating approximately $1.86 billion); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. H, Tit. II, 131 Stat. 135, 531 (May 5, 2017) (appropriating approximately $1.67 billion); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. H, Tit. II, 129 Stat.

2242, 2612–13 (Dec. 18, 2015) (appropriating approximately $1.67 billion); Consolidated and

Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, Div. G. Tit. II, 128 Stat.

2130, 2479 (Dec. 16, 2014) (appropriating approximately $1.56 billion).   Thus, funding for the

URM and UC Programs comes from a general budget appropriation.

2.     *The United States Conference of Catholic Bishops*

The United States Conference of Catholic Bishops, or USCCB, is a long-time grantee of

ORR and, in fact, is the largest recipient of URM and UC Program grants.  Pls.' Mem. in Supp.

of Pls.' Opp'n to Mot. to Dismiss, ECF No. 34 [hereinafter Pls.' Opp'n], at 17.  As relevant to

this case, USCCB did not itself use the grants to provide child welfare services.  Instead, it

disbursed the funds to a sub-grantee in Fort Worth, Texas, who in turn directly delivered services

under the URM and UC Programs.

In its HHS grant applications for both programs, USCCB made known its Catholic

identity and how that identity would affect its use of grant funds.  In its URM Program grant

application, USCCB represented that it "must ensure that services provided under this application

are not contrary to the authentic teaching of the Catholic Church, its moral convictions, or

religious beliefs."  Am. Compl. ¶ 30.  Similarly, in its UC Program grant application, USCCB

stated that it "must ensure that services provided under this application are not contrary to the

authentic teaching of the Catholic Church, its moral convictions, and religious beliefs in an

approach that is consistent with" the agency's Policy on Grants to Faith-Based Organizations.  *Id.*

¶ 31.

USCCB also made clear that its sub-grantees would "ensure" delivery of services

consistent with the Catholic faith.  USCCB notified ORR that sub-grantees would have to comply

with an agreement provision titled "Catholic Identity," under which the sub-grantee promised

4

"[to] ensure that services provided to those served under this Agreement are not contrary to the authentic teaching of the Catholic Church, its moral convictions, and religious beliefs. Accordingly, [USCCB] expects that the Sub-recipient will provide services under this Agreement within certain parameters . . . " *Id.* ¶ 32.

At the time it submitted these grant applications, USCCB's position on same-sex marriage was unequivocal and a matter of public record. For instance, USCCB's Fact Sheets concerning adoption and foster care services, which have appeared on USCCB's website "since at least 2013," state that "'[w]hen placing children with couples, Catholic Charities ensures those children enjoy the advantage of having a mother and a father who are married.'" *Id.* ¶ 35 (citing Discrimination Against Catholic Adoption Services, USCCB, http://www.usccb.org/issues-and-action/religious-liberty/discrimination-against-catholic-adoption-services.cfm (last visited Feb. 16, 2018)). Another section of the website, titled "Frequently Asked Questions About the Defense of Marriage," states that "[p]lacing a child in the care of two men or two women may be well-intentioned, but ultimately deprives the child of that which best serves his or her interests – a mother and a father." *Id.* ¶ 36 (citing Frequently Asked Questions About the Defense of Marriage, USCCB, http://www.usccb.org/issues-and-action/marriage-andfamily/marriage/promotion-and-defense-of-marriage/frequently-asked-questions-ondefense-of-marriage.cfm (last visited Feb. 16, 2018)). Notwithstanding these clear positions on same-sex marriage and placing children with same-sex couples, year-upon-year ORR continued to award grant funding to USCCB to administer the URM and UC Programs. *Id.* ¶ 38.

### 3. *Plaintiffs Fatma Marouf and Bryn Esplin*

Plaintiffs Fatma Marouf and Bryn Esplin are a same-sex married couple living in Fort Worth, Texas. Am. Compl. ¶ 5. They pay federal taxes. *Id.* Married since 2015, Plaintiffs aver

that they are "eager to bring a child into their family" and have been actively exploring different options to do so. *Id.* ¶ 44.

