**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| FATMA MAROUF, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | Civil Action No. 1:18-cv-00378 APM |
| v. | ) | |
| | ) | |
| XAVIER BECERRA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**DEFENDANT U.S. CONFERENCE OF CATHOLIC BISHOPS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.    Factual Background ................................................................................................... 2

    A.    Unaccompanied Immigrant Children Programs ................................................ 2

    B.    USCCB and Its Historical Partnership with the Federal Government
        To Care for Unaccompanied Immigrant Children ............................................. 3

    C.    Texas Withdraws from the URM Program ....................................................... 4

    D.    Plaintiffs Cannot Foster Through CCFW Due to Its Religious Beliefs .............. 5

    E.    The Government Seeks Alternative Providers to Accommodate Plaintiffs ......... 7

II.   Procedural Background ............................................................................................ 10

LEGAL STANDARD ....................................................................................................... 12

ARGUMENT .................................................................................................................... 12

I.    Plaintiffs' Claims Must Be Dismissed as Moot ...................................................... 12

II.   Plaintiffs' Establishment Clause Claim Fails on the Merits .................................... 16

    A.    Supreme Court Precedent Precludes Plaintiffs' Claims ................................... 16

    B.    This Case Involves None of the Historical Hallmarks of Establishment ........... 18

    C.    Even Under the Now-Abrogated *Lemon* Test, Plaintiffs' Claims Fail ............. 26

        1.    There is no evidence the government lacked a secular purpose ....................... 26

        2.    The government's funding activity did not have the primary effect
            of advancing religion ....................................................................................... 30

            (a)    The grants do not result in indoctrination ................................................. 31

            (b)    The government's grant criteria are secular and neutral ........................... 33

            (c)    The grants do not foster excessive entanglement ..................................... 34

III.  Plaintiffs' Equal Protection and Due Process Claims Fail on the Merits ................. 36

    A.    Because Plaintiff's Establishment Clause Claim Fails, the Remaining
        Claims Receive and Easily Survive Rational-Basis Review ............................ 36

    B.    There Is No Unconstitutional Action by the Government ................................. 38

    C.    The Conduct of USCCB and CCFW Cannot Be Attributed
        to the Government ........................................................................................... 40

CONCLUSION ................................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU of N. Cal. v. Azar*,
No. 16-CV-03539-LB, 2018 WL 4945321 (N.D. Cal. Oct. 11, 2018) ........................... *passim*

*Agostini v. Felton*,
521 U.S. 203 (1997) ............................................................................................... *passim*

*Am. Legion v. Am. Humanist Ass'n*,
139 S. Ct. 2067 (2019) ........................................................................................... 36

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ................................................................................................. 42

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................... 12

*Arizonans for Off. Eng. v. Arizona*,
520 U.S. 43 (1997) ................................................................................................. 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 39

*Az. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) ............................................................................................... 20

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ............................................................................................... 41

*Bonieskie v. Mukasey*,
540 F. Supp. 2d 190 (D.D.C. 2008) ...................................................................... 12

*Bowen v. Kendrick*,
487 U.S. 589 (1988) ......................................................................................20, 34, 35

*Bradfield v. Roberts*,
175 U.S. 291 (1899) ............................................................................................... 21

*Buck v. Gordon*,
429 F. Supp. 3d 447 (W.D. Mich. 2019) .............................................................. 17

*Carson ex rel. O.C. v. Makin*,
142 S. Ct. 1987 (2022) ........................................................................................... 26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................... 12

*Cierco v. Mnuchin*,
857 F.3d 407 (D.C. Cir. 2017) .............................................................................. 15

*Citizens for Resp. & Ethics in Wash. v. Wheeler*,
352 F. Supp. 3d 1 (D.D.C. 2019) .......................................................................... 15

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)....................................................................................................14

*Cmty. House, Inc. v. City of Boise*,
    490 F.3d 1041 (9th Cir. 2007) ..............................................................................31

*Connecticut v. Gabbert*,
    526 U.S. 286 (1999)...........................................................................................36, 37

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day
Saints v. Amos*,
    483 U.S. 327 (1987)............................................................................... *passim*

*DeStefano v. Emergency Hous. Grp., Inc.*,
    247 F.3d 397 (2d Cir. 2001)...............................................................................31, 32

*Ehlers-Renzi v. Connelly Sch. of the Holy Child*,
    224 F.3d 283 (4th Cir. 2000) ................................................................................26

*Empresa Cubana Exportadora de Alimentos y Productos Varios v.
U.S. Dep't of Treasury*,
    638 F.3d 794 (D.C. Cir. 2011) .............................................................................36

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020).................................................................................19, 20, 26

*Ficken v. Guzman*,
    No. 19-cv-3281, 2021 WL 1166834 (D.D.C. Mar. 26, 2021) .................................12

*Flagg Bros. v. Brooks*,
    436 U.S. 149 (1978)..............................................................................................43

*Forbush v. J C Penney Co.*,
    132 F.3d 1456 (5th Cir. 1997) .............................................................................15

*Forest Hills Early Learning Ctr., Inc. v. Grace Baptist Church*,
    846 F.2d 260 (4th Cir. 1988) ...........................................................................27, 29

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021)........................................................................... *passim*

*Grimes v. District of Columbia*,
    794 F.3d 83 (D.C. Cir. 2015) ...............................................................................12

*Harris v. McRae*,
    448 U.S. 297 (1980)..............................................................................................40

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012)..............................................................................................19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hsu v. Roslyn Union Free Sch. Dist. No. 3*,
    85 F.3d 839 (2d Cir. 1996)............................................................................27, 30, 35

*Institut Pasteur v. Chiron Corp.*,
    No. CIV. A. 03-0932 (JDB), 2005 WL 366968 (D.D.C. Feb. 16, 2005) ...............................14

*Jackson v. Metro. Edison Co.*,
    419 U.S. 345 (1974)..........................................................................................42

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022)........................................................................17, 18, 19, 26

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971)..........................................................................16, 26, 30

*Locke v. Davey*,
    540 U.S. 712 (2004).........................................................................................37

*Lown v. Salvation Army, Inc.*,
    393 F. Supp. 2d 223 (S.D.N.Y. 2005)........................................................... *passim*

*Lynch v. Donnelly*,
    465 U.S. 668 (1984).........................................................................................27

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019).......................................................................22, 41, 43

*Mark v. Borough of Hatboro*,
    51 F.3d 1137 (3d Cir. 1995)...............................................................................22

*McCarthy v. Azure*,
    22 F.3d 351 (1st Cir. 1994)................................................................................15

*McCreary Cnty. v. ACLU of Ky.*,
    545 U.S. 844 (2005).........................................................................................27

*Mitchell v. Helms*,
    530 U.S. 793 (2000).........................................................................................20

*Mount Royal Joint Venture v. Kempthorne*,
    477 F.3d 745 (D.C. Cir. 2007)............................................................................30

*Mueller v. Allen*,
    463 U.S. 388 (1983).........................................................................................26

*Nicholson v. Williams*,
    203 F. Supp. 2d 153 (E.D.N.Y. 2002) ...................................................................23

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020).....................................................................................19

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rendell-Baker v. Kohn,*
    457 U.S. 830 (1982) .................................................................................................36, 41, 42

*Roemer v. Bd. of Pub. Works of Md.,*
    426 U.S. 736 (1976) ...........................................................................................................20

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ...........................................................................................................22

*Rust v. Sullivan,*
    500 U.S. 173 (1991) .....................................................................................................35, 40

*Scott v. Harris,*
    550 U.S. 372 (2007) ...........................................................................................................12

*Shurtleff v. City of Boston,*
    142 S. Ct. 1583 (2022) .............................................................................................19, 20, 22

*Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs,*
    788 F.3d 580 (6th Cir. 2015) ......................................................................................32, 34

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) .............................................................................................................13

*Tex. Monthly, Inc. v. Bullock,*
    489 U.S. 1 (1989) ...............................................................................................................21

*Torcaso v. Watkins,*
    367 U.S. 488 (1961) ...........................................................................................................21

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014) ...........................................................................................................19

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) ................................................................................................21, 34

*United States v. Morrison,*
    529 U.S. 598 (2000) ...........................................................................................................38

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021) ..................................................................................................13, 14

*Walz v. Tax Comm'n of City of N.Y.,*
    397 U.S. 664 (1970) ...........................................................................................................17

*Washington v. Davis,*
    426 U.S. 229 (1976) .....................................................................................................36, 38

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ...........................................................................................................40

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Zelman v. Simmons-Harris*,
   536 U.S. 639 (2002)...............................................................................................26

**STATUTES**

6 U.S.C. § 279...............................................................................................................2, 3, 7

8 U.S.C. § 1232.................................................................................................................2, 7

8 U.S.C. § 1522.................................................................................................................2, 7

**OTHER AUTHORITIES**

45 C.F.R. § 75.300.............................................................................................................39

45 C.F.R. § 87.3.....................................................................................................3, 31, 33

Naomi Cahn, *Perfect Substitutes or the Real Thing?*,
   52 Duke L.J. 1077 (2003)....................................................................................23

Kelsi Brown Corkran, *Principal-Agent Obstacles to Foster Care Contracting*,
   2 J.L. Econ. & Pol'y 29 (2006)...........................................................................24

Linda Gordon, *Child Welfare: A Brief History*,
   Social Welfare History Project (2011)................................................................23

Timothy A. Hasci, Second Home: Orphan Asylums and Poor Families
   in America (1997)................................................................................................23

Susan Vivian Mangold, *Protection, Privatization, & Profit in the Foster
   Care Sys.*, 60 Ohio St. L.J. 1295 (1999)............................................................22

Michael W. McConnell, *Establishment and Disestablishment at the Founding,
   Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003)............19, 20, 24, 25

Brenda G. McGowan, Historical Evolution of Child Welfare Services,
   in Child Welfare for the Twenty-First Century: A Handbook of
   Practices, Policies, and Programs (2005)...........................................................24

*Orphanages: An Historical Overview*, Minn. Dep't of Human Servs.
   (Mar. 16, 1995)....................................................................................................23

Catherine E. Rymph, Raising Government Children: A History of Foster
   Care and the American Welfare State (2017).......................................................23

# INTRODUCTION

Just last year, a unanimous Supreme Court ordered the City of Philadelphia to accommodate a Catholic group as part of its public foster-care program. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). The factual setting was nearly identical to this one. As here, the Catholic group had a religious objection to placing foster children with same-sex couples. And as here, government funds underwrote the foster services at issue. Yet the Court held that the Constitution required the City to allow the Catholic organization to participate in the funding program. Plaintiffs now insist that this relief was unconstitutional: the arrangement the Supreme Court *ordered* in *Fulton* is precisely what Plaintiffs *challenge* here. Ruling in their favor would thus require contradicting a unanimous Supreme Court decision issued just over a year ago.

