# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FATMA MAROUF and BRYN ESPLIN, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Case No. 1:18-cv-378 (APM) |
| ) | |
| XAVIER BECERRA, in his official capacity as ) | |
| Secretary of the United States Department of ) | |
| Health and Human Services, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiffs Fatma Marouf and Bryn

Esplin ("Plaintiffs") move for the entry of summary judgment. Summary judgment is warranted

because the record demonstrates, as a matter of law, that Plaintiffs prevail on all of their claims. In

particular, the Court should enter judgment in Plaintiffs' favor because, as explained in detail in

the accompanying Memorandum of Law:

    I.   Federal Defendants have violated the equal protection and due process guarantees

       of the Fifth Amendment:

        A.  Federal Defendants have discriminated against Plaintiffs based on sexual

           orientation, sex, and the exercise of their fundamental right to marry, in

           violation of the equal protection guarantee;

        B.  Federal Defendants have infringed Plaintiffs' fundamental right to marry,

           to have their marriage respected, and to family integrity and intimate

           association, in violation of due process guarantees; and

C.  Federal Defendants' infringement of Plaintiffs' equality and liberty interests cannot be justified.

II.  Federal Defendants have violated the religion clauses of the First Amendment by structuring federal programs to exclude participants who fail to satisfy a particular religious denomination's litmus test:

A.  Federal Defendants have impermissibly delegated governmental functions to a religious entity without establishing and maintaining adequate safeguards to avoid discrimination against disfavored classes based on the entity's religious beliefs; and

B.  Allowing Defendant United States Conference of Catholic Bishops ("USCCB") to administer federal grants in a discriminatory manner that excludes disfavored classes is not a permissible religious accommodation.

WHEREFORE, Plaintiffs respectfully request that the Court enter summary judgment for Plaintiffs and:

A.  Enter a declaratory judgment that Federal Defendants' failure to ensure that Plaintiffs may apply to be foster or adoptive parents to a child under the Unaccompanied Refugee Minors ("URM") Program or Unaccompanied Alien Children ("UAC") Program through Federal Defendants' grantee USCCB absent religious or other criteria that disfavor them based on their sexual orientation or sex or the same-sex character of their marriage violates the First and Fifth Amendments to the United States Constitution.

B.  Enter a declaratory judgment that Federal Defendants' actions in enabling, sanctioning, ratifying, or failing to implement adequate safeguards against the use

of religious or other criteria disfavoring same-sex relationships to determine who may participate in the URM Program and UAC Program violates the First and Fifth Amendments to the United States Constitution.

C.  Issue a permanent injunction requiring Federal Defendants to ensure that Plaintiffs may apply to be foster or adoptive parents to a child under the URM or UAC Program through Federal Defendants' grantee USCCB absent religious or other criteria that disfavor them based on their sexual orientation or sex or the same-sex character of their marriage.

D.  Issue a permanent injunction prohibiting Federal Defendants from enabling, sanctioning, ratifying, or failing to implement adequate safeguards against the use of religious or other criteria to exclude foster or adoptive parent applicants based on their sexual orientation or sex or the same-sex character of their marriage in the administration of the URM Program and the UAC Program, including, as necessary, prohibiting Federal Defendants from awarding URM or UAC grants to Defendant United States Conference of Catholic Bishops.

E.  Award Plaintiffs their reasonable costs and attorney's fees.

F.  Grant any other and further relief that this Court may deem fit and proper.

A proposed order is attached.

Dated: July 27, 2022                                    Respectfully submitted,

                                                        By: /s/ Kenneth Y. Choe
                                                        Kenneth Y. Choe (pro hac vice)
                                                        Jessica L. Ellsworth (D.C. Bar No. 484170)
                                                        James A. Huang (pro hac vice)
                                                        Michael D. Gendall (D.C. Bar No. 1029790)

Brendan C. Quinn (D.C. Bar No. 1616841)
Katherine Culora (D.C. Bar No. 1671154)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
ken.choe@hoganlovells.com
jessica.ellsworth@hoganlovells.com
james.huang@hoganlovells.com
mike.gendall@hoganlovells.com
brendan.quinn@hoganlovells.com
katherine.culora@hoganlovells.com

Russell A. Welch (pro hac vice)
**HOGAN LOVELLS US LLP**
609 Main Street, Suite 4200
Houston, TX 77002
Telephone: (713) 632-1437
Facsimile: (713) 632-1401
russell.welch@hoganlovells.com

Camilla B. Taylor (pro hac vice)
**LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.**
105 West Adams, 26th Floor
Chicago, IL 60603-6208
Telephone: (312) 663-4413
ctaylor@lambdalegal.org

Karen L. Loewy (DC Bar No. 1722185)
**LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.**
1776 K Street, N.W. 8th Floor
Washington, D.C. 20006-2304
Telephone: (202) 804-6245
kloewy@lambdalegal.org

Richard B. Katskee (D.C. Bar No. 474250)
Kenneth D. Upton, Jr. (D.C. Bar No. 1658621)
**AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE**
1310 L Street, N.W., Suite 200
Washington, D.C. 20005
Telephone: (202) 898-2133
katskee@au.org
upton@au.org

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FATMA MAROUF and BRYN ESPLIN, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-378 (APM) |
| | ) | |
| XAVIER BECERRA, in his official capacity as | ) | Hon. Amit P. Mehta |
| Secretary of the United States Department of | ) | |
| Health and Human Services, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 2

    A.    The URM and UAC Programs............................................................................ 2

    B.    Program Grantee USCCB Refuses, on Religious Grounds, to Place Children with Married Same-Sex Couples .......................................................... 3

    C.    Federal Defendants Knew That USCCB Would Administer Its Program Grants in a Manner Consistent with Its Religious Beliefs, to the Detriment of Married Same-Sex Couples and Program Children .......................................... 4

    D.    Federal Defendants Know That USCCB in Fact Administers Its Program Grants in Accordance with Its Religious Beliefs, to the Detriment of Same-Sex Married Couples and Program Children .............................................. 5

    E.    Federal Defendants Have Implemented No Safeguards to Prevent the Use of Federal Funds to Administer Programs Using Religious Criteria to Discriminate Against Married Same-Sex Couples ................................................ 7

    F.    Federal Defendants' Recent Changes to the URM Program Compound the Constitutional Violation........................................................................... 9

    G.    Excluding Married Same-Sex Couples from the Pool of Program Foster Parents Runs Contrary to Child Welfare Principles and Federal Defendants' Obligation to Act in the Best Interests of the Children in Their Care ................. 11

LEGAL STANDARD................................................................................................. 15

ARGUMENT ......................................................................................................... 16

I.    FEDERAL DEFENDANTS HAVE VIOLATED THE EQUAL PROTECTION AND DUE PROCESS GUARANTEES OF THE FIFTH AMENDMENT.................... 16

    A.    Federal Defendants Have Discriminated Against Plaintiffs Based on Sexual Orientation, Sex, and the Exercise of Their Fundamental Right to Marry, in Violation of the Equal Protection Guarantee ......................................... 16

    B.    Federal Defendants Have Infringed Plaintiffs' Fundamental Right to Marry, to Have Their Marriage Respected, and to Family Integrity and Intimate Association, in Violation of Due Process Guarantees ......................................... 20

    C.    Federal Defendants' Infringement of Plaintiffs' Equality and Liberty Interests Cannot Be Justified ................................................................... 21

II. FEDERAL DEFENDANTS HAVE VIOLATED THE RELIGION CLAUSES OF THE FIRST AMENDMENT BY STRUCTURING FEDERAL PROGRAMS TO EXCLUDE PARTICIPANTS WHO FAIL TO SATISFY A PARTICULAR RELIGIOUS DENOMINATION'S LITMUS TEST ....................................................... 25

    A.    Federal Defendants Have Impermissibly Delegated Governmental Functions to a Religious Entity Without Establishing and Maintaining Adequate Safeguards to Avoid Discrimination Against Disfavored Classes Based on the Entity's Religious Beliefs............................................................... 28

    B.    Allowing USCCB to Administer Federal Grants in a Discriminatory Manner That Excludes Disfavored Classes Is Not a Permissible Religious Accommodation .................................................................................................. 32

CONCLUSION.................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Agostini v. Felton*,
    521 U.S. 203 (1997)................................................................31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................15

*Barghout v. Bureau of Kosher Meat & Food Control*,
    66 F.3d 1337 (4th Cir. 1995) ...................................................28

*Baskin v. Bogan*,
    766 F.3d 648 (7th Cir. 2014) ...................................................17

* *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
    512 U.S. 687 (1994)................................................26, 28, 29, 32

*Bolling v. Sharpe*,
    347 U.S. 497 (1954)................................................................16

* *Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020)........................................................18, 19

*Bowers v. Hardwick*,
    478 U.S. 186 (1986)................................................................17

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014)................................................................34

*Campaign for S. Equal. v. Bryant*,
    64 F. Supp. 3d 906 (S.D. Miss. 2014)....................................18

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)................................................................26

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)................................................................21

*Cnty. of Allegheny v. Am. Civ. Liberties Union Greater Pittsburgh Chapter*,
    492 U.S. 573 (1989)............................................................33, 34

*Commack Self-Service Kosher Meats, Inc. v. Weiss*,
    294 F.3d 415 (2d Cir. 2002)....................................................28

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*,
483 U.S. 327 (1987) ................................................................................................. 33

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) ...................................................................................... 27, 33, 37

*Employment Div. v. Smith*,
494 U.S. 872 (1990) ................................................................................................. 33

*Ermold v. Davis*,
936 F.3d 429 (6th Cir. 2019) .................................................................................. 25

* *Estate of Thornton v. Caldor, Inc.*,
472 U.S. 703 (1985) ......................................................................................... *passim*

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ................................................................................. 20, 35, 36

*Golinski v. U.S. Office of Personnel Mgmt.*,
824 F. Supp. 2d 968 (N.D. Cal. 2012) .................................................................. 17

*Griswold v. Connecticut*,
381 U.S. 479 (1965) ................................................................................................. 21

*Harper v. Virginia State Bd. of Elections*,
383 U.S. 663 (1966) ................................................................................................. 19

*Heckler v. Mathews*,
465 U.S. 728 (1984) ................................................................................................. 20

*Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*,
386 F.3d 1148 (D.C. Cir. 2004) ............................................................................. 18

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) .................................................................................. 34

*Hutchins v. District of Columbia*,
188 F.3d 531 (D.C. Cir. 1999) ............................................................................... 21

*In re Ams. United for Separation of Church & State v. Prison Fellowship Ministries*,
432 F. Supp. 2d 862 (S.D. Iowa 2006) ................................................................. 31

*Kaemmerling v. Lappin*,
553 F.3d 669 (D.C. Cir. 2008) ......................................................................... 33, 34

*Kennedy v. Bremerton Sch. Dist.*,
  142 S. Ct. 2407 (2022) .................................................................25

*L.V.M. v. Lloyd*,
  318 F. Supp. 3d 601 (S.D.N.Y. 2018) ...........................................36

* *Larkin v. Grendel's Den, Inc.*,
  459 U.S. 116 (1982) ............................................................ *passim*

*Larson v. Valente*,
  456 U.S. 228 (1982) ....................................................................26

*Latta v. Otter*,
  771 F.3d 456 (9th Cir. 2014) .......................................................19

* *Lawrence v. Texas*,
  539 U.S. 558 (2003) .........................................................16, 17, 21

*Lebron v. Nat'l R.R. Passenger Corp.*,
  513 U.S. 374 (1995) ....................................................................25

*Lee v. Weisman*,
  505 U. S. 577 (1992) ...................................................................30

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ....................................................................20

*Nat'l Black Police Ass'n v. Velde*,
  712 F.2d 569 (D.C. Cir. 1983) .....................................................25

*Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*,
  508 U.S. 656 (1993) ....................................................................20

*Norwood v. Harrison*,
  413 U.S. 455 (1973) ...............................................................25, 26

*Carson ex. rel. O. C. v. Makin*,
  142 S. Ct. 1987 (2022) .................................................................32

* *Obergefell v. Hodges*,
  576 U.S. 644 (2015) ...................................................4, 16, 21, 22

*Padula v. Webster*,
  822 F.2d 97 (D.C. Cir. 1987) .......................................................17

* *Palmore v. Sidoti*,
  466 U.S. 429 (1984) ...............................................................22, 24

v

*Pavan v. Smith,*
    137 S. Ct. 2075 (2017)......................................................................................16

*Pedersen v. Office of Personnel Mgmt.,*
    881 F. Supp. 2d 294 (D. Conn. 2012).............................................................17

*Pierce v. Soc'y of the Sisters of the Holy Names Jesus and Mary,*
    268 U.S. 510 (1925).........................................................................................21

*Plyler v. Doe,*
    457 U.S. 202 (1982).........................................................................................17

\* *Romer v. Evans,*
    517 U.S. 620 (1996).........................................................................................22

*Sessions v. Morales-Santana,*
    137 S. Ct. 1678 (2017)...............................................................................17, 19

*Shelley v. Kraemer,*
    334 U.S. 1 (1948).............................................................................................22

*Shurtleff v. City of Boston,*
    142 S. Ct. 1583 (2022).....................................................................................30

*SmithKline Beecham Corp. v. Abbott Labs.,*
    740 F.3d 471 (9th Cir. 2014)...........................................................................17

*Steffan v. Perry,*
    41 F.3d 677 (D.C. Cir. 1994)...........................................................................17

*Swift v. United States,*
    649 F. Supp. 596 (D.D.C. 1986)......................................................................17

\* *Texas Monthly, Inc. v. Bullock,*
    489 U.S. 1 (1989)................................................................................26, 33, 34

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017).....................................................................................20

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973).........................................................................................21

*United States v. Virginia,*
    518 U.S. 515 (1996)...................................................................................19, 24

*United States v. Windsor,*
    570 U.S. 744 (2013)...........................................................................16, 20, 21

*Van Orden v. Perry,*
  545 U.S. 677 (2005) ..................................................................................30

*Veitch v. England,*
  471 F.3d 124 (D.C. Cir. 2006) ..................................................................15

*Wallace v. Jaffree,*
  472 U.S. 38 (1985) ....................................................................................35

*Whitewood v. Wolf,*
  992 F. Supp. 2d 410 (M.D. Pa. 2014) ......................................................18

* *Windsor v. United States,*
  699 F.3d 169 (2d Cir. 2012) ...............................................................17, 18

*Zablocki v. Redhail,*
  434 U.S. 374 (1978) ..................................................................................19

**STATUTES:**

8 U.S.C. § 1232(c)(2)(A) ..................................................................3, 22, 37

8 U.S.C. § 1522(a)(3) ...................................................................................37

8 U.S.C. § 1522(a)(5) ...................................................................................37

8 U.S.C. § 1522(a)(6) ...................................................................................37

8 U.S.C. § 1522(d) ........................................................................................37

**REGULATIONS:**

45 C.F.R. pt. 80 .............................................................................................23

45 C.F.R. pt. 84 .............................................................................................23

45 C.F.R. pt. 86 .............................................................................................23

45 C.F.R. pt. 87 .............................................................................................23

45 C.F.R. pt. 91 .............................................................................................23

45 C.F.R. § 75.300(c) (2016) ........................................................................23

45 C.F.R. § 400.115(c) ...................................................................................3

45 C.F.R. § 400.118(b) ...................................................................................3

**Rules:**

Fed. R. Civ. P. 56(a) ...................................................................................................15

LCvR 7(h)(1) ................................................................................................................2

**Other Authorities:**

ACF, *Children's Bureau Child Welfare Outcomes State Data Review Portal: Texas*, https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/texas.html (last visited July 27, 2022)...................................................................................................23

Ltr. to S.C. Gov. Henry McMaster from ACF (Nov. 18, 2021), *available at* https://www.acf.hhs.gov/sites/default/files/documents/withdrawal-of-exception-from-part-75.300-south-carolina-11-18-2021.pdf .................................38

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131-81 (2003).........................................................................................................................30

ORR, *Unaccompanied Children (UC) Program: Fact Sheet*, (Feb. 17, 2022) https://www.hhs.gov/sites/default/files/uac-program-fact-sheet.pdf .......................3

ORR, *Unaccompanied Refugee Minors Program* (current as of Nov. 23, 2021), https://www.acf.hhs.gov/orr/programs/refugees/urm ...............................................2

## INTRODUCTION

This case presents a simple question of profound importance: Does the Constitution prohibit the Government from sponsoring discrimination against married same-sex couples as a religiously disfavored class? The answer is yes, and, therefore, the Government should be enjoined from continuing to do so. It is a matter of undisputed fact that the Government has:

- Awarded grants to a grantee that put the Government on express notice that the grantee would administer the grants in accordance with the grantee's religious beliefs, which condemn married same-sex couples;

- Declined to impose safeguards against the administration of the grants in a manner that impermissibly furthers the grantee's religious beliefs, including by discriminating against married same-sex couples;

- Upon express notice that the grantee has in fact administered the grants in a manner that so discriminates, failed to redress such discrimination; and

- As a result, harmed, not only married same-sex couples, who have been excluded from equal participation in federal child welfare programs, but also children in such programs, who have been deprived of the full range of placement options that may be in their best interests.

All of this government-sponsored, religion-based discrimination is unconstitutional.

Plaintiffs Fatma Marouf and Bryn Esplin, ("Plaintiffs") a married same-sex couple, have been denied the opportunity to become foster parents to children in the care of the Government under the Unaccompanied Refugee Minors ("URM") and Unaccompanied Alien Children ("UAC") Programs ("Programs")—federally funded and administered programs—because the grantee administering the programs on the Government's behalf systematically rejected them, and rejects similar couples, on religious grounds. Plaintiffs' request in this litigation is straightforward: an opportunity equal to that of others to provide a Program child a safe, loving home. What the Government has done is pernicious and unconstitutional: It has categorically denied Plaintiffs that opportunity by funding and ratifying the use by Program grantee United States Conference of Catholic Bishops ("USCCB") of a religious litmus test that bars married same-sex couples from

1

eligibility to be foster parents under the Programs it administers on the Government's behalf. In doing so, the Government violates the First and Fifth Amendments to the United States Constitution, resulting in direct injury both to married same-sex couples and to Program children whose best interests would be served by placement with them.

