# DECLARATION B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FATMA MAROUF AND BRYN ESPLIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> *Defendants*. | Case No. 1:18-cv-378 (APM) <br><br> **DECLARATION OF BRYN ESPLIN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Bryn Esplin, of lawful age and competent to testify as to each fact below, makes the following declaration based on her personal knowledge:

1. I am an Assistant Professor in the Department of Medical Education at the University of North Texas Health Science Center Texas College of Osteopathic Medicine, where I teach Medical Ethics and Jurisprudence.

2. I was raised as a member of the Church of Jesus Christ of Latter-day Saints in St. George, Utah, and have parents in the healthcare field—one a physician and the other a Clinical Social Worker—so the principle of serving others in need was instilled in me by both faith and family from the beginning. It continues to guide my personal and professional life and serve as the foundation of who I am and what I do. I chose to pursue law and bioethics in hopes that I might also be of service to others at their most vulnerable, faced with dilemmas that present impossible decisions. As an educator, I seek to equip future physicians with these tools as well.

3. Only in hindsight have I come to realize just how fortunate and unique my experience of revealing my sexual orientation was. Despite the societal discrimination I knew that LGBTQ

1

Declaration of Bryn Esplin

persons face, I never once feared rejection from my family, nor doubted my own intrinsic worth, so coming out was easy. My family embraced me just the way that I am, and, when I met my wife, Fatma Marouf, they quickly embraced her, too. Fatma and I were married in the same small town where I grew up, surrounded by friends and all of my family—immediate and extended.

    4. Though we both always wanted to have children, Fatma and I were long distance while I finished my Bioethics Fellowship at the Cleveland Clinic in Cleveland, Ohio, so we had to wait. It was not until we moved to Fort Worth, Texas, in 2016 that we were finally able to try. Unfortunately, it was not as easy as we had hoped. After an unsuccessful In Vitro Fertilization attempt, we began exploring different avenues to adopt or foster a child. We both felt strongly that family consists of more than just biology and knew we could offer a loving, secure home to a child in need. Because of Fatma's background and her expertise in immigration and asylum law, she worked with countless children who had endured unspeakable trauma, including torture and persecution, and knew how desperately they were in need of a loving, stable home. Because of our backgrounds, our focus on family, and our shared passion for helping others, we believe we are uniquely suited to provide just that, especially for any LGBTQ child.

    5. In January of 2017, Fatma was invited to tour a Catholic Charities of Fort Worth (CCFW) facility and urged to apply to the refugee foster care program, which CCFW administered through the government. I remember that it felt like the answer to our prayers when she told me about it that night, and we soon began to e-mail CCFW for more information about how to start the process. After multiple e-mails with a CCFW employee, we set up an initial telephone interview in February with a CCFW representative. During the call, the representative described the population of children in need of a foster home and listed various requirements necessary to become foster parents. I remember the list began with tangible items: a bed, a

dresser, a fire extinguisher. And, then, the representative told us of an additional requirement—in order to apply, couples must "mirror the holy family." Seeking clarification, Fatma explicitly stated that we were a same-sex couple. The CCFW representative responded that, because of this, we did not "qualify" to sponsor a child. I was devastated by her statement and remember looking at Fatma in disbelief. Fatma asked about children in the government's care who might be lesbian, gay, bisexual, or transgender, or might be questioning their identities, because persecution due to one's sexual orientation is a basis for granting asylum. The CCFW representative told us that she had not known that about the law and proceeded to say that there were not any LGBTQ children in the program. The call ended abruptly after that. We both sat speechless for a while, stunned and saddened that we were locked out of a governmental program before we even had the chance to be considered.

6. The next day, I was still feeling distressed about being rejected and feeling powerless. Given our legal training, we were certain that the government must be unaware of CCFW's discriminatory requirement, so Fatma sent an e-mail to the general address for the federal government's Office of Refugee Resettlement (ORR) to inform them. In the e-mail, she asked whether this discriminatory criteria was permissible and sought information about alternative programs that would allow same-sex couples to foster refugee children in the government's care.

7. We did not hear back from ORR until April of 2017, when we received an e-mail asking for the name of the individual who told us that "the agency does not license foster families who do not mirror the holy family." Fatma responded with the requested information, and ORR sent an email acknowledging receipt. That was last communication we ever received.

8. The experience of being denied the opportunity to be a potential foster parent was not only shocking but deeply insulting, demeaning, and harmful. To be turned away solely on the

basis of my sexual orientation sent a clear message that my home will always be lesser. More than that, it meant that who I am as a person will always be inferior. Though I thought I had an unshakeable sense of self-worth, this feeling of unworthiness and shame began to creep in and has not left since. In fact, it has become even more pronounced now that I have become a parent. Fatma and I were blessed to welcome a daughter into our lives in December of 2019. She is undoubtedly the light of our lives, and parenthood is simultaneously the most rewarding and difficult thing I have ever experienced. Keeping our children safe from harm is a fundamental responsibility of any parent, and the precariousness of life is something that, despite constant vigilance, we can never fully protect them from. Yet I feel like I am failing to protect her from the stigma of being a child of same-sex parents, one who is the product of a home that has been deemed inferior not just by others who hold different religious beliefs, but by the government itself.

  9. For the first time, I have felt an urgent need to hide who I am and whom I love so that my daughter will not be subjected to the discrimination she otherwise could be because of this. I struggle with the dilemma of being completely truthful about who we are or hiding it in hopes I can protect her.  I feel compelled to omit details about our family to people at her day care center, evading questions when asked quotidian questions about what my spouse does when we are at the park, failing to correct anyone who assumes I am straight and asks a question about what my husband does, or outright deceiving others so that my daughter will not be the target of hate. Worst of all, I fear for her physical safety because of the backlash against LGBTQ people and same-sex marriage. I would do anything to keep her from harm in any form even though it feels wrong. And ironically, doing so despite my good intentions, hurt her, too. because she absorbs everything I do and say. And everything I stay silent about sends a message, too. It

breaks my heart to know that I might be reinforcing the same insidious message that there is something shameful about our family, but I feel as though I don't have a real choice.

10. I believe that there are kids who are in the government's refugee program who deserve loving homes, ones that are not demeaned solely by the makeup of marriages like mine, and it is important to me to maximize the pool of potential families. Any system that treats us differently—whether by excluding us or referring us to a different and inferior process—does not simply disadvantage us, but also disadvantages the kids as well. Some of these kids very likely are lesbian, gay, bisexual, or transgender themselves, or questioning or struggling with their identities. A program that views same-sex relationships or LGBTQ persons as "lesser than" cannot serve the developmental needs of any child.

11. I have often thought about the day in February 2017 on which we had the call with the CCFW representative and the items on CCFW's list of requirements. As a mother now, I think about what was not on its list: to love the child. Love, without condition, along with a bed, a dresser, and a fire extinguisher, is something I know Fatma and I can provide.

I declare under penalty of perjury that the foregoing is true and correct. If called as a witness in the matter, my testimony would be consistent with this declaration.

Dated July 24, 2022.

*Bryn Esplin*
Bryn Esplin