# DECLARATION C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FATMA MAROUF AND BRYN ESPLIN,<br><br>                          *Plaintiffs*,<br><br>       v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>                          *Defendants*. | Case No. 1:18-cv-378 (APM)<br><br>**DECLARATION OF FATMA MAROUF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

      Fatma Marouf, of lawful age and competent to testify as to each fact below, makes the following declaration based on her personal knowledge:

      1. I am Professor of Law and Director of the Immigrant Rights Clinic at Texas A&M University School of Law. My parents immigrated to the United States from Egypt and Turkey, and, at a young age, I was exposed to the enormous economic and social disparities in our world. My interest in human rights eventually drew me to law school. I wanted to learn to use law as a tool to empower people and create social change.

      2. I was raised Muslim, and it took years for me to come out to my parents, and many more years for them to accept my sexual orientation. Throughout my life, I had to battle feelings of brokenness and guilt for inflicting shame on my family. There were countless times when I did not disclose my sexual orientation to others out of fear of how they might react, or because of social pressure to conform. It often felt easier to stay quiet than to risk rejection by correcting false assumptions. But I knew that owning and speaking my truth was the only way I would be able to survive. Developing my own sense of identity—an identity that embraces both self-

acceptance and spirituality—was painstakingly hard.

3. Long after I came out, marriage was still just a distant dream. But, when Bryn and I began dating, the high was dizzying. From the moment she put her arms around me in front of the Bellagio fountains in Las Vegas, I knew that she was the one. After a whirlwind romance, we were married on May 24, 2015, in Saint George, Utah. My immediate family and all of Bryn's extended family attended our wedding. We got married shortly before *Obergefell* was decided, but, after the Tenth Circuit had upheld the right of same sex couples to marry. Walking into the Washington County, Utah Clerk's Office to obtain our marriage license filled me with an unexpected sense of pride. The judge I clerked for officiated our ceremony and announced us married "under the laws of the state of Utah *and the Constitution of the United States*," a sentence that still gives me goosebumps seven years later.

4. At the time we got married, I was teaching law and co-directing the Immigration Clinic at the University of Nevada, Las Vegas (UNLV), while Bryn was finishing a fellowship in bioethics at the Cleveland Clinic. One of the programs I helped establish at UNLV focused on providing immigration services to undocumented children. Most of the children we worked with were seeking asylum and/or Special Immigrant Juvenile Status. Through this job and my prior work experience in immigration, I had heard numerous harrowing accounts of persecution recounted by children and their families seeking refugee status in the United States.

5. Bryn and I moved to Fort Worth, Texas, in August 2016, after we both obtained academic positions at Texas A&M University. I was hired by the law school as a tenured professor to establish an Immigrant Rights Clinic, and Bryn was hired by the medical school to teach bioethics.

6. Once we were settled in Texas, we decided it was the right time for us to start a family.

2

Declaration of Fatma Marouf

Both of us had grown up in religious traditions that prized family above all else, and that value was deeply engrained in us. We both love children and yearned to become parents. But there was no easy path for us. We talked about different options, including adoption (international and domestic), fostering, and assisted reproductive technology. Because of our own struggles, we were especially open to fostering or adopting children who might be grappling with their own identities.

7. On December 2, 2016, I was invited in my professional capacity to tour a Catholic Charities of Fort Worth (CCFW) facility. I, along with two of my law school colleagues and eight other people, toured the CCFW facility on January 10, 2017. During the tour, we were shown an area inside CCFW's building where refugee children were housed. It was hard to imagine children living in such a sterile office environment. I felt saddened to see the walls devoid of art and the children's paltry possessions. The CCFW staff stressed how much they needed foster parents and encouraged us to apply.

8. Shortly after the tour, Bryn and I began to discuss the possibility of fostering and potentially adopting a child through the refugee foster care program. Given our work history, family history, and diverse backgrounds, we decided that this program was not only right for us, but also that we could be uniquely beneficial foster parents to a child in the program.

9. We began to e-mail CCFW for more information. Through multiple e-mails, we communicated with a CCFW employee about the next steps for bringing a refugee child into our home. We then scheduled an initial telephone interview with a CCFW representative, which occurred in February 2017.

10. During the interview, the representative described the various requirements to become foster parents, as well as the population of children in need of foster homes. It soon

3

Declaration of Fatma Marouf

became apparent to CCFW that Bryn and I are a same-sex couple, at which point the representative told us that, to foster a child, we must "mirror the holy family." For a few seconds, I was stunned and speechless. I struggled to comprehend what this statement meant. Did we need to be Christian or even Catholic to apply? Or was this a vague reference to sexual orientation? Seeking clarification, I explicitly stated that we are a same-sex couple. The CCFW representative then responded that we did not "qualify" to foster a child.

11. Because this was a federal program, it had never occurred to me that the program could be administered based on Catholic religious beliefs. Requiring prospective parents to "mirror the holy family" also seemed to require applicants themselves to adopt certain religious beliefs. I felt like I was being asked to conform to someone else's religion in order to have an opportunity to foster a refugee child, especially because CCFW was the only agency operating the refugee program in the Dallas-Fort Worth area. I was as shocked as if they had told me that I was ineligible to apply based on my religion or race.

