# DECLARATION D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FATMA MAROUF AND BRYN ESPLIN, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | Case No. 1:18-cv-378 (APM) |
| XAVIER BECERRA, in his official capacity as Secretary of the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) ) ) | **DECLARATION OF VIVIANA CHAPA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| *Defendants*. | ) | |

I, Viviana Chapa, declare as follows:

1. I make this declaration of my own personal knowledge; if called as a witness, I would be competent to testify to the contents hereof.

2. I am 42 years old and live in Nashville, Tennessee, with my wife of six years, Kirstin Mason, and our two children. I am a quality assurance engineer at Reify Health, and Kirstin, who is 44 years old, is an occupational therapist at TriStar Skyline Medical Center.

3. Kirstin and I met working at the same restaurant while in college at the University of Tennessee, Knoxville. Following graduation, Kirstin moved to South Carolina. We reconnected in 2005, when Kirstin began to commute to Nashville, where I was living at the time, to pursue a master's degree at Belmont University. Kirstin and I began dating in 2007 and we both moved to South Carolina in 2010.

4. In 2012, Kirstin and I began to consider having children. We visited a fertility clinic and began in vitro fertilization treatments. We were thrilled when our first child was born in 2014. We now have two wonderful children.

1

Declaration of Viviana Chapa

5. Kirstin and I decided to get married in 2015 and had a small ceremony in South Carolina on June 13th, 2015, with our two close friends as witnesses. A week later, we had a large wedding in Charleston, South Carolina with each of our friends and family present. We decided to have our ceremony before the U.S. Supreme Court was set to issue its decision on marriage equality for same-sex couples out of fear that it would not rule in our favor.

6. In 2015, while living in Greenville, South Carolina, I was moved by the news stories of unaccompanied youth migrating from Central America. As I am of Mexican heritage and our children's heritage on the donor's side is El Salvadorian, I felt a particular pull to get involved and use my resources to help these kids by providing them a loving home. Kirstin and I had a house and were already parents. I felt we were in a good position to become foster parents.

7. I contacted Lutheran Immigration and Refugee Services ("LIRS") in Greenville, South Carolina, regarding the unaccompanied youth foster care program. I was told that there was not a facility in South Carolina, so we were unable to participate in this program.

8. After relocating to Tennessee, I continued to read news stories on the immigration crisis and was particularly upset upon reading about an Immigration and Customs Enforcement raid that took place in Mississippi during a school day, leaving children without parents to take them home. These stories are always personal to me as I can relate to the plight of Hispanic immigrants who cross the border and, because of my legal status, I am fortunate not to have to worry about my family being separated. After reading this story, Kirstin and I decided to try to foster again and look into the process. Because we had moved, I wondered if there was a facility and unaccompanied youth foster program in Tennessee.

9. In August 2019, I contacted Bethany Christian Services ("BCS") by e-mail to request information about its unaccompanied youth foster program. A few days later, I was

contacted by a BCS recruiter from its program. After thanking me for my interest, the recruiter expressed that she was excited to know I was bilingual because "[t]here is not only a huge need for foster parents but also foster parents who are bilingual." The recruiter included 15 bullet points of information about the program in the same e-mail.

10. I was completely overjoyed when soon thereafter, I spoke over the phone with the BCS recruiter who was very eager to begin the process of foster parent licensure. I felt that I was being actively pursued by BCS specifically because I am bilingual, and language would be one less thing for children to worry about during an already challenging period of transition.

11. The BCS recruiter and I discussed the logistics of traveling to East Nashville, where the educational facility for the program is located. As the facility is close to my office, I would drive the child/children there during my morning commute.

12. At first, I was not concerned about my sexual orientation and marriage to my wife being an issue, but I began to grow concerned after doing additional research into BCS and its policies regarding working with same-sex couples at that time. To address these concerns, I e-mailed the BCS recruiter to explain that Kirstin and I were a same-sex couple with two children of our own. The recruiter responded that BCS was "discussing this with our stakeholder" and included the e-mail contact information for a designated United State Conference of Catholic Bishop ("USCCB") employee. I understood this to mean that whether we could work with BCS would be in the hands of USCCB. After this e-mail, I received no further communication from the BCS recruiter.

13. Seeking more information, I contacted the USCCB employee, Kylie Diebold, I was referred to. In the e-mail I included information about myself and my family, and I mentioned that I "didn't think my homosexuality would be an issue, but the more I researched,

3

Declaration of Viviana Chapa

the more it became apparent that my sexual orientation could indeed be a problem." I received no response from the USCCB employee.

14.     Finding no other recourse, on August 8, 2019, we contacted the United States Department of Health and Human Services ("HHS"), Administration of Children and Families ("ACF"), Office of Refugee Resettlement ("ORR") by e-mail. I wrote that I am "legally married to another woman," recounted my correspondence and experiences with BCS, USCCB, and LIRS, and the following lack of response from BCS or USCCB resulting in our inability to participate in their unaccompanied youth foster care program.

15.     In a reply e-mail, I was informed that, "there are no URM [Unaccompanied Refugee Minors] programs in the state of Tennessee" and was directed to contact the Unaccompanied Alien Children program ("UAC") "to inquire if there are currently any long-term foster care providers or plan to open any facilities in your area." I received no additional correspondence or assistance. We were incredibly disappointed by the lack of action to address the harm and rejection we experienced.

16.     This rejection from fostering under a federal program based upon a fundamental part of who we are, and enabled by federal agencies, has left both Kirstin and me dealing with feelings of rejection and defeat. I had felt so much enthusiasm. Kirstin and I had already discussed the logistics and were ready to provide a home to children in need. Instead, I faced a system that treated me differently solely because of my sexual orientation and my marriage to a woman. Kirstin and I had already navigated inequality and stigma because we were unable to get married as soon as we wanted because it was not legal where we lived at the time.

17.     As I was raised Catholic, I have long had to navigate the stigma and shame of a faith community that does not accept my identity. While I would like to say I have risen above

all the psychological harm the Catholic Church has caused me, I still am easy to tears when I stop to think of all the harm that has been done to me and others. So this rejection by USCCB while trying to foster had a special sting for me.

19. To me, discrimination in foster parent licensing by programs that are designed to help children in need was yet another unfortunate example of the hardships and harm same-sex couples experience. While the reality of this discrimination did not come as a huge shock, the pain of the rejection does not lessen. Especially after contacting the federal government, alerting it of the discrimination we faced, and receiving no assistance, I was extremely defeated and felt that there was no other route to pursue: that our options to foster children in need were stopped dead in their tracks.

19. It continues to be very upsetting and hurtful to me that my country, through the actions of the federal government, condones this behavior and continues to provide funding to organizations with discriminatory practices. By not taking action, the government sent me the message that unaccompanied youth are better off placed in subpar living conditions in group homes or detention centers than with a loving family headed by a same-sex couple, such as my family.

20. Because the federal government seemed unable or unwilling to stop this discrimination, it made it seem that there was no recourse. Our only hope was that, in the future, fostering children would be an option for Kirstin and me and other couples like us, regardless of our sexual orientation or marriage.

21. I was saddened by our experience because I had felt that we could have been helpful to children who are currently housed in detention centers, rather than loving family homes, like ours. My personal connection to immigration and being bilingual made this program

particularly compelling and being denied the opportunity to participate was a major blow to me and our family.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24 day of July 2022.

                                                Respectfully Submitted

                                                _____

                                                Viviana Chapa

Declaration of Viviana Chapa