# DECLARATION E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FATMA MAROUF AND BRYN ESPLIN, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> *Defendants.* | Case No. 1:18-cv-378 (APM) <br><br> **DECLARATION OF CATELYN DEVLIN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT.** |

**DECLARATION OF CATELYN DEVLIN.**

I, Catelyn Devlin, do declare as follows:

1. I make this declaration of my own personal knowledge; if called as a witness, I would be competent to testify to the contents hereof.

2. I was an intern with Catholic Charities of Fort Worth ("CCFW") Unaccompanied Refugee Minor ("URM") and Unaccompanied Children ("UC") programs in or about 2010 and 2011, and then employed by CCFW in the URM/UC programs from 2011 to in or about October of 2016. During that time, I worked as a Home Developer and later as a Program Manager. As a home developer, I trained, evaluated (i.e. conducted home studies), licensed, and provided the ongoing management of foster families. Once I became a Program Manager in 2013, I was involved with recruitment and oversaw all foster parent training, home studies, evaluation of the suitability of prospective foster parents, licensure, acceptance or denial of URM/UC referrals, the placement of URM/UC children and youth in foster homes, and the ongoing management of

1

foster parents working with URM/UC programs.

3. Domestic foster care programs are separate from federal child welfare programs, especially in terms of funding, foster youth eligibility, and admission into foster care. Since contracts and funding sources for domestic youth, URM, and UC youth are different, youth services are strictly separated for accounting purposes. This financial separation can impact services, specifically in limiting the ability to share resources. In Texas, foster families are also unable to be licensed with more than one foster care agency. CCFW was unable to place URM or UC youth in foster homes serving domestic foster youth, creating a dramatically smaller pool of available foster homes compared to homes available for domestic youth.

4. Regarding difference in foster youth eligibility: youth eligibility for domestic foster care involves safety risks within a parent-child relationship which reach the legal threshold for grounds for the removal of the child from their caregivers. Youth eligibility for URMs or UCs involves the child's history as it relates to their immigration status and their lack of an available caregiver. Both child candidates for domestic foster care and child candidates for the URM/UC program face documented safety risks, but local jurisdictions determine youth eligibility for domestic foster care while federal agencies determine youth eligibility for the URM/UC program. Further, children in domestic foster care are separated from their parents through legal means while URM/UCs are separated from their parents largely through circumstances such as war, persecution, or genocide.

5. Regarding difference in admission: generally, once a child is determined to be eligible for domestic foster care, local authorities remove the child from an unsafe situation and place them in out-of-home care (i.e. foster care). Even if there are no foster homes available for children in domestic foster care, local authorities still remove children due to imminent danger and safety risks, and children may spend time in a shelter, residential facility, or even in local

protective service providers' offices until a foster family can be found. For domestic foster care, eligibility determination is consistently followed by admission into foster care as foster home availability has no impact for the legal grounds for removal. However, eligible URMs are only admitted into a federal foster care program if there are available foster homes to take them. During my time at CCFW, by the time CCFW received referrals for URM/UC youth, URM/UC youth had been deemed eligible for federal foster care by the federal government, and the last step before they were admitted to the CCFW program was to determine if we had an available foster home for them. If there were no available foster homes, URM youth would remain in refugee camps and UC youth would remain in residential shelters. Eligibility for the URM program does not mean the child will be admitted to the program despite a documented safety risk of remaining unaccompanied in refugee camps or child immigrant shelters, as admission into the CCFW program depends on available foster families. While admission is automatic for domestic youth, admission for URM youth is dependent on available foster families.

6. At CCFW, we recruited throughout North Texas to try to find enough foster families to serve URM/UC youth in need. Between 2011 and 2015, our recruitment policy at CCFW stated we could only license single individuals or "legally married couples." It was understood by staff that by only licensing legally married couples, this automatically disqualified LGBTQ+ couples from becoming licensed at CCFW due to the lack of marriage equality in Texas prior to 2015. For single foster parent applicants, we did not directly ask about their sexual orientation but asked about their dating history during the home study interview process. If the applicant disclosed that they previously dated the opposite sex, we did not ask any further questions to assess their sexual orientation and assumed that they were straight. To my knowledge no foster parent applicants disclosed that they dated any same-sex persons during the home study process during my time at CCFW. During my time at CCFW it was understood that we were not allowed

3

to license openly gay or lesbian individuals. I first learned about this policy when I was an intern. During the hiring process, I was asked to commit explicitly to adhering to this policy. During my employment, this policy was enforced.