In February 2017, Plaintiffs approached Catholic Charities of Fort Worth ("CCFW"), a sub-grantee of USCCB, about fostering an unaccompanied refugee child. *Id.* ¶ 46.   After exchanging emails with CCFW about their foster care programs and the process for becoming a foster parent, CCFW scheduled an initial telephone interview with Plaintiffs. *Id.*   During that call, a CCFW representative advised that prospective foster parents must "mirror the holy family." *Id.* ¶ 48.  Plaintiffs made clear they were a same-sex couple.  The CCFW representative then advised them that did not "qualify" to foster a child. *Id.*  The representative also stated that none of the children that CCFW serves is a member of the LGBT community. *Id.* ¶ 49.   At the time, there were no other child welfare organizations in the Fort Worth area with whom HHS had an agreement to provide child placement services under either the URM Program or the UC Program. *See* Hr'g Tr. (draft), Nov. 30, 2018, at 14.[1]

Plaintiffs immediately lodged a complaint with ORR.  On or about February 22, 2017, Plaintiff Marouf wrote to the general email address for ORR and informed the agency that CCFW had discriminated against them on the basis of their same-sex marital status. *Id.* ¶ 51.  Marouf did not receive a response until April 14, 2017.  Even then, ORR simply asked for "the names of the individuals at CCFW" who had advised her that Plaintiffs would not qualify as foster parents. *Id.*  After inquiring with CCFW, Marouf learned the name of the representative with whom she and Esplin had spoken and, on May 1, 2017, forwarded the name to ORR. *Id.* ¶¶ 52–53.   Other

---

[1] In the interim, at the court's suggestion, HHS has identified and is in the process of contracting with a child welfare organization that is willing to place children with same-sex couples. *See* Jt. Status Rpt., ECF No. 44; Notice and Unopposed Mot. for Status Conference, ECF No. 46.  Though this agreement is not yet final, the court very much appreciates the agency's efforts.

than a return email thanking Marouf for the information, Plaintiffs received no additional communication from ORR.  *Id.* ¶ 53.

### B.  Procedural Background

Plaintiffs filed this case on February 20, 2018.  *See* Compl., ECF No. 1.  Along with USCCB, they named as defendants HHS; Alex Azar, in his official capacity as the Secretary of HHS; Steven Wagner, in his official capacity as Acting Assistant Secretary of the Administration for Children and Families; the Administration for Children and Families; Scott Lloyd, in his official capacity as Director of ORR; and ORR ("Federal Defendants").  *See id.*  On March 22, 2018, Plaintiffs amended their complaint to add the National LGBT Bar Association as a plaintiff.  *See* Am. Compl.  The National LGBT Bar Association is a non-profit with more than 10,000 members who are "supportive of lesbian, gay, bisexual, and transgender ('LGBT') rights," *id.* ¶ 7, and it specifically brought this "action on behalf of its members who are federal taxpayers," *id.* ¶ 8.

Plaintiffs' Amended Complaint advances three claims:  (1) violation of the Establishment Clause, (2) violation of the Equal Protection Clause, and (3) violation of substantive rights under the Due Process Clause.  *Id.* ¶¶ 58–91.  Each claim, at its core, alleges that the Federal Defendants are unlawfully "funding [ ] certain child welfare organizations that perform federal taxpayer-funded services relating to unaccompanied refugee children in federal care and custody in a manner that impermissibly discriminates against same-sex couples who are prospective foster and adoptive parents.  The organizations use religious doctrine regarding same-sex relationships to categorically exclude such couples from applying to be foster parents."  *Id.* ¶ 1.  All three Plaintiffs assert standing to sue Defendants for a violation of the Establishment Clause based on their status as federal taxpayers.  *Id.* ¶ 72.  Additionally, Marouf and Esplin assert that they have

standing to assert all three claims, as they are individuals harmed by federal government action or inaction.  *See* Pls.' Opp'n at 3.

On May 21, 2018, the Federal Defendants filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1), asserting that no Plaintiff has standing as to any claim and therefore the court lacks subject matter jurisdiction.  *See* Fed. Defs.' Mot. to Dismiss, ECF No. 28; Fed. Defs.' Stmt. of Pts. and Auth., ECF No. 28-1 [hereinafter Fed. Defs.' Stmt.].  USCCB separately filed a Motion to Dismiss on the same day, likewise arguing that Plaintiffs lack standing to sue. *See* Def. USCCB Mot. to Dismiss, ECF No. 29; Def. USCCB's Mem. of Pts. and Auth., ECF No. 29-1 [hereinafter USCCB's Mem.].  The court held oral argument on Defendants' motions on November 30, 2018.