This Court should decline to take that step. As *Fulton* makes clear, the Constitution does not command the exclusion of religious organizations from neutral government-funding programs simply because they provide charitable services in a manner consistent with their religious beliefs. That is especially clear where, as here, the government program also includes alternative providers that can provide any services the religious organization finds objectionable. Indeed, with the government's decision to stand up alternative providers in the Dallas-Fort Worth area, Plaintiffs have been able to participate in the programs at issue for quite some time; they have simply chosen not to do so. What is more, for the only remaining program at issue, the government has now established a neutral clearinghouse to which *all* prospective foster parents in the area must apply. That clearinghouse will then match applicants with a provider willing and able to offer licensing and placement services. This is—literally—the solution proposed by Plaintiffs. The government has now given Plaintiffs exactly what they wanted, and in exactly the way they wanted it. That not only defeats their claim on the merits but also moots this case and independently requires dismissal.

1

## BACKGROUND

I.     **Factual Background.**

A.     **Unaccompanied Immigrant Children Programs.**

The Office of Refugee Resettlement ("ORR"), a component of the U.S. Department of Health and Human Services, administers two programs to care for unaccompanied immigrant children: the Unaccompanied Refugee Minor Program ("URM Program") and the Unaccompanied Alien Children Program ("UC Program"). (Defendant U.S. Conference of Catholic Bishops' Statement of Undisputed Material Facts ("SUMF") ¶¶ 1–2, 6.)

The URM Program was established in 1980 to care for children who are unaccompanied by a parent or guardian but have legal status in the United States (i.e., unaccompanied refugee children). 8 U.S.C. § 1522; SUMF ¶ 3. Eligible children include refugees, victims of trafficking, and asylees. (SUMF ¶ 5.) Through the URM Program, children receive foster-care services and benefits, which may include long-term foster-care placements. (SUMF ¶ 4.) Eligible children are the sole clients and beneficiaries of this program. *See* 8 U.S.C. § 1522(a), (d) (authorizing services and funds for "refugee children"); *see also* App. 70, 112, 130–31, 252.

The UC Program similarly focuses on unaccompanied minors, but it cares for children lacking lawful immigration status (i.e., unaccompanied alien children). *See* 8 U.S.C. § 1232; 6 U.S.C. § 279(g); SUMF ¶ 7. These children generally receive the same services and benefits available in the URM Program, including long-term foster-care placement as appropriate. (SUMF ¶ 8.) Children are the sole clients and beneficiaries of this program. *See* 8 U.S.C. § 1232; 6 U.S.C. § 279(g) (authorizing services and funds for "unaccompanied alien children"); App. 231–32.

In neither program, however, does the government provide foster-care services directly. (SUMF ¶ 9.) Instead, it issues grants to a network of public and private agencies to care and provide

services for eligible children. (SUMF ¶ 10.) While faith-based organizations may participate, 45 C.F.R. § 87.3(a); SUMF ¶ 12, the government's selection criteria are secular and neutral. (SUMF ¶ 11.) Regulations also forbid grantees from using funds to "support or engage in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization), as part of the programs or services funded with direct financial assistance from the HHS awarding agency." 45 C.F.R. § 87.3(b).

**B.    USCCB and Its Historical Partnership with the Federal Government To Care for Unaccompanied Immigrant Children.**

The United States Conference of Catholic Bishops ("USCCB") is an assembly of Catholic bishops that organizes and conducts religious and charitable activities in the United States and abroad. (SUMF ¶ 13.) As part of its longstanding religious mission to "care for immigrants," USCCB has for decades served unaccompanied immigrant children. (SUMF ¶ 14.) USCCB is one of the largest refugee settlement agencies in the world (SUMF ¶ 15.), and has acquired a global reputation as an expert on migrating children and for setting a "high bar" for quality of services. (App. 150.) Indeed, USCCB effectively wrote the book on the subject. In 2013, USCCB assisted the Council on Accreditation in developing standards for immigrant children in care. (App. 454.)

Much of USCCB's experience caring for immigrant children predates ORR and the two programs at issue. Before Congress established ORR and the URM Program in 1980, USCCB had worked to place unaccompanied refugee children in foster-care programs. (SUMF ¶ 16.) USCCB had also been working with unaccompanied alien children before ORR began administering the UC Program in 2003. *See* 6 U.S.C. § 279; SUMF ¶¶ 16–17. ORR thus understandably sought USCCB's advice when Congress charged it with administering the URM and UC programs. (App. 62, 149–50, 156.) And ORR has regularly awarded grants to USCCB under both programs ever since, in both Republican and Democratic administrations. (SUMF ¶ 17.) In fact, if USCCB ever

withdrew, the government's URM capacity would "shrink immediately" by half, and USCCB's deep "expertise" and "historical knowledge," which are not easily replicated, would be lost. (App. 62, 133–35, 151–53 .)

USCCB does not provide foster-care services directly. (SUMF ¶ 20.) Instead, it awards subgrants to various organizations for that purpose. (SUMF ¶ 21.) One such subgrantee was Catholic Charities of Fort Worth ("CCFW"), which provided foster services under both the URM and UC programs in the Dallas-Fort Worth area. (SUMF ¶¶ 27–28.) At issue in this case are the ORR grants for FY 2017 out of which USCCB made subgrants to CCFW for the period including February 2017. (SUMF ¶¶ 18–19.)

USCCB's religious beliefs underlie its efforts to care for unaccompanied minors, and also dictate the manner in which that care is provided. Accordingly, USCCB allocates funds provided by the government in a manner consistent with its sincerely held religious beliefs. (SUMF ¶ 22.) Among other things, it would violate USCCB's sincerely held religious beliefs to fund services contrary to Catholic teaching. (SUMF ¶ 23.) So while USCCB may allocate funds to organizations that do not share its religious beliefs, USCCB does not allocate funds to any organization that would use those funds to provide services contrary to the teaching of the Catholic Church, including by licensing or placing children with same-sex foster parents. (SUMF ¶¶ 24–25.) Because Catholic teaching does not regard the homosexual inclination in itself as morally objectionable, USCCB will, however, fund organizations that license single persons with homosexual orientations or that place foster children with such individuals. (App. 429.)

### C.      Texas Withdraws from the URM Program.

In September 2016, the State of Texas, which had administered the URM Program within its borders, suddenly announced it would no longer perform that role as of January 2017. (SUMF

¶ 29.) This generated a "crisis" within ORR, which had never before faced this situation. (App. 87, 90, 145–46.) To fill the vacuum and ensure "no gaps" in services, it was "quite urgent" to find a so-called "replacement designee" to take custody of eligible children and ensure they continued to receive appropriate foster-care services. (SUMF ¶ 30; App. 88–89, 124.)

ORR quickly formed a task force to search for a private grantee to operate the URM Program in Texas. (App. 91–92.) Given Texas's size and the nature of the program, it was a "large undertaking" to fill the position on the "very short time frame" available. (SUMF ¶¶ 30–31.) In ORR's view, of the two viable options, USCCB was "best equipped" for the role. (SUMF ¶¶ 32–33.) It had "ongoing URM programs" in Texas, a "very good working relationship with" ORR, and "a long history" of providing "long-term foster care."  (App. 123–24.) ORR thus approached USCCB, which promptly submitted an application. (SUMF ¶¶ 33–34; App. 146–47.) After two months of review and correspondence, ORR approved the application, just days before Texas's January 31, 2017 withdrawal. (SUMF ¶ 35.)

For USCCB, the replacement-designee role was "new territory." (App. 246, 475.) The URM Program is "complex," the replacement-designee role entailed a "learning curve," and elements of the program were still "under development." (App. 476.) It was during this transition that the events giving rise to this suit occurred.

### D. Plaintiffs Cannot Foster Through CCFW Due to Its Religious Beliefs.

Plaintiffs Fatma Marouf and Bryn Esplin are a legally married same-sex couple living in Fort Worth, Texas. (SUMF ¶¶ 36–37.) Within days of USCCB's becoming replacement designee for the Texas URM Program, Plaintiffs approached CCFW about fostering a refugee child. (SUMF ¶ 38.) On February 22, 2017, CCFW officials and Plaintiffs had a call, during which Plaintiffs indicated that they were a same-sex couple. (App. 10.) Due to its faith commitments, CCFW

believed it could not place foster children with anyone other than a man and woman who are married. (SUMF ¶ 39.) CCFW thus informed Plaintiffs that they would not license them as foster parents. (SUMF ¶ 40.) CCFW did, however, identify alternative foster-care agencies, albeit outside of the URM or UC programs, for Plaintiffs to consider. (App. 181–83.) CCFW and Plaintiff Marouf also continued to collaborate on other immigration matters as well. (App. 162–63.)

The same day, Plaintiffs emailed the government's URM Program office about their interaction with CCFW. (SUMF ¶ 41.) Plaintiffs relayed CCFW's statement that Plaintiffs were not eligible because they did not "mirror the holy family," a reference to CCFW's religious belief about placements with same-sex foster parents. (App. 7, 10.)

The government had never before received a complaint about any provider refusing to place children with same-sex couples. (SUMF ¶ 43.) Nor did the government anticipate the issue, though it was familiar with USCCB's Catholic identity.[1] (See SUMF ¶¶ 42, 44–50; App. 42–43, 105 App. 204–05; 210–11, 500.) Indeed, USCCB's grant applications for the relevant period stated that to serve as a grantee, USCCB would have to "ensure that services provided under this application are not contrary to the authentic teaching of the Catholic Church, its moral convictions, and religious beliefs." (SUMF ¶ 44; see also SUMF ¶¶ 45–46.) The government agreed to these terms. (App. 296, 298–329.) But, at the time, the government did not appreciate that they would apply to the recruitment and selection of foster parents or implicate USCCB's religious beliefs regarding same-sex marriage. (See SUMF ¶ 50; App. 51, 96, 98, 106–07, 197, 199–203, 210–13, 217, 230, 233–34, 255, 262–63, 265, 267–68.) Before the incident in this case, there were no communications between USCCB and the government regarding how USCCB's or its

---

[1] This was also true at USCCB.  The individual employees overseeing the URM and UC programs in Texas had apparently not encountered or considered the same-sex foster-parent issue before CCFW's interactions with Plaintiffs.  (See App. 239–44, 249.)

subgrantees' religious beliefs applied to the placement of children with same-sex foster parents. (SUMF ¶ 49.)