## FACTUAL BACKGROUND

### A.  The URM and UAC Programs.

The Office of Refugee Resettlement ("ORR")—a component of the Administration for Children and Families ("ACF"), which in turn is part of the United States Department of Health and Human Services ("HHS")[1]—administers the URM and UAC Programs, which are federally funded child welfare programs that provide care for thousands of unaccompanied refugee and immigrant children, including through placement in foster homes. Pls.' Statement of Undisputed Material Facts ("PMF") ¶¶ 1-3.[2]

The URM Program provides for the care of children who enter the country with refugee or asylee (or similar) status and are unaccompanied by an adult. URM children are often fleeing extreme persecution, violence, and abuse.[3] The UAC Program serves children who are in the United States without lawful immigration status and who have no available parent or legal

---

[1] Plaintiffs collectively refer to ORR, ACF, HHS, and the officials who lead them as "Federal Defendants."

[2] Pursuant to Local Civil Rule 7(h)(1) and the Court's summary judgment procedure order (ECF No. 87), Plaintiffs' Statement of Material Undisputed Facts is filed as an attachment to Plaintiffs' Motion for Summary Judgment. Citations to Plaintiffs' Statement of Material Undisputed Facts are formatted as follows: (PMF ¶ _.). Attached hereto are Declarations A-E in support of Plaintiffs' motion and attachments. Numbered exhibit references refer to exhibits filed as attachments to the Declaration of Kenneth Y. Choe (Declaration A).

[3] *See* ORR, *Unaccompanied Refugee Minors Program*, (current as of Nov. 23, 2021), https://www.acf.hhs.gov/orr/programs/refugees/urm.

guardian.[4]

Any child in Federal Defendants' care under either Program must be "promptly placed in the least restrictive setting that is in the best interest of the child," which generally is achieved by placing the child in a foster home. *See* 8 U.S.C. § 1232(c)(2)(A); PMF ¶¶ 4, 129. These placement decisions must be made based on the best interest of the child. *See, e.g.*, 45 C.F.R. §§ 400.115(c), 400.118(b); PMF ¶ 4.

### B. Program Grantee USCCB Refuses, on Religious Grounds, to Place Children with Married Same-Sex Couples.

Under both Programs, Federal Defendants award federal funds to grantees that administer the Programs on Federal Defendants' behalf pursuant to grant agreements. *Id.* ¶ 5. Defendant USCCB is one such grantee. *Id.* ¶¶ 5-6. The federal funds that USCCB receives cover the costs of providing child welfare services under the Programs, including those associated with recruiting potential foster parent applicants, processing prospective foster parent applications, training potential foster parents, licensing them, and making foster care placement decisions. *See id.* ¶¶ 5-6, 10. At the time of the events at issue, USCCB's subgrantee in Dallas-Fort Worth, Texas, for both Programs was Catholic Charities of Fort Worth ("CCFW"). *Id.* ¶ 7. At present, Catholic Charities of Dallas ("CCD") serves as USCCB's local URM Program subgrantee.[5] *Id.* ¶ 9.

USCCB is a Catholic organization that holds and seeks to further the religious belief that "marriage is between one man and one woman," and, as a result, "[w]hen placing children with couples, [its subgrantee] ensures those children enjoy the advantage of having a mother and a father who are married." *Id.* ¶¶ 16-18. USCCB openly rejects parenting by couples unless they are

---

[4] *See* ORR, *Unaccompanied Children (UC) Program: Fact Sheet*, (Feb. 17, 2022) https://www.hhs.gov/sites/default/files/uac-program-fact-sheet.pdf.
[5] USCCB currently does not have a local UAC Program subgrantee. *See id.* ¶ 80.

a married couple comprising one man and one woman; USCCB's agreements with its subgrantees require that they provide services in a manner consistent with USSCB's religious beliefs, including by not processing foster parent applications of, or placing foster children with, same-sex couples. *Id.* ¶¶ 15-20.

In response to the United States Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644, 681 (2015), which recognized that the fundamental right to marry extends to same-sex couples, CCFW implemented a policy under which only couples who "mirror the holy family," i.e., married different-sex couples, were permitted even to apply to become Program foster parents. PMF ¶¶ 166-69 (describing how CCFW's policies, both before and after *Obergefell*, did not permit same-sex couples to apply to become Program foster parents). CCFW's policy complied with the above-referenced requirement that USCCB imposes on its subgrantees. *Id.* ¶¶ 31, 168-69.

### C. Federal Defendants Knew That USCCB Would Administer Its Program Grants in a Manner Consistent with Its Religious Beliefs, to the Detriment of Married Same-Sex Couples and Program Children.

Federal Defendants awarded USCCB its fiscal year ("FY") 2017 URM and UAC Program grants knowing that USCCB would administer the grants in compliance with its religious beliefs. *Id.* ¶¶ 10, 15-24. In its FY 2017 grant applications for the URM and UAC Programs, USCCB expressly stated that it " ███████████████████████████████████████████ ███████████████████████████████████████████ . . . ." *Id.* ¶ 15. Federal Defendants nevertheless awarded USCCB FY 2017 Program grants, which encompassed the Dallas-Fort Worth region. *See id.* ¶¶ 6-8.

USCCB's religious beliefs condemn marriages of and parenting by same-sex couples. *Id.* ¶¶ 15-20. Indeed, USCCB's website openly advocates against parenting of children by same-sex couples. *Id.* ¶¶ 17-18. These religious beliefs were known to Federal Defendants; ORR knew about USCCB's religious beliefs disfavoring same-sex couples, when it awarded USCCB the grants at

issue. *Id.* ¶¶ 15-24.

    **D.**     **Federal Defendants Know That USCCB in Fact Administers Its Program Grants in Accordance with Its Religious Beliefs, to the Detriment of Same-Sex Married Couples and Program Children.**

Plaintiffs are a same-sex couple who married in 2015 and reside in Texas. *Id.* ¶ 25; *see also* Declaration of Fatma Marouf ("Marouf Decl.") (Declaration C) ¶ 5. Plaintiffs began considering foster care options in early 2017 and sought to apply to be foster parents under the URM or UAC Program. PMF ¶ 26. In February 2017, Plaintiffs spoke with CCFW representative Dana Springer about fostering a URM or UAC child. *Id.* ¶ 27. During the conversation, Plaintiffs told Springer that they are a married same-sex couple. *Id.* Springer informed Plaintiffs that CCFW would not accept their foster parent application because they do not "mirror the holy family." *Id.* ¶ 28.

Marouf notified Federal Defendants by e-mail of CCFW's refusal to accept their Program foster parent application. *Id.* ¶ 29. Marouf informed Federal Defendants that she and her wife had been denied the opportunity to serve as URM or UAC foster parents on the basis of religious beliefs regarding married same-sex couples and requested assistance from Federal Defendants in redressing the discrimination. *See id.*; *see also* Marouf Decl. ¶ 14; Declaration of Bryn Esplin ("Esplin Decl.") (Declaration B) ¶ 6.

Federal Defendants confirmed with USCCB that CCFW had refused to allow Plaintiffs to apply to become Program foster parents on account of religious objections to their status as a married same-sex couple. PMF ¶ 30. USCCB and CCFW also informed Federal Defendants that CCFW is "guided by Catholic teaching, which supports their practice of recruiting foster parents that mirror the Holy Family," that turning away married same-sex couples has been CCFW's practice for as long as it has been in existence, and that such practice accords with a requirement that USCCB imposes on its subgrantees. *Id.* ¶ 31.

As a result of being turned away by CCFW, Esplin "was devastated." Esplin Decl. ¶ 5. She

testified that "[i]t was really painful to be rejected" as a result of the "discrimination" that Federal

Defendants allowed to occur. PMF ¶ 32. She explained:

> The experience of being denied the opportunity to be a potential foster parent was
> not only shocking but deeply insulting, demeaning, and harmful. To be turned away
> solely on the basis of my sexual orientation sent a clear message that my home will
> always be lesser. More than that, it meant that who I am as a person will always be
> inferior. Though I thought I had an unshakeable sense of self-worth, this feeling of
> unworthiness and shame began to creep in and has not left since.

Esplin Decl. ¶ 8.

> Marouf similarly "reel[ed]" from shock and rejection:

> I could not understand how our marriage could be degraded in this way by a federal
> program. At the same time, being rejected based on one aspect of my identity made
> me feel like less than a full person. We were not even given a chance to be evaluated
> based on the environment and care that we could provide a child—the inquiry ended
> based on our same-sex marriage.

Marouf Decl. ¶¶ 12, 14. She further explained, *"That our own government would reject us as*

potential foster parents—not based on our ability to care for a refugee child, but solely because of

disapproval of who we are—is incredibly painful in ways people may not easily understand who

have never experienced the sting of discrimination." *Id.* ¶ 16. The experience of being turned away

from CCFW because of her same-sex relationship caused her to fear being turned away again,

when pursuing other foster parent opportunities. *See id.* ¶ 21; *see also* PMF ¶¶ 37, 39.

Esplin and Marouf also experience distress for Program children who are denied an

appropriate placement as a result of Federal Defendants' actions, and who receive the message

resulting from Federal Defendants' actions that same-sex couples are unfit to be parents. As Esplin

put it:

> I believe that there are kids who are in the government's refugee program who
> deserve loving homes, ones that are not demeaned solely by the makeup of
> marriages like mine, and it is important to me to maximize the pool of potential
> families. Any system that treats us differently—whether by excluding us or
> referring us to a different and inferior process—does not simply disadvantage us,
> but also disadvantages the kids as well. Some of these kids very likely are lesbian,

gay, bisexual, or transgender themselves, or questioning or struggling with their identities. A program that views same-sex relationships or [lesbian, gay, bisexual, and/or transgender] persons as "lesser than" cannot serve the developmental needs of any child.

Esplin Decl. ¶ 10.

Since filing this case, Marouf and Esplin have been overjoyed to welcome a daughter into their family after achieving pregnancy through reproductive technology. Marouf Decl. ¶ 17. They continue to wish to provide a loving home to refugee children. *Id.* ¶ 19. Their experience of discrimination on account of Federal Defendants' actions has left them fearful and anxious, not just for themselves, but also for their daughter, who is growing up in a world in which her own government devalues, rejects, and demeans her family. *See id.* ¶¶ 17-18; Esplin Decl. ¶¶ 8-9.

**E.    Federal Defendants Have Implemented No Safeguards to Prevent the Use of Federal Funds to Administer Programs Using Religious Criteria to Discriminate Against Married Same-Sex Couples.**

The discrimination Plaintiffs suffered results directly from Federal Defendants' failure to establish and maintain meaningful safeguards against its grantee's use of religious criteria in the administration of the URM and UAC Programs to exclude married same-sex couples. Federal Defendants were on notice that USCCB would administer Program grants consistent with and in furtherance of its religious beliefs, which Federal Defendants understood included condemning and refusing to recognize marriages between same-sex partners. When ORR awarded URM and UAC Program grants to USCCB, it did not prohibit or otherwise restrict USCCB from categorically turning away prospective Program foster parents who are married same-sex couples. PMF ¶¶ 6, 21-23. Nor did Federal Defendants implement any other safeguards to prevent USCCB from administering the grants in a religiously discriminatory manner. *Id.* ¶¶ 23-24. Federal Defendants did not even require USCCB to *notify* ORR when USCCB or its subgrantee declined

to process a Program foster parent application of a same-sex couple on account of its religious beliefs. *Id.* ¶ 23.

The absence of any safeguard has resulted in systematic discrimination against same-sex couples, including Plaintiffs. *See id.* ¶¶ 41-76 (identifying multiple instances of such discrimination)). Indeed, a CCFW federal foster care program official turned away so many foster parent applicants on the basis of religious objections to their sexual orientation (or marital status) that she memorialized those conversations in an e-mail, stating, "Third call I have had to do like this between yesterday and today. They actually all went super well (because I'm the queen of sharing this news now)." *Id.* ¶ 59. Yet Federal Defendants continue to refer same-sex couples who inquire about becoming Program foster parents to USCCB, despite knowing that USCCB will reject the couples out of hand. *See, e.g.*, *id.* ¶¶ 41-52.

While Plaintiffs experienced discrimination because they are a married same-sex couple, Federal Defendants' ratification of USCCB's use of religious criteria also resulted in discrimination against other religiously objectionable classes. *See*, *e.g.*, Declaration of Catelyn Devlin ("Devlin Decl.") ¶¶ 10-12, 14-15 (Declaration E); *see, e.g.*, PMF ¶ 169-79 (CCFW also discriminated against single individuals and non-Christian individuals who inquired with CCFW about becoming Program foster parents). All such discrimination confirms that Federal Defendants have not established and maintained meaningful safeguards against religious discrimination in the operation of the URM and UAC Programs.

In short, Federal Defendants have ratified USCCB's practice of turning away prospective Program foster parents who are married same-sex couples based on its religious beliefs. Compounding that religious discrimination, Federal Defendants have, for years, continued to refer same-sex couples who express an interest in serving as Program foster parents to USCCB, knowing

that USCCB will reject them out of hand on account of its religious beliefs. *See, e.g.*, PMF ¶¶ 41-52.

### F.    Federal Defendants' Recent Changes to the URM Program Compound the Constitutional Violation.

Although Federal Defendants recently modified the URM Program, the modification did not stop the religiously discriminatory administration of the URM Program by USCCB and its subgrantee. Indeed, Federal Defendants not only sanctioned such unconstitutional administration anew, but indeed made it worse by funding a third-party entity to screen and segregate same-sex couples from other applicants by reference to USCCB's religious beliefs. In other words, acting through their agent, Federal Defendants have now adopted USCCB's religious beliefs as a determinant of governmental decision-making.

In response to this litigation, Federal Defendants contracted with the U.S. Committee for Refugees and Immigrants ("USCRI") to conduct intake with respect to URM Program foster parent applicants solely in the Dallas-Fort Worth region. *Id.* ¶ 84. USCRI solicits demographic information about applicants (including whether they are a married same-sex couple) and then refers each applicant for further processing either to USCCB's subgrantee CCD or to Upbring, the subgrantee of Lutheran Immigration and Refugee Service ("LIRS"), which was recently awarded a URM Program grant in the Dallas-Fort Worth region. *Id.* ¶¶ 84-86. Upbring does not object to licensing same-sex couples as foster parents. *Id.* ¶ 83. As a new subgrantee, however, Upbring lacks the capacity to process applicants on the same scale that CCD enjoys and, thus, is not similarly situated to CCD. *See id.* ¶ 102.[6] USCRI, CCD, and Upbring constitute a "Consortium." *See id.* ¶¶ 81-84.

---

[6] As of December 2021, CCD housed approximately ███████████████████████ *Id.* ¶ 104. CCD currently has approximately 50 children in its care. *Id.* ¶ 105. Upbring was designated as a URM Program subgrantee in 2020, but has not yet served any foster children, and

Federal Defendants understand that: 1) USCRI will operate in such a way that all applicants will have an opportunity to work with a URM Program services provider; but 2) as a result of USCCB's religious objections, CCD continues to refuse to even consider same-sex couples who wish to apply to be Program foster parents. *Id.* ¶ 91. Thus, USCRI will segregate same-sex couples from other applicants and refer them exclusively to Upbring. *Id.* ¶¶ 91-92. The Consortium participants deliberately did not document in writing the criteria used by USCRI for determining to which agency it refers applicants because doing so would put USCRI " ███████████████████ " and invite additional lawsuits. *Id.* ¶ 88. Instead of recording the criteria in writing, a representative of USCRI met with a representative of USCCB to ██████████████████████████ ████████████████ . *Id.* ¶ 89. USCRI currently receives $ █████ directly from ORR to perform this screening and segregation of foster parent applicants. *Id.* ¶¶ 94-95.

Federal Defendants profess ignorance about how USCRI will operate, and state that it is "possible" that Plaintiffs themselves would be turned away by USCCB's subgrantee all over again were they to reapply under the new regime. *Id.* ¶ 107. By their own admission, Federal Defendants have failed to take steps to ensure that, under this new regime, an applicant will not be turned away based on a Program grantee's religious beliefs. *See id.* To the contrary, the Consortium's organizing documents contain blanket prospective waivers providing that no Consortium participant will be required to take any future action that would violate its religious beliefs. *Id.* ¶ 108. The record is devoid of any evidence that any Consortium participant specifically identified any required action that would result in a substantial religious burden and would necessitate a

---

is still working to hire staff and license foster parents. *Id.* ¶ 102. Upbring does not have any children in its care, and has only one licensed foster family in its network. *Id.* ¶ 103.

waiver, or that the Government considered any burden on or harm to third parties that will result from the blanket prospective waivers.

Federal Defendants' creation of the Consortium does not remedy the "stigma, rejection, and humiliation" experienced by Plaintiffs. Marouf Decl. ¶ 20. To the contrary, Marouf states:

> To us, it sounds like a thinly veiled attempt by the federal government to fashion a "separate but equal" scheme, where same-sex couples are shunted through one door, while heterosexual couples are invited to apply through another. Even if a screen is placed over the segregation, we know it exists, and the screen itself symbolizes the stigma that we feel. We understand that USCRI's primary job is to identify same-sex couples in the pool of applicants and place them in a separate pile. Being segregated in this way is as upsetting and insulting as a blanket rejection. We had hoped that the federal government would address the discrimination we experienced. Instead, they set up a system that, shielded from public view, segregates same sex couples, thereby perpetuating discrimination.

*Id.*

### G.   Excluding Married Same-Sex Couples from the Pool of Program Foster Parents Runs Contrary to Child Welfare Principles and Federal Defendants' Obligation to Act in the Best Interests of the Children in Their Care.

Finding stable, loving, permanent homes for foster children, including those in the URM and UAC Programs, represents one of the most important responsibilities for any child welfare agency. Despite this responsibility, Federal Defendants' actions run contrary to well-established child welfare principles.

Children in foster care experience pre-placement adversity and trauma that lead to increased risks of psychological and educational maladjustment during childhood and adolescence, as well as poorer life adjustment in adulthood. PMF ¶ 116; *see also* Ex. 50 ¶ 21 (D. Brodzinsky Report). Youth who enter foster care through the URM and UAC Programs are psychologically vulnerable because of histories of separation from family members, early life adversity, and trauma. PMF ¶ 117; *see also* Ex. 50 ¶ 21 (D. Brodzinsky Report). These children have high rates of emotional and behavioral disturbance, including Post-Traumatic Stress

11

Disorder. PMF ¶ 118; Ex. 50 ¶ 21 (D. Brodzinsky Report). With appropriate support, care, and expectations from foster families, these children can show remarkable resilience and adjustment to their new homes and, unique to Program children, their new country. PMF ¶ 118; Ex. 50 ¶ 21 (D. Brodzinsky Report).