12. It was insulting and hurtful to be disqualified based on my sexual orientation. I could not understand how our marriage could be degraded in this way by a federal program. At the same time, being rejected based on one aspect of my identity made me feel like less than a full person. We were not even given a chance to be evaluated based on the environment and care that we could provide a child—the inquiry ended based on our same-sex marriage.

13. My next thought was about the refugee children in CCFW's care. Because sexual orientation is a ground for refugee status in the United States, I asked about children in the program who might be LGBTQ. The representative responded that she was not aware of any LGBTQ children served by CCFW. This response made me even more concerned about the well-being of LGBTQ children in the federal foster care program.

14. The following day, I was still reeling from the shock and rejection I felt during that phone call. Certain that the federal government could not possibly be aware of this discrimination, I decided to send an e-mail to the general address for the Office of Refugee Resettlement (ORR) to report that CCFW had discriminated against me and my spouse by telling us that we were not eligible to foster because we did not "mirror the holy family." In this e-mail I asked whether such conduct was permissible and sought information about any alternative organizations that would allow same-sex couples to become foster parents of refugee children.

15. I did not receive an e-mail response until April 2017, when ORR asked for the names of the individual at CCFW who had informed me that "the agency does not license foster families who do not mirror the holy family." I provided the requested information, and ORR acknowledged its receipt. That was the last communication I received from them.

16. That our own government would reject us as potential foster parents—not based on our ability to care for a refugee child, but solely because of disapproval of who we are—is incredibly painful in ways people may not easily understand who have never experienced the sting of discrimination.

17. After multiple IVF cycles, Bryn and I now have a two-year-old daughter. Motherhood has changed us, made us stronger and more vulnerable at the same time. I learned that love comes not from giving birth to this divine little spirit, but through every act of care. We put her to bed exhausted and then cannot stop talking about her. When our daughter caresses the photo of her family on her classroom wall, announces with delight that she has "*two* mommies," and demands "family hugs," we relax knowing that she feels pride in her family. But we also worry about how long that feeling will last. Soon, she may realize that none of the other children in her class have two mommies or that her family does not look like the ones in the stories read

by her teachers. As mothers, the idea that our daughter may one day feel devalued is crushing.

18. We are keenly aware that the rejection we experienced by the federal refugee foster care program sends a message not only to us, but also to our daughter, that her family is less worthy than other families. It stigmatizes her and sets her apart from other children whose opposite-sex parents are deemed "good enough" to foster a refugee child. We are already apprehensive about what messages our daughter will receive from society. One day care center that we visited told us that they would "tolerate" our sexual orientation, even though they do not "promote" it. Being "tolerated" does not feel like acceptance or equality; being rejected outright as potential foster parents hurts far more. We want our daughter to grow up confident that her family has as much dignity as anyone else's. We want her to have an unshakable sense of self-love and belonging. We know that the lessons she absorbs as she grows will be based not only on how she is treated, but also on how her parents are treated.

19. We have provided a nurturing and loving home to our daughter, and I believe we can do the same for other children who desperately need a family. Bryn and I have worked for many years with vulnerable populations, we are culturally competent, and we understand the impact of trauma on children. We can offer a stable and supportive home to a refugee child if given an opportunity to do so.

20. The proposed consortium involving USCRI, which would operate only in the Dallas-Fort Worth area and appears intended to moot out our lawsuit, does not remedy the stigma, rejection, and humiliation that we felt when turned away by CCFW. To us, it sounds like a thinly veiled attempt by the federal government to fashion a "separate but equal" scheme, where same-sex couples are shunted through one door, while heterosexual couples are invited to apply through another. Even if a screen is placed over the segregation, we know it exists, and the

screen itself symbolizes the stigma that we feel. We understand that USCRI's primary job is to identify same-sex couples in the pool of applicants and place them in a separate pile. Being segregated in this way is as upsetting and insulting as a blanket rejection. We had hoped that the federal government would address the discrimination we experienced. Instead, they set up a system that, shielded from public view, segregates same sex couples, thereby perpetuating discrimination.

21. Additionally, we fear that the newly created consortium with USCRI will not provide us with the same opportunities to foster a child. We understand that Upbring is still trying to put together its staffing and has licensed only one family since the Consortium was created, and that family has yet to receive placement of a child. Meanwhile, CCFW, as well as its successor Catholic Charities of Dallas (CCD), have licensed over a dozen families. In terms of resources and staffing, Upbring clearly is not an equal partner in the Consortium at this time, and USCRI would inevitably send us there. This new system therefore diminishes not only our marriage but also our chance of becoming foster parents. Whether we are locked out of an entire system of federal foster care, or only part of it, the feeling of exclusion and inferiority endures.

22. At the same time, the Consortium prevents a significant number of refugee children, some of whom are doubtless LGBTQ, from the opportunity to be placed with same-sex couples who could affirm their identity. I believe this could be extremely harmful to the children, especially given the national shortage of foster parents and the risk of children being left in refugee camps abroad or repatriated to countries where they experienced persecution. Cutting the children off from any group of potential foster parents is potentially destructive to their lives.

23. For the children, as well as for prospective LGBTQ foster parents like ourselves, we hope that the Court will recognize the discrimination we experienced as unconstitutional.

I declare under penalty of perjury that the foregoing is true and correct. If called as a witness in the matter, my testimony would be consistent with this declaration.

Dated July 22, 2022.

_____
Fatma Marouf