7. While I was employed at CCFW, I recall a CCFW director stated explicitly that CCFW employees should not even refer lesbian or gay applicants to other foster care agencies. I never provided such a referral and I do not know of any instance when any other employee gave one.

8. In the early years of my employment, I can remember an instance in which a gay man called to inquire about becoming a foster parent. A coworker turned him away before he could apply to become a foster parent, informing him that CCFW could not license him because he was openly gay. I recall overhearing part of that conversation and that he sounded upset.

9. This policy of prohibiting staff from accepting foster parent applications from lesbian or gay people became more explicit in 2015 after the decision by the United States Supreme Court in Obergefell v. Hodges which struck down laws banning same-sex couples from marriage in June of 2015. In or about August of 2015, CCFW leadership informed our program management staff that, because of the Obergefell v. Hodges ruling, Catholic Bishops in the U.S. were evaluating whether to keep certain Catholic Charities programs in operation based on whether the program would have to assist or work with LGBTQ+ couples. CCFW leadership informed program management staff that Bishops have authoritative and unilateral power in determining how Catholic Charities programs within their diocese (i.e. jurisdiction) interpret and implement Catholic doctrine as a practical matter when administering programs, including federal child welfare programs administered by Catholic Charities. CCFW leadership explained that a process by which Bishops determine how to respond to issues like this was called "Cooperation with Evil" (sometimes alternatively described as "Cooperation in Evil"). CCFW leadership explained that Bishops can subjectively arrive at different conclusions in their

assessment of "Cooperation with Evil" and that Bishops have authority to direct programs operating within their diocese based on their interpretation. CCFW leadership shared that the outcome of this process in the Fort Worth area meant CCFW would continue to operate federal child welfare programs for Unaccompanied Children and Unaccompanied Refugee Minors notwithstanding Obergefell, but that the Obergefell decision necessitated changes to policies concerning the identities of permissible foster parent applicants.

10. Around the time of Obergefell, CCFW leadership and employees began to discuss how foster families needed to reflect or mirror "the holy family" as a requirement to become a licensed foster family. In their view, there was no "family" unless it was a married male-female couple with children. In order to enforce this policy of "mirroring the holy family," single people—regardless of sexual orientation—were not allowed to become foster parents, and lesbian and gay people, whether married or single, continued to be prohibited from licensure. Prior to implementation of this policy, CCFW would license single people as foster parents regularly. At the time the policy was changed, there were three single foster parents with URM/UC placements, and there had been more before. The three licensed single foster parents with children placed in their homes were allowed to be grandfathered in under the new policy, but later there was discussion that no new URM/UC youth would be placed in their homes, which would have effectively resulted in their homes closing once the youth already placed in their homes left foster care.

11. At the time of the single-parent policy was changed, at least two different single women who were in the pipeline to become foster parents were turned away as a result of the new requirement that applicants "mirror the holy family." Another program manager and I called the single foster parent applicants who were in the process of becoming licensed to let them know we would not be able to move forward with licensing them. The woman I called had

5

almost finished the licensure process and already accepted a sibling group of approximately 4 children to be placed in her home. She had already purchased bunk beds for the youth. When I spoke with her over the phone and told her we would not be able to license her as we were only allowed to license couples moving forward, she said "but my husband just died." I understood this to mean that since her husband had only died a couple years ago, she was upset that she was so close to being able to be licensed and that now that her husband was dead, she was no longer eligible to become a foster parent. I asked CCFW leadership to reimburse the woman for the cost of the bunk beds, and then I was tasked with finding a different foster home who could take a large sibling group at the risk of otherwise having to split the siblings across multiple foster homes. I recall my coworker had to call a single foster parent applicant who had separated from her previous husband due to intimate partner violence, and I remember discussing how upsetting that could be for the applicant to be told she was suddenly ineligible for foster placement because she was single after her experience of intimate partner violence.

12. In or about August of 2015 when the "single parent policy" was rolled out, prohibiting us from licensing single adults, CCFW leadership also discussed that the Bishop's preference for foster family licensing was to prioritize Catholic families first, then Christian families. Previously we had licensed people of various faiths, and our policies and practices of recruiting within communities with diverse religions and ethnicities were critically important to providing quality care for URM/UC children and youth.