## III.   LEGAL STANDARD

Every plaintiff in federal court bears the burden of showing that she meets the "irreducible constitutional minimum" of Article III standing: (1) injury in fact, (2) causation, and (3) redressability.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  At the motion to dismiss stage, a plaintiff "must state a plausible claim that [she has] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)).  The court must accept as true all well-pleaded factual contentions and draw all reasonable inferences therefrom, but it need not accept thread-bare recitals of the elements of standing or legal conclusions couched as an assertion of fact.  *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

In deciding a Rule 12(b)(1) motion, the court "may consider materials outside the pleadings[.]" *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citation and alteration omitted).

## IV.   DISCUSSION

The court will begin its discussion by addressing taxpayer standing as to all Plaintiffs for the Establishment Clause claim.  It then will turn to Marouf and Esplin's individual standing as to all three claims.

### A.   Taxpayer Standing

#### 1.   General Principles

The Supreme Court has consistently held that a "taxpayer's interest in ensuring that appropriated funds are spent in accordance with the Constitution does not suffice to confer Article III standing." *In re Navy Chaplaincy*, 534 F.3d 756, 761 (D.C. Cir. 2008).  Beginning with *Frothingham v. Mellon*, the Court has routinely rejected assertions of taxpayer standing, with few exceptions.  262 U.S. 447 (1923) (holding that the "minute and indeterminable" interest of a federal taxpayer in "the moneys of the treasury" offers no basis to challenge an expenditure as a violation of the Tenth Amendment).

The Supreme Court cracked the door open to taxpayer standing in 1968, with its decision in *Flast v. Cohen*, 392 U.S. 83, 88 (1968).  It permitted the plaintiffs in that case to challenge the expenditure of federal funds used for the "instruction . . . and for guidance in religious and sectarian schools" and the "purchase of textbooks and instructional and library materials for use in religious and sectarian schools" as a violation of the Establishment Clause.  *Id.* at 87.  The Court observed that "[t]he nexus demanded of federal taxpayers" to establish standing consists of two elements.  *Id.* at 102.  First, federal taxpayers may challenge "the unconstitutionality only

of exercises of congressional power under the taxing and spending clause of Art. I, s 8, of the Constitution." *Id.*  Second, taxpayers "must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power." *Id.* at 102–03.  Thus, the Court explained, a plaintiff could establish taxpayer standing only if challenging a "congressional action under the taxing and spending clause [alleged to be] in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power," such as the Establishment Clause.  *Id.* at 106.  Applying that standard, the Court found that the plaintiffs in *Flast* qualified for taxpayer standing.

Subsequent Supreme Court cases have made clear that "*Flast* is a very narrow exception to the general bar against taxpayer standing" and that the two-part test must be applied with rigor. *See In re Navy Chaplaincy*, 534 F.3d at 761; *see also Kurtz v. Baker*, 829 F.2d 1133, 1139 (D.C. Cir. 1987) (stating that "*Flast* is the only Supreme Court decision holding that a taxpayer has standing to complain about alleged government misuse of tax revenues in violation of the establishment and free exercise clauses of the First Amendment," and noting that "the Court interpreted *Flast* to apply narrowly to challenges directed only at exercises of congressional power") (cleaned up)).  For instance, in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, the Court denied the plaintiffs' claim of standing where the challenged action—the cost-free transfer of a 77-acre tract of surplus military property to a religious college—was executed by the Executive Branch through the Secretary of Health, Education, and Welfare, rather than by Congress.  454 U.S. 464, 467–68, 482 (1982).  The Court found that the law enabling the Executive Branch to make the challenged property transfer was passed pursuant to Congress's power under the Property Clause, U.S Const. Art. IV, § 3, cl. 2. as

10

opposed to the Taxing and Spending Clause, *id.* Art. I, § 8, as required by *Flast*. *See Valley Forge*, 454 U.S. at 480. The plaintiff therefore lacked taxpayer standing. *See id.* at 480–82.