This was understandable. Unaccompanied minors—not prospective foster parents—are the clients and beneficiaries of both the URM and UC programs. *See* 8 U.S.C. § 1522(a), (d) (authorizing services and funds for "refugee children"); 8 U.S.C. § 1232; 6 U.S.C. § 279(g) (authorizing services and funds for "unaccompanied alien children"). The government required grantees to comply with state licensing standards, but the actual recruitment (where necessary) and licensing of foster parents was handled by grant recipients. (App. 23–26, 49–50 70–71, 77–78, 80–84, 256–60.) The application process thus focused on what services organizations could or could not provide *to children*. (App. 130–31, 197–98, 212–15, 244–45.) And USCCB committed to serving "all refugee eligible students, including lesbian, gay, bisexual, and transgender (LGBT) populations," (SUMF ¶ 26), which it did (App. 128, 154–56, 232, 247–48). Moreover, USCCB's prior religious objections related to the provision of certain services to children—namely, abortion and contraception. (SUMF ¶ 47.) It was in this context that both parties initially understood the conscience provisions in USCCB's grant applications. (App. 197, 199–203, 230, 233–34, 239–41, 243–44, 262–63.)

### E. The Government Seeks Alternative Providers to Accommodate Plaintiffs.

Nevertheless, after the government became aware of Plaintiffs' situation, it worked to accommodate their desire to foster children from the programs. (SUMF ¶ 53; App. 224–29.) Though neither program operates in every city or state (App. 514–16, 542–43), the government sought agencies that could provide additional foster-care services in the Dallas-Fort Worth area. (SUMF ¶ 53.) It identified two, which would have to relocate or stand up new programs, given state-law limits on where foster-care providers can operate. (App. 207–09.)

7

Both organizations agreed to participate. On May 29, 2020, ORR appointed Lutheran Immigration and Refugee Services ("LIRS") as a second replacement designee to establish a URM Program in the Dallas-Fort Worth area, which it did through its subgrantee Upbring. (SUMF ¶¶ 54–55.) The approval was effective June 1, 2020. (App. 496.)  ORR also awarded Baptist Children Family Services ("BCFS") a grant to establish a UC Program in the same area. (SUMF ¶ 56.) Today, both programs are operating and willing to license and make placements with same-sex foster parents. (SUMF ¶¶ 57–58.)

That, however, was not the end of the government's efforts to accommodate Plaintiffs. The government has named "a neutral third party"—the U.S. Committee for Refugees and Immigrants ("USCRI")—"to field all inquiries from prospective URM foster parents in the Dallas/Fort Worth, Texas area."  (SUMF ¶ 59.)  As of March 28, 2022, USCRI works in consortium with LIRS and its subgrantee Upbring, as well as USCCB and its subgrantee Catholic Charities of Dallas ("CCD"),[2] to "ensure that all prospective foster parents in the Dallas-Fort Worth area have the opportunity to work with a URM provider."  (SUMF ¶ 60.) Specifically, USCRI is tasked with:

- establish[ing] a hotline and email address to receive inquiries from individuals or couples interested in fostering minors in the URM program in the Dallas/Fort Worth, Texas area;
- respond[ing] to all inquiries from individuals or couples interested in fostering minors in the URM program in the Dallas/Fort Worth, Texas area; [and]
- conduct[ing] initial intakes of the individuals or couples, to collect basic demographic and family composition information.

(SUMF ¶ 61.) Following intake, "USCRI will refer such prospective foster parents to either Catholic Charities Dallas or Upbring for training and licensing in accordance with applicable

---

[2] Since this litigation began, CCFW has undergone a programmatic restructuring and no longer provides foster-care services. (SUMF ¶ 51; App. 177.) Accordingly, as of July 1, 2019, USCCB began allocating funds received from ORR to CCD, which has taken over all services previously provided by CCFW. (SUMF ¶ 52; App. 10.) To comply with the terms of its agreement with USCCB, CCD would decline to license or place children with same-sex foster parents.  (App. 7, 10.)

8

Texas law." (SUMF ¶ 62.) USCRI's referrals are based on information collected during the intake process, including, "[d]emographic information, household and background information," as well as "criteria" established by each consortium partner, which can include religious objections. (SUMF ¶ 63.)

For their part, CCD and Upbring have committed to "refer all" prospective foster parents to USCRI," to "respond to referrals from USCRI" within established timeframes, and to "license all [prospective foster parents] that meet Texas state licensing, agency, accreditation, and home study requirements." (SUMF ¶ 64.) In the event CCD or Upbring are unable to work with certain prospective foster parents "for reasons unrelated to Texas licensing requirements," they will refer those individuals to the other subgrantee or back to USCRI. (SUMF ¶ 65.)

The government has confirmed that neither USCRI nor LIRS (i.e., Upbring) has any "objection to working with same-sex couples seeking to foster children through the URM program." (SUMF ¶ 66.) That being the case, nothing precludes "a couple in a same sex relationship in the Dallas-Fort Worth area from having their application to serve as a foster parent processed by the consortium" and "referred to a URM provider." (App. 283, 293–94.)[3]

Accordingly, Plaintiffs are now able to pursue fostering opportunities through both the URM and UC Programs in the Dallas-Fort Worth area—indeed, they have been able to do so for quite some time. (App. 117, 194, 267–69, 280, 293.) While they have continued to press this litigation, however, Plaintiffs have not availed themselves of these opportunities, despite expressing a desire to learn more about alternative providers. (App. 164–66, 170, 172–74, 294.)

---

[3] The consortium involves only the URM Program because ORR no longer provides funds to USCCB for long-term foster care services in Texas under the UC Program. (SUMF ¶ 67.) And all prior UC grant funds were expended by February 28, 2021. (App. 3.) Thus, USCCB no longer has any subgrantees participating in the UC Program in the Dallas-Fort Worth area.

## II.     Procedural Background.

On February 20, 2018, Plaintiffs sued the U.S. Department of Health and Human Services ("HHS"), the Administration for Children and Families ("ACF"), and ORR, as well as the heads of each of those federal agencies or components (in their official capacities), challenging their inability to foster children in the URM and UC Programs administered by CCFW. Dkt. 1. USCCB was included as a Rule 19 defendant. *Id.* Plaintiffs later amended their complaint, adding the National LGBT Bar Association as a plaintiff. Dkt. 21 ("FAC").

The FAC alleged that the government violated the Constitution by awarding grants to USCCB, which in turn awarded sub-grants to CCFW, the organization that refused to license or place children with Plaintiffs. *E.g.*, FAC ¶ 56. Plaintiffs contend this violated the Establishment Clause, along with the equal-protection and due-process components of the Fifth Amendment. FAC ¶¶ 74, 83, 91. They sought both declaratory and injunctive relief, as well as nominal damages. FAC Prayer for Relief.

On May 21, 2018, USCCB and the government moved to dismiss for lack of standing. Dkts. 28 & 29. On June 12, 2019, this Court granted those motions as to the National LGBT Bar Association, but held that Plaintiffs Marouf and Esplin had individual (though not taxpayer) standing to pursue their constitutional claims. Dkt. 48 ("MTD Op.").

In its opinion, the Court noted that Plaintiffs had narrowed their request for relief since commencing the litigation. Though they originally sought to "strip[] USCCB of funding" or to compel the "placement of a child on a non-discriminatory basis through USCCB," "Plaintiffs have since backed off such demand[s]." MTD Op. 21 n.2; *see also* Dkt. 80 ("MTD Oral Arg. Tr.") 53 ("We're not asking that the government remove all of its funding to USCCB."); *id.* at 67–68 ("[W]e are not looking to take away funding from USCCB."); MTD Op. 21 n.2 ("'Plaintiffs do *not* demand

10

that USCCB necessarily render the determination as to [their] eligibility to be foster parents, or make the decision to place a child with [Plaintiffs].'" (quoting Dkt. 34 ("Pls.' MTD Opp'n") at 11)). "Instead, they seek injunctive relief requiring the Federal Defendants to ensure that they may apply to be foster . . . parents under the URM Program or the UC Program without disfavoring them based on their sexual orientation." MTD Op. 20–21. To that end, "Plaintiffs have signaled openness to relief that 'accomodat[es] the religious views of URM and UC grantees,' so long as it does not 'ultimately restrict placement options based solely on USCCB's religious doctrine and does not impose materially unequal burdens, stigma, or indignity on religiously disfavored applicants relative to favored ones.'" MTD Op. 21 n. 2 (quoting Pls.' MTD Opp'n 11).

At the hearing on the motion to dismiss, Plaintiffs gave a specific example of an accommodation they would find acceptable. If "there were no obstacles put in front of [same-sex couples] that weren't put in front of other couples," Plaintiffs explained, they "wouldn't have any objections." MTD Oral Arg. Tr. 49, 68. Noting that "there's a difference between . . . providing placement and actually screening the application[s]," Plaintiffs proposed that the government "or someone else" "take over the application process" and "create a screening process" for prospective foster parents. *Id.* at 57, 62. All prospective foster parents would "have to go through that process" to be directed to the "grantee they would go to" to foster a child. *Id.* at 58–61 (suggesting that "no matter who the individual is, they [would] have a right to walk in and initiate that application process," with the administering entity "determining who that couple would go to"). This would allow USCCB subgrantees to participate in the URM and UC programs, so long as a non-objecting entity administered the screening process and there was "another provider in the Fort Worth area" that did not object to placing children with same-sex foster couples. *See id.* at 57, 62, 68. While

11

such a "chang[e in] federal policy" would upend "the whole process of how everything is functioning" in those programs, it would "immediately redress" Plaintiffs' claims. *Id.* at 65.

## LEGAL STANDARD

The Court may grant summary judgment "when the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Ficken v. Guzman*, No. 19-cv-3281, 2021 WL 1166834, at *3 (D.D.C. Mar. 26, 2021) (citation omitted). A "fact is 'material' if it could affect the outcome of the litigation." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a "dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Although the moving party must identify the evidence that "demonstrates the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), when the moving party has done so, the opposing party must "designate specific facts showing that there is a genuine issue for trial," *Grimes v. District of Columbia*, 794 F.3d 83, 94–95 (D.C. Cir. 2015). "[C]onclusory allegations and unsubstantiated speculation do not create genuine issues of material fact." *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008).

## ARGUMENT

### I.    Plaintiffs' Claims Must Be Dismissed as Moot.

As detailed above, since filing their complaint, Plaintiffs narrowed their demand for relief. MTD Op. 20; *supra* pp. 10–11. Their current aim is for "the Federal Defendants to ensure that they may apply to be foster . . . parents under the URM Program or the UC Program without disfavoring them based on their sexual orientation." MTD Op. 20–21. For some time now, Plaintiffs have been able to do just that. The government has not only set up alternative providers in the Dallas-Fort Worth area who will license and place children with same-sex couples; it has also established the

12

exact "screening process" Plaintiffs requested. *Supra* pp. 8–12. With Plaintiffs having obtained their requested relief, their claims are moot, which alone entitles USCCB to summary judgment.