It is essential for child welfare agencies to maximize the pool of available foster homes. Nationally recognized standards, such as those promulgated by the Child Welfare League of America, clearly state that a "family foster care agency should not reject foster applicants solely due to their age, income, marital status, race, religious preference, sexual orientation, physical or disabling condition, or location of the foster home." PMF ¶¶ 119-20. These standards seek to maximize the number of placement options for vulnerable children, focusing exclusively on ensuring that placements serve children's best interests, and a prospective foster parent's capacity to understand and meet the needs of a given child. *See id.* ¶ 121.

Including as many families who may be qualified as possible in the process of identifying potential candidates for foster placement is important in part because of the significant shortage of families available to meet the needs of children in the foster care system. *Id.* ¶ 125. CCFW chronically lacked sufficient foster homes in which to place Program children. *See id.* ¶ 129. Excluding same-sex couples may have a particularly significant adverse effect on children in need of foster or adoptive homes because lesbian, gay, and bisexual adults are four to six times more likely to foster or adopt children than their heterosexual peers. *See id.* ¶ 126. Lesbian, gay, and bisexual adults are also disproportionately more likely than their heterosexual peers to adopt children with the kinds of special needs commonly seen among children in the URM and UAC Programs, including older age when entering foster care, minority racial/ethnic group membership, trauma history, and developmental and emotional difficulties. *See id.* ¶ 127. Excluding lesbian,

gay, and bisexual adults from fostering reduces the pool of families from which to find good matches to meet the needs of all children seeking placement under the Programs. *See id.* ¶ 128.

Without available foster parents, children eligible for the URM Program are left in unsafe environments such as refugee camps abroad, and children eligible for the UAC Program may end up in group homes or other institutional environments. *Id.* ¶¶ 137, 182, 185. Institutional environments can prevent children from developing and maintaining secure attachment bonds, and deprive them of the stability, nurturance, safety, lifelong family connections and support, and genuine sense of legal, residential, relational, and psychological permanence that families can provide. *See, e.g., id.* ¶ 138.

Reducing the pool of available foster families increases the chances that children will be placed with families who are not well-matched to their individual needs, or who do not understand or are unprepared to cope with their special needs, often resulting in placement disruption or breakdown. *Id.* ¶ 139. Given the older age of children placed through the URM and UAC Programs and their history of adverse life experiences, they are at risk for the type of individual and relational problems correlated with placement instability and breakdown. *See id.* ¶¶ 127, 139, 221. Having available the largest possible pool of prospective foster parents, including those who identify as lesbian, gay, bisexual, or transgender, is in the interest of these children because it increases the chances of a good placement match. *Id.* ¶ 141.

When Federal Defendants authorize child welfare agencies to turn away or establish less favorable procedures for qualified Program foster parent applicants based on criteria unrelated to child welfare, such as the applicants' sexual orientation or sex, or the religious beliefs of the child welfare agency, children in the care of those child welfare agencies may lose out on families who would have best served the children's needs. *Id.* Instead, a child may be placed with a family who

13

meets the qualifications to foster but is a less appropriate choice for that particular child, including because the family is not as well-prepared to meet or manage the child's emotional or medical issues or other special needs; has different expectations regarding the placement than those of the child placed with them; or has difficulty understanding and supporting the child's sexual orientation or gender identity. *See id.* ¶ 142.

Same-sex couples possess the parenting characteristics that best serve the needs of children in foster care in measure equal to or greater than different-sex couples. *Id*. ¶ 143. Indeed, Federal Defendants themselves do not dispute that placing a child with a married same-sex couple can be consistent with the best interest of the child, and that it would be "a good thing if the potential pool of foster families included foster homes headed by [] same-sex married couple[s] . . . ." *Id*. ¶ 130. By permitting child welfare agencies to categorically reject same-sex couples as potential foster parents for children in the URM and UAC Programs, Federal Defendants allow those agencies to eliminate a class of individuals who have parenting characteristics that are correlated with successful placements. *Id*. ¶ 144.

When Federal Defendants permit child welfare agencies acting on their behalf to turn away same-sex couples regardless of their qualifications, it deters same-sex couples' participation in the foster care and adoption system as a whole out of fear that they will face discrimination at the hands of other child welfare agencies. *Id*. ¶ 145. The psychological harm of experiencing discrimination and prejudice because of membership in a minority class, such as that experienced by lesbian, gay, and bisexual people, can deter people from participating in various areas of life, negatively affect their physical and emotional health, undermine identity and self-image, and compromise the pursuit of life goals. *Id.* ¶ 146. The stigma and harm from such discrimination

further drive lesbian, gay, and bisexual people out of the child welfare system, further reducing the pool of available and appropriate placements. *Id.* ¶ 147.

When Federal Defendants sanction discrimination based on sexual orientation by child welfare agencies, their action has a disproportionate negative effect on lesbian, gay, and bisexual youth, who are among the most vulnerable and overrepresented youth in the child welfare system, likely including in the URM and UAC Programs. *Id.* ¶ 149. Such government-sanctioned discrimination sends the damaging and stigmatizing message to lesbian, gay, and bisexual youth in the care of such child welfare agencies that those responsible for their welfare deem them to be deviant and unsuitable to be parents when they grow up. *Id.* ¶ 151. Such a message significantly harms these vulnerable youth, whose identity and self-esteem are already fragile. *Id.*

Yet Federal Defendants have allowed—and continue to allow—USCCB to categorically exclude married same-sex couples from serving as foster parents under the URM and UAC Programs—undercutting the animating principle of these child welfare programs. The record contains no facts supporting any legitimate governmental interest that could justify subverting the fundamental objective of the Programs in this manner.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must accept as true the non-movant's evidence and draw all reasonable inferences in its favor. *Id.* at 255. The non-movant may not, however, rely on "mere allegations" or conclusory statements. *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring).

## ARGUMENT

### I.   FEDERAL DEFENDANTS HAVE VIOLATED THE EQUAL PROTECTION AND DUE PROCESS GUARANTEES OF THE FIFTH AMENDMENT.

Federal Defendants' actions violate the equal protection and due process guarantees of the Fifth Amendment by treating married same-sex couples, including Plaintiffs, differently from and worse than married different-sex couples.[7]  More specifically, Federal Defendants not only discriminate against couples based on their sexual orientation and their sex, but also treat them less favorably in the exercise of their fundamental right to marry. Similarly, Federal Defendants' actions impermissibly infringe on couples' fundamental liberty interests in marrying and having their marriages recognized and respected by the Government, as well as family integrity and intimate association. Time and again, courts have held that there is no sufficient justification for burdening the liberty interests of people in same-sex relationships. *See, e.g.*, *Pavan v. Smith*, 137 S. Ct. 2075, 2078-79 (2017) (per curiam); *Obergefell*, 576 U.S. at 681; *United States v. Windsor*, 570 U.S. 744, 774-75 (2013); *Lawrence v. Texas*, 539 U.S. 558, 582-85 (2003) (O'Connor, J., concurring). Here, too, Federal Defendants have impermissibly impinged on the fundamental guarantees of equality and liberty in contravention of the Constitution, and their actions in facilitating and sanctioning this discrimination cannot be justified.

### A.   Federal Defendants Have Discriminated Against Plaintiffs Based on Sexual Orientation, Sex, and the Exercise of Their Fundamental Right to Marry, in Violation of the Equal Protection Guarantee.

Under established equal protection jurisprudence, class-based discrimination by the Government involving a suspect class or the exercise of a fundamental right is "presumptively

---

[7] Though framed in terms of due process, the Fifth Amendment also forbids discrimination that denies equal protection of the law. *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

invidious," triggering heightened scrutiny. *See Plyler v. Doe*, 457 U.S. 202, 216 (1982). Federal Defendants' actions classify and discriminate in both of these invidious ways.

First, in excluding same-sex couples from equal participation in federal child welfare programs, Federal Defendants discriminate on the bases of sexual orientation and sex, both of which trigger heightened scrutiny. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017) (sex); *Baskin v. Bogan*, 766 F.3d 648, 654-656 (7th Cir. 2014) (sexual orientation); *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 484 (9th Cir. 2014) (sexual orientation); *Windsor v. United States*, 699 F.3d 169, 181-85 (2d Cir. 2012) (sexual orientation), *aff'd*, 570 U.S. 744.[8] Classifications based on sexual orientation warrant heightened scrutiny under either a functional analysis of recent case law or the more traditional test for suspect and quasi-suspect classifications.

Supreme Court precedents such as *Windsor* require courts "to apply heightened scrutiny to classifications based on sexual orientation for purposes of equal protection." *SmithKline*, 740 F.3d at 484. For example, the Supreme Court's assessment of the Defense of Marriage Act's principal purpose and effect of imposing inequality on same-sex couples, its refusal to entertain hypothetical justifications for the law, and its finding that no legitimate governmental purpose could overcome the law's imposition of second-class status on lesbian, gay, and bisexual people constituted heightened scrutiny. *See id.* at 479-83; *id.* at 483 ("*Windsor* requires that when state action

---

[8] This Circuit has no controlling case law regarding the appropriate level of scrutiny for classifications based on sexual orientation. The District of Columbia Circuit's decisions addressing the issue relied on *Bowers v. Hardwick*, 478 U.S. 186 (1986), *overruled by Lawrence*, 539 U.S. 558, 578 (2003). *See, e.g., Steffan v. Perry*, 41 F.3d 677, 685 n.3, 690 (D.C. Cir. 1994); *Padula v. Webster*, 822 F.2d 97, 102-03 (D.C. Cir. 1987); *Swift v. United States*, 649 F. Supp. 596, 601-02 (D.D.C. 1986). These decisions were necessarily abrogated when the Supreme Court overruled *Bowers* in *Lawrence*, 539 U.S. at 578. *See Pedersen v. Office of Personnel Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012); *Golinski v. U.S. Office of Personnel Mgmt.*, 824 F. Supp. 2d 968, 984 (N.D. Cal. 2012).

discriminates on the basis of sexual orientation, [the court] must examine its actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.").

Additionally, courts look to the independent hallmarks of suspect or quasi-suspect classifications: a history of discrimination against the class, whether the characteristic that defines the class bears on ability to contribute to society, whether the characteristic is essential to identity, and lack of political power to overcome majoritarian processes. *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1154 (D.C. Cir. 2004). Classifications based on sexual orientation bear each of these independent hallmarks: the long and marked history of discrimination against lesbian, gay, and bisexual people; the lack of any connection between a person's sexual orientation and the person's ability to perform or contribute to society; the nature of sexual orientation as a sufficiently essential personal characteristic; and that lesbian, gay, and bisexual people lack sufficient political power to "adequately protect themselves from the discriminatory wishes of the majoritarian public." *Windsor*, 699 F.3d at 181-85 (analyzing sexual orientation as a "quasi-suspect class"); *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 929 (S.D. Miss. 2014), *aff'd,* 791 F.3d 625 (5th Cir. 2015); *Whitewood v. Wolf*, 992 F. Supp. 2d 410, 426-30 (M.D. Pa. 2014).

Here, there is no question that Federal Defendants have classified would-be foster parents based on sexual orientation. Their actions exclude lesbian, gay, and bisexual people, but not heterosexual people, from Program participation. This disparate treatment based on sexual orientation warrants heightened scrutiny.

Federal Defendants' actions also discriminate on the basis of sex. As the Supreme Court recognized in *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020), sexual orientation

discrimination "necessarily entails discrimination based on sex." Federal Defendants have classified based on sex by knowingly sponsoring and ratifying differential treatment of individuals under their programs based on having same-sex, as opposed to different-sex, partners. More specifically, Marouf has been denied equal access to the Programs because she, a woman, has a female spouse, whereas an otherwise similarly situated man with the same spouse would have full access. *See id.* at 1741 (recognizing as sex discrimination a circumstance in which a male employee is fired for his attraction to men because that same trait is tolerated in his female colleague). Governmental actions that treat same-sex and different-sex couples disparately facially classify on the basis of sex. *See Latta v. Otter*, 771 F.3d 456, 479-86 (9th Cir. 2014) (Reinhardt, J., concurring, and Berzon, J., concurring). Federal Defendants' actions are therefore subject to heightened scrutiny and require an "exceedingly persuasive justification." *See Morales-Santana*, 137 S. Ct. at 1689 (quoting *United States v. Virginia*, 518 U.S. 515, 531 (1996)).

Second, Federal Defendants' sanction and facilitation of discrimination against same-sex spouses differentially penalizes the exercise of the fundamental right to marry, such that "it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). *See also Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined"). Here, as a result of Federal Defendants' actions, those who exercise the fundamental right to marry by choosing a same-sex spouse are disadvantaged under the Programs as compared with those who exercise that right by choosing a different-sex spouse. Federal Defendants' actions "identify a subset of state-sanctioned

marriages and make them unequal[,]" *Windsor*, 570 U.S. at 772, depriving same-sex spouses, like Plaintiffs, of equal protection.

The harm that flows from this invidious discrimination at the hands of Federal Defendants is profound. It is not merely about losing the benefit of participating in the Programs, but also about the stigma and degradation of being denied equal treatment by the Government.

> [D]iscrimination itself, . . . by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.

*Heckler v. Mathews*, 465 U.S. 728, 739 (1984) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)); *cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017) ("[T]he 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." (quoting *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993))); *see also* Mem. Op. at 16, 22 (ECF No. 48). This is a harm of constitutional magnitude that requires close judicial scrutiny and appropriate remedy. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021) (governmental interest in the equal treatment of prospective foster parents and foster children is a "weighty one").

**B.      Federal Defendants Have Infringed Plaintiffs' Fundamental Rights to Marry, to Have Their Marriage Respected, and to Family Integrity and Intimate Association, in Violation of Due Process Guarantees.**

Federal Defendants' actions in excluding same-sex spouses from participation in federal child welfare programs also impermissibly impinge on those spouses' fundamental liberty interests in the dignity and integrity of their marriages and families. USCCB, acting with governmental authority to administer a federal program, "restricts and restrains . . . persons who are joined in same-sex marriages made lawful by the state" and thus deemed "entitled to recognition and protection to enhance their own *liberty*." *Windsor*, 570 U.S. at 775 (emphasis added). And, though

agencies have certain discretion to administer their programs within the bounds of Congressionally delegated authority, they "cannot deny the liberty protected by the Due Process Clause of the Fifth Amendment." *Id.* at 774. When Federal Defendants allow USCCB's religious opposition to the marriages of same-sex couples to determine who may participate in a government program, "the necessary consequence is to put the imprimatur of the [government] itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied." *Obergefell*, 576 U.S. at 672.

Federal Defendants' actions similarly impinge on Plaintiffs' liberty interests in familial integrity, intimate association, autonomy, and privacy. *See Lawrence*, 539 U.S. at 573-74; *Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965); *Pierce v. Soc'y of the Sisters of the Holy Names Jesus and Mary*, 268 U.S. 510, 534-35 (1925). Under the Due Process Clause, a penalty or burden on the exercise of a fundamental right by the Government is subject to strict scrutiny. *See, e.g.*, *Hutchins v. District of Columbia*, 188 F.3d 531, 536 (D.C. Cir. 1999) (government impingement on a fundamental right "would be measured under a strict scrutiny standard and would be justified only if the infringement is narrowly tailored to serve a compelling state interest"). Thus, Federal Defendants' actions, including their recent URM Program modifications, can survive only if Federal Defendants demonstrate that those actions are narrowly tailored to further a compelling governmental interest.

### C.   Federal Defendants' Infringement of Plaintiffs' Equality and Liberty Interests Cannot Be Justified.

Federal Defendants' actions cannot survive under *any* level of scrutiny: Even under rational basis review, governmental action must not disadvantage a disfavored group for its own sake, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), and must bear at least a rational relationship to a legitimate governmental interest, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

Whether viewed through the framework of narrow tailoring under strict scrutiny or reasoned decision-making under rational basis review, Federal Defendants' actions cannot be justified. First, discrimination against a disfavored class for its own sake is inherently impermissible—and this is equally true when the Government endorses discrimination by a third party. *See Romer v. Evans*, 517 U.S. 620, 631-36 (1996) (striking down provision "born of animosity toward" lesbian, gay, and bisexual people, and holding that private religious and moral disapproval is not a rational basis for government-facilitated discrimination); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("private biases" are not "permissible considerations for" governmental action); *see also Obergefell*, 576 U.S. at 672 (personal religious or philosophical objections to same-sex couples may not constitutionally be given the imprimatur of the Government). "The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals." *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948).

Federal Defendants' actions are also irrational because they undermine the compelling governmental interests in child welfare that directly undergird Congress's purpose in establishing the URM and UAC Programs. *See*, *e.g.*, 8 U.S.C. § 1232(c)(2)(A) (UAC Program placements must be made in the best interest of the child); PMF ¶ 116 (URM placements). Federal Defendants' authorization of USCCB's discrimination in the administration of the Programs lacks any rational relationship to the statutory child welfare objectives of the URM and UAC Programs; indeed, there is no valid child welfare justification for a scheme that excludes a class of prospective Program foster parents for a reason wholly unrelated to (and in fact destructive of) child welfare. There is a "dramatic shortage of families available to meet the needs of children in the foster care system," Ex. 50 ¶ 27 (D. Brodzinsky Report), including in the Dallas-Fort Worth region. PMF ¶ 116. In

Texas in any given year, there are nearly 30,000 children residing in foster care. *See, e.g.*, ACF, *Children's Bureau Child Welfare Outcomes State Data Review Portal: Texas*, https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/texas.html (last visited July 27, 2022); *see also* Ex. 50 ¶ 27 (D. Brodzinsky Report). Allowing USCCB to categorically exclude married same-sex couples from serving as foster parents under the URM and UAC Programs irrationally shrinks the pool of eligible foster parents for reasons that are completely divorced from and contrary to the child welfare interests that underlie the Programs. *See, e.g.*, *id.* ¶¶ 26-27.

Indeed, Federal Defendants have irrationally departed from their own policies. Federal Defendants' own regulations prohibit grantees from discriminating on the basis of sexual orientation. *See* 45 C.F.R. § 75.300(c) (2016);[9] *see also* 45 C.F.R. pts. 80, 84, 86, 87, 91 (nondiscrimination regulations that grantees are required to follow). Further, Federal Defendants' policies put direct responsibility on ORR to "follow through" and fill any gap in URM and UAC Program administration occasioned by a Program grantee with a religiously motivated objection to a task under its grant agreement. *See* PMF ¶ 22 (citing Ex. 58 at 2) (ACF policy in effect when Plaintiffs were turned away by CCFW). Yet Federal Defendants did not redress USCCB's discrimination against Plaintiffs when notified of it, and, in the succeeding five and a half years, have continued to deny Plaintiffs an equal opportunity to foster Program children. In doing so, Federal Defendants have elevated USCCB's religious beliefs over ORR's own nondiscrimination policies, and failed to abide by Program policy that required ORR to "follow through" and ensure

---

[9] HHS adopted amendments to 45 C.F.R. § 75.300 in 2021, but, as a result of litigation, *Facing Foster Care in Alaska v. U.S. Dep't of Health & Hum. Servs.*, 1:21-cv-00308-JMC (D.D.C. filed Feb. 2, 2021), these amendments have been vacated and remanded by court order dated June 29, 2022.

that USCCB's religiously motivated objection to working with Plaintiffs did not subvert equal access to the Programs.