13. CCFW policies required us to make every effort to place youth ages 12 and under in an ethnically matched foster home to support their cultural development; when we were unable to do so, we had to justify and document as much in the youth's file. Further, youth in foster care in Texas, including URM and UC youth served by CCFW, had explicit rights to speak and be spoken to in their own language. Foster care agencies in Texas were tasked in making every

6

effort to place children and youth with foster parents who can communicate with foster youth placed in their home, and foster families were required to be able to communicate with foster youth in the foster youth's own language or have means to communicate with the youth in the youth's own language. Inability to meet these requirements had to be documented. Subsequently, CCFW made every effort to recruit foster families who spoke the languages spoken by URMs/UCs, including Spanish, Arabic, Swahili, Lingala, Burmese, etc. Since the majority of CCFW foster families spoke English, federal funding had to pay for interpretation services as needed when CCFW was unable to recruit diverse foster families. CCFW policies required us to continue recruiting until a foster family who spoke the youth's language could be recruited and licensed or until the foster family and youth placed in their home were able to develop a way to communicate with each other.

      14. Per our policies prior to 2015, we worked to recruit Muslim families and partnered with at least one Muslim organization in our attempts to license Muslim families, because it was particularly challenging to recruit Muslim foster families which made it harder to match Rohingya, Hazara, or Somali youth by language or ethnicity. We even held recruitment events at various religious organizations and in nonreligious settings, which was reported to USCCB. However, after the changes were made in response to Obergefell, CCFW leadership communicated that, per the Bishop's request, we were to license Catholic families first, then Christian families, then non-Christian families in that order. CCFW leadership shared that the Bishop would prefer we would only license Catholic couples, but we discussed how that would be impossible to sustain since we had so few Catholic couples who were licensed or seemed interested in becoming licensed.

      15. There were also discussions on CCFW leadership's preference to not license any non-Christian families at all. Around this time, I remember CCFW leadership asking me to look and

7

see if there was anything in our contract or other program requirements that required we worked to recruit Muslim families. My understanding is that we were being asked to stop licensing non-Christian families by executive CCFW leadership, and some at CCFW were trying to see if there was any way we could show we were required to recruit non-Christian families. I showed staff our policies and annual work plan which indicated we were to recruit families from diverse backgrounds. Not being able to license Muslim families would have made it virtually impossible to place Rohingya, Hazara, or Somali children in foster homes that were language or ethnicity matches. I also assisted in licensing an atheist couple in summer 2016, and it was my understanding we did not know they were atheist until we completed the home study. At that point, we had already designated two foster youth to be placed with the atheist family because the foster youth's previous foster parents decided to close their home, requiring CCFW to find another foster home to care for the two foster youth already in care. I was later told by CCFW staff that the family I assisted in licensing was intended to be the last non-Christian family they allowed into the program.

16. There were also increasingly stringent expectations of foster families, URM, and UC youth to follow Catholic Church's teaching on sexuality. In the beginning of my time at CCFW, there were limitations on who could discuss contraception with foster youth. CCFW staff and foster parents were prohibited from discussing contraception, and foster parents were to take foster youth to the doctor where medical professionals could discuss contraception as necessary. Later on, it was discussed that CCFW did not even want foster parents to provide transportation for youth to go to the doctor or to go to the pharmacy to pick up contraception medications, regardless of whether contraception was provided for medical reasons outside of sexual activity. State foster care regulations generally require that foster care staff and foster parents follow doctors' orders, including filling prescriptions prescribed by doctors, and refusing to fill

8

prescriptions prescribed by doctors can be a major violation of best practices and licensing requirements. During my employment at CCFW, URM/UC staff also reviewed "abstinence-only" sexual education material that had been selected for us by CCFW leadership to use with URM/UC youth. URM/UC staff shared our concerns with CCFW leadership about how harmful the content could be for youth, including parts of the curriculum which described same-sex behavior as being wrong or sinful and parts which told girls and young women to practice modesty to prevent men from lusting after them. We were concerned what message this would send to URM/UC youth, including many URM/UC youth who had experienced sexual assault and rape. It was also understood that CCFW would never consent to a foster youth's abortion, and if the foster youth was between ages 18-21 and obtained an abortion, CCFW would discharge the foster youth from the foster care program. I was made aware of this policy as an intern, asked to enforce this policy as an employee, and this remained the policy throughout my employment at CCFW.