In *Bowen v. Kendrick*, the Court allowed taxpayer standing once more, but under unique facts. *See* 487 U.S. 589, 589–620 (1988). In that case, the statute at issue expressly appropriated funds for religious organizations to reduce teen pregnancy. Congress had "expressly enlist[ed] the involvement of religiously affiliated organizations in the federally subsidized programs." *Id.* at 606. Pivotal to the Court's conclusion in *Bowen* was the recognition that the challenged legislation was "at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers," evidenced by the fact that the plaintiffs' claims "call[ed] into question how the funds authorized by Congress [were] being disbursed pursuant to the [the legislation]'s statutory mandate." *Id.*; *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 607 (2007) (same). Thus, the distinguishing feature of *Bowen* was Congress's express authorization of funding for religious organizations.

In *Hein*, however, the Court dispelled any notion that *Bowen* revitalized *Flast*. There, the plaintiffs brought suit to challenge an action by the President, who had "issued an executive order creating the White House Office of Faith-Based and Community Initiatives within the Executive Office of the President" in order to "ensure that private and charitable community groups, including religious ones [ ] have the fullest opportunity permitted by law . . . to compete equally for federal assistance." *Hein*, 551 U.S. at 593-93 (internal quotation marks and citations omitted). In finding that the plaintiffs lacked standing, the Court reiterated the limits of *Flast*:

> Because almost all Executive Branch activity is ultimately funded
> by some congressional appropriation, extending the *Flast* exception
> to purely executive expenditures would effectively subject every
> federal action—be it a conference, proclamation, or speech—to
> Establishment Clause challenge by any taxpayer in federal court. To
> see the wide swathe of activity that respondents' proposed rule

> would cover, one need look no further than the amended complaint
> in this action, which focuses largely on speeches and presentations
> made by Executive Branch officials.

*Id.* at 610–11.  With that explanation, the Court in *Hein* "largely . . . confined [*Flast*] to its facts."

*Id.* at 609.  And though some members of the Court were prepared to overrule *Flast*, ultimately

the Court "[left] *Flast* as [it] found it."  *Id.* at 615.

Following *Hein*, the D.C. Circuit in *In re Navy Chaplaincy* stressed the limits of *Flast*.

There, the plaintiffs alleged that the Navy had discriminated in favor of Catholic chaplains in

certain aspects of its retirement system, and they asserted standing as "taxpayers who object to

the Navy's allegedly discriminatory operation of its chaplaincy program."  534 F.3d at 761.  In

finding that "plaintiffs' claim does not fit within the narrow *Flast* exception," the court reasoned:

> No legislative enactment expressly authorizes or appropriates funds
> for the Navy to favor Catholic chaplains in its retirement system.
> Plaintiffs cite, for example, the statutes establishing the Navy
> Chaplain Corps, but those statutes make no reference to
> denominational category, only to chaplains generally.  *See* 10 U.S.C.
> §§ 5142, 5150.  And plaintiffs, who themselves are chaplains,
> obviously do not contend that congressional legislation establishing
> the Navy Chaplaincy itself violates the Establishment Clause; they
> merely want the Navy to operate the Chaplain Corps differently.

*Id.* at 762.  In other words, the court explained, the plaintiffs' contention that the Navy was acting

*contrary* to law—as opposed to expending money as expressly authorized or mandated by

Congress—"directly undermine[d] any claim to taxpayer standing."  *Id.*

### 2.    Analysis

Applying the foregoing principles compels the conclusion that Plaintiffs in this case lack

taxpayer standing.  Just as in *In re Navy Chaplaincy*, this case involves "[n]o legislative enactment