"At all stages of litigation, a plaintiff must maintain a personal interest in the dispute." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). "The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Id.* "Mootness has been described as the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (citations omitted).

Absent "any continuing, present adverse effects," "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). That is because, "[t]o demonstrate standing, the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct but must also seek a remedy that redresses that injury." *Uzuegbunam*, 141 S. Ct. at 796. If "a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot." *Id.*

These principles resolve this case. Plaintiffs' claims are moot because there is no present or future injury they are likely to suffer, much less an injury that an injunction or declaratory relief would solve. Plaintiffs can apply to foster through the URM and UC programs in the Dallas-Fort Worth area, because the government has appointed two additional providers that do not object to licensing same-sex couples. *Supra* pp. 7–9; (App. 208 (the alternative providers "don't have any objections to working with same sex couples"); App. 52 (same); App. 116 (same); App. 279.) So even if Plaintiffs suffered a cognizable injury when CCFW declined to license them, Plaintiffs

cannot establish "that [they] [are] realistically threatened by a repetition of [this] experience." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).

While the presence of alternative providers alone moots Plaintiffs' claims, there is more. *First*, USCCB no longer receives funding for long-term foster care in Texas under the UC Program. *Supra* p. 9 n.3. There is thus no possible "remedy" that Plaintiffs could seek with respect to that program, much less the potential for future injury. *Uzuegbunam*, 141 S. Ct. at 796.

*Second*, with respect to the URM Program, not only has the government provided *what* Plaintiffs demanded, it has done so in the *manner* Plaintiffs themselves proposed. Specifically, the government has instituted a screening process under which a neutral third-party, USCRI, processes inquiries from all prospective foster parents for the URM program in the Dallas-Fort Worth area and makes referrals to appropriate foster-care agencies. *Supra* pp. 8–9. Under this arrangement, there is no basis to claim that anyone in the Dallas-Fort Worth area will be turned away from the URM Program on the basis of his or her sexual orientation. "[T]here [are] no obstacles put in front of [same-sex couples] that [a]ren't put in front of other couples," so plaintiffs should no longer "have any objections." MTD Oral Arg. Tr. 49.

Indeed, *Plaintiffs' counsel represented in open court* that they would be "satisfied" if the government provided precisely this relief.[4] If "not quite a judicial admission," that is surely "the next closest thing" when it comes to proving that no live controversy remains. *Institut Pasteur v. Chiron Corp.*, No. CIV. A. 03-0932 (JDB), 2005 WL 366968, at *13 (D.D.C. Feb. 16, 2005). At

---

[4]     THE COURT: So if as government counsel said, say there is, tomorrow, another provider in the Fort Worth area that would not discriminate on the basis of your clients being a same-sex couple, would that satisfy you?

[Plaintiffs' Counsel]: So long as . . . there would be seamless treatment of their applications and they could be treated equally, that would not be a problem.

THE COURT: Okay. I just want to make sure I'm clear on that.

MTD Oral Arg. Tr. 68.

minimum, principles of judicial estoppel should bar Plaintiffs from moving the remedial goalposts after getting what they asked for. *E.g.*, *McCarthy v. Azure*, 22 F.3d 351, 355 n.4 (1st Cir. 1994) (holding that a plaintiff "will be disabled from pursuing any . . . claims" he agreed "to abandon"); *Forbush v. J C Penney Co.*, 132 F.3d 1456 (5th Cir. 1997) (similar).

Nor do any exceptions to mootness apply in this case. "There are two principal exceptions to mootness": (1) injuries that are "capable of repetition, yet evading review" and (2) cases involving "voluntary cessation." *Cierco v. Mnuchin*, 857 F.3d 407, 414–15 (D.C. Cir. 2017). This case is not "capable of repetition, yet evading review," because the "challenged action" is not too "short" in duration to provide time for review. *Id.* Nor does the "voluntary cessation" exception apply. For one thing, the government *created* new opportunities for Plaintiffs, thus obviating any potential injury. And even assuming there was some deficiency in the government's original policy, "where the harm alleged is a deficient policy and the only relief sought is prospective, it is hard to see[] how any effect could possibly linger after the Agency corrects the policy." *Citizens for Resp. & Ethics in Wash. v. Wheeler*, 352 F. Supp. 3d 1, 14 (D.D.C. 2019). This conclusion is also supported by the principle that "where the defendant is a government actor—and not a private litigant—there is less concern about the recurrence of objectionable behavior." *Id.* at 13; *see also Cierco*, 857 F.3d at 415 ("The Government has assured the court that the disputed Notices have been completely withdrawn."). Simply put, Plaintiffs can obtain the opportunities they want, and there is no evidence that this will change.

Plaintiffs may assert that they can still press a claim for nominal damages. But that is wrong for two reasons. First, this Court narrowed their permissible claims to injunctive relief. MTD Op. 20–21 ("[Plaintiffs] seek injunctive relief requiring the Federal Defendants to ensure that they may apply to be foster or adoptive parents under the URM Program or the UC Program without

disfavoring them based on their sexual orientation."). And the Court relied on this understanding to distinguish past precedent and allow Plaintiffs' claims to go forward. *Id.* Second, as Plaintiffs previously admitted, sovereign immunity precludes them from seeking even nominal damages on their pending claims. *See* Pls. MTD Opp'n 22 & n.5.

In short, this Court should dismiss Plaintiffs' claims as moot.

## II.    Plaintiffs' Establishment Clause Claim Fails on the Merits.

Even if Plaintiffs' Establishment Clause claim was somehow justiciable, it fails on the merits for three reasons. First, to the extent Plaintiffs have reneged on their disavowal of any desire to defund USCCB, the Supreme Court has specifically held that religious organizations may (and sometimes must) be allowed to participate in government foster programs even if they object to placing foster children with same-sex couples. *See Fulton*, 141 S. Ct. at 1868. That is particularly clear where, as here, the government program allows same-sex couples to work with other participating organizations to become foster parents. Second, the history-and-tradition test confirms that result. Religious organizations have long worked with governments to provide care for displaced children—and they have done so in a manner consistent with their religious beliefs. Even setting aside that history, the government's conduct here bears none of the telltale marks of a religious "establishment" that the First Amendment was designed to prevent. Third, were this Court apply the now-abrogated *Lemon* test, the result would be the same: There is no evidence that the government lacked a secular purpose in allowing USCCB to participate in the URM and UAC programs, and such participation does not have the primary effect of advancing religion.

### A.    Supreme Court Precedent Precludes Plaintiffs' Claims.

As an initial matter, Plaintiffs' Establishment Clause claim must be rejected because it squarely contradicts the Supreme Court's recent—unanimous—decision in *Fulton*, which held that

16

the Free Exercise Clause prohibited the City of Philadelphia from excluding a Catholic agency from its public foster-care program. The Establishment Clause and the Free Exercise Clause "appear in the same sentence of the same Amendment," and they have "'complementary' purposes, not warring ones." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022) (citation omitted). Thus, the Establishment Clause cannot *prohibit* what the Free Exercise Clause *compels*. *See Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 667–72 (1970). Otherwise, governments would violate the Constitution coming and going—with officials facing the impossible task of both including *and* excluding religious organizations from government programs. That scenario is absurd on its face.

But that absurdity is exactly what Plaintiffs peddle here, as their arguments would make an Establishment Clause violation out of the very remedy that the Supreme Court ordered in *Fulton.* In *Fulton*, the Court decided a case on facts very similar to those here: A Catholic foster-care organization declined—for reasons of faith—to place children with same-sex couples, and the City of Philadelphia sought to exclude the organization from its foster program for that reason. 141 S. Ct. at 1874–76, 1882. The Catholic organization sued, and the Supreme Court held—by a *unanimous vote*—that the City's policy of exclusion violated the Free Exercise Clause. *Id.*; *accord Buck v. Gordon,* 429 F. Supp. 3d 447 (W.D. Mich. 2019) (granting a preliminary injunction that required the state to allow Catholic agency to continue to provide adoption and foster-care services despite its objection to assisting same-sex couples with licensing).

Under *Fulton*, Plaintiffs *necessarily* lose on the merits. *Fulton* held that the Free Exercise Clause *required* the City of Philadelphia to allow a Catholic foster organization to participate in a public foster-care program even though the organization had a religious objection to placing foster children with same-sex couples. 141 S. Ct. at 1874–76, 1882. That remedy, endorsed by a

unanimous Supreme Court, cannot possibly violate the Establishment Clause, or else the First Amendment would be at "war[]" with itself—which is exactly the proposition that the Supreme Court has rejected. *Kennedy*, 142 S. Ct. at 2426.

Nor do Plaintiffs have any prospect of distinguishing *Fulton*. If anything, this case is even easier from an Establishment Clause perspective. In *Fulton*, if a same-sex couple approached a religious foster organization, it would "refer the couple to another agency that is happy to provide that service." 141 S. Ct. at 1886 (Alito, J., concurring). Thus, while same-sex couples could ultimately adopt in Philadelphia, they could—at least theoretically—face a situation where an agency they walked into sent them elsewhere for religious reasons. *Id.* No similar possibility exists here now that the government has adopted a consortium model. As things now stand in the Dallas-Fort Worth area, all prospective adoptive couples—gay or straight—receive precisely the same treatment. Each now begins their journey at a third-party intake organization, USCRI. That agency collects demographic information and then sends each couple to an agency prepared to work with them. *Supra* pp. 8–9. With this safeguard in place, Plaintiffs face no risk of even having their initial application rejected or referred elsewhere by a religious organization (much less actually being barred from serving as foster parents).

### B.      This Case Involves None of the Historical Hallmarks of Establishment.

Even putting *Fulton* aside, the Supreme Court's other recent precedent makes clear there is no "Establishment of religion" here. As the Court reaffirmed last month, courts must interpret the Establishment Clause by "'reference to historical practices and understandings.'" *Kennedy*, 142 S. Ct. at 2428 (citation omitted). Any distinction "between the permissible and the impermissible" must "accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers." *Id.* (quotation omitted). That is because the Establishment Clause guards

18

against a defined category of abuses the framers had witnessed at the hands of the British government, including various methods of "control exercised by the Crown and its representatives over religious offices." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 183 (2012).

Accordingly, to prevail on an Establishment Clause challenge, Plaintiffs must show that the government practice at issue bears the historical "hallmarks of religious establishment[.]" *See Kennedy*, 142 S. Ct. at 2429 & n.5 (citing Michael W. McConnell*, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131–81 (2003) ("McConnell")). Those hallmarks are: (1) "control over [church] doctrine and personnel"; (2) "mandatory attendance" at a church; (3) "punish[ment of] dissenting churches and individuals for their religious exercise"; (4) "restrictions on political participation by dissenters"; (5) "financial support of [an] established church"; and (6) "use of [an] established church to carry out civil functions." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., concurring); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258 (2020) (Roberts, C.J.) (citing McConnell); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2079 (2020) (Sotomayor, J., dissenting) (same); *Town of Greece v. Galloway*, 572 U.S. 565, 605 (2014) (Thomas, J., concurring) (same).