Federal Defendants' recent modification to the URM Program compounds these concerns. Federal Defendants established the Consortium in direct response to this litigation to shield USCCB's refusal to work with same-sex couples. Among USCRI's screening functions is the determination of whether prospective foster parents are same-sex couples. Federal Defendants understand that: 1) USCRI will ensure that all prospective foster parents are referred to a URM Program services provider that will work with them; and 2) USCCB's subgrantee, CCD, continues to refuse to work with same-sex couples. In other words, despite the Consortium participants' deliberate decision not to leave a paper trail, Federal Defendants' understanding is that USCRI will segregate same-sex couples from other applicants and refer them only to Upbring, a new URM Program service provider with zero Program children currently in its care, and a smaller staff and budget than CCD's. For this reason alone, the Consortium arrangement is itself unconstitutional because the URM Program services provider to which all same-sex couples are sent is less established, with fewer staff and resources available to license foster families and support placements. *Cf. United States v. Virginia*, 518 U.S. 515, 547-53 (1996).

But more fundamentally, Federal Defendants may not segregate and treat differently a disfavored class—which is the entire point of their Consortium—for the sole purpose of indulging private bias. *See Palmore*, 466 U.S. at 433. This is especially so here, where the Government has adopted religious beliefs as a determinant of its decision-making. *See*, *infra*, Section II.

Nor may Federal Defendants launder their discrimination through a third party by contracting it out, and then claim ignorance of what is going on, simply because they have asked

that no one put anything in writing.[10] The Constitution does not allow the Government to do indirectly what it is forbidden to do directly. *Norwood v. Harrison*, 413 U.S. 455, 463-67 (1973). "Activities that the . . . government could not constitutionally participate in directly cannot be supported indirectly through the provision of support for other persons engaged in such activity." *Nat'l Black Police Ass'n v. Velde*, 712 F.2d 569, 580 (D.C. Cir. 1983). Just as a government, state or federal, cannot "evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form," *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995), so, too, are Federal Defendants unable to evade the requirements of the Constitution by effectuating discrimination through an agent. Put simply: "[T]hat's not how constitutional rights work." *Ermold v. Davis*, 936 F.3d 429, 436 (6th Cir. 2019).

## II.   FEDERAL DEFENDANTS HAVE VIOLATED THE RELIGION CLAUSES OF THE FIRST AMENDMENT BY STRUCTURING FEDERAL PROGRAMS TO EXCLUDE PARTICIPANTS WHO FAIL TO SATISFY A PARTICULAR RELIGIOUS DENOMINATION'S LITMUS TEST.

As the Supreme Court recently reaffirmed, the First Amendment's Religion Clauses "have 'complementary' purposes, not warring ones where one Clause is always sure to prevail over the others." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022). Animating both Religion Clauses is governmental neutrality as to religion; such neutrality is essential to *both* protecting free

---

[10] Federal Defendants professed ignorance about the criteria used by USCRI for determining to which URM Program services provider to refer a foster parent applicant, and even speculated that it is "possible" that USCRI will send same-sex couples to CCD. If USCRI were to do so, CCD would refuse to work with those couples, and they would suffer the same stigma and indignity of discrimination that Plaintiffs experienced. Thus, either the Consortium does nothing to alter the landscape because same-sex couples who wish to apply to be Program foster parents will still be turned away by USCCB's subgrantee, or it exacerbates the constitutional deficiency because, on the Government's behalf, USCRI will actively segregate same-sex couples and treat them less favorably by sending them to a new URM Program services provider with significantly less capacity to support licensure and placements—and will do so by reference to USCCB's religious beliefs. Either way, constitutional infirmity persists.

exercise of religion *and* maintaining separation of religion and government. The assessment of neutrality under both Religion Clauses triggers an equal protection mode of analysis to identify any discriminatory object of governmental action, including by looking to the historical background of the government's decision and the specific series of events leading to the government's policy. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993). Here, the evidence demonstrates that the line of neutrality has been crossed repeatedly: Time and again, Federal Defendants have favored and ratified USCCB's religious beliefs in the course of their administration of the Programs.

The Government must remain neutral between religion and religion, and between religion and nonreligion. *See Larson v. Valente*, 456 U.S. 228, 244 (1982). Hence, the Government "may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general." *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 9 (1989) (plurality opinion). Yet, contrary to these well-established constitutional principles, the government programs and federal funds here are knowingly being used to disfavor a class of people because they are religiously objectionable and fail to satisfy a particular denomination's litmus test. This practice is at the heart of what the First Amendment proscribes: It directly contravenes the constitutional principles that protect us all against government-sponsored, religion-based harm.

If the Government delegates "important, discretionary governmental powers" to religious organizations, *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 127 (1982), it must put adequate "safeguard[s]" in place to ensure that its delegated power is used only for secular, neutral, and nonideological purposes, *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 703 (1994). For the Government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 465 (internal quotation

omitted). Nor may the Government accommodate religion by imposing undue burdens on others. *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (governmental action crosses the line from permissible religious accommodation to unconstitutional establishment if it shifts burdens or harms from benefited religious exercise to nonbeneficiaries); *see also Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005).

In this case, Federal Defendants have violated the Religion Clauses by: (1) improperly delegating governmental functions to USCCB without establishing and maintaining adequate safeguards to ensure that USCCB does not administer government programs or use taxpayer funds in a manner that impermissibly discriminates against and excludes disfavored classes based on USCCB's religious beliefs; and (2) benefiting religion in a manner that results in significant harms to third parties. And the ensuing harm is neither theoretical nor trivial. Federal Defendants are tasked with the paramount task of ensuring the welfare of the Program children in their care. Yet, as a direct result of government-sponsored, religiously motivated discrimination against prospective Program foster parents who are married same-sex couples, Program children are systematically deprived of the full range of placement options that would be in their best interests.

Moreover, the impact on prospective Program foster parents and Program children alike is not only painful and degrading, but also deeply coercive. Federal Defendants' administration of the URM and UAC Programs pressures lesbian, gay, and bisexual prospective foster parents to hide their sexual orientation when applying, to the extent that is possible, by signaling that the only path to participation, and thus to avoid discrimination, is to "mirror the Holy Family" or disavow same-sex relationships altogether. Program children receive the message that they should conform to religious beliefs to which they may not adhere, and decline to disclose if they are lesbian, gay,

bisexual, or transgender, because their identity may be condemned. As Esplin explained, her experience has caused her to alter her behavior going forward:

> For the first time, I have felt an urgent need to hide who I am and whom I love so that my daughter will not be subjected to the discrimination she otherwise could be because of this. I struggle with the dilemma of being completely truthful about who we are or hiding it in hopes I can protect her. I feel compelled to omit details about our family to people at her day care center, evading questions when asked quotidian questions about what my spouse does when we are at the park, failing to correct anyone who assumes I am straight and asks a question about what my husband does, or outright deceiving others so that my daughter will not be the target of hate. Worst of all, I fear for her physical safety because of the backlash against LGBTQ people and same-sex marriage. I would do anything to keep her from harm in any form even though it feels wrong. And ironically, doing so despite my good intentions, hurt her, too[,] because she absorbs everything I do and say. And everything I stay silent about sends a message, too. It breaks my heart to know that I might be reinforcing the same insidious message that there is something shameful about our family, but I feel as though I don't have a real choice.

B. Esplin Decl. ¶ 9.

### A. Federal Defendants Have Impermissibly Delegated Governmental Functions to a Religious Entity Without Establishing and Maintaining Adequate Safeguards to Avoid Discrimination Against Disfavored Classes Based on the Entity's Religious Beliefs.

The Government has structured its Programs in a way that presents two distinct delegation problems under the First Amendment.

**Fusion of governmental and religious functions.** "The core rationale underlying the Establishment Clause is preventing a fusion of governmental and religious functions[.]" *Larkin*, 459 U.S. at 126 (internal quotation omitted). When the Government delegates "important, discretionary governmental powers" to a religious entity, its action "inescapably implicates the Establishment Clause." *Id.* at 123, 127; *accord Grumet*, 512 U.S. at 696-97 (delegating important, discretionary governmental powers to religious bodies without adequate safeguards impermissibly fuses governmental and religious functions); *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 429 (2d Cir. 2002); *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d

1337, 1343 (4th Cir. 1995).

Providing for the care of Program children, including through placement with a foster family who best meets the child's needs, is an "important, discretionary governmental power[]." *Larkin*, 459 U.S. at 127. Through Program grants, Federal Defendants have delegated their governmental power and discretion to USCCB. Critically, in doing so, Federal Defendants failed to establish or maintain adequate safeguards to ensure that the government's power would be wielded by USCCB only in a secular, neutral, and nonideological manner, while knowing full well that USCCB intended to administer the Programs in accordance with its religious tenets and in furtherance of its religious ends. In doing so, the Government impermissibly fused governmental and religious functions in violation of the Religion Clauses. The actual religious belief and its ultimate effect are immaterial: Impermissible fusion of government and religion has occurred because the Government has structured the Programs in an unconstitutional manner that gives a religious entity discretion to exercise delegated governmental power to impermissibly further religious doctrine. This structural fusion violates the Religion Clauses, separate and apart from the equally impermissible religious discrimination that has resulted from USCCB's exercise of delegated governmental power (as explained below). For, "[w]here 'fusion' is an issue, the difference lies in the distinction between a government's purposeful delegation on the basis of religion and a delegation on principles neutral to religion, to individuals whose religious identities are incidental to their receipt of civic authority." *Grumet*, 512 U.S. at 699.

*Larkin* is instructive. There, a state statute gave churches an effective veto over liquor license applications. 459 U.S. at 117-19. That veto power constituted the impermissible establishment of religion because "[t]he churches' power under the statute [wa]s standardless" in the sense that it "could be employed for explicitly religious goals, for example, favoring liquor

licenses for members of that congregation or adherents of that faith." *Id.* at 125. As the Court recognized, this structure created an impermissible fusion that, in and of itself, threatened the general principle that civil power must be exercised in a manner that is neutral with respect to religion. The scheme, "by delegating a governmental power to religious institutions, inescapably implicates the Establishment Clause." *Id.* at 123. "The Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id.* at 127.

Establishment Clause history teaches that, whenever the government uses religious institutions "to carry out certain civil functions, often by giving [them] a monopoly over a specific function," Establishment Clause concerns are triggered. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., concurring) (citing Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131-81 (2003)). Such historical concerns include "coerc[ion]" regarding "religion or its exercise." *Id.* (quoting *Lee v. Weisman*, 505 U. S. 577, 587 (1992)); *see also Lee*, 505 U.S. at 640 (Scalia, J., dissenting); *Van Orden v. Perry*, 545 U.S. 677, 693 (2005) (Thomas, J., concurring)). Indeed, Justice Gorsuch specifically pointed out in *Shurtleff* that this historical understanding helps explain the Court's decision in *Larkin.* 142 S. Ct. at 1610 (Gorsuch, J., concurring).

Federal Defendants' administration of the URM and UAC Programs suffers the same fatal flaw as the scheme in *Larkin*. The Government has impermissibly delegated standardless discretion to USCCB, granting it veto power over Program foster care placement-related decisions in a manner that allows USCCB to use governmental authority to further its own, explicitly religious goals. It is "offensive to the spirit of the Constitution" to allow the religious beliefs of a governmental delegee to "substitute[]" for the "reasoned decisionmaking" of the Government. *See*

*Larkin*, 459 U.S. at 127.

Finally, the unconstitutional delegation of governmental functions to a religious entity is only compounded by Federal Defendants' recent modification of the URM Program. Federal Defendants have unconstitutionally delegated to USCCB and LIRS as well as USCRI (as members of a Consortium), *with no governmental oversight whatever*, the uniquely governmental function of determining the criteria—including any religious litmus tests—by which URM Program foster parent applicants in the Dallas-Fort Worth region will be sorted to local URM Program subgrantees. *See* PMF ¶¶ 81-108. The Consortium has deliberately declined to put in writing or otherwise disclose to ORR the criteria on which referrals will be made. *Id.* ¶¶ 87-88. Moreover, according to the Consortium's organizing documents, each participant has been granted a blanket prospective waiver against being required to exercise governmental authority in a way that would impose an (entirely unspecified) burden the entity's religious beliefs. *Id.* ¶ 108. The utter lack of governmental oversight of the delegation of unfettered authority to religious entities is constitutionally fatal.

**Use of government authority and funds to discriminate on the basis of religion.** Due to the lack of adequate safeguards, USCCB has unconstitutionally used the Programs to discriminate based on its own religious beliefs and ends. *See Agostini v. Felton*, 521 U.S. 203, 235 (1997); s*ee also In re Ams. United for Separation of Church & State v. Prison Fellowship Ministries*, 432 F. Supp. 2d 862, 933 (S.D. Iowa 2006) (finding First Amendment violation where there were "no adequate safeguards" to ensure that government funds were not directly used to coerce religion), *aff'd in pertinent part*, 509 F.3d 406 (8th Cir. 2007).[11]

---

[11] The Programs operate as *direct* aid programs because federal dollars are provided directly from the Government to Program grantees. For Establishment Clause purposes, the Supreme Court has long distinguished direct aid programs in which the government gives funds directly to

Constitutionally mandated safeguards were particularly important here, given that USCCB was outspoken as to its intent to administer the Programs in furtherance of its religious beliefs, as well as USCCB's open opposition to placing children with same-sex couples. Yet Federal Defendants implemented no safeguards to prevent delegated governmental authority from being used for expressly religious purposes. Instead, Federal Defendants affirmatively permitted USCCB to exercise delegated governmental discretion to turn away prospective Program foster parents who do not "mirror the Holy Family." *See, e.g.*, PMF ¶¶ 28-29, 31, 53, 172.

### B.    Allowing USCCB to Administer Federal Grants in a Discriminatory Manner That Excludes Disfavored Classes Is Not a Permissible Religious Accommodation.

In addition to violating the Religion Clauses for the reasons and in the manner stated above, Federal Defendants' actions cannot pass constitutional muster because the Government may not accommodate religion in a manner that results in significant harms to nonbeneficiaries. By allowing USCCB to administer its Program grants based on its religious beliefs, Federal Defendants injure married same-sex couples. Moreover, Federal Defendants' religious favoritism inflicts critical harms on Program children, who are denied placement options that may be in their best interests, based solely on religious criteria plainly unrelated to child welfare.

Though the Government may in some circumstances accommodate religious entities by exempting them from generally applicable legal requirements, "accommodation is not a principle without limits." *Grumet*, 512 U.S. at 706. To be constitutional, religious exemptions and exceptions: (1) must lift substantial, government-imposed burdens on the exercise of religion; and

---

participating entities from indirect aid programs—where the government gives aid to private individuals and public funds flow to religiously affiliated entities only as a result of independent choices of private benefit recipients. *See, e.g.*, *Carson ex. rel. O. C. v. Makin*, 142 S. Ct. 1987, 1989 (2022).

(2) must not impose undue burdens on third parties. *See, e.g., Cnty. of Allegheny v. Am. Civ. Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 613 n.59 (1989), *abrogated by Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 348 (1987) (O'Connor, J., concurring)). For, if the Government has not imposed a substantial burden on religious exercise to begin with, an exemption from a generally applicable law is an unconstitutional religious preference. *Texas Monthly*, 489 U.S. at 15; *Caldor*, 472 U.S. at 709-10. And, if, in purporting to accommodate the religious exercise of some, the Government imposes costs and burdens attendant to that religious exercise on others, it favors the faith of the benefited over the rights and the faith of the burdened. *See Cutter*, 544 U.S. at 722; *Texas Monthly*, 489 U.S. at 15, 18 n.8; *Caldor*, 472 U.S. at 709-10.

This standard is plainly violated here. All other considerations aside, Federal Defendants cannot "accommodate" USCCB's religious beliefs by delegating the responsibility to administer critical government programs to USCCB while exempting it from the nondiscrimination requirements that apply to the Government itself and therefore also to those acting on its behalf.

Exempting USCCB and its subgrantees from adhering to generally applicable nondiscrimination requirements does not alleviate an "exceptional government-created burden[ ] on private religious exercise." *Cutter*, 544 U.S. at 720. That is because, under the First Amendment, religious exercise is not substantially burdened by a neutral, generally applicable legal requirement (such as the constitutional nondiscrimination obligation here) unless that requirement "proscribes (or prescribes) conduct that [a person's] religion prescribes (or proscribes)." *Kaemmerling v. Lappin*, 553 F.3d 669, 677 (D.C. Cir. 2008) (quoting *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)).

Conditioning the award of a Program grant on a nondiscrimination obligation does not

cognizably burden USCCB's religious exercise. *See Allegheny*, 492 U.S. at 613 n.59; *Henderson v. Kennedy*, 253 F.3d 12, 16-17 (D.C. Cir. 2001) (ban on peddling on National Mall did not substantially burden religious exercise of plaintiffs who wished to sell religious T-shirts, in part because the ban was "at most a restriction on one of a multitude of means" of fulfilling their mission "to spread the gospel by 'all available means' "). USCCB's faith does not specifically prescribe Program participation, even if it does generally prescribe serving needy children. Program participation is just "one of a multitude of means" by which USCCB might effectuate its ministry. *Henderson*, 253 F.3d at 17; *see Kaemmerling*, 553 F.3d at 678 (stating that "a burden on activity unimportant to the adherent's religious scheme" does not constitute a substantial burden). The exemptions Federal Defendants have granted USCCB from the nondiscrimination requirements here thus cannot "reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion." *Texas Monthly*, 489 U.S. at 15.

Additionally, the Religion Clauses bar religious exemptions from neutral, generally applicable laws if the exemptions would shift costs, harms, or other burdens to nonbeneficiaries. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693, 729 n.37 (2014) ("Nor do we hold . . . that . . . corporations have free rein to take steps that impose disadvantages . . . on others or that require the general public [to] pick up the tab." (internal quotations omitted) (some omissions in original)); *Texas Monthly*, 489 U.S. at 18 n.8 (sales-tax exemption for religious periodicals impermissibly "burden[ed] nonbeneficiaries by increasing their tax bills . . . to offset the benefit bestowed on subscribers to religious publications."); *Caldor*, 472 U.S. at 710 (invalidating religious accommodation for Sabbath-observing employees in part because it imposed "substantial economic burdens" on employers and "significant burdens on other employees . . . . ").