17. Based on my personal observations, diminishing the pool of potential foster parent applicants in the ways described above harms children and youth. When CCFW leadership first told program management staff about the decision to further limit the pool of eligible potential foster families, I vividly remember the first thing I said in response was "this means more kids in camps." What I meant was that not licensing appropriate foster families for characteristics which did not impact their ability to provide a safe home would result in CCFW saying no to more referrals of URM/UC youth in need of placement, leaving them in dangerous situations. Over the course of my work with CCFW, we chronically lacked sufficient foster homes in which to place children and youth. A severe shortage of foster parents caused many children to be stuck in refugee camps abroad or in disfavored group settings instead of being safe in a foster home.

18. For example, we would receive referrals from USCCB for refugee children living in

9

refugee camps. Often, these referrals would be for youth who were 17 years old. We needed to get conservatorship for these minors before they turned 18. The Tarrant County court system in Fort Worth could process conservatorship for these children more quickly than other courts working with URM programs, resulting in CCFW receiving a disproportionate number of referrals for 17-year-old youth. To my knowledge, if CCFW was unable to place URM youth nearing their 18th birthday in a foster home, there were no other federal foster care programs for USCCB to send the referral because other locations' courts were unable to grant conservatorship before the youth turned 18. To my knowledge, every time we said no to a URM/UC referral it was only because we did not have a foster home who had room to take the URM/UC in. If we could not accept URMs, they would be stuck in refugee camps abroad, unaccompanied, ineligible for services, often in horrendous conditions.

19. Other times, we would receive referrals of youth with medical conditions requiring prompt treatment or complex treatment in the U.S.; with no available foster homes we either were unable to accept the youth into the program or medical care would be delayed while we finished licensing a new foster home because there were no other foster homes available. We would also receive referrals for youth with companion cases where URMs had extended family members who would be resettled in the adult resettlement program for whichever city accepted the URM placement. Occasionally a related adult or child on the case would need prompt medical care, and if we were unable to accept the URM youth, the entire family would be unable to be resettled or face delays in resettlement, complicating the need for prompt medical care.

20. We also received referrals for URMs residing in hostile foreign countries who would be deported back to the country they fled from if we were unable to place them in foster homes expeditiously. In order to be eligible as a URM, youth had to have fled their home country due to war, violence, or persecution, be outside their country of origin, and be unable to avail

10

themselves to the protection of their country of origin, and deporting URMs back to their country of origin can have deadly consequences. On at least one occasion, USCCB sent us a referral for approximately six URMs who urgently needed placement as the country they entered was about to deport them. Their referral described how they all almost died in trying to flee their country of origin and how many of their family members and neighbors had been persecuted, disenfranchised, and killed. We only had enough foster homes to accept two of the six youth. I am unsure if the other four children found safe placements or if they were deported back to the country whose military regime had attempted to kill them.

21. USCCB would regularly send us referrals of unaccompanied refugee children living alone in refugee camps, complete with a photo of the child, and I would have to say no because we didn't have enough foster homes for them. There was always a greater need for foster homes with the number of children in need of resettlement and placement far exceeding the number of available beds. At certain points USCCB would stop sending us referrals of children in need and wait until we informed them we had a foster care placement bed open up because of how frequently and regularly we had to say no to referrals of children due to a chronic severe shortage of foster homes. I was never told what happened to the referrals I said no to due to not having enough foster families, and while we were able to resettle the referrals we accepted, I was always fearful the children might die of something like malaria or a militant attack on a refugee camp, both of which are common occurrences within refugee camps.

22. In addition to unaccompanied refugee minors, unaccompanied children also had needs for a speedy and efficient court process. It was important for UCs to get special immigrant juvenile status (SIJS) quickly because once they had SIJS, they could apply for the URM program where they could stay in federal foster care until they were 21. However, CCFW had to be appointed as conservator for the SIJS youth before they turned 18 to ensure eligibility into the

11

URM program. Without getting conservatorship of SIJS youth before they turn 18, SIJS youth would essentially age-out of foster care at age 18. Consequently, we received a significant number of referrals for older children in the UC program, too. Prior to that happening, UC children would be placed in shelters if they didn't have a family member deemed a safe and appropriate placement or if a foster care agency like CCFW did not have enough foster homes to provide a safe placement for UC youth.

23. Based on our use of trauma-informed care models at CCFW, we understood that harms to children in shelters can be extensive. For decades foster families have been preferable over shelters. A child's experience in a shelter can be psychologically and educationally harmful and disruptive to the child's development, particularly for younger children for whom it is particularly important to have a consistent caregiver. Children can be vulnerable to abuse, physical assault, and other forms of mistreatment in shelters, and frequently develop post-traumatic stress disorder. A shelter placement is rarely in a child's best interest when a potential foster placement is available as an alternative.