[that] expressly authorizes or appropriates funds" to HHS to favor Catholic child welfare

organizations such as USCCB.  *Id.*; *see also Hein*, 551 U.S. at 608 (rejecting taxpayer standing

where the challenged expenditures "were not expressly authorized or mandated by any specific congressional enactment"). To the contrary, Congress has funded the URM and UC Programs through general appropriations whose overarching purpose is to carry out "refugee and entrant assistance activities authorized" by multiple statutes. *See, e.g.,* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. at 728; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. at 531. There is no mention of either the URM Program or the UC Program in any of in these appropriation measures, let alone the specific action challenged by Plaintiffs here—grantmaking to a religiously affiliated child welfare organization. Plaintiffs thus are actually contesting a discretionary executive action—not a legislative directive—as to which taxpayer standing under *Flast* is not available. *See Dumont v. Lyon*, 341 F. Supp. 3d 706, 726–730 (E.D. Mich. 2018) (holding, in a nearly identical case, that the plaintiffs, who were turned away by a state-contracted and taxpayer-funded child placement agency based on their same-sex relationship, lacked taxpayer standing because "the legislative enactment at issue does not expressly authorize the religiously-challenged expenditure at issue").

Plaintiffs advance several arguments to avoid this result, none of which are convincing. Plaintiffs assert that the "rule" of *Flast*, *Hein*, and *Bowen* is that "taxpayer standing exists in cases where Congress specifically appropriated funds for programs enacted under statutory schemes with a purpose of disbursing those funds, understanding that those funds might be distributed to religious organizations, and the disbursement of those funds is alleged to inappropriately favor or disfavor religion." Pls.' Opp'n at 15. But this is an inaccurate recitation of the law. As the D.C. Circuit made clear in *In re Navy Chaplaincy*, taxpayer standing under *Flast* requires a "legislative enactment [that] *expressly* authorizes or appropriates funds" for the challenged

expenditure itself.  534 F.3d at 762 (emphasis added).  It is therefore not enough that taxpayer funds "*might be* distributed to religious organizations."  Pls.' Opp'n at 15 (emphasis added).

Next, Plaintiffs contend that Congress has in fact "specifically contemplate[d] disbursement of funds to *certain* entities to provide *certain* services to *certain* refugees and immigrants, including *certain* unaccompanied youth," thereby giving rise to taxpayer standing. Pls.' Opp'n at 16 (emphasis added).  Plaintiffs' repeated use of the word "certain" is telling.  It reveals the absence of any specific designation of funds by Congress for any religious purpose or organization.  As discussed above, none of the Consolidated Appropriations Acts that fund child placement services for unaccompanied minors specifically mention the URM Program or the UC Program, let alone direct that taxpayer funds be provided to religiously affiliated organizations in general, or to USCCB in specific, to implement those programs.  Congress's general appropriations that fund the URM and UC Programs cannot, without more, facilitate taxpayer standing.  *See Hein*, 551 U.S. at 608 n.7 ("Nor is it relevant that Congress may have informally 'earmarked' portions of its general Executive Branch appropriations to fund the offices and centers whose expenditures are at issue.").

Unable to find a textual hook in any piece of legislation, Plaintiffs advance a secondary argument.  They maintain that Congress "plainly understood" it was funding religious organizations because HHS delivered annual reports disclosing that "USCCB receives the majority of grant funds under the URM and UC programs," thus providing the required nexus to Congress's tax and spending power.  Pls.' Opp'n at 17.  But Plaintiffs cite no case that stands for the proposition that Congress's "plain understanding" of how taxpayer funds are actually being spent is sufficient to establish taxpayer standing.  If Congress's mere knowledge of the challenged expenditures were sufficient to establish taxpayer standing, it would stretch that concept well

beyond the outer limits established by the Court in *Hein*.  Indeed, it is difficult to conceive of what expenditures would be off limits to an Establishment Clause challenge under Plaintiffs' proposed interpretation, as Congress presumably knows how the Executive Branch is spending taxpayer money before reauthorizing it, even if through a general appropriation.  *Cf. Hein*, 551 U.S. at 614 ("Almost all Executive Branch activities are ultimately funded by *some* congressional appropriation, whether general or specific, which is in turn financed by tax receipts.").  Congress's purported knowledge of how the Executive Branch has spent taxpayer funds is therefore not enough to confer taxpayer standing.