This case involves none of the historical hallmarks of Establishment. No matter how hard one squints, the first four hallmarks have no conceivable application here. As for the fifth, this case does not involve any impermissible "financial support of [an] established church," because funding under the URM and UAC programs is available on a neutral basis, determined by secular criteria, and without favoritism for any particular faith. Finally, this case does not involve religious

organizations carrying out traditional "civil functions," because foster care and adoption services were historically handled overwhelmingly by private *religious* organizations, not the government.

**1. Government funding.** When the Establishment Clause was adopted, it sought to prevent the evil of "government . . . financial support of [an] established church." *Shurtleff*, 142 S. Ct. at 1609 (Gorsuch, J., concurring). At the Founding, that concern related to the fear that certain favored churches would be singled out for special support, so that "citizens w[ould be] required to pay taxes to support religious institutions with whose beliefs they disagreed." *Az. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 141 (2011); *see also* McConnell, *supra*, at 2146–58 (overviewing the history of religious funding concerns and noting that they related to religious land grants and compulsory tithes).

That, of course, does not mean that religious organizations can never receive government funds. To the contrary, the Supreme Court has repeatedly rejected the argument that "religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." *Bowen v. Kendrick*, 487 U.S. 589, 609 (1988). And "[i]t long has been established" that "the State may send a cleric, indeed even a clerical order, to perform a wholly secular task." *Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736, 746 (1976) (plurality op.); *Espinoza*, 140 S. Ct. at 2254 ("We have repeatedly held that the Establishment Clause is not offended when religious . . . organizations benefit from neutral government programs.").

Countless examples illustrate that point. For instance, religious groups may receive government funds "for services and research in the area of premarital adolescent sexual relations and pregnancy." *Bowen*, 487 U.S. at 593, 608. Likewise, religious schools may receive government aid to carry out their programs. *Mitchell v. Helms*, 530 U.S. 793, 801 (2000) (plurality op.); *id.* at 837 (O'Connor, J., concurring in the judgment); *accord Agostini v. Felton*, 521 U.S.

203, 209 (1997). Religious hospitals can be constructed with federal funds. *See Bradfield v. Roberts*, 175 U.S. 291, 299 (1899). And faith-based groups cannot be made to choose between "participat[ing] in an otherwise available benefit program or remain[ing] a religious institution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021–22 (2017).

Tellingly, other courts have reached similar conclusions even in cases where the funding recipients' religious commitments affected their administration of the programs. The U.S. District Court for the Southern District of New York, for example, held that the government does not violate the Establishment Clause merely by providing funds to the Salvation Army to provide social services, even though the Salvation Army used those funds to hire employees based on religious criteria. *See Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 249–52 (S.D.N.Y. 2005). More recently, the U.S. District Court for the Northern District of California upheld the award of government funds to USCCB to care for trafficking victims, even though USCCB will not, for religious reasons, provide abortions or contraception to its clients. *See ACLU of N. Cal. v. Azar*, No. 16-CV-03539-LB, 2018 WL 4945321, at *14 (N.D. Cal. Oct. 11, 2018).

This case fits the same mold. The government has elected to contract with private entities to help place vulnerable children in homes where they will receive care. To accomplish this task, it has created a neutral funding program that allows federally subsidized foster-care services to be provided by any organization that can meet certain requirements, regardless of whether it is religious or not. Plaintiffs have never alleged that the government has applied any sort of "religious test" in determining which agencies to partner with, *Torcaso v. Watkins*, 367 U.S. 488, 490 (1961), or impermissibly "favor[s] the adherents" of one belief system over another, *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 9 (1989) (quotation omitted). Nor could they, given that the government's selection criteria are secular and neutral, and it funds multiple organizations from both religious

21

and secular backgrounds. *Supra* pp. 3, 7–9. Under these circumstances, the government is not providing financial support for any church as such—and certainly not an established church—but is instead providing fair compensation for services rendered. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 843–44 (1995) ("Any benefit to religion is incidental to the government's provision of secular services for secular purposes on a religion-neutral basis."). That does not offend the Establishment Clause; any contrary conclusion would require excluding religious entities from bidding for public contracts—a result that would plainly violate the Free Exercise Clause. *Supra* pp. 12–16.

**2. Civil functions.** Likewise, for at least three reasons, this case does not involve a church carrying out traditional "civil functions." *Shurtleff*, 142 S. Ct. at 1609 (Gorsuch, J., concurring).

*First*, adoption and foster-care services are not traditional "civil functions" at all, much less functions "traditionally exclusively reserved to the State" for purposes of a state actor analysis. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019); *see Mark v. Borough of Hatboro*, 51 F.3d 1137, 1144 (3d Cir. 1995) (looking for a "near symbiotic relationship" for "[E]stablishment [C]lause purposes") (quotation omitted); *see also infra* pp. 41–43. Quite the opposite: for much of American history foster care and adoption were the *sole* province of private (and overwhelmingly religious) entities, and the government has only injected itself into this area relatively recently. The history of foster care in the United States emerged from the "privately operated child welfare system," which significantly "preceded the entry of public agency participation," and which throughout our history has primarily been "religiously affiliated." Susan Vivian Mangold, *Protection, Privatization, & Profit in the Foster Care Sys.*, 60 Ohio St. L.J. 1295, 1297–98 & n.7 (1999); *see also Fulton*, 141 S. Ct. at 1885 (Alito, J., concurring) (recounting that history). That history traces back until at least 1727, when Ursuline nuns established what would

become the first orphanage in America. *See* Timothy A. Hasci, Second Home: Orphan Asylums and Poor Families in America 17 (1997). More soon followed: A Lutheran orphanage in what is now West Seneca, New York, and a Methodist orphanage in what is now Bethesda, Georgia. *Id.* at 17–18. This pattern—"individuals with strong religious convictions" seeing "children who desperately needed help, and responding by creating an orphan asylum"—would be "repeated time and time again over the following century." *Id.* at 17–18. By "1830, the vast majority of asylums in existence were being managed by members of [various] churches." *Id.* at 19. Between 1830 and 1850, fifty-six additional children's institutions sprung up, *see Orphanages: An Historical Overview*, Minn. Dep't of Human Servs. (Mar. 16, 1995), and by 1880, there were more than 600 orphanages in the United States, *see* Catherine E. Rymph, Raising Government Children: A History of Foster Care and the American Welfare State 19 (2017). These were overwhelmingly run by religious organizations. *See* Linda Gordon, *Child Welfare: A Brief History*, Social Welfare History Project (2011).

Religious organizations played an equally significant role in the development of adoption. In 1853, minister Charles Loring Brace founded the Children's Aid Society, which placed roughly "150,000 poor and homeless children from the streets of New York" with "families in the Midwest." *Nicholson v. Williams*, 203 F. Supp. 2d 153, 195 (E.D.N.Y. 2002) (Weinstein, J.). Following his formula, a groundswell of other private organizations—the vast majority religious— rose up to "provide[] houses of refuge for children" and "to place [those children] with foster families, either locally or in other parts of the country." Naomi Cahn, *Perfect Substitutes or the Real Thing?*, 52 Duke L.J. 1077, 1091 (2003).

In noted contrast, government agencies came late to the adoptive services enterprise. At the time of the Founding, "social welfare was rudimentary at best, and entirely entrusted to the

church." McConnell, *supra*, at 2170. Governments placed responsibility on religious entities to "car[e] for . . . orphans and other homeless children." *Id.* Only in the latter half of the 1800s did governments first begin to take an interest in adoption. But even then, most states and localities elected to merely "aid[] private institutions" so as to avoid having to "accept responsibility for the care" of children, and to keep costs low. Brenda G. McGowan, Historical Evolution of Child Welfare Services, in Child Welfare for the Twenty-First Century: A Handbook of Practices, Policies, and Programs 18 (2005) (quotation omitted). "[I]nto the early twentieth century, the care of orphaned and abandoned children in the United States remained largely in the hands of private charitable and religious organizations.'" *Fulton*, 141 S. Ct. at 1885 (Alito, J., concurring). A century later, little has changed. While some states have created "public agencies that directly place children in foster homes," "most continue to contract these services out to private nonprofit organizations," who "in turn contract[] with individual families to provide foster homes." Kelsi Brown Corkran*, Principal-Agent Obstacles to Foster Care Contracting*, 2 J.L. Econ. & Pol'y 29, 32 (2006). Accordingly, it cannot plausibly be maintained that adoption or foster-care services are the type of traditional "civil function" off-limits to religious organizations.

The story is much the same with respect to the specific programs in this case. USCCB has been providing foster-care services to unaccompanied immigrant children since before either ORR or the URM and UC programs were established. *Supra* pp. 3–4. Indeed, the government relied on USCCB's prior experience and expertise to shape and develop both programs. *Supra* pp. 3–4. It would beggar belief to suggest that the government's entry into this field somehow transformed USCCB's longstanding efforts—and religious obligation—to care for immigrants into a "civil function"; USCCB is simply doing what it has always done.

*Second*, even if providing foster services qualified as a "civil function," the government has not surrendered that function here. While the government *collaborates* with private entities (including some religious entities) in carrying out those programs, it has in no way passed the "statutory responsibility" for administering them off to a particular church. *See* McConnell, *supra*, at 2171. In noted contrast to the civil functions that were controlled by the Church of England in Great Britain and in the early American colonies, here the secular government retains exclusive control of the UC and URM programs. It sets and monitors performance benchmarks. (*E.g.*, App. 16–18, 74–76, 550–51, 524–25, 546.) It periodically decides whether or not to issue or renew its grant awards. *Supra* pp. 3–4. At all times, the distinction between the government (as grantor) and the foster care agencies (as grantees) is readily apparent to all parties. No one could confuse the one with the other. *E.g.*, *infra* p. 32. In all those respects, the government's collaboration with USCCB here no more abdicates responsibility for the URM and UC programs than purchasing B-52s from Boeing abdicates responsibility for the national defense.

*Third*, even if the Court found that the government here did in fact abdicate a genuinely "civil function," that *still* would not offend the Constitution because USCCB and its subgrantees are not an "established church." First and most obviously, the government's programs are neutral and open to all applicants. No evidence suggest that the government imposed religious conditions on applicants, or else indicated that it would favor religious applicants over secular ones. To the contrary, the evidence is exactly the opposite. *Supra* p. 3. And the fact the government is simultaneously working with Catholics, Baptists, *and* the Lutherans belies any notion that one religious group is singled out for favorable treatment. *Supra* pp. 3, 7–8. Contrast that with early establishments, where a single church assumed statutory responsibility for core social functions,

25

carried them out via individuals who were part clergy, part government official, and bankrolled them via tithes on the general public.