When a religious exemption or exception for one creates significant detriments to others, it fails to promote tolerant comity in furtherance of the free exercise of religion and instead crosses

the line from permissible accommodation to unconstitutional religious preference. *See id.* 472 U.S. at 710 & n.9 (government's consideration of accommodations must account for the interests of and effects on third parties and must not provide "unyielding weighting" in favor of religious viewpoints). In other words, the Government may not use the guise of accommodation to further religion at the expense of other viewpoints—much less other fundamental rights and constitutional interests. *See Wallace v. Jaffree*, 472 U.S. 38, 53 (1985) ("[T]he First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of free and voluntary choice by the faithful . . . ."). The Supreme Court's recent decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), is not in conflict. There, the Court held that, where a city's foster care program rules permit, as a formal matter, one official or their designee entirely "in his/her sole discretion" to grant individualized exceptions from nondiscrimination requirements, *id.* at 1878 (internal quotation omitted), the requirements are neither neutral nor generally applicable. That type of wholly unfettered discretionary exception process is not at issue here. More importantly, there was no evidence in *Fulton* that any person had been excluded, turned away, or otherwise harmed by a child welfare agency.[12] By contrast, Federal Defendants are perpetuating obvious injury and

---

[12] In *Fulton*, the City of Philadelphia offered no meaningful and particularized evidence that granting the exception would do harm to any third parties, which resulted in the City being unable to carry its burden of persuasion. The City offered three governmental interests: maximizing the number of foster families, minimizing liability, and an interest in equal treatment of prospective foster parents. However, with respect to the first two interests, the City offered only "broadly formulated interests" and unsupported "speculation" of harms. *Id.* at 1881-82 (internal quotation omitted). With respect to the interest in equal treatment, the City failed to explain "why it has a *particular* interest in denying an exception [to religiously affiliated entities]" while making [the exception] available to others," and thus presented no particularized evidence of harm to third parties. *Id.* at 1882 (emphasis added).

35

resultant harm both to married same-sex couples and to Program children by funding and authorizing USCCB's religious discrimination. As a result, *Fulton* "does not foreclose or predetermine this Court's assessment of the . . . Defendants' infringement of Plaintiffs' rights under the Establishment Clause of the First Amendment or the Equal Protection Clause of the Fourteenth Amendment." Order at 6, *Rogers v. U.S. Dep't of Health & Hum. Servs.*, No. 6:19-cv-01567-JD (D.S.C. Dec. 2, 2021), ECF No. 201. Where such harm is clear, no alleged accommodation of USCCB's religious discrimination can overcome the government's "weighty" interest in "the equal treatment of prospective foster parents and foster children." *Fulton*, 141 S. Ct. at 1882.

Federal Defendants do not contest the significant harm to Program children that results from their refusal to provide married same-sex couples an equal opportunity to serve as foster parents under the Programs. *See* PMF ¶ 130 (acknowledging that it is beneficial for Program children if the pool of potential Program foster parents includes married same-sex couples). Indeed, the harm to child welfare is obvious: Every Program child deserves a shot at the placement that is in his or her best interests. Yet Federal Defendants' actions ensure that the full set of placement options is off the table for reasons entirely unrelated to child welfare.

"Even if there were an abundance of families willing to foster"—which there is not—"it would still be critical to access every qualified family to ensure that all [Program] children can be placed with families that are well-matched to meet their *specific* needs." Ex. 50 ¶ 30 (D. Brodzinsky Report) (emphasis added); PMF ¶ 135. "All children have unique needs and families are not fungible." Ex. 50 ¶ 30 (D. Brodzinsky Report). This is the tenet that undergirds our nation's child welfare jurisprudence: The familiar "best interest of the child" standard looks to the "unique nature of each child's situation" for this very reason. *See L.V.M. v. Lloyd*, 318 F. Supp. 3d 601,

608 & n.2 (S.D.N.Y. 2018) (describing ORR's stated approach to best-interests-of-the-child analysis in the UAC Program). This is also why national child welfare standards uniformly make clear that "all individuals and families should be considered when applying to foster or adopt children, including those who are sexual minority adults." Ex. 50 ¶ 24 (D. Brodzinsky Report); *see also* PMF ¶ 120. Federal Defendants' authorization and funding of USCCB's administration of the Programs in accordance with its religious views thus undermines the Government's own compelling interest in child welfare. *See Cutter*, 544 U.S. at 709, 720 ("An accommodation must be measured so that it does not override other significant interests."); *Caldor*, 472 U.S. at 710 (policies that give "unyielding weighting in favor" of religious observers "over all other interests" violate the Religion Clauses).

Preventing same-sex couples from being considered as placement options for Program children "reduce[s] the chances of [Program] children finding nurturing and permanent life-long family connections in a timely manner and increase[s] the risk for long-term adjustment difficulties," all of which is directly contrary to the best interests of Program children. Ex. 50 ¶¶ 27, 29 (D. Brodzinsky Report); PMF ¶ 128; *see also* 8 U.S.C. §§ 1232(c)(2)(A) (UAC Program placements must be based on the child's best interest), 1522(a)(3), (5)-(6), (d) (URM Program must take into account the relevant needs of the refugees populations at issue); PMF ¶ 129.

Finally, Federal Defendants' recent modification of the URM Program does not fare any better as a permissible religious accommodation. The Consortium's organizing documents contain blanket prospective waivers relieving all Consortium participants of any requirement to carry out any task under their delegated governmental authority that would violate their religious beliefs. PMF ¶ 108. But no Consortium member has identified with specificity any such required task or shown that carrying out such task would pose a significant burden on its religious exercise. It

necessarily follows that, with nothing more than an abstract exemption, no meaningful analysis of the harms to third parties could have been performed.

In a notable inconsistency, Federal Defendants have permitted this scheme despite elsewhere taking pains to detail precisely why they are in no position to enable this very form of discrimination. *See* Ltr. to S.C. Gov. Henry McMaster from ACF (Nov. 18, 2021), *available at* https://www.acf.hhs.gov/sites/default/files/documents/withdrawal-of-exception-from-part-75.300-south-carolina-11-18-2021.pdf (withdrawing exemption from nondiscrimination requirement in foster care context because it applied to entities that had neither requested it nor shown any substantial burden to their religious exercise, as well as on account of both the potential harm of limiting the diversity of available foster homes and the governmental interest in accounting for the harms that the exemption may have on third parties). Thus, Federal Defendants themselves recognize the impropriety of blanket waivers.

In light of their own admission in the above-referenced matter, Federal Defendants know well that their scheme here—similarly predicated on an improper waiver—cannot withstand scrutiny.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted.

Dated: July 27, 2022                              Respectfully submitted,

By: /s/ *Kenneth Y. Choe*
Kenneth Y. Choe (pro hac vice)
Jessica L. Ellsworth (D.C. Bar No. 484170)
James A. Huang (pro hac vice)
Michael D. Gendall (D.C. Bar No. 1029790)
Brendan C. Quinn (D.C. Bar No. 1616841)
Katherine Culora (D.C. Bar No. 1671154)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109

Telephone: (202) 637-5600
Facsimile: (202) 637-5910
ken.choe@hoganlovells.com
jessica.ellsworth@hoganlovells.com
james.huang@hoganlovells.com
mike.gendall@hoganlovells.com
brendan.quinn@hoganlovells.com
katherine.culora@hoganlovells.com

Russell A. Welch (pro hac vice)
**HOGAN LOVELLS US LLP**
609 Main Street, Suite 4200
Houston, TX 77002
Telephone: (713) 632-1437
Facsimile: (713) 632-1401
russell.welch@hoganlovells.com

Camilla B. Taylor (pro hac vice)
**LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.**
105 West Adams, 26th Floor
Chicago, IL 60603-6208
Telephone: (312) 663-4413
ctaylor@lambdalegal.org

Karen L. Loewy (DC Bar No. 1722185)
**LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.**
1776 K Street, N.W. 8th Floor
Washington, D.C. 20006-2304
Telephone: (202) 804-6245
kloewy@lambdalegal.org

Richard B. Katskee (D.C. Bar No. 474250)
Kenneth D. Upton, Jr. (D.C. Bar No.
1658621)
**AMERICANS UNITED FOR
SEPARATION OF CHURCH AND
STATE**
1310 L Street, N.W., Suite 200
Washington, D.C. 20005
Telephone: (202) 898-2133
katskee@au.org
upton@au.org

*Attorneys for Plaintiffs*

39

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on July 27, 2022, a true and correct copy of the foregoing document with attachments was filed using the Court's CM/ECF System, which will serve all counsel of record.

By: <u>/s/ *Kenneth Y. Choe*</u>
Kenneth Y. Choe (pro hac vice)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| FATMA MAROUF and BRYN ESPLIN, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-378 (APM) |
| | ) | |
| XAVIER BECERRA, in his official capacity as | ) | |
| Secretary of the United States Department of | ) | |
| Health and Human Services, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Fatma Marouf and Bryn Esplin ("Plaintiffs") submit this Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment pursuant to Local Rule 7(h) and Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs state as follows:

**A.**   **Administration Of The Unaccompanied Refugee Minors And Unaccompanied Alien Children Programs**

1.     The Office of Refugee Resettlement ("ORR") is a component of the Administration for Children and Families ("ACF"), which is in turn a component of the United States Department of Health and Human Services ("HHS") (collectively, along with the officials who lead them, "Federal Defendants").

2.     Federal Defendants' responsibilities include the administration of child welfare programs that provide care for thousands of unaccompanied refugee and immigrant children—the Unaccompanied Refugee Minors ("URM") Program and the Unaccompanied Alien Children ("UAC") Program (collectively, "Programs"). *See* 6 U.S.C. § 279 (UAC Program); 8 U.S.C. § 1522(d) (URM Program); Ex. 1 at HHS01144 (Cooperative Agreement between

1

HHS/ACF/ORR, Division of Unaccompanied Children's Operations ("DUCO"), and United States Conference of Catholic Bishops ("USCCB"), effective from February 1, 2017, to January 31, 2020) ("The Director of [ORR] of [HHS] has responsibility for the care and placement of unaccompanied children in accordance with Section 462 of the Homeland Security Act of 2002 . . . , 6 U.S.C. § 279.").

3.     The provision of care by Federal Defendants under the Programs includes recruitment and screening of prospective foster parents, training of foster parents, and placement of Program children with foster parents. *See* Ex. 2 at HHS13124 (



); Ex. 3 at HHS04221 at HHS4223-25 (ACF and ORR's Standing Announcement of Residential (Long Term Foster Care) Services for Unaccompanied Alien Children ("UAC"), dated May 9, 2018) (describing care provider responsibilities, including recruiting, assessing, selecting, credentialing, training, monitoring, and retaining foster parents and foster care sites); Ex. 4 at USCCB00006-07 (USSCB Replacement Designee Appl., FY 2017) (describing foster family recruitment certification and development); Ex. 5 at HHS_SUPP_000253-55, HHS_SUPP_000260, HHS_SUPP_000262 (                                                ).

4.     Foster care placement is required to be made consistent with each child's best interest. *See* 8 U.S.C. § 1232(c)(2)(A); 45 C.F.R. §§ 400.115(c), 400.118(b).

B.   **Delegation Of Functions Relating To The URM And UAC Programs To Defendant USCCB**

5.      Under both the URM and the UAC Programs, Federal Defendants award federal funds to grantees that administer the Programs on Federal Defendants' behalf pursuant to grant agreements.[1]

6.      ORR awarded URM and UAC Program grants to Defendant USCCB for the URM and UAC Program grant periods encompassing February 2017, when Plaintiffs sought to apply to be foster parents under the URM or UAC Program (the "Relevant Period"). Ex. 1 at HHS01144 (Cooperative Agreement).

7.      Catholic Charities of Fort Worth ("CCFW") was the subgrantee of USCCB for both Programs in the Dallas-Fort Worth, Texas area during the Relevant Period. *See id.*

8.      USCCB entered into subgrant agreements with CCFW to administer the Program grants in the area on its behalf, including by processing Program foster parent applications of local applicants. *See* Ex. 6, Krystin Peck Deposition Transcript ("K. Peck Dep. Tr.") at 42:6-45:5.

9.      Currently, USCCB's subgrantee in the area for the URM Program is Catholic Charities of Dallas ("CCD"). *See* Ex. 7, Kathryn Kuennen Deposition Transcript ("K. Kuennen Dep. Tr.") at 33:8-20; *see also* Ex. 8 at HHS00216 (Ltr. from K. Kuennen to ACF, dated June 6, 2019).

10.     In its capacity as a grantee during the Relevant Period, USCCB was delegated by Federal Defendants the responsibility for recruitment and screening of prospective foster parents, training of foster parents, and placement of Program children with foster parents. *See* Ex. 9 at HHS03493 (███████████████████████████████████████

---

[1] *See* ORR, *Unaccompanied Refugee Minors Program*, (current as of Nov. 23, 2021), https://www.acf.hhs.gov/orr/programs/refugees/urm.

3

████████████████████████████████████████████████████████████████

██████████████████████████████████); Ex. 2 at HHS13124, HHS13129, HHS13132-33; Ex. 3 at HHS04221 at HHS4225; Ex. 4 at USCCB00006 (URM Replacement Designee Grant Appl., FY 2017) (acknowledging responsibility for foster parent recruitment, certification, and development); Ex. 10 at HHS23983-85 (███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████); Ex. 11 at USCCB000200 (Agreement between Catholic Charities, Diocese of Fort Worth, Inc. and USCCB/Migration Refugee Services ("MRS"), dated March 20, 2017).

11.     In the Dallas-Fort Worth area during the Relevant Period, USCCB delegated these responsibilities, including but not limited to the recruitment and screening of prospective foster parents, to CCFW. *See* Ex. 12 at HHS10364 (Agreement between Catholic Charities, Diocese of Fort Worth, Inc. and USCCB/MRS, dated March 20, 2018) (describing responsibilities for foster care placement).

12.     Federal Defendants are and were at all relevant times obligated to ensure that USCCB abides by applicable laws in administering its Program grants. *See* Ex. 13, Kenneth Tota Deposition Transcript ("K. Tota Dep. Tr.") at 106:5-107:16

13.     Federal Defendants' regulations prohibit grantees from discriminating on the basis of sexual orientation. *See* 45 C.F.R. § 75.300; *see also* 45 C.F.R. pts. 80, 84, 86, 87, 91 (nondiscrimination regulations that grantees are required to follow).

14.     During the Relevant Period, Federal Defendants were on notice that there was a shortage of foster parents in the Programs, as USCCB detailed in its grant applications that

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

**C.      Federal Defendants' Awareness Of USCCB's Religious Beliefs**

15.      USCCB's URM and UAC Program grant applications for the Relevant Period expressly stated the caveat that "████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████; Ex. 13, K. Tota Dep. Tr. at 144:18-148:6 (acknowledging USCCB's intent to administer its FY 2017 URM Program grant in accordance with its religious beliefs).

16.      USCCB's religious beliefs include the belief that marriage must be between one man and one woman. *See* Ex. 6, K. Peck Dep. Tr. at 100:4-5, 115:2-8.

17.      Reflecting its religious beliefs, USCCB openly rejects parenting by married couples unless they are in a legal union of one man and one woman: "[P]lacing a child in the care of two men or two women . . . deprives the child of either a mother or a father."[2]

18.      USCCB's fact sheets concerning foster care and adoption, which have appeared on USCCB's website since at least 2013, state that, "[w]hen placing children with couples, Catholic

---

[2]    USCCB, *FAQs on the Meaning of Marriage & Sexual Difference*, https://www.usccb.org/committees/promotion-defense-marriage/faqs-meaning-marriage-sexual-difference (last visited July 27, 2022).

Charities ensures those children enjoy the advantage of having a mother and a father who are married."[3]

19.     USCCB refuses to enter into Program subgrant agreements with organizations that would process foster parent applications of, or place foster children with, same-sex couples. *See* Ex. 11 at USCCB000204 (Agreement between Catholic Charities, Diocese of Fort Worth, Inc. and USCCB/MRS, dated March 20, 2017).

20.     USCCB's agreements with its subgrantees require that they administer its Program grants in a manner consistent with its religious beliefs, including by not processing foster parent applications of, or placing foster children with, same-sex couples. *See* Ex. 7, K. Kuennen Dep. Tr. at 110:4-13.

21.     ORR staff responsible for the URM and UAC Programs, including Kenneth Tota and Jallyn Sualog, knew of USCCB's religious beliefs disfavoring same-sex couples and their marriages at the time ORR awarded USCCB the grants in effect during the Relevant Period. Ex. 13, K. Tota Dep. Tr. at 155:1-9, 156:20-157:7; Ex. 15, Jallyn Sualog Deposition Transcript ("J. Sualog Dep. Tr.") at 232:4-18.

22.     When ORR awarded the URM and UAC Program grants to USCCB for the Relevant Period, it did not prohibit USCCB from administering the grants based on its religious beliefs. *See* Ex. 7, K. Kuennen Dep. Tr. at 42:24-43:25, 62:8-18; *see also* Ex. 58 (ACF Policy on Grants to Faith-Based Organizations (Ex. 7 to Viola Dep.)).

23.     Federal Defendants did not require USCCB to notify them when it or its subgrantee declined to process a Program foster parent application of a same-sex couple. *See* Ex. 7, K.

---

[3] USCCB, *USCCB Fact Sheet: Discrimination Against Catholic Adoption Services*, https://www.usccb.org/issues-and-action/religious-liberty/upload/Discrimination-against-Catholic-adoption-services.pdf (last visited July 27, 2022).

Kuennen Dep. Tr. at 45:21-48:24; Ex. 16 at HHS14860 (███████████████████
████████████████████).

24.     Federal Defendants never communicated any concern to USCCB, or its subgrantee CCFW, about their discrimination against same-sex couples. Ex. 17, Dana Springer Deposition Transcript ("D. Springer Dep. Tr.") at 45:7-45:14, 91:23-92:2, 92:9-17.

**D.      USCCB's Subgrantee CCFW Excluded Plaintiffs From Participation In The URM And UAC Programs On Account Of A Religious Objection To The Fact That They Are A Same-Sex Married Couple, And Plaintiffs Informed Federal Defendants Of Such Exclusion**

25.     Plaintiffs Fatma Marouf and Bryn Esplin are a married same-sex couple who were married in 2015. *See* Ex. 18, Fatma Marouf Deposition Transcript ("F. Marouf Dep. Tr.") at 22:11-19.