24. Foster families are severely in short supply for domestic foster care in the U.S., but there were additional challenges which made foster parent recruitment for immigrant children and youth even more difficult, making our pool of potential applicants even smaller. We tried to recruit in domestic foster care circles, but certain domestic foster parents and applicants would be offended that we were there trying to recruit foster families to serve kids who would be immigrating into the US while there was also a shortage of foster homes for domestic youth in foster care. Subsequently, we stopped recruiting within those circles and had that much more difficulty recruiting foster families than domestic foster care programs do. Anti-immigrant sentiment and Islamophobia were additional barriers we faced which domestic programs did not face to the same extent. During surges of unaccompanied children crossing the border, we even

12

had a bomb threat to CCFW which required us to remove the name from one of the buildings for another program that temporarily housed migrant youth before family reunification. Families were concerned about language barriers with federal foster care, which was less commonly a barrier for domestic foster care. In foster care, families commonly prefer to care for younger kids, and finding foster families willing to take older youth is commonly a challenge. Since CCFW served almost exclusively older international youth with few exceptions, this also made CCFW's foster family pool even smaller. The time commitment was also an additional barrier CCFW faced in foster family recruitment which was not a challenge within domestic foster care to the same extent. Domestic foster care programs operate on the legal case timeline, which has specific timeframes ranging from 12 months to 24 months as it revolves around the government having the burden of proof for why children should not be returned to their parents. For federal foster care, the majority of URM youth aged out of care by age 21, and federal foster care programs need foster families to commit to being a foster parent for years. Subsequently, foster families would at times quit because they couldn't maintain such a long commitment to care for a child from age 17 to 21 (which would be one of the shorter placement durations).

25. Placement disruptions are harmful to foster youth, and being a placement for a URM/UC from age 17 to 21 is difficult for many families to commit to. We had attrition of foster families, which meant new foster families had to be recruited to replace families who left, in addition to needing to recruit new foster families to serve URM/UC children in unsafe conditions in camps or shelters. Not only did a severe undersupply of foster parents result in children being left in refugee camps or shelters, it also was harmful to the URM and UC children and youth under CCFW's conservatorship. I can recall at least six youth who had placement breakdowns where their foster parents decided to close their home, and we had no place to put the youth because all other foster home beds were full. Due to this foster parent shortage, these

13

URM youth spent short lengths of time in respite at various foster homes, had to change schools, and experienced detrimental disruption and stress.

26. When we had few foster homes to pick from, it was difficult to place youth in a foster home best suited to meet their needs; at times, placing youth in a foster home simply because the foster home had an open bed for the youth took precedent over the youth's best interests due to a shortage of foster families.

27. There was clear pressure from USCCB and the government to recruit more foster families due to the high number of children who needed foster family placements who were going unserved, left unaccompanied in camps or shelters with lasting risk of harm to their legal immigration status. To add additional barriers to foster family recruitment when federal foster family recruitment was already difficult enough made a small foster parent pool even smaller.

28. CCFW program managers knew the risk of how much more difficult this would make the already challenging task of foster parent recruitment and how harmful reducing the foster parent pool would be for URM/UC children in unsafe situations. The other program managers and I discussed our concerns over this policy change and the deadly effects it would have for the children we worked to serve. We expressed our understanding that this policy was communicating the idea that it was better for children to be unaccompanied in unsafe situations than to be accompanied by single, non-Christian, or LGBTQ+ caregivers in safe homes. From my conversations with CCFW, it was understood that CCFW was aware of the effect of this policy, that its recruitment policies would in effect result in children remaining unaccompanied in unsafe situations rather than be accompanied by single, non-Christian, or LGBTQ+ parents in a safe situations.

29. The entire program budget depended on the recruitment of foster parents. The size of the grant and the reimbursement for expenses turned on the number of foster parents recruited,

14

trained, licensed, and available. The number of new foster families recruited determined the number of trainers and home developers working within the agency as they could only train and license so many families at once. With more newly recruited foster families, we could hire more staff for training and licensure, but with fewer recruited foster families, we were at-risk of having to cut those positions. We would also consider new families with new placements when we could calculate mileage reimbursements for staff – with fewer foster families, less would be spent on mileage, putting the mileage line item at risk of being underspent.