Finally, Plaintiffs make a policy argument, asserting that if taxpayer standing is denied here, "Establishment Clause violations uniquely could go unchecked in many instances." Pls.' Opp'n at 21.  But the Court rejected that very argument in *Hein*.  *See* 551 U.S. at 614 (rejecting the "parade of horribles that [respondents] claim could occur if *Flast* is not extended to discretionary Executive Branch expenditures").  *Hein* makes clear that taxpayer standing is not an all-access pass to the federal courts to challenge Executive Branch expenditures that might run afoul of the Establishment Clause.  *See Hein*, 551 U.S. at 615 (refusing to "expand[] [*Flast*] to the limit of its logic").  Other means are available to curtail Executive Branch encroachment of the Establishment Clause, including Congressional action and, as will be seen, challenges "by plaintiffs who would possess standing based on grounds other than taxpayer standing." *Id.*  Thus, Plaintiffs assertion that, absent recognition of taxpayer standing in this case, Executive Branch abuses might go unchecked is unpersuasive.

For the reasons discussed, all Plaintiffs lack taxpayer standing.  As taxpayer standing is the only ground upon which Plaintiff National LGBT Bar Association presses its Establishment Clause claim, it is dismissed from this action.

### C.      Individual Standing

But all is not lost for individual plaintiffs Marouf and Esplin.  They also assert individual standing to challenge the Federal Defendants' actions.  Defendants do not contest that Marouf and Esplin have satisfied the first element of standing, an injury in fact.  *See* Fed. Defs.' Stmt. at 15; *see also* Pls.' Opp'n at 4 (asserting as injury the "lost opportunity to foster a child," and "the act of shutting the door to same-sex couples' foster parenting applications demeans and stigmatizes these families").  Nor could they.  *Cf. Allen v. Wright*, 468 U.S. 737, 755 (1984) (recognizing that stigmatizing injury caused by racial discrimination of plaintiffs who are personally denied equal treatment is sufficient to confer standing); *see also Doe 2 v. Shanahan*, 917 F.3d 694, 739 n.8 (D.C. Cir. 2019) (Williams, J., concurring).

Instead, Defendants argue that Plaintiffs' injuries are not "fairly traceable to the Federal Defendants because" a third party, Catholic Charities of Fort Worth, "caused the alleged injury by application of its own criteria for foster parents."  Fed. Defs.' Stmt. at 15; *see also* USCCB Mem. at 8 ("[W]hen the government provides funding to a grant recipient that subsequently makes an independent decision that allegedly injures a third party, that third party does not have standing to challenge the legality of the government funding.").  Defendants also contend that "individual Plaintiffs cannot show that their alleged injury is likely to be redressed by the relief requested against the Government."  Fed. Defs.' Stmt. at 17; *see also* USCCB Mem. at 9–11.

To establish standing, Marouf and Esplin must show that their injury is "fairly traceable to the defendant's allegedly unlawful conduct" and "likely to be redressed by the requested relief."  *Lujan*, 504 U.S. at 590.  When, as here, "plaintiffs' claim hinges on the failure of government to prevent another party's injurious behavior, the 'fairly traceable' and redressability

inquiries appear to merge." *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 418 (D.C. Cir. 1994).  The court therefore addresses these requirements as one.

The troubling consequence of Defendants' position, if accepted, is apparent on its face. According to the Federal Defendants, a federal agency cannot be held to account for a grantee's known exclusion of persons from a federally funded program on a prohibited ground.  That is an astonishing outcome.   Surely, the government would not take this position if, say, Plaintiffs here were excluded from fostering a child based on their gender (both are women), national origin (Marouf is the daughter of Egyptian and Turkish immigrants), or religious faith (Marouf was raised a Muslim, Esplin a Mormon).  Yet, despite conceding that there is no agency policy that prevents child placement with same sex couples, *see* Hr'g Tr. (draft), Nov. 30, 2018, at 5–6, the Federal Defendants in this case wish to avoid the responsibility that comes with being good stewards of federal funds.  They cannot do so.