If any doubt remains, it helps to maintain perspective: The services provided by foster agencies look *far* less like a traditional civil function than, for instance, education. And it is by now beyond dispute that religious schools' receipt of government funds via neutral grant programs is of no constitutional concern. *See, e.g., Carson ex rel. O.C. v. Makin*, 142 S. Ct. 1987, 1997 (2022); *Espinoza*, 140 S. Ct. at 2255; *Zelman v. Simmons-Harris*, 536 U.S. 639, 644 (2002). In just the same way, the Constitution does not forbid—and indeed the Constitution *requires*—religious organizations having the freedom to collaborate with the government for the ends of social welfare in just the same manner any secular organization could.

### C.      Even Under the Now-Abrogated *Lemon* Test, Plaintiffs' Claims Fail.

The Supreme Court has now clarified that history and tradition serve as the guides for mapping the Establishment Clause's contours, and that the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), was "long ago abandoned." *Kennedy*, 142 S. Ct. at 2427. However, should this Court choose to apply the *Lemon* test, USCCB would still prevail. Under that test, as refined by *Agostini*, 521 U.S. 203, governmental action does not violate the Establishment Clause if (1) it has a secular purpose and (2) its primary effect neither advances nor inhibits religion. 521 U.S. at 222–23. Plaintiffs cannot satisfy either prong.

### 1.      There is no evidence the government lacked a secular purpose.

To begin, there is "no evidence" that any of the government's dealings with USCCB lacked a secular purpose. *See ACLU*, 2018 WL 4945321, at *14. The Supreme Court has explained that courts should be "reluctan[t] to attribute unconstitutional motives" to the government. *Mueller v. Allen*, 463 U.S. 388, 394 (1983). As a result, the bar for finding a secular purpose is "low." *Ehlers-*

*Renzi v. Connelly Sch. of the Holy Child*, 224 F.3d 283, 288 (4th Cir. 2000) (citation omitted). Government activity lacks a secular purpose only when there is "no question that the statute or activity was motivated wholly by religious considerations," *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984), or where "the government acts with the ostensible and predominant purpose of advancing religion," *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005). Even in cases where "substantial" benefits have flowed to religious organizations from government action courts have found a secular purpose. *Lynch*, 465 U.S. at 681–82; *see also Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839 (2d Cir. 1996) (student group could receive religious accommodation from nondiscrimination policy and official recognition, including access to school resources, despite its exclusionary leadership policy); *Forest Hills Early Learning Ctr., Inc. v. Grace Baptist Church*, 846 F.2d 260, 263–64 (4th Cir. 1988) (noting that "statute's singular exemption of religious groups" did not "render its purpose suspect," since "'lifting a regulation that burdens the exercise of religion'" is a permissible purpose (quoting *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338 (1987))).

Here, Plaintiffs do not come anywhere close to meeting this test. The purpose of the grants to USCCB is as secular as it is plain—to care for unaccompanied immigrant children—as the Plaintiffs themselves repeatedly acknowledge. *See, e.g.*, FAC ¶¶ 19, 59. USCCB is one of the largest providers of services to this population in the world. *Supra* pp. 3–4. It is an acknowledged expert in the field of migrating children. *Id.* And it draws on years of experience of care for these children that pre-date the very programs at issue. *Id.* The government selected USCCB because of this experience and its unquestioned ability to perform important foster-care services for unaccompanied children. (App. 61, 121–24, 126.) In fact, USCCB's efforts helped solve the "crisis" that ORR was facing when the State of Texas withdrew from the URM Program in 2017.

(App. 87, 90, 145–46.) And there is no dispute the government elsewhere awards grants to secular organizations similarly capable of providing relevant services. (FAC ¶ 21; App. 20–21, 543.)

In contrast, there is no evidence that the government agreed with USCCB's religious beliefs, much less wanted to advance them. The government encourages the placement of children with same-sex foster parents, has no policy against it, and, most telling of all, sought and secured alternative providers in the Dallas-Fort Worth area that would license and place children with same-sex couples. (*E.g.*, App. 40–46.) It then went even further, and has now promised to adopt the very "screening process" Plaintiffs previously indicated would alleviate their objections, even though it will upend "the whole process of how everything is functioning" in the URM Program in the Dallas-Fort Worth area. *See supra* pp. 7–9, 12. It did all this even though numerous cities and states in America have no URM or UC Program at all. *Supra* p. 7. Because of the government's efforts, Plaintiffs now have opportunities unavailable to the many Americans. Ultimately, by taking steps to ensure Plaintiffs could foster a child through the URM and UC programs, "the government acted in a manner that is in opposition to [USCCB]'s religious beliefs," which undercuts Plaintiffs' Establishment Clause claim. *See ACLU*, 2018 WL 4945321, at *15.

To the extent the government did not take the additional step of canceling USCCB's grants (a step even Plaintiffs at one point conceded is unwarranted, *supra* pp. 10–11), there is again no evidence that the motive was to abet USCCB's religious views. The government had a significant interest in preserving existing foster-care capacity for a highly vulnerable population of minors and avoiding the dislocation of minors in the care of USCCB subgrantees—both of which are valid, secular purposes. (*See* App. 67–68, 87–88 (describing the "real concern" that there would be "no gap in services" after Texas withdrew from the URM Program); App. 49–50 (if a grantee left the program, ORR "would have to make arrangement" for children under the grantee's care).)

It is also a valid, secular purpose to accommodate religious practice and belief. *See, e.g.*, *Amos*, 483 U.S. at 338 (sustaining religious exemption from Title VII's non-discrimination mandate, noting that government acts with a "proper purpose" where it "lift[s] a regulation that burdens the exercise of religion"); *Forest Hills Early Learning Ctr.,* , 846 F.2d at 263–64 (stating that a "statute's singular exemption of religious groups" from generally applicable child-care regulations did not "render its purpose suspect").

Moreover, even before ORR received Plaintiffs' complaint in February 2017, there is no evidence the government had any purpose to advance or affirm USCCB's views on same-sex marriage. In its application materials, USCCB indicated that it would ensure that services provided under its grants were consistent with its religious beliefs. *Supra* p. 6. But the government did not consider or appreciate how that language would apply in the context of foster-parent licensing and placement decisions. In fact, government officials did not anticipate or consider the same-sex foster-parent issue at all. (*See* SUMF ¶¶ 47–50; App. 51, 96, 98, 106–07, 197, 199–203, 210–13, 217, 230, 233–34, 255, 262–63, 265, 267–68.) This is understandable. The government had never before received a complaint involving a refusal to license same-sex couples under the programs. (SUMF ¶ 43.) And prior discussions or invocations of USCCB's conscience clauses had involved the provision of abortion and contraception to children in the programs. (SUMF ¶¶ 47–49.) The government thus did not consider whether or how they would apply to the recruitment and selection of foster parents or implicate USCCB's religious beliefs regarding same-sex marriage. (*See* SUMF ¶ 50; App. 51, 96, 98, 106–07, 197, 199–203, 210–13, 217, 230, 233–34, 255, 262–63, 265, 267–68.) On top of that, it appears that only one government official even knew of USCCB's views on same-sex marriage—and, more importantly, that none appreciated that those

views would preclude it from licensing same-sex couples. (*See* SUMF ¶ 50; App. 51, 96, 98, 106–07, 197, 199–203, 210–13, 217, 230, 233–34, 255, 262–63, 265, 267–68.)

In summary, the grants USCCB received represent nothing more than the government's confidence in USCCB's ability to serve unaccompanied immigrant children. (App. 61, 121–24.) That is a secular purpose, which the government has long held and never abandoned. Plaintiffs' claim thus fails under the first *Lemon* prong.

### 2. The government's funding activity did not have the primary effect of advancing religion.

Just as the government had no purpose to advance religion, the "primary effect" of its conduct does not do so either. *Agostini*, 521 U.S. at 234. To determine whether governmental funding has the primary effect of advancing religion, courts consider whether it "result[s] in governmental indoctrination," "define[s] its recipients by reference to religion," or "create[s] an excessive entanglement." *Agostini*, 521 U.S. at 234; *see also Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 758 (D.C. Cir. 2007). These same criteria inform whether the activity constitutes an unconstitutional "endorsement" of religion. *Agostini*, 521 U.S. at 235.

Under these standards, courts have sustained governmental action that would undisputedly *enhance* religious organizations' ability to conduct distinctively religious activities, including exemptions from otherwise applicable antidiscrimination provisions. *See Amos*, 483 U.S. at 335. Courts have reached this conclusion even in the government-funding context. *See Hsu*, 85 F.3d 839 (student group could receive official recognition, including access to school resources, despite its exclusionary leadership policy); *ACLU*, 2018 WL 4945321, at *14 (USCCB could receive government grants to care for trafficking victims, despite its religious refusal to provide abortion and contraceptive services); *Lown*, 393 F. Supp. 2d at 249–52 (government could provide funds to the Salvation Army to provide social services, even though the Salvation Army used those funds

to hire employees based on religious criteria). This is because an unconstitutional "effect" occurs only when "the government itself has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337.

In this case, the only effect of the government's grant decisions is to advance purely secular ends—namely, a broader pool of organizations serving unaccompanied immigrant children. It is thus no surprise that all of the "unconstitutional effects" criteria point in the same direction—that the government's conduct has not unconstitutionally advanced religion.

(a)      **The grants do not result in indoctrination.**

The first factor under the "effects" prong is whether the activity "result[s] in governmental indoctrination." *Agostini*, 521 U.S. at 234. This requires a plaintiff to show that the governmental activity (1) "constitutes or results in indoctrination," and (2) "that such indoctrination is attributable to the government." *DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397, 414 (2d Cir. 2001). Neither element is implicated here.

Both the URM and UC programs focus on providing services to children through grantees. Regulations prohibit grantees from using those funds to engage in any explicitly religious activities. 45 C.F.R. § 87.3(b). And there is no evidence that USCCB or CCFW violated this provision. (*See* App. 503 ("USCCB never received [an ORR] finding that we were advancing our religious beliefs.").) Indeed, there is no challenge to those services at all.

Instead, at the heart of Plaintiffs' claim is CCFW's refusal to license same-sex couples and the government's supposed failure to address it. But neither action is indoctrination. The term "indoctrinate" means "to instruct in a body of doctrine or principles" or "[t]o imbue with a partisan or ideological point of view." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1056–57 (9th Cir. 2007) (brackets and quotation marks omitted). It entails "impress[ing] (something) upon the mind

31

of another by frequent instruction or repetition." *DeStefano*, 247 F.3d at 414. In *DeStefano*, the Second Circuit concluded that even active encouragement of program beneficiaries to attend a religious program did not qualify as indoctrination. *Id.*at 414–15. If active encouragement toward religious programming is not indoctrination, then a *refusal* to engage with third parties is not either. There is no risk that such a refusal will somehow "impress" beliefs on the refused or "imbue" them with a particular "point of view." This is especially obvious in this case, where CCFW was not didactic or proselytizing but merely explained its desire to ensure that its own conduct comported with Catholic teaching. (*See* SUMF ¶ 40; App. 181–85.)