26.     Plaintiffs were married to each other when, in February of 2017, they sought to submit an application to be Program foster parents under the URM or UAC Program through CCFW. *See id.* at 22:16-19, 49:14-50:6.

27.     On or about February 22, 2017, Plaintiffs spoke with a CCFW representative about their interest in fostering a Program child. *Id.* at 39:9-25. During Plaintiffs' conversation with CCFW representative Dana Springer, they told Springer that they are a married same-sex couple. *Id.* at 39:17-42:5.

28.     Springer conveyed to Plaintiffs that their application to be Program foster parents would not be accepted because they do not "mirror the holy family." *Id.* at 39:17-42:5, 76:25-77:6; *see also* Ex. 17, D. Springer Dep. Tr. at 106:17-107:22.

29.     On February 28, 2017, Plaintiff Marouf notified Federal Defendants by electronic mail that CCFW had refused to allow Plaintiffs to submit an application to be Program foster parents because they do not "mirror the holy family." *See* Ex. 19 at USCCB000235-36 (E-mail

7

chain re: Refugee Foster Care Program – LGBT Foster Parents); Ex. 20 at HHS02686 (E-mail

chain re: Refugee Foster Care Program – LGBT Foster Parents).

30.     Federal Defendants contacted USCCB, which conferred with CCFW, which

confirmed to Federal Defendants that it had refused to allow Plaintiffs to apply to be Program

foster parents because they are a same-sex married couple. Ex. 19 at USCCB000234-36 (E-mail

chain re: Refugee Foster Care Program – LGBT Foster Parents); Ex. 21 at HHS03006 ███████

████████████████████████████).

31.     USCCB and CCFW also informed Federal Defendants that CCFW is "guided by

Catholic teaching, which supports their practice of recruiting foster parents that mirror the Holy

Family," that turning away same-sex couples has been CCFW's practice for as long as it has been

in existence, and that such practice is a requirement that USCCB imposes on its subgrantees. Ex.

19 at USCCB000234-36; *see also* Ex. 21 at HHS03006.

32.     As a result of being turned away by CCFW, Plaintiff Esplin "was devastated,"

"insult[ed]" and was left "feeling of unworth[y] and shame[ful]." *See* Declaration of Bryn Esplin

("Esplin Decl.") ¶¶ 5, 8. She testified that "[i]t was really painful to be rejected" as a result of the

"discrimination" that Federal Defendants allowed to occur. Ex. 22, Bryn Esplin Deposition

Transcript ("B. Esplin Dep. Tr.") at 67:6-68:11.

33.     Plaintiff Marouf similarly "reel[ed]" from shock and rejection:

I could not understand how our marriage could be degraded in this way by a federal
program. At the same time, being rejected based on one aspect of my identity made me feel
like less than a full person. We were not even given a chance to be evaluated based on the
environment and care that we could provide a child—the inquiry ended based on our same-
sex marriage.

*See* Declaration of Fatma Marouf ("Marouf Decl.") ¶¶ 12, 14.

34.     Plaintiff Marouf further explained, "That our own government would reject us as potential foster parents—not based on our ability to care for a refugee child, but solely because of disapproval of who we are—is incredibly painful in ways people may not easily understand who have never experienced the sting of discrimination." *Id.* ¶ 16.

35.     Plaintiffs also feel distress for Program children who are denied an appropriate placement as a result of Federal Defendants' actions, and who receive the message resulting from Federal Defendants' actions that same-sex couples are unfit to be parents:

> I believe that there are kids who are in the government's refugee program who deserve loving homes, ones that are not demeaned solely by the makeup of marriages like mine, and it is important to me to maximize the pool of potential families. Any system that treats us differently—whether by excluding us or referring us to a different and inferior process— does not simply disadvantage us, but also disadvantages the kids as well. Some of these kids very likely are lesbian, gay, bisexual, or transgender themselves, or questioning or struggling with their identities. A program that views same-sex relationships or [lesbian, gay, bisexual, and/or transgender] persons as "lesser than" cannot serve the developmental needs of any child.

*See* Esplin Decl. ¶ 10; *see also, e.g.,* Marouf Decl. ¶¶ 13, 22.

36.     Since filing this case, Plaintiffs have been overjoyed to welcome a daughter into their family after achieving pregnancy through reproductive technology. Marouf Decl. ¶ 17.

37.     Plaintiffs' experience of discrimination on account of Federal Defendants' actions has left them fearful and anxious, not just for themselves, but for their daughter, who is growing up in a world in which her own government devalues, rejects, and demeans her family. *Id.* ¶¶ 17-18; Esplin Decl. ¶¶ 8-9.

38.     Plaintiffs continue to wish to provide a loving home to refugee children. Marouf Decl. ¶ 19.

39.     The experience of being excluded from a federal program because of her same-sex relationship caused Plaintiff Marouf to fear being turned away again. *Id.* ¶¶ 20-21. Plaintiff Esplin

explained that the experience has caused her to alter her behavior in a way that affects her daily life. *See* Esplin Decl. ¶ 9.

40.　　To this day, Plaintiffs have been denied an opportunity to submit a URM Program foster parent application in the Dallas-Fort Worth, Texas area without regard to USCCB's religious beliefs disfavoring same-sex marriage. *See* Ex. 18, F. Marouf Dep. Tr. at 24:4-10; *see also* Esplin Decl. ¶ 7; *see also* Marouf Decl. ¶ 15.

**E.　Federal Defendants Continue To Refer Same-Sex Couples To USCCB**

41.　　████████████. On April 2, 2019, Federal Defendants received an e-mail from ██████████, who stated that he and his husband were "████████████████████ ████████████████████" *See* Ex. 23 at HHS01572 (████████████████ █████).

42.　　His spouse is bilingual, and his own abilities in Spanish are ████████████ ████████████████. *Id.*

43.　　████████ informed Federal Defendants that he and his spouse had a bed open in their home and would love to foster a Program child. *Id.*

44.　　After conferring internally in light of "███████████," Federal Defendants referred █████ to USCCB's website. *Id.*

45.　　████████. On February 24, 2020, Federal Defendants received an e-mail from █████████ stating that he and his partner were interested in fostering unaccompanied refugee minors, and asking for information about the process. Ex. 24 at HHS25012 (████████████ ████████████████████).

46.　　The signature line of the e-mail indicated ████████████████████ ████████████████. *Id.* at HHS25013.

47.     Federal Defendants referred █████ to the websites of USCCB and Lutheran Immigration and Refugee Services ("LIRS"), another national agency to which Federal Defendants delegate URM Program functions in certain states, but that did not administer the URM Program in Texas at that time. *Id.* at HHS25012.

48.     ███████████. On April 30, 2020, Federal Defendants received an e-mail from ███████████ stating that █████ and her partner were interested in "██████████



██████████████████████████████████████████████████████████████

████████████████████████████████████████████" Ex. 25 at HHS25014 (███████████

███████████).

49.     Federal Defendants similarly referred █████ to the websites of USCCB and LIRS. *Id.*

50.     ███████████. On May 28, 2020, Federal Defendants received an e-mail from Jamie Brennan inquiring about the "██████████████████████," and stating that █████ and █████'s Spanish-speaking partner were interested in fostering a Program child. Ex. 26 at HHS25009 (███████████████████████).

51.     Federal Defendants similarly referred █████ to the websites of USCCB and LIRS. *Id.*

52.     At the time Federal Defendants referred the above individuals to USCCB, they knew that USCCB had a religious objection to same-sex couples serving as foster parents. *See* Ex. 19 at USCCB000234-236; Ex. 21 at HHS03006.

**F.**  **USCCB's Subgrantees, Including CCFW, Have Turned Away Additional Foster Parent Applicants Because They Were Single, Lesbian, Gay, Or A Member Of A Same-Sex Couple**

53.    CCFW has turned multiple other prospective foster parent applicants away because they were unmarried or a member of a same-sex couple and therefore did not "mirror the holy family." Ex. 17, D. Springer Dep. Tr. at 95:24-96:18, 106:21-107:3.

54.    CCFW turned at least one other lesbian, gay, or bisexual person away in 2017, within a day or two of informing Plaintiffs that they also would not be permitted to apply. *Id.* at 96:19-97:9, 105:7-16.

*i.*    ████████████████



55.    ████████████, who communicated with USCCB via e-mail on February 6, 2017, sought information about USCCB's foster care program for minors "████████████████████ ████." Ex. 27 at CCFW 000090 (████████████████████). She wrote, "██ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████." *Id.*

56.    On February 7, 2017, an employee of CCFW responded to ██████ with information and invited her to attend a tour and fill out a survey. *Id.* at CCFW 000089-90.

57.    ██████ responded the same day to say, "████████████████████." *Id.* at CCFW 000089. In her response, Lambert also asked, ████████████████████ ████████████████████████████████████" *Id.*

58.    The CCFW employee wrote back via an e-mail on February 8, 2017, to say that ██████ would like to speak with ██████, and requested a telephone number, which ██████ provided on February 9, 2017. *Id.*

59.     In an e-mail to the chief executive officer of CCFW dated February 22, 2017, Springer memorialized multiple conversations in which she turned away lesbian, gay, or bisexual and/or unmarried prospective foster parent applicants. *See* Ex. 28 at CCFW 000045 (E-mail chain re: Refugee Foster Care Program). In the e-mail, Ms. Springer stated: "Third call I have had to do like this between yesterday and today. They actually all went super well (because I'm the queen of sharing this news now)." *Id.*; *see also* Ex. 17, D. Springer Dep. Tr.at 104:25-106:25.

### ii.  *Viviana Chapa and Kirstin Mason*

60.     Viviana Chapa and Kirstin Mason are a married same-sex couple who live in Nashville, Tennessee. *See* Declaration of Viviana Chapa ("Chapa Decl.") ¶ 2; Ex. 29 at HHS22260 (███████████████████████████████).

61.     Chapa and Mason were married to each other in 2019, when they sought to be foster parents under the UAC Program in Nashville through Bethany Christian Services ("BCS"), a Program subgrantee of USCCB. Chapa Decl. ¶¶ 5, 9; Ex. 29 at HHS22260. Chapa informed a BCS recruiter that she is bilingual, and the recruiter wrote, "[t]here is not only a huge need for foster parents but also foster parents who are bilingual." Chapa Decl. ¶ 9.

62.     Chapa sent an inquiry to the BCS recruiter asking whether her marriage to Mason would pose a barrier to becoming a foster parent. Chapa Decl. ¶ 12; Ex. 29 at HHS22260.

63.     In response, the BCS recruiter referred Viviana to its "stakeholder," USCCB, and provided an e-mail address for a USCCB employee. Chapa Decl. ¶ 12; Ex. 29 at HHS22260.

64.     Chapa e-mailed the USCCB employee, providing relevant information about her family, and indicating that she "didn't think [her] homosexuality would be an issue, but the more [she] researched, the more it became apparent that [her] sexual orientation could indeed be a problem." Chapa Decl. ¶ 13.

65.     Chapa received no response from the USCCB employee. *Id.*

66.     In August 2019, Chapa notified Federal Defendants by e-mail that BCS had referred her and her wife to USCCB, that she had e-mailed USCCB to inquire whether her sexual orientation created a barrier to becoming a foster parent, and that she had received no response from USCCB. *See* Chapa Decl. ¶ 14; Ex. 29 at HHS22260.

67.     Federal Defendants informed Chapa that "███████████████████████████ █████████" and directed her to contact the UAC Program "████████████████████ ██████████████████████████████████." Ex. 29 at HHS22260; *see also* Chapa Decl. ¶ 15.

68.     Chapa has not received further correspondence from Federal Defendants or USCCB. *Id.* ¶ 15.

69.     Chapa was deeply distraught and hurt on account of her interactions with BCS, USCCB, and Federal Defendants. *Id.* ¶¶ 16-21. She continues to feel pain as a result of the rejection that she experienced from a federal program, and the message she received from the federal government that her family is so unworthy of fostering a child that she would not even be considered as a potential placement. *Id.*

### iii. Kelly Easter

70.     Kelly Easter is a single lesbian woman living in Nashville, Tennessee, who submitted an e-mail inquiry to ORR about how to become a foster parent of refugee youth. *See Easter v. United States Dep't of Health & Hum. Servs.*, No. 1:21-cv-02681 (D.D.C. Oct. 13, 2021), ECF No. 1 ("Compl.") ¶¶ 7, 49.

71.     ORR informed Easter that her contact information had been forwarded to USCCB and included a link to Bethany Christian Service ("BCS"), USCCB's Program subgrantee in Nashville. *Id.* ¶ 51.

72.     In or about September 2020, Easter contacted BCS seeking to apply to be a Program foster parent. *Id.* ¶ 52.

73.     BCS repeatedly denied her the opportunity to apply to be a Program foster parent because she is a lesbian, specifically referencing USCCB's religious objections, and BCS's constraints as USCCB's subgrantee. *Id.* ¶¶ 54-57.

74.     On October 13, 2021, Easter filed suit against Federal Defendants after notifying them of the discrimination but receiving no substantive response. *See generally id.*

75.     On February 25, 2022, a representative of USCCB sent a letter to BCS, copying ORR, stating that USCCB was aware of Easter's lawsuit against Federal Defendants, and that "this litigation is driven by a misunderstanding concerning the USCCB's religious beliefs that govern foster care placements." Ex. 30 at HHS_SUPP_00043 (Ltr. from W. Canny to A. Scott, dated February 25, 2022). The letter further stated that "neither the USCCB's religious beliefs nor its subgrant agreement with BCS bars a single person with a homosexual orientation from serving as a foster parent by virtue of his or her orientation. Likewise, placement of a foster child with such an individual would violate neither the USCCB's religious beliefs nor its subgrant agreement with BCS." *Id.*; *see also* Ex. 31 at HHS_SUPP_000012 (████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████).

76.     Easter subsequently dismissed her lawsuit. *See Easter*, No. 1:21-cv-02681 (D.D.C.

Jun. 24, 2022), ECF No. 21, Notice of Voluntary Dismissal Without Prejudice.

**G.     Federal Defendants Continue To Delegate Child Welfare Functions To USCCB In The Dallas-Fort Worth Area**

77.     CCFW transitioned its URM and UAC Programs to Catholic Charities Dallas

("CCD"), another USCCB subgrantee, at some point after this litigation commenced. *See* Ex. 17,

D. Springer Dep. Tr. at 129:13-15; Ex. 32, Anne Mullooly Deposition Transcript, May 18, 2022

("A. Mullooly Dep. Tr.") at 41:2-3 (CCD has replaced CCFW).

78.     CCD rents or leases office space from CCFW, and CCFW turned over its files to

CCD. Ex. 17, D. Springer Dep. Tr. at 121:8-13. CCD took over leases on group homes previously

operated by CCFW. *Id.* at 123:12-24.

79.     All of the staff who worked in the federal foster care programs at CCFW were

offered jobs at CCD, and the vast majority of them transitioned to CCD. *Id.* at 122:19-24.

80.     USCCB subsequently ceased operating a UAC Program, but has continued to

operate a URM Program through CCD, in the Dallas-Fort Worth area. Fed. Defs.' Mot. to Stay

Summ. J. Deadlines at 2 n.1 (Nov. 8, 2021), ECF No. 95 [hereinafter "ECF No. 95"].[4]

**H.     Federal Defendants Created A Consortium To Screen And Segregate Same-Sex Couples Who Wish To Apply To Be URM Program Foster Parents In The Dallas-Fort Worth Area**

81.     Federal Defendants created a "Consortium" to perform intake for prospective URM

Program foster parent applicants in the Dallas-Fort Worth area in response to this litigation

regarding USCCB's and its subgrantees' refusal to work with same-sex couples. Ex. 33 at

HHS_SUPP_000193 (████████████████████████████████████████████████

---

[4] Unless otherwise noted, all references to ECF entries refer to pleadings filed in the proceedings.

██████████████████████████████████████████████████████

███████████████████ ); Ex. 34 at HHS_SUPP_000269-70 (███████████████████████

████████████████████████████████████████████████████████

████████████ ); Ex. 35 at HHS_SUPP_000009 (E-mail chain re: USCRI Approval for TX URM

Task) (asking Consortium participant "not to publicize this new role in any way considering the

sensitivities around the pending litigation that prompted this consortium"); Ex. 31 at

HHS_SUPP_000011-14; Ex. 32, A. Mullooly Dep. Tr. at 59:8-21.

82.     In connection with this new arrangement, Federal Defendants funded LIRS and its

subgrantee Upbring to begin providing URM Program services in the Dallas-Fort Worth area. *See*

Ex. 36 at HHS_SUPP_000146-58 (Dallas-Fort Worth URM Prospective Foster Parent Intake

(Training Materials)).

83.     Neither LIRS nor Upbring objects to working with same-sex couples. *See* ECF No.

95 at 3; Ex. 32, A. Mullooly Dep. Tr. at 42:13-17.

84.     Federal Defendants also sought out and funded a third-party entity—the U.S.

Committee for Refugees and Immigrants ("USCRI")—to screen prospective URM Program foster

parents exclusively in the Dallas-Fort Worth area for the sole purpose of directing them to either

CCD or Upbring based on certain criteria. *See* ECF No. 95 at 2; Ex. 36 at HHS_SUPP_000147

(Consortium created at the request of and under the initial guidance of ORR).

85.     USCRI's responsibility is to operate an e-mail inbox and telephone hotline and to

direct prospective URM Program foster parent applicants to fill out a form that collects

demographic information, including "family composition," which indicates whether the applicant

is, among other things, a member of a same-sex couple. Ex. 31 at HHS_SUPP_000011-12 (URM

Consortium Kick-Off for D/FW Meeting Notes, dated October 14, 2021); Ex. 37 at

HHS_SUPP_000179 (Meeting to Inform the TX RD About the Consortium Meeting Notes); Ex. 38 at HHS_SUPP_0196 (Consortium Model Flow Chart); Ex. 39 at HHS_SUPP_000010 (Ltr. from K. Tota to USCRI, dated Sept. 28, 2021).

86.     USCRI's responsibilities include referring prospective applicants to either CCD or Upbring for potential licensure and training as a URM Program foster parent based on the following factors: 1) demographic information, including family composition; 2) whether the prospective applicant has an existing tie to either of the agencies, such as whether the prospective applicant attended a recruitment event hosted by either of the agencies; and 3) additional criteria imposed by CCD and/or Upbring with respect to URM Program foster parent eligibility beyond requirements for licensure under state law. Ex. 36 at HHS_SUPP_000146-58; Ex. 37 at HHS_SUPP_000179; Ex. 40 at HHS_SUPP_000053-55 (Intake and Referral Procedures).