30. As part of licensing foster parents, staff assessed the number of children they could appropriately care for. Once we placed those children in their home, the family would be reimbursed approximately $45 a day per child. For serving approximately 20-50 URMs within a year, foster parent reimbursements made up a large portion of our budget. Whenever we would create our budget, we estimated how many new foster families we expected to recruit and how many URMs we expected to place in those families. We consistently overestimated the number of foster families we thought we could recruit, so while we thought we might be able to serve 50 kids a year, we would only end up serving 30 kids a year because we were unable to find enough foster homes for the other 20 children we expected to be able to serve, resulting in a lot of unspent funding due to not having places to put URM children and having to decline referrals.

31. After being underspent on the grant for at least more than one fiscal year, in 2014, CCFW's URM program had a significant budget cut because of unspent funding due to the inability to recruit enough foster families. As a result of the budget cut, important vacant positions were not filled, including a case manager and our Educational Specialist. Case managers could only serve so many children on a caseload, so the number of children we placed determined how many case managers we hired. The number of case managers or home developers we had on staff determined how many program managers we needed to supervise

15

these positions. The Educational Specialist position was cut with their tasks being allocated to case managers, but previously the Educational Specialist was a skilled position available to assist with school enrollment, special needs testing, English as a Second Language (ESL) services, and tutoring – all of which were critical to immigrant youth succeeding educationally. Further, the budget covered lots of youth expenses which had expenses tied to each child, including the estimated costs of tutoring per anticipated youth, interpretation per youth, legal assistance per youth, respite (paid babysitting for foster families) per youth, international phone cards per youth, etc. With fewer youth served due to insufficient foster families recruited, we would be underspent in these categories as well.

32. My understanding of our purpose as a federal foster care provider was that we provided foster parents to unaccompanied children and unaccompanied refugee minors – that we helped them go from being "unaccompanied" to "accompanied." Each best interest determination (BID) sent to me by USCCB described children's eligibility in the URM/UC program within two prongs: 1) their eligibility as a refugee or unaccompanied child (the harrowing experiences of children fleeing persecution and facing likely death if the US or their current country-of-residence were to deport them back to their country-of-origin) and 2) their eligibility as an *unaccompanied* refugee minor or *unaccompanied* child, specifically what happened to the child's parents and how the child became unaccompanied.

33. To work with unaccompanied children is to know that they were not always unaccompanied. We typically did not work with very young children because very young children (ages 0-7) typically do not survive an unaccompanied flight from their country-of-origin or survive living unaccompanied in a refugee camp. We were able to work with children typically ages 8-17 because they were previously accompanied. The BIDs I read began with a picture of the child's face and then detailed what happened to each child's parents: mothers and

fathers, parents who put their babies on boats, placed their children in trunks of cars or into the hands of strangers to escort them to a safer, future country. By the time I was a Program Manager of the URM/UC programs, we had served over 100 children, and each of their USCCB referrals detailed what happened to their parents and how the children became unaccompanied in the first place. While many children faced persecution that their parents did not (i.e. child soldiers) which resulted in their parents sending their children away while the parents remained behind, many other accounts described parents dying en route to a safer, future country and placing their children in the hands of relatives, loved ones, and even strangers, asking them to make sure the entrusted adult keeps their child safe and alive and en route.

34. After accepting a USCCB referral, picking a child up from the airport, and placing them into a foster home, I would often wonder about the child's parents. Having read what their parents went through to keep their children alive and get them to a safe country, I would wonder what their parents would think of the foster family I licensed: what they thought of the home I put their child in, the family I placed their child with. After I was told by CCFW leadership that I would not be able to license single parents due to the Obergefell ruling, it was very difficult to think of the parents who put their babies on boats, their children in trunks, parents who put their children's lives in the hands of strangers like me, only to have those strangers fail them. Parents who were failed by strangers like me who were not able to grant their children safe passage to a future country where their children could live safely and without persecution, where their children could stay alive. I became a parent myself in the last three months of my employment at CCFW, but even before I became a parent, I knew the gravity of what over 100 children's parents gave up for their children and the cruelty of what our program, CCFW, did with full-knowing of how harmful policies prohibiting any single, non-Christian, or LGBTQ parent were to children and the legacies of their parents. Knowing how much the parents of URM children

17

gave up all to make sure their children reached a safer, future country, I do not imagine any of them agreeing with the idea that it is better for their children to live alone, in an unsafe refugee camp where they continue to face persecution and risk of death than to be placed with a single, non-Christian, or LGBTQ parent in a safer country. I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of July, 2022.

Respectfully Submitted

Catelyn Devlin

18