The D.C. Circuit has recognized that a "federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004); *see also Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 442 (D.C. Cir. 1998) (en banc) ("Both the Supreme Court and this circuit have repeatedly found causation where a challenged government action *permitted* the third party conduct that allegedly caused a plaintiff injury, when that conduct would have otherwise been illegal.  Neither court has ever stated that the challenged law must *compel* the third party to act in the allegedly injurious way.").  So, for example, in *Animal Legal Defense Fund, Inc. v. Glickman*, the D.C. Circuit sitting en banc allowed a plaintiff to challenge U.S. Department of Agriculture regulations concerning the treatment of primates by zoos and other exhibitors of

animals.  154 F.3d at 440–44.  Although the plaintiff's claimed aesthetic injury resulted from the actions of third parties that maintained captive primates in allegedly inhuman conditions, the court held that the plaintiff had established causation because the plaintiff alleged that the regulations permitted exhibitors to maintain primates in inhumane conditions, even though such conduct would have been illegal in the absence of those regulations.  *See id.* at 438–43.  The plaintiff also established causation by asserting that agency inspectors had visited one of the exhibitors and, notwithstanding the alleged inhumane conditions, determined that the conditions complied with agency regulations.  *See id.* at 439–40.  A favorable decision, the court held, would redress the plaintiff's injury because animal exhibitors would no longer be able to keep animals in inhumane living conditions without violating the law.  *See id.* at 443–44.  In cases like *Animal Legal Defense Fund*, "causation and redressability thus are satisfied . . . because the intervening choices of third parties are not truly independent of government policy."  *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940–41.

Plaintiffs' allegations here satisfy both the causation and redressability requirements. Recall, the Federal Defendants do not take the position that it is lawful to administer a federal program in a manner that disfavors same-sex couples.  Defendants nevertheless issued grants to USCCB knowing that USCCB and its sub-grantees would not place a child with a same-sex couple.  As Plaintiffs allege in their Complaint, USCCB's grant applications expressly stated that USCCB and its sub-grantees "must ensure that services provided . . . are not contrary to the authentic teaching of the Catholic Church, its moral convictions, and religious beliefs . . ."  Am. Compl. ¶¶ 31–32.  At the time, USCCB's position on same-sex marriage and the placement of children with same-sex couples was a matter of public record.  *See id.* ¶¶ 35–37.  So, too, were the teachings, convictions, and beliefs of the Catholic Church.  Thus, "[w]hen ORR awarded the

18

URM and UC grants to USCCB for the relevant period, it was on notice that USCCB's religious beliefs disfavored same-sex relationships." *Id.* ¶ 38.  Accordingly, by partnering with USCCB to deliver services under the URM and UC Programs, the Federal Defendants "permit[ted] or authorize[d] third-party conduct," i.e., disfavoring sex-same couples in the placement of unaccompanied refugee minors, "that would otherwise be illegal in the absence of the Government's action." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940.

And there is more.  Plaintiffs allege that they immediately notified ORR about their disqualification as foster parents based on their same-sex relationship. *Id.* ¶¶ 51–53.  Yet, ORR did nothing to address, let alone remedy, the exclusion. *See id.* ¶¶ 53, 57.  This inaction permitted USCCB to continue to use federal funds in a manner that disfavored same-sex couples.  These allegations are sufficient at the motion-to-dismiss stage to establish both the "causative link" between government action (or inaction) and plaintiff's injury, *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007) (stating that a plaintiff must do more than "simpl[y] . . . plead this causative link"), and that their injury will be redressed by a favorable decision, *see Lujan*, 504 U.S. at 561; *see also Dumont*, 341 F. Supp. 3d at 722–26 (finding that same-sex couple plaintiffs had adequately alleged causation and redressability in nearly identical circumstances).

For their part, Defendants rely largely on one case, *Freedom Republicans, Inc. v. Federal Election Commission*, 13 F.3d 412, to support their contrary position. *See* Fed. Defs.' Stmt. at 18–19; USCCB Mem. at 8–9.  The plaintiffs in *Freedom Republicans* challenged the Commission's funding of the Republican Party's nominating process, which they alleged was racially discriminatory.  The plaintiffs demanded that the Commission act to prevent the alleged discriminatory practice or cut off federal funding. *See Freedom Republicans*, 13 F.3d at 414.

The D.C. Circuit held that the plaintiffs lacked standing because the elements of causation and redressability were absent. *See id.* at 416–18.  The court held that "the injury alleged in Freedom Republicans' complaint is not fairly traceable to any encouragement on the part of the government, but appears instead to be the result of decisions made by the Party without regard to funding implications." *Id.* at 419.  Moreover, the court held that, "[i]n the absence of any evidence that the perpetuation of the [nominating] scheme is founded on other than pragmatic political considerations, we would be venturing into the realm of pure speculation were we to attempt to foretell the Party's response to termination of its present funding." *Id.*  USCCB analogizes its religious view on same-sex marriage to the Republican Party's nominating system; that is, USCCB argues that its belief regarding placing children with same-sex couples is unconnected to federal funding and that belief would not change even if federal funding were pulled from USCCB.