There is also no way to "attribut[e]" to the government CCFW's approach to same-sex foster parents, even if that approach were somehow indoctrinating. *DeStefano*, 247 F.3d at 414. For one thing, Plaintiffs knew that it was CCFW's religious views at work: Plaintiffs could readily infer it was not the government that required aspiring foster parents to "mirror the holy family." (App. 7, 10.) And, as noted, the government has no policy against the placement of children with same-sex foster parents; it encourages the practice, and in fact sought and secured alternative arrangements to facilitate fostering by same-sex couples in the Dallas-Fort Worth area. *Supra* pp. 7–9. Given these circumstances, no reasonable observer would mistake CCFW's views on recruiting and licensing same-sex foster parents for the government's. *See Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 590 (6th Cir. 2015) (the "reasonable observer" is "deemed aware of the history and context of the community, as well as the context in which the challenged government activity took place"); *ACLU*, 2018 WL 4945321, at *1 ("A reasonable person would not view the government, which facilitated access to abortion by transferring unaccompanied minors who want abortions to shelters where they can obtain them, to be endorsing [USCCB]'s anti-abortion views.").

**(b)      The government's grant criteria are secular and neutral.**

Nor did the government define grant recipients "by reference to religion." *Agostini*, 521 U.S. at 234. The Supreme Court has explained that if the government determines funding recipients using religious criteria, then "the criteria might themselves have the effect of advancing religion by creating a financial incentive to undertake religious indoctrination." *Id.* at 230–31. "This incentive is not present, however, where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Id.* at 231.

Here, the government awards grants on the basis of such "neutral, secular criteria" and makes them available to "both religious and secular beneficiaries" alike. *Id.* The governing regulations provide that "religious organizations are eligible, *on the same basis as any other organization*, to participate in any HHS awarding agency program for which they are otherwise eligible." 45 C.F.R. § 87.3(a) (emphasis added). Plaintiffs do not allege that the government has violated those regulations. Nor could they. The government does not ask applicants to identify their religious affiliation (if any), does not use religious selection criteria, and regularly awards grants to both religious and secular organizations. (SUMF ¶ 11; App. 20–21, 27, 58–59, 118–22, 543; FAC ¶ 21.) Nor did the government select USCCB to advance USCCB's religious beliefs or because USCCB would refuse to license same-sex couples. (App. 59–60, 220–21, 270–71.) In short, the government made the grants "available to both religious and secular beneficiaries on a nondiscriminatory basis," which means it has not selected grant recipients on the basis of religion. *Agostini*, 521 U.S. at 231.

**(c)      The grants do not foster excessive entanglement.**

Finally, Plaintiffs have not alleged an entanglement theory, which is understandable. The relationship between USCCB and the government "does not resemble the kinds of relationships that give rise to entanglement problems." *Smith*, 788 F.3d at 593. That is because USCCB was not receiving governmental aid but reimbursement for services performed at the government's behest. This fact alone significantly diminishes the risk of entanglement. *See id.* ("An important difference between this case and many other Establishment Clause cases is that, although money changed hands between the government and a religious institution, the School Board paid money under a contract for a specific, essential service. In other words, this case does not involve government aid."). Regardless, there is no risk of entanglement here. Though itself religious, USCCB is providing secular services for eligible children. And there is no allegation that USCCB has used government funding for religious activities or that the government has become entangled in religious matters by enforcing the prohibition on religious activity in the URM or UC programs.

*        *        *        *        *

As noted above, the Supreme Court has affirmed the ability of religious organizations to provide federally funded social services, *Bowen*, 487 U.S. at 617–18, and has vigilantly guarded against the exclusion of such organizations, *Fulton*, 141 S. Ct. at 1874–76; *Trinity Lutheran*, 137 S. Ct. at 2021–22. This would be a hollow promise if organizations wishing to provide such services must check their religious character at the program door, *Lown*, 393 F. Supp. 2d at 249 ("The notion that the Constitution would compel a religious organization contracting with the state to secularize its ranks is untenable in light of [*Bowen*]."), or applied only where the government is able to find secular alternatives whenever a religious objection arises. While the government managed in this case not only to find alternative services providers in the Dallas-Fort Worth area,

34

but also to adopt Plaintiffs' own proposal for how the services at issue would be provided, that will not necessarily be true in every instance. And, in any event, nothing in *Bowen* and related cases turned on the availability of secular alternatives. Allowing the government to rely on religious organizations to provide social services, even where they have conscience-based objections to aspects of those services, expands the availability of those services while accommodating religious beliefs, both of which are valid secular purposes and effects. *See Amos*, 483 U.S. at 339 ("limiting governmental interference with the exercise of religion" is a "permissible purpose"); *Hsu*, 85 F.3d at 864–65 (concluding that exempting exclusionary student group from public school's nondiscrimination policy had a secular purpose).

The implications of Plaintiffs' contrary position are startling. Their position would exclude religious organizations from participating in all kinds of government funding programs. The Little Sisters of the Poor, who do not admit men as nuns for religious reasons, could not run government-funded retirement homes with an all-female staff. *Contra Lown*, 393 F. Supp. 2d at 251 ("A religious organization that receives federal funds is not required to waive its eligibility for [the religious exemption from Title VII's nondiscrimination mandate].". A hospital with religious objections to abortion would also be excluded, despite the fact that, for secular reasons, the government may ban contractors from using Federal funding for abortions. *See Rust v. Sullivan*, 500 U.S. 173 (1991). Indeed, Plaintiffs' position is all the more shocking because it would (apparently) preclude religious groups from receiving government funds *even where there are secular alternatives at hand. Contra, e.g., Fulton*, 141 S. Ct. 1868, 1875 (requiring Philadelphia to allow Catholic Charities to decline to certify same-sex foster parents where there were "other agencies" available to certify same-sex couples). That is not neutrality toward religion, but hostility. And nothing in the Establishment Clause countenances, much less compels, that result.

*Cf. Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2074 (2019) (stating that "removal or radical alteration [of monument] at this date would be seen by many not as a neutral act but as the manifestation of a hostility toward religion that has no place in our Establishment Clause traditions" (internal quotation marks and citation omitted)).

## III.    Plaintiffs' Equal Protection and Due Process Claims Fail on the Merits.

Plaintiffs further allege that the government's provision of funding to USCCB also violates the equal-protection and due-process components of the Fifth Amendment. These claims fail, however, for two independent reasons. First, if a government action that allows religious organizations to act in accordance with their beliefs comports with the Establishment Clause, it will receive (at most) only rational basis review under "more generalized" constitutional provisions. *Connecticut v. Gabbert*, 526 U.S. 286, 293 (1999); *Amos*, 483 U.S. at 339. This standard is easily satisfied here, which alone requires dismissal of Plaintiffs' remaining claims.

Second, even taking Plaintiffs' claims at face value, they fail because there is no evidence that the government itself acted with the requisite "discriminatory purpose," *Washington v. Davis*, 426 U.S. 229, 239 (1976), much less infringed a fundamental right, *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 800–01 (D.C. Cir. 2011). The Complaint does allege that CCFW—a private organization two levels removed from any government actor—refused to license Plaintiffs, but this act is not "fairly attributable to the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). This is an independent reason these claims fail on the merits.

### A.    Because Plaintiff's Establishment Clause Claim Fails, the Remaining Claims Receive and Easily Survive Rational-Basis Review.

At bottom, Plaintiffs challenge conduct that has allowed Catholic organizations that draw distinctions "based on [their] religious beliefs" to participate alongside secular entities in receiving

federal funds. FAC ¶¶ 31–34, 56–57, 60–66. But the Supreme Court has held that where government action does not violate the Religion Clauses, it receive only minimal scrutiny under other constitutional provisions. *See Amos*, 483 U.S. at 338–39; *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) ("Because we hold that the program is not a violation of the Free Exercise Clause . . . we apply rational-basis scrutiny to [the] equal protection claims.").

In *Amos*, the appellee argued that Title VII's religious accommodation—which allows religious employers to hire and fire on the basis of religion—violated both the Establishment Clause and equal-protection principles. *Amos*, 483 U.S. at 330, 338–39. After upholding the exemption against the Establishment Clause challenge, *id.* at 334–38, the Supreme Court applied only rational-basis review to the equal-protection claim, *id.* at 339. The Court explained that, "[i]n cases such as these, where a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, we see no justification for applying strict scrutiny to a statute" that comports with the Establishment Clause. *Id.* The "proper inquiry is whether Congress has chosen a rational classification to further a legitimate end." *Id.* Under that test, the Court concluded that Title VII's religious accommodation was "rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.*

This principle is consistent with the rule that courts will analyze constitutional claims under "explicit provision[s]" rather than "more generalized notions of substantive due process." *Gabbert*, 526 U.S. at 293. Where a court, for example, determines that a religious accommodation comports with the Establishment Clause, it has necessarily concluded that the government does not endorse—and is certainly not responsible for—conduct undertaken by religious groups pursuant to the accommodation. As the Supreme Court has explained, a religious accommodation "allows

37

churches," rather than "the government itself," "to advance religion." *Amos*, 483 U.S. at 337 (emphasis omitted). Thus, any resulting conduct must be attributed to the private actor, not to the government. *See id.* at 337 n.15 ("Undoubtedly, [the employee's] freedom of choice in religious matters was impinged upon, but it was the Church . . . and not the Government, who put him to the choice of changing his religious practices or losing his job.").

This principle provides an independent reason to dispose of Plaintiffs' equal-protection and due-process claims. The Establishment Clause does not forbid the government from allowing USCCB to participate in the grant programs. *Supra* pp. 16–36. Like the Title VII exemption in *Amos*, that action is subject to only rational-basis review under the Fifth Amendment. It easily passes that test. Allowing USCCB to participate in the URM and UC programs is rationally related to the legitimate ends of providing foster services for immigrant and refugee children, and ensuring that religious groups may compete for government grants without violating their faith.

### B. There Is No Unconstitutional Action by the Government.

But even taken on their own terms, Plaintiffs' claims fail on the merits. It is a "time-honored principle" that the Constitution "prohibits only state action," not "private conduct." *United States v. Morrison*, 529 U.S. 598, 621 (2000). Thus, to establish a claim under either the equal-protection or due-process components of the Fifth Amendment, Plaintiffs must prove that the government intentionally discriminated against them or deprived them of a constitutionally protected liberty interest. Here, there is no evidence that the government itself did either.