87.     With respect to this last factor—additional criteria imposed by CCD and/or Upbring with respect to URM Program foster parent eligibility beyond state licensure requirements—ORR and the Consortium participants made a deliberate choice not to identify such criteria in writing. Ex. 41 at HHS_SUPP_000161-63 (███████████████████████████████████████ ███████████████████████); Ex. 42 at HHS_SUPP_000164-68 (████████████████ ███████████████████████████████████████).

88.     ORR reasoned that recording such criteria in writing would put USCRI "████ █████████████" and invite additional lawsuits. Ex. 41 at HHS_SUPP_000162 ("████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████"); Ex. 42 at HHS_SUPP_164-65 (ORR representative states, "███████████████████ ███████████████████████████████████████████████

18

███████████████████████████████████████████). Ex. 32, A.

Mullooly Dep. Tr. at 99:3-6, 100:6-8 (Consortium participants did not want to put referral criteria

in writing because of "concerns about potential additional litigation").

89.    Instead of recording the criteria in writing, a representative of USCRI met with a

representative of USCCB to ███████████████████████████████████

███████████████████. Ex. 41 at HHS_SUPP_000162.

90.    Federal Defendants were not informed of the criteria that USCRI considers in

making its referrals. Ex. 32, A. Mullooly Dep. Tr. at 93:16-24.

91.    Federal Defendants' understanding is that USCRI will operate in such a way that

all prospective applicants in the Dallas-Fort Worth area will have an opportunity to work with a

provider of URM Program services, and that, as a result of USCCB's religious objections, CCD

continues to refuse to work with same-sex couples who wish to apply to be URM Program foster

parents. *Id.* at 40:11-16 ("Based on previous experiences, I would say that the government believes

that USCCB is not willing to work with same-sex couples or I should say their subgrantees,

Catholic Charities of Dallas, is not willing to work with same sex couples."); *see also id.* at 48:25-

49:4, 80:17-19.

92.    Federal Defendants understand that USCRI likely will refer all same-sex couples

to Upbring rather than CCD. *Id.* at 49:23-50:6.

93.    Federal Defendants are not seeking information from USCRI about why applicants

are being sent to Upbring versus CCD, and Federal Defendants' representative refused to answer

questions about the purpose of or reason for the Consortium or the process for how USCRI

determines whether to send a prospective applicant to one agency versus the other. *Id.* at 26:5-

27:5, 35:2-6, 64:19-65:8, 78:3-25, 94:2-14.

94.     USCRI receives funding directly from ORR to perform this screening and segregation of prospective URM Program foster parent applicants. *See* Ex. 43 at HHS_SUPP_000202 (Ltr. from K. Tota to USCRI).

95.     USCRI's budget for these activities is $███████. Ex. 44 at HHS_SUPP_000015 (███████████████████████████████████████████).

96.     CCD is not obligated to send to USCRI for screening 1) already licensed foster parents in its network, or 2) those who have pursued licensure because they are interested in domestic foster care or in federal foster care under the UAC Program. *See* Ex. 36 at HHS_SUPP_000146-58; Ex. 42 at HHS_SUPP_000164-68; Ex. 31 at HHS_SUPP_000011-14.

97.     Thus, CCD already has a pool of licensed foster parents and does not need to send them to USCRI. Ex. 32, A. Mullooly Dep. Tr. at 19:9-25.

98.     If a URM Program foster parent working with CCD enters a same-sex relationship, making the person ineligible to continue working with CCD, Federal Defendants anticipate that the person will be sent back to USCRI and then referred to Upbring. Ex. 31 at HHS_SUPP_000011-14.

99.     Dallas-Fort Worth is the only geographic area where Federal Defendants have created a Consortium model. *See* ECF No. 95 at 2; Ex. 37 at HHS_SUPP_000179.

100.    Dallas-Fort Worth is the only geographic area where Federal Defendants have two providers of URM Program services; in all other areas where USCCB operates a URM Program, it is the only agency performing such services. Ex. 32, A. Mullooly Dep. Tr. at 61:22-24.

101.    Federal Defendants' creation of the Consortium does not remedy the "stigma, rejection, and humiliation" experienced by Plaintiffs. *See* Marouf Decl. ¶ 20.

20

102.    Upbring was designated as a URM Program grantee in 2020, but has not yet served any foster children, and is still working to hire staff and license foster parents. Ex. 32, A. Mullooly Dep. Tr. at 22:4-8.

103.    Upbring has only one licensed foster family in its network, and this family does not have a foster child placed with them. *Id.* at 35:7-12, 36:4-9.

104.    As of December 2021, CCD housed approximately ████████████████████ ████████. Ex. 45 at HHS_SUPP_000187-88 (████████████████████████ ████████████████████████).

105.    CCD currently has approximately 50 children in its direct care. Ex. 32, A. Mullooly Dep. Tr. at 21:15-18.

106.    CCD's budgeting, funding, and staffing are more robust than Upbring's; they are materially different-sized programs, with CCD's materially larger than Upbring's. *See id.* at 89:24-90:22.

107.    Federal Defendants profess ignorance about how USCRI will operate, and state that it is "possible" that Plaintiffs themselves would be turned away by USCCB's subgrantee all over again were they to reapply under the new regime. *Id.* at 105:17-23.

108.    The Consortium's organizing documents contain blanket prospective waivers providing that no Consortium participant will be required to take any future action that would violate its religious beliefs. Ex. 46 at HHS_SUPP_000076-78 (Conflict of Interest Plan: Dallas-Fort Worth, Texas URM Consortium); Ex. 32, A. Mullooly Dep. Tr. at 44:4-46:24.

## I.    Impact Of Federal Defendants' Actions On Program Youth

109.    Both youth candidates for domestic foster care and youth candidates for the URM/UAC Programs face documented safety risks, but local jurisdictions determine youth

eligibility for domestic foster care while federal agencies determine youth eligibility for the URM/UAC Programs. Declaration of Caitlyn Devlin ("Devlin Decl.") ¶¶ 4-5.

110.    Children in domestic foster care are separated from their parents through legal means while URMs/UACs are separated from their parents largely through circumstances such as war, persecution, or genocide. *Id.*; *see also* Ex. 47 at HHS_SUPP_000094 (Differences Between International Foster Care and Domestic Foster Care).

111.    URM Program priorities include placement of youth in the least restrictive care setting possible. Ex. 48 at HHS_SUPP_000114 (██████████████████████████████████████ ████████████████████████████████████████████████).

112.    Eligible URMs are admitted into the URM Program only if there are available foster beds. *See* Ex. 49 at HHS_SUPP_000083 (CCD Flyer reflecting steps to become an international foster parent and explaining how refugee young people enter the URM Program); Devlin Decl. ¶ 5; Ex. 32, A. Mullooly Dep. Tr. at 108:9-109:4.

113.    Once a youth is eligible for the URM Program, ORR or the State Department sends the youth's information to the national network of URM Program service providers (*e.g.*, USCCB, LIRS) and then the providers submit a "placement assurance memo" indicating that they have a licensed foster family or other placement that would suit the youth's needs, before the youth may be admitted into the URM Program. *See* Ex. 49 at HHS_SUPP_000083; Ex. 32, A. Mullooly Dep. Tr. at 108:9-109:4.

114.    Providers must reach out to subgrantee foster care programs that accept URM referrals to determine if there is an available foster home for the youth prior to submitting a placement assurance memo. *See* Ex. 49 at HHS_SUPP_000083; *see also* Devlin Decl. ¶ 5; Ex. 32, A. Mullooly Dep. Tr. at 108:9-109:4.

115.    Finding stable, loving, and permanent homes for foster children, including those in the URM and UAC Programs, represents one of the most important responsibilities for child welfare agencies. Ex. 50 ¶ 22 (D. Brodzinsky Report).

116.    Children in foster care are some of the most vulnerable children in our nation, often experiencing pre-placement adversity and trauma that lead to increased risk of psychological and educational maladjustment during childhood and adolescence, as well as poorer life adjustment in adulthood. *Id.* ¶ 21 (incorporating citations within).

117.    Youth who enter foster care through the UAC and URM Programs in particular are psychologically vulnerable because of histories of separation from family members, early life adversity and trauma. *Id.*; *see also* Ex. 40 at HHS_SUPP_000053-55 (children in the URM Program "among the most vulnerable minors in the world").

118.    Research indicates that these children have high rates of Post-Traumatic Stress Disorder, as well as other forms of emotional/behavioral disturbance, although they can also show remarkable resilience and adjustment to their new home and country with appropriate support, care, and expectations from their foster family. *See* Ex. 50 ¶ 21 (D. Brodzinsky Report) (incorporating citations within).

119.    Child welfare agencies are charged with guaranteeing that the best interests of children are paramount, in accordance with well-established professional standards in the field of child welfare. *See id.* ¶ 22.

120.    These professional standards include welcoming all capable prospective foster and adoptive parents regardless of race, religion, marital status, gender, disability, or sexual orientation. *Id.* ¶¶ 22-24 (D. Brodzinsky Report) (incorporating citations within); *see also, e.g.*, Ex. 51 (Child Welfare League of America, *Standards of Excellence for Family Foster Care*

*Services* 97 (Child Welfare League of America ed., rev. ed. 1995)) ("The family foster care agency should not reject foster applicants solely due to their age, income, marital status, race, religious preference, sexual orientation, physical or disabling condition, or location of the foster home.").

121.    These professional standards seek to maximize the number of placement options for vulnerable children, focusing exclusively on ensuring that placements serve children's best interests, and a prospective foster parent's capacity to understand and meet the needs of a particular available child. *See* Ex. 50 ¶¶ 22-24 (D. Brodzinsky Report) (incorporating citations within); *see also, e.g.*, Ex. 51 at 97 (Child Welfare League of America, *Standards of Excellence for Family Foster Care Services*); Ex. 52 (Child Welfare League of America, *CWLA Standards of Excellence for Adoption Services* 56-5 (Child Welfare League of America ed., rev. ed. 2000)); ("Applicants should be assessed on the basis of their abilities to successfully parent a child needing family membership and not on their race, ethnicity or culture, income, age, marital status, religion, appearance, differing lifestyle, or sexual orientation. Applicants should be accepted on the basis of an individual assessment of their capacity to understand and meet the needs of a particular available child at the point of the adoption and in the future.").

122.    These standards also make clear that there is no scientific basis to prefer heterosexual people over lesbian, gay, or bisexual people when considering or approving would-be foster or adoptive parents or making placement or adoption decisions. Ex. 50 ¶¶ 25-26 (D. Brodzinsky Report) (incorporating citations within).

123.    Major professional organization dedicated to children's health and welfare, including the American Academy of Pediatrics, the American Psychological Association, the American Medical Association, the American Academy of Child and Adolescent Psychiatry, the American Psychiatric Association, and the Child Welfare League of America ("CWLA"), have

reached consensus that children reared by lesbian, gay, or bisexual parents are just as likely to be well-adjusted as children of heterosexual parents. *Id.* (incorporating citations within).

124.    There is no basis in social science or child welfare principles for categorically barring lesbian, gay, or bisexual people from being foster or adoptive parents. *See id.* (incorporating citations within).

125.    Including all families who maybe qualified in the foster care process is important in part because of the significant shortage of families available to meet the needs of children in the foster care system. *See, e.g.*, *id.* ¶ 27 (incorporating citations within); Ex. 2 at HHS13133; Ex. 9 at HHS03493.

126.    Excluding same-sex couples may have a particularly significant impact on children in need of foster or adoptive homes because lesbian, gay, and bisexual adults are four to six times more likely to foster and adopt children than their heterosexual peers. Ex. 53 (Gary J. Gates, *LGBT Parenting in the United States*, The Williams Inst. (Feb. 2013)); *see also* Ex. 50 ¶¶ 27-28 (D. Brodzinsky Report).

127.    Same-sex couples are also disproportionately more likely than heterosexual adults to adopt children with the kinds of special needs commonly seen among children in the URM and UAC Programs, including older age when entering foster care, minority racial/ethnic group membership, trauma history, and developmental and emotional difficulties. *See generally, e.g.*, Ex. 54 (Gary J. Gates et al., *Adoption and Foster Care by Gay and Lesbian Parents in the United States*, The Williams Inst. (Mar. 2007)); *see also* Ex. 50 ¶¶ 28-29 (D. Brodzinsky Report) (incorporating citations within).

128.    Categorically preventing married same-sex couples from being considered as placement options for Program children "reduce[s] the chances of [Program] children finding

nurturing and permanent life-long family connections in a timely manner and increase[s] the risk for long-term adjustment difficulties," all of which is directly contrary to the best interest of Program children. *Id.* ¶¶ 27, 29 (D. Brodzinsky Report) (incorporating citations within).

129.    There is a shortage of available foster parent placement options, including in the Dallas-Fort Worth area. *See* The Chronicle for Social Change, *The Foster Care Housing Crisis*, 4 https://imprintnews.org/wp-content/uploads/2017/10/The-Foster-Care-Housing-Crisis-10-31.pdf (last visited July 21, 2022) (at least half of the states in the United States have seen foster care capacity decrease between 2012 and 2017); Children's Bureau, *The AFCARS Report*, (Aug. 22, 2019), https://www.acf.hhs.gov/sites/default/files/cb/afcarsreport26.pdf (during October 1, 2017, through September 30, 2018, over 437,283 children resided in foster care, with 125,422 children waiting to be placed for adoption); ACF, *Children's Bureau Child Welfare Outcomes State Data Review Portal for Texas*, https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/texas.html (last visited July 21, 2022) (in Texas, between 2016 and 2020, an average of 31,453 children resided in foster care, with an average of 12,979 waiting to be adopted); *see also* Devlin Decl. ¶¶ 20-21, 24-27 (there is a shortage of foster families available to meet the needs of Program children in the Dallas-Fort Worth, Texas area); *see also* 8 U.S.C. §1232(c)(2)(A) (UAC Program placements must be based on the child's best interest), §§ 1522(a)(3), (a)(5)-(6), (d) (URM Program must take into account the relevant needs of the refugees populations at issue); Ex. 15, J. Sualog Dep. Tr. at 158:13-16 (the goal of the UAC Program is "absolutely" that placement decisions be made in the best interest of the child).

130.    Children are not disadvantaged psychologically, socially, or educationally when they are raised by same-sex couples. *Id.* at 161:18-162:6 (testifying that it would be "a good thing if the potential pool of foster families included foster homes headed by []same-sex married

couple[s]" and that placement in these homes may be consistent with the best interest of a child); *see also* Ex. 55 (Rachel H. Farr et al., *LGBTQ Adoptive Parents and Their Children*, in *LGBTQ-Parent Families: Innovations in Research and Implications for Practice* 45-64 (Abbie E. Goldberg & Katherine R. Allen, eds., 2d ed. (2020)).

131.    CWLA issued a position statement affirming that sexual minority adults are equally capable of raising children as their heterosexual counterparts and strongly opposing efforts to exclude foster care and adoption applicants based solely on their sexual orientation. *See* CWLA, *CWLA's Position on Same-Sex Parenting*, https://www.cwla.org/position-statement-on-parenting-of-children-by-lesbian-gay-and-bisexual-adults (last visited July 22, 2022).

132.    Requiring child placement agencies to comply with federal nondiscrimination obligations would not reduce the availability of families for children in the foster care system. *See, e.g.*, Ex. 50 ¶¶ 46-47 (D. Brodzinsky Report).

133.    No evidence suggests that, if child placement agencies were to choose to discontinue their foster care and adoption services because they have religious objections to complying with nondiscrimination requirements to accept all qualified families, this would cause a reduction in the number of families available for children in the foster care system or otherwise impaired the government's ability to meet the needs of children in its care. *See id.*

134.    Given that both secular and religious agencies generally adhere to professional child welfare standards, and that those standards call for the acceptance of all qualified prospective foster and adoptive parents regardless of sex or sexual orientation, there is no reason to expect that the Federal Defendants could not find agencies willing and able to recruit families to care for children in these Programs in a non-discriminatory manner as needed. *Id.*

135.    Even if there were no shortage of foster or adoptive homes, the qualities of those homes matter in addition to the quantity. *Id.* ¶ 30. Having a wide variety of family circumstances, identities, backgrounds, and experiences to choose from is necessary in order to meet the unique needs of the different children in the Programs. *Id.*

136.    Excluding lesbian, gay, and bisexual adults from fostering and adopting reduces the pool of families from which to find good matches to meet the needs of each child. *See id.*

137.    Without sufficient numbers of prospective foster or adoptive parents, children remain in the Programs for extended periods of time, often moving from home to home or ending up in group homes or other institutional environments. *Id.* ¶¶ 32-33 (incorporating citations within).

138.    This harms these children by preventing them from developing and/or maintaining secure attachment bonds, and by depriving them of the stability, nurturance, safety, life-long family connections and support, and genuine sense of legal, residential, relational, and psychological permanence that families can provide. *See id.*; Ex. 9 at HHS03492 (███████████ ████████████████████████████████████).

139.    Reducing the pool of available foster or adoptive families increases the chances that children will be placed with families who are not well-matched for their individual needs, or who do not understand or are unprepared to cope with their special needs, often resulting in placement disruption or adoption breakdown. *See* Ex. 50 ¶ 35 (D. Brodzinsky Report) (incorporating citations within).

140.    In order to increase the chances of a good placement match, having the largest pool of prospective foster and adoptive applicants available, including those who identify as lesbian, gay, or bisexual, is in the interest of these youth. *See id.*

141.    When Federal Defendants enable organizations to turn away or establish different procedures for qualified foster parent applicants based on criteria unrelated to child welfare, such as the applicant's sexual orientation or sex, or the religious beliefs of the organizations, children in the care of those organizations may lose out on the family that would have best served their needs. *See id.* ¶ 36.

142.    Instead, a child may be placed with a family in an organization's pool of licensed families who meets the qualifications to foster or adopt but is a less appropriate choice for that particular child, including because they are not as well-prepared to meet or manage a child's emotional or medical issues or other special needs; have different expectations regarding the placement than the youth placed with them; or have difficulty understanding and supporting the youth's sexual orientation or gender identity. *See id*.

143.    Same-sex couples possess the parenting characteristics research has found to best serve the needs of children in foster care in equal or greater measure than different-sex couples. *See id.* ¶ 37 (incorporating citations within).

144.    By permitting organizations to turn away lesbian, gay, and bisexual applicants as potential foster parents for youth being placed through the URM and UAC Programs, Federal Defendants allow those organizations to eliminate a group of individuals who have the very parenting characteristics that are correlated with success of these placements. *See id.*

145.    When Federal Defendants permit child placement agencies acting on their behalf to exclude same-sex couples regardless of their qualifications, it deters same-sex couples' participation in the foster care and adoption system as a whole out of fear that they will face discrimination at the hands of another agency. *See id.* ¶¶ 38-40 (incorporating citations within).