Though this case bears some resemblance to *Freedom Republicans*, it is different in two critical respects.  First, USCCB's very ability to make decisions regarding the eligibility of same-sex couples as foster parents under the URM and UC Programs is enabled by their selection as a federal grantee, whereas the Republican Party's nominating process was put in place decades before it ever received federal funding.  In other words, unlike a political party's creation of a nominations process, USCCB would have no say in qualifying persons to be a foster parent to unaccompanied refugee minors but for its receipt of federal funds.  Second, unlike the plaintiffs in *Freedom Republican* who called on the FEC to adopt regulations to force the party to alter its nominating process, Plaintiffs here do not seek to use the levers of federal power to change USCCB's position on same-sex marriage.  Instead, they seek injunctive relief requiring the Federal Defendants to ensure that they may apply to be foster or adoptive parents under the URM

Program or the UC Program without disfavoring them based on their sexual orientation. Thus, they seek a change to the federal program itself, not USCCB's views on same-sex marriage. Nor do Plaintiffs demand an order compelling USCCB to place a child with them, notwithstanding its religious views on same-sex marriage.[2]   Accordingly, this case is not controlled by *Freedom Republicans*.

Nor does the Supreme Court's decision in *Simon v. Eastern Kentucky Welfare Rights Organization* compel a different result, as USCCB insists. *See* USCCB Mem. at 8–9. In *Simon*, a group of indigent patients challenged an IRS Revenue Ruling that afforded favorable tax treatment to nonprofit hospitals that offered indigent patients emergency treatment only. 426 U.S. 26, 28 (1976). The plaintiffs claimed that the Revenue Ruling "encouraged" hospitals to deny services to indigent patients. *See id.* at 42. The Court held that the plaintiffs lacked standing because "[i]t is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications. It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services." *Id.* at 42–43. In this case, by contrast, a positive finding of causation and redressability requires no speculation at all. As discussed, the Federal Defendants caused Plaintiffs' injury both by creating a system that permits religiously affiliated grant recipients to deny federally funded services to same-sex couples *and* by failing to take any action after Plaintiffs gave notice of what happened to them. Moreover, the relief that Plaintiffs seek requires

---

[2] In their prayer for relief, Plaintiffs suggest as injunctive relief placement of a child on a non-discriminatory basis through USCCB or stripping USCCB of funding. *See* Am. Comp. at 24. Plaintiffs have since backed off such demand for relief. *See* Pls.' Opp'n at 11 ("Plaintiffs do *not* demand that USCCB necessarily render the determination as to Fatma and Bryn's eligibility to be foster parents, or make the decision to place a child with Fatma and Bryn."). Indeed, Plaintiffs have signaled openness to relief that "accomodat[es] the religious views of URM and UC grantees," so long as it does not "ultimately restrict placement options based solely on USCCB's religious doctrine and does not impose materially unequal burdens, stigma, or indignity on religiously disfavored applicants relative to favored ones." *Id.*

no speculation.  Ordering the Federal Defendants to develop a system that removes barriers to same-sex couples becoming foster parents and evaluates their eligibility by the same criteria as any heterosexual couple or person will make Plaintiffs whole.  "No speculative inferences are necessary here to conclude that the relief requested will result in the Plaintiffs receiving the dignity and equal treatment they seek."  *Dumont*, 341 F. Supp. 3d at 725 (similarly distinguishing *Simon*).

## IV.    CONCLUSION

For the reasons discussed in this Memorandum Opinion, the court grants in part and denies in part Defendants' Motions to Dismiss.  Plaintiff National LGBT Bar Association is dismissed from this case for lack of standing.  Plaintiffs Marouf and Esplin have standing not as taxpayers, but as individuals.  Plaintiffs Marouf and Esplin therefore may pursue each of their constitutional claims.

Dated: June 12, 2019

Amit P. Mehta
United States District Court Judge