**1.** A valid equal-protection claim requires proof that the government itself engaged in unlawful discrimination by acting with a "discriminatory purpose." *Davis*, 426 U.S. at 239. This requirement dooms Plaintiffs' claim. The government has no policy against same-sex foster parents and, as detailed above, did not select grantees for the purpose of excluding such parents

from the URM or UC programs. *See supra* pp. 3, 6–9; App. 57–60, 119–23. Indeed, there is no evidence that ORR was even aware that USCCB or CCFW would refuse to place children with same-sex couples when it awarded the grants at issue. *See supra* pp. 6–7. There is thus no basis to conclude the government acted with "discriminatory purpose" in selecting USCCB as a grantee.

There is also no basis to conclude that the government acted with discriminatory purpose after learning that CCFW had refused to license Plaintiffs. To start, knowledge does not establish purpose. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Under extant precedent, purposeful discrimination requires more than intent as volition or intent as awareness of consequences."). Plaintiffs must therefore show that the government acted (or refused to act) "'because of,' not merely 'in spite of,'" USCCB's alleged "disfavoring" of same-sex couples. *Id.* at 677. But they cannot make that showing. Even after the government received notice of CCFW's refusal to license Plaintiffs, its purpose in retaining USCCB was to preserve the already limited universe of service providers, not to discriminate against same-sex couples. Indeed, the government sought and secured alternative providers in the Dallas-Fort Worth area not once, but twice—first to ensure Plaintiffs had the opportunity to foster through the URM and UC Programs, and then to accommodate Plaintiffs' wishes as to how those programs would be structured. *See supra* pp. 7–9. And the government maintains a general policy *against* discrimination in the administration of these grant programs. FAC ¶¶ 41–42 (citing 45 C.F.R. § 75.300(c)–(d)). Together, these actions and policies paved the way for same-sex couples like Plaintiffs to serve as foster parents in the Dallas-Fort Worth area, even if they cannot do so through a USCCB subgrantee. This confirms that the government itself has not engaged in purposeful discrimination. *See Lown*, 393 F. Supp. 2d at 236.

**2.** Likewise, the Due Process Clause provides "heightened protection" for "certain fundamental rights and liberty interests"—but only "against *government* interference." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (emphasis added). Even assuming the ability to foster children amounts to a "fundamental right" or "liberty interest," there would be no government interference here because no law or regulation prevents Plaintiffs from fostering children. Plaintiffs are free to avail themselves of any of the myriad public and private programs dedicated to that end. (*E.g.*, App. 554–56.) Even assuming further that the right at issue extends to the ability to foster children through a specific government program in a specific geographic location, thanks to the additional providers the government has made available, Plaintiffs may now participate in the URM and UC programs in the Dallas-Fort Worth area—and they can do so on terms they themselves proposed. *Supra* pp. 7–9. There is thus no government-imposed obstacle to Plaintiffs' efforts to foster.

But even if there were, the Supreme Court has long distinguished between government *interference* with rights protected by the Due Process Clause, and government *subsidy* for programs that may enhance the exercise of such rights. Only the latter is at issue here, and this type of subsidy program does not implicate the Due Process Clause, especially given the available alternative providers in the very programs at issue. *See, e.g.*, *Rust*, 500 U.S. 173; *Harris v. McRae*, 448 U.S. 297 (1980).

### C. The Conduct of USCCB and CCFW Cannot Be Attributed to the Government.

While there is no evidence that the government itself engaged in unconstitutional conduct, Plaintiffs allege that "USCCB and its sub-grantee used federal funds provided by Federal Defendants to discriminate against [Plaintiffs'] based on USCCB's religious beliefs." FAC ¶ 63. These allegations, however, have no constitutional significance unless the alleged conduct is

40

"fairly attributable to the State." *Rendell-Baker*, 457 U.S. at 838 (quotation marks omitted). And in this case, no such attribution can be made.

The Supreme Court has sharply limited the circumstances in which the conduct of private actors can be attributed the government. *See Halleck*, 139 S. Ct. at 1928. While there is no single test for state action, the Court has held that a challenged activity may be state action "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Id.*

Here, the conduct at issue is not attributable to the government. The Complaint alleges that the government "provided and continues to provide federal taxpayer funds to USCCB and its sub-grantees." FAC ¶ 59. But the Supreme Court has held that government funding does not transform private conduct into state action. For example, the Court has held that a private school's decision to fire employees was not state action even though "virtually all of the school's income was derived from government funding" provided under government contracts. *Rendell-Baker*, 457 U.S. at 840. As the Court explained, the school was "not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government." *Id.* at 840–41. Although these private corporations receive government funding, their acts "do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Id.* at 841; *accord Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982) (holding that nursing homes were not state actors even though the government subsidized "the operating and capital costs of the facilities" and paid "the medical expenses of more than 90% of the patients in the facilities"); *Lown*, 393 F. Supp. 2d at 228, 243–

44 (holding that the Salvation Army was not a state actor even though it "derive[d] more than 95% of its approximately $50 million budget from its contracts with government entities").

Plaintiffs also allege the government was "on notice" that USCCB and CCFW "would administer the grants in a discriminatory manner," FAC ¶ 61, but "failed to implement adequate safeguards" to prevent them from doing so, FAC ¶ 62, and "failed to take any corrective action" after learning of the alleged discrimination, FAC ¶ 64. Setting aside the fact that these allegations have been overtaken by subsequent events, *supra* pp. 7–9, they are immaterial because the conduct of neither USCCB nor CCFW can be attributed to the government: "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

Particularly instructive on this point is *Jackson v. Metropolitan Edison Co.* There, a utility company exercised its right under state law to terminate the plaintiff's electric service for nonpayment of bills. 419 U.S. 345, 346–47 (1974). Although state law authorized the termination, the Court held that the utility company was not a state actor. The "[a]pproval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.'" *Id.* at 357. "At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired." *Id.* Thus, the company's "exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action.'" *Id.* (footnote omitted); *see also Rendell-Baker*, 457 U.S. at 841 (holding that a private actor's decision to fire an employee was not state action when the government "showed relatively little interest in the school's personnel

42

matters"); *Lown*, 393 F. Supp. 2d at 243–44 (holding that the Salvation Army was not a state actor when the plaintiffs "proffer[ed] no allegations indicating that the state had any role whatsoever in the development or effectuation of the Salvation Army's allegedly discriminatory policies").

Nor can Plaintiffs contend that USCCB and CCFW were performing a "traditional, exclusive public function" such that their conduct could be attributable to the state. *Halleck*, 139 S. Ct. at 1928. To qualify as a "public function," "[i]t is not enough that the federal, state, or local government exercised the function in the past, or still does." *Id.* "And it is not enough that the function serves the public good or the public interest in some way." *Id.* at 1928–29. Instead, "the government must have traditionally and exclusively performed the function." *Id.* "While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978) (quotation marks omitted).

The federal government plainly does not have a monopoly on foster-care services. As detailed above, these service have long been performed by private entities, including religious organizations that have been providing such care far longer than the government. *Supra* pp. 22–26. Even in the specific context of unaccompanied immigrant children, USCCB's services predates both the URM and UC programs, as well as the very existence of ORR. *Supra* p. 24. As this history suggests, such services are neither traditionally nor exclusively performed by government, which forecloses this theory of liability.

## CONCLUSION

USCCB is an acknowledged leader in service to unaccompanied immigrant children. (App. 150.) It maintains one of the largest network of providers in the country to serve this vulnerable population. (SUMF ¶ 15.) It has been engaged in this charitable work before ORR or the programs at issue even existed. (SUMF ¶ 16.) It stepped into the URM Program to help ORR solve the

"crisis" created by the State of Texas's withdrawal from the program in 2017. *See supra* pp. 4–5. And its performance has "exceeded expectations" and "helped improve the lives of vulnerable children." (App. 126–27; *see also* App. 62 (describing USCCB's performance as "very good" and affirming its "positive impact" on the UC Program).) Losing USCCB's contributions—its capacity, expertise, and historical knowledge of the programs—would be devastating and not easily replicated. (App. 150–51; *see also* App. 62, 131–34 (USCCB's withdrawal "would have a substantial impact on … our ability to carry out … the program" and would be "a substantial loss in experience for the program").) Any gains from a categorical exclusion of organizations with religious objections to same-sex placements would not compensate for the foster capacity that would be lost. (App. 154; *see also* App. 134–35 (agreeing that USCCB's exclusion from the program would cause "a substantial loss in family placement options").) Ultimately, USCCB "seeks . . . only" to "continue" to do what it has done for decades: to "serv[e] the children [in the URM and UC Programs] in a manner consistent with its religious beliefs." *Fulton*, 141 S. Ct. at 1882. "[I]t does not seek to impose those beliefs on anyone else." *Id.*

Nothing in the Constitution requires this Court to upend this arrangement. The best evidence for this is, once again, the Supreme Court's decision in *Fulton*. No member of the Court breathed even a hint of concern that it was establishing a religion or violating the constitutional rights of aspiring same-sex foster parents when they unanimously ordered the City of Philadelphia to accommodate a Catholic foster-care agency that objected to placing children with same-sex couples. Yet if Plaintiffs are right here, the Supreme Court was wrong there. While the evidence and case law is enough reason to dismiss Plaintiffs' claims, dismissal is doubly warranted to avoid impugning relief unanimously ordered by the Supreme Court and destroying an arrangement that serves the "most vulnerable" among us (App. 237.).

For these reasons, this Court should grant USCCB's motion for summary judgment.

Dated: July 27, 2022                              Respectfully submitted,

                                                  /s/ David T. Raimer.
                                                  David T. Raimer (DC ID #994558)
                                                  Anthony J. Dick (DC ID #1015585)
                                                  JONES DAY
                                                  51 Louisiana Ave. NW
                                                  Washington, DC, 20001-2113
                                                  Tel.: 202-879-3939
                                                  Fax: 202-626-1700
                                                  dtraimer@jonesday.com
                                                  ajdick@jonesday.com

                                                  *Leon F. DeJulius, Jr. (PA ID #90383)
                                                  *John D. Goetz (PA ID #47759)
                                                  *Joshua R. Sallmen (PA ID #325948)
                                                  JONES DAY
                                                  500 Grant Street, Suite 4500
                                                  Pittsburgh, PA 15219-2514
                                                  Tel.: 412-391-3939
                                                  Fax: 412-394-7959
                                                  lfdejulius@jonesday.com
                                                  jdgoetz@jonesday.com
                                                  jsallmen@jonesday.com

                                                  *Attorneys for Defendant United States
                                                  Conference of Catholic Bishops*

                                                  *Admitted pro hac vice*