146.    The psychological harm of experiencing discrimination and prejudice because of membership in a minority class, such as that experienced by lesbian, gay, and bisexual people, can deter people from participating in various areas of life, negatively affect their physical and emotional health, undermine identity and self-image, and compromise the pursuit of life goals. *See id.* (incorporating citations within).

147.    When Federal Defendants sanction this type of discrimination, the stigma and harm further drive lesbian, gay, and bisexual people out of the child welfare system, thereby further reducing the pool of available and appropriate placements. *See id.* (incorporating citations within).

148.    Even when lesbian, gay, and bisexual people are willing to keep trying to participate in the child welfare system, when Federal Defendants permit child placement agencies to exclude same-sex couples, the agencies that are willing to work with them may be sufficiently distant that the prospective foster parents are not able to access the necessary preparation or supports that result in successful placements or the agencies may not otherwise be appropriate for the prospective foster parent's circumstances. *See id.* ¶ 42.

149.    When Federal Defendants sanction discrimination by child welfare agencies, it has a disproportionate impact on lesbian, gay, and bisexual youth, who are both among the most vulnerable and overrepresented youth in the child welfare system, including likely in the URM and UAC Programs. *See id.* ¶¶ 43-44 (incorporating citations within).

150.    Excluding same-sex couples reduces the pool of foster and adoptive homes, making it more challenging to find homes for these vulnerable young people, both in general and specifically with families who understand, accept, and support them, who may well be the preferred placements for particular youth. *Id.*

30

151.    When Federal Defendants allow child placement agencies acting on their behalf to exclude same-sex couples, it sends the damaging and stigmatizing message to lesbian, gay, and bisexual youth in the care of those agencies that the people responsible for their welfare deem them to be deviant and unsuitable to be parents when they grow up. *See id.* ¶ 45 (incorporating citations within). Such a message significantly harms these vulnerable youth, whose identity and self-esteem are already fragile. *See id.*

**J.   Federal Defendants' Actions Have Harmed Children And Prospective Foster Parents In The Dallas-Fort Worth Area**

152.    For at least the period between 2011 and late 2016, by the time CCFW received referrals for URMs, such youth had been deemed eligible for federal foster care by the federal government, and the last step before they were admitted to the URM Program was to determine if CCFW or other Program grantees or sub-grantees had an available foster home for them. *See* Devlin Decl. ¶ 5.

153.    If there were no available foster homes, youth eligible to be URMs remained in refugee camps. *Id.*

154.    Eligibility for the URM Program does not mean an eligible youth will necessarily be admitted to the Program where there is a documented safety risk of remaining unaccompanied in a refugee camps, because admission into the Program depends on available foster beds. *Id.*

155.    CCFW recruited throughout North Texas to try to find enough foster families to serve URMs in need. *Id.* ¶ 6.

156.    Between 2011 and 2015, CCFW's recruitment policy stated that CCFW personnel could license either single individuals or "legally married couples." *Id.*

157.    It was understood by CCFW staff that licensing only legally married couples automatically disqualified same-sex couples from becoming licensed through CCFW because

same-sex couples could not legally marry in Texas prior to 2015. *Id.*; *see also* Ex. 17, D. Springer Dep. Tr. at 72:7-21.

158.    Between 2011 and 2015, CCFW personnel did not directly ask single foster parent applicants about their sexual orientation but instead asked only about their dating history during the home study interview process. Devlin Decl. ¶ 6.

159.    If the applicant disclosed that they had previously dated a member of the opposite sex, CCFW personnel did not ask any further questions to assess their sexual orientation and assumed that they were heterosexual. *Id*.

160.    It was understood by CCFW staff during this period that CCFW personnel were not allowed to license openly gay or lesbian individuals. *Id*.

161.    At least one employee responsible for foster parent recruitment was asked to commit explicitly to this policy during the hiring process. *Id*.

162.    Catelyn Devlin, a former program manager for CCFW during this period, recalls that a CCFW director stated explicitly that CCFW employees should not refer lesbian or gay applicants to other foster care agencies. *Id.* ¶¶ 2, 7.

163.    Accordingly, Devlin never provided such a referral and does not know of any instance when any other employee of CCFW did so. *Id.* ¶ 7.

164.    Devlin remembers an instance in which a gay man was turned away from CCFW before he could apply to become a foster parent. *Id.* ¶ 8.

165.    CCFW informed him that it could not license him because he was openly gay. *Id*.

166.    CCFW's policy of prohibiting staff from accepting foster parent applications from lesbian or gay people became more explicit in 2015 after the decision by the United States Supreme

Court in June of 2015 in *Obergefell v. Hodges*, which struck down laws banning same-sex couples from marrying. *Id*. ¶¶ 9-10.

167.    In or about August of 2015, CCFW leadership informed CCFW's Program management staff that the *Obergefell* decision necessitated changes to policies concerning the identities of permissible foster parent applicants. *Id*. ¶ 9.

168.    CCFW leadership and employees began to require families to reflect or mirror "the holy family" to become a licensed foster family. *Id.* ¶ 10.

169.    To enforce this policy of "mirroring the holy family," single people—regardless of sexual orientation—were no longer be allowed to become foster parents, and lesbian and gay people, whether married or single, continued to be prohibited from licensure. *Id.*; *see also* Ex. 17, D. Springer Dep. Tr. at 52:10-19; 72:16-73:12; 81:12-14; Ex. 56 (CCFW Mem. re: Foster Care Services Minimum Standards (Ex. 9 to D. Springer Dep.)); Ex. 57 (CCFW Mem. re: Foster Care Services Praesidium Requirements (Ex. 10 to D. Springer Dep.)) (testimony acknowledging that CCFW's policy changed over this period from permitting single foster parents to disallowing them, together with documents memorializing this change in policy); *see also generally* Ex. 31 at HHS_SUPP_000011-14.

170.    Prior to implementation of this policy, CCFW licensed single people as foster parents on a regular basis. Devlin Decl. ¶ 10.

171.    At the time the policy was changed, there were three single foster parents with URM/UAC placements. *Id*. The three licensed single foster parents with URMs/UACs placed in their homes were allowed to be grandfathered in under the new policy, but their homes closed to potential new placements once the youth previously placed in their homes left foster care. *Id*.

33

172.    At the time of the single-parent policy change by CCFW, at least two single women who were in the pipeline to become foster parents were turned away as a result of the new requirement that applicants must "mirror the holy family." *Id.* ¶ 11.

173.    Devlin and another program manager called the single foster parent applicants who were in the process of becoming licensed to inform them that CCFW would not move forward with licensing them. *Id.*

174.    One such woman had almost finished the licensure process and already accepted a sibling group of children to be placed in her home. *Id.*

175.    She appeared to be upset because her husband had died a couple of years prior, she had been close to being licensed, , and she was no longer eligible to become a foster parent. *Id.*

176.    Devlin's coworker was tasked with informing a single foster parent applicant who had separated from her previous partner due to intimate partner violence that she was ineligible for foster placement. *Id.*

177.    In or about August of 2015 when the single-parent policy was implemented, prohibiting CCFW personnel from licensing single adults, CCFW leadership conveyed that the Bishop's preference with respect to foster family licensing was to prioritize Catholic families first, then other Christian families, then non-Christian families, in that order. *Id.* ¶ 12.

178.    Previously, CCFW had licensed people of various faiths, and CCFW's policies and practices of recruiting within communities with diverse religions and ethnicities were critically important to providing quality care for URMs/UACs. *Id.* ¶¶ 12-13.

179.    After the changes CCFW made in response to *Obergefell*, CCFW's policies disfavored licensing non-Christian families. *Id.* ¶¶ 12-15.

180.     When CCFW leadership first told Program management staff about the decision to further limit the pool of eligible potential foster families, Devlin stated, "this means more kids in camps." *Id*. ¶ 17. What she meant was that not licensing appropriate foster families on account of characteristics that did not affect their ability to provide a safe home would result in CCFW limiting acceptance of referrals of URMs/UACs in need of placement, leaving them in dangerous situations. *Id*.

181.     CCFW chronically lacked sufficient foster homes in which to place youth. *Id*.

182.     A severe shortage of foster parents caused many youth to be stuck in refugee camps abroad or in group settings that were materially worse for their welfare than being in a foster home. *Id*.

183.     CCFW regularly received referrals from USCCB for refugee children in camps. *Id*. ¶ 17.

184.     Lack of a foster family who had room to take in the URM was the primary reason for turning down referred youth. *Id*. ¶ 18.

185.      If CCFW could not accept URMs, they remained in refugee camps abroad, unaccompanied, ineligible for services, often in horrendous conditions. *Id*.

186.     Often, referrals from USCCB for refugee children in camps would be for youths who were 17 years old. *Id*.

187.     CCFW was required to get conservatorship for these minors before they turned 18. *Id.*

188.     The Tarrant County, Texas court system in the Fort Worth area could process conservatorship for these youth more quickly than other courts working with URM Programs,

resulting in CCFW receiving a disproportionate number of referrals for 17-year-old youth, and making CCFW a placement option of last resort. *Id.*

189.    At times, CCFW received referrals of youth with medical conditions requiring prompt and/or complex treatment in the United States. *Id.* ¶ 19.

190.    In Devlin's experience, when there were no available foster homes, CCFW either was unable to accept the youth into the program or medical care would be delayed while CCFW personnel finished licensing a new foster home because there were no existing foster homes available. *Id.*

191.    CCFW also received referrals for youth with companion cases where URMs had extended family members who would be resettled in the adult resettlement program for whichever city accepted the URM placement. *Id.*

192.    Occasionally, a related adult or child on the case needed prompt medical care, and, if CCFW was unable to accept the URM because there were no available foster homes, the entire family could not be resettled or faced delays in resettlement, complicating the need for prompt medical care. *Id.*

193.    CCFW received referrals for URMs residing in hostile foreign countries who would be deported back to the country they fled from if CCFW was unable to place them in foster homes expeditiously. *Id.* ¶ 20.

194.    To be eligible as a URM, a youth had to have fled their home country due to war, violence, or persecution, be outside their country of origin, and be unable to avail themselves of the protection of their country of origin. *Id.*

195.    Deporting youth who are eligible to be URMs back to their country of origin can have deadly consequences. *Id.*

196. On at least one occasion, USCCB sent CCFW a referral for URMs who urgently needed placement because the country they entered was about to deport them. *Id*.

197. The referral described how they almost died trying to flee their country of origin and indicated how many of their family members and neighbors had been persecuted and killed. *Id*.

198. CCFW had enough foster homes to accept only two of the youth. *Id*.

199. Devlin is unsure if the other youth found safe placements or if they were deported back to the country whose military regime had attempted to kill them. *Id*.

200. USCCB regularly sent CCFW referrals of URMs living alone in refugee camps, complete with a photo of the youth, and Devlin would have to say no because CCFW did not have enough foster homes for them. *Id*. ¶ 21.

201. The URM Program in Dallas-Fort Worth was chronically in need of more foster homes, with the number of youth in need of resettlement and placement far exceeding the number of available beds. *Id*.

202. At certain points USCCB stopped sending CCFW referrals of youth in need, instead waiting until CCFW informed USCCB that CCFW had a foster care placement bed open up because of how often CCFW had to say no to referrals of youth due to a chronic severe shortage of foster homes. *Id*.

203. Devlin was never told what happened to the referrals she said no to due to not having enough foster families, and, while CCFW personnel were able to resettle the referrals they accepted, Devlin was always fearful the non-accepted youth might die of something like malaria or a militant attack on a refugee camp, both of which are common occurrences within refugee camps. *Id*.

204.    UACs would be placed in shelters if they did not have a family member deemed a safe and appropriate placement or if a foster care agency could not provide a foster home. *Id*. ¶ 22.

205.    Based on the use of trauma-informed care models for child welfare services at CCFW, CCFW staff understood that harms to children in shelters can be extensive. *Id*. ¶ 23.

206.    For decades, foster families have been preferable over shelters. *Id*.

207.    A child's experience in a shelter can be psychologically and educationally harmful and disruptive to the child's development, particularly for younger children for whom it is particularly important to have a consistent caregiver. *Id*.

208.    Children can be vulnerable to abuse, physical assault, and other forms of mistreatment in shelters, and frequently develop post-traumatic stress disorder. *Id*.

209.    A shelter placement is rarely in a child's best interest when a potential foster placement is available as an alternative. *Id*.

210.    Foster families are severely in short supply for domestic foster care in the United States, and additional challenges made foster parent recruitment for URMs/UACs even more difficult, making CCFW's pool of potential applicants even smaller. *Id*. ¶ 24.

211.    Because CCFW served almost exclusively older international youth with few exceptions, this also made CCFW's foster family pool even smaller. *Id*.

212.    The fostering time commitment asked of foster families of URMs/UACs was an additional barrier CCFW faced in foster family recruitment; such time commitment is not a challenge within domestic foster care to the same extent. *Id*.

213.    For federal foster care, the majority of URMs age out of care at age 21; accordingly, federal foster care programs need foster families to commit to being a foster parent for multiple years. *Id*.

214.    Placement disruptions are harmful to foster youth, but being a foster placement for a URM from ages 17 to 21 (one of the shorter durations for such youth) is difficult for many families to commit to. *Id.* ¶ 25.

215.    CCFW experienced attrition of foster families, which meant new foster families had to be recruited to replace families who left, in addition to needing to recruit new foster families to serve URMs/UACs in unsafe conditions in camps or shelters. *Id.*

216.    When CCFW personnel had few foster homes to pick from, it was difficult to place youth in a foster home best suited to meet their needs; at times, placing youth in a foster home simply because the foster home had an open bed for the youth took precedence over other aspects of the youth's interests due to a shortage of foster families. *Id.* ¶ 26.

217.    There was clear pressure from USCCB to recruit more foster families due to the high number of children who needed foster family placements who were going unserved, left unaccompanied in camps or in shelters, with lasting risk of harm. *Id.* ¶ 27.

218.    Imposing additional exclusions based on religion on foster family recruitment when federal foster family recruitment was already difficult enough made a small foster parent pool even smaller. *Id.*

219.    Devlin and other program managers at CCFW discussed concerns about the policy change made after *Obergefell* with CCFW leadership and the deadly effects it would have for the youth they worked to serve. *Id.* ¶ 28.

220.    Not only did a severe undersupply of foster parents result in youth being left in refugee camps or shelters, it also negatively affected the URMs/UACs under CCFW's conservatorship. *Id.* ¶¶ 18, 22, 25.

221.     Devlin recalls multiple youth who had placement breakdowns where their foster parents decided to close their home, and CCFW had no place to put the youth because all beds were full. *Id*. ¶ 25.

222.     CCFW's Program budget depended in part on the recruitment of foster parents. *Id*. ¶ 29.

223.     Reimbursement for expenses and therefore the size of the grant turned in part on the number of foster parents recruited, screened, trained, and available. *Id*.

224.     The number of new foster families recruited determined the number of home developers and trainers working within the agency as they could only train and license so many families at once. *Id*.

225.     With more newly recruited foster families, CCFW could hire more staff for licensure and training. *Id.*

226.     With fewer recruited foster families, CCFW was at risk of having to cut positions. *Id*.

227.     Additionally, with fewer foster families, less would be spent on mileage, putting the mileage line item at risk of being underspent. *See id*.

228.     Once foster families were licensed, CCFW personnel assessed the number of youth they could appropriately care for. *Id*. ¶ 30.

229.     Once CCFW placed a youth in a foster home, the family was reimbursed approximately $45 a day per youth. *Id*.

230.     Foster parent reimbursements made up a large portion of CCFW's budget. *Id*.

231.   Whenever CCFW personnel created the organization's budget, they estimated how many new foster families they expected to recruit and how many URMs/UACs they expected to place with those families. *Id*.

232.   CCFW personnel consistently overestimated the number of foster families they thought they could recruit. *Id*.

233.   After underspending the grant for more than one FY, in 2014, CCFW's federal program experienced a significant budget cut because of unspent funding due to the inability to recruit enough foster families. *Id.* ¶ 31.

234.   As a result of the budget cut, important vacant positions were not filled. *Id*.

235.   Case managers could serve only so many children on a caseload, so the number of children CCFW placed determined how many case managers CCFW hired. *Id*.

236.   The number of case managers or home developers CCFW had on staff determined how many program managers CCFW needed to supervise these positions. *Id*.

237.   The Educational Specialist position, a skilled position, was cut with their tasks being allocated to case managers; the Educational Specialist had been available to assist with school enrollment, special needs testing, English as a Second Language services, and tutoring—all of which were critical to URMs/UACs succeeding educationally. *Id*.


Dated: July 27, 2022                              Respectfully submitted,


                                                  By: /s/ *Kenneth Y. Choe*
                                                  Kenneth Y. Choe (pro hac vice)
                                                  Jessica L. Ellsworth (D.C. Bar No. 484170)
                                                  James A. Huang (pro hac vice)
                                                  Michael D. Gendall (D.C. Bar No. 1029790)
                                                  Brendan C. Quinn (D.C. Bar No. 1616841)
                                                  Katherine Culora (D.C. Bar No. 1671154)
                                                  **HOGAN LOVELLS US LLP**

41

555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
ken.choe@hoganlovells.com
jessica.ellsworth@hoganlovells.com
james.huang@hoganlovells.com
mike.gendall@hoganlovells.com
brendan.quinn@hoganlovells.com
katherine.culora@hoganlovells.com

Russell A. Welch (pro hac vice)
**HOGAN LOVELLS US LLP**
609 Main Street, Suite 4200
Houston, TX 77002
Telephone: (713) 632-1437
Facsimile: (713) 632-1401
russell.welch@hoganlovells.com

Camilla B. Taylor (pro hac vice)
**LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.**
105 West Adams, 26th Floor
Chicago, IL 60603-6208
Telephone: (312) 663-4413
ctaylor@lambdalegal.org

Karen L. Loewy (DC Bar No. 1722185)
**LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.**
1776 K Street, N.W. 8th Floor
Washington, D.C. 20006-2304
Telephone: (202) 804-6245
kloewy@lambdalegal.org

Richard B. Katskee (D.C. Bar No. 474250)
Kenneth D. Upton, Jr. (D.C. Bar No. 1658621)
**AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE**
1310 L Street, N.W., Suite 200
Washington, D.C. 20005
Telephone: (202) 898-2133
katskee@au.org
upton@au.org

*Attorneys for Plaintiffs*

43