**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FATMA MAROUF, *et al.*,

                    Plaintiffs,

        v.

XAVIER BECERRA, in his official capacity
as Secretary of the United States Department
of Health and Human Services, *et al.*,

                    Defendants.

Case No. 18-cv-378 (APM)

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.      PLAINTIFFS' CLAIMS ARE MOOT. ............................................................. 3

        A.      The Consortium is Not "a 'separate but equal' scheme." ...................... 3

        B.      The Consortium Does Not Cause or Compound Any Constitutional
                Violation. ................................................................................................. 6

II.     PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE
        MERITS. ............................................................................................................ 8

        A.      Plaintiffs' Establishment Clause Claim Fails. ...................................... 8

                1.      Plaintiffs' arguments are inconsistent with governing standards
                        recently articulated by the Supreme Court. ................................ 9

                2.      ORR has not caused any impermissible delegation of governmental
                        powers to USCCB. .................................................................... 10

                3.      ORR has not created impermissible religious accommodation. .............. 13

        B.      Plaintiffs' Fifth Amendment Claims Fail. ............................................ 16

                1.      Plaintiffs' claims are subject to rational-basis review. ............................ 16

                2.      Federal Defendants' actions easily survive rational-basis review. ........... 18

CONCLUSION .................................................................................................................. 23

## TABLE OF AUTHORITIES

**CASES**

*Board of Education of Kiryas Joel Village School District v. Grumet*,
    512 U.S. 687 (1994) ................................................................................................. 11, 12

*Brown v. Board of Education*,
    347 U.S. 483 (1954) ......................................................................................................... 4

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
    483 U.S. 327 (1987) ................................................................................... 2, 13, 16, 17

*County of Allegheny v. ACLU, Greater Pittsburgh Chapter*,
    492 U.S. 573 (1989) ....................................................................................................... 13

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ....................................................................................................... 15

*Estate of Thornton v. Caldor*,
    472 U.S. 703 (1985) ................................................................................................. 14, 15

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ................................................................................................. 19, 23

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ....................................................................................................... 23

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ........................................................................................... 9, 10, 11

*Harkness v. Sec'y of the Navy*,
    858 F.3d 437 (6th Cir. 2017) ....................................................................................... 12

*In re Navy Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012) ................................................................................... 13

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ............................................................................................... 2, 9

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ....................................................................................................... 14

*Larkin v. Grendel's Den, Inc.*,
    459 U.S. 116 (1982) ................................................................................................. 11, 12

*Louisville Gas & Elec. Co. v. Coleman*,
    277 U.S. 32 (1928) ......................................................................................................... 18

*Marouf v. Azar*,
    391 F. Supp. 3d 23 (D.D.C. 2019) ................................................................. 3, 6, 8

*Romer v. Evans*,
    517 U.S. 620 (1996) ....................................................................................... 18

*Tex. Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989) ........................................................................................... 14

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014) ...................................................................................... 2, 9

*United States v. Lanier*,
    520 U.S. 259 (1997) ....................................................................................... 17

*Warth v. Seldin*,
    422 U.S. 490 (1975) ....................................................................................... 14

## REGULATIONS

45 C.F.R. § 87.3 .................................................................................................... 13

## OTHER AUTHORITIES

ORR, *Unaccompanied Refugee Minors Program*,
    https://www.acf.hhs.gov/orr/programs/refugees/urm ............................................. 21

**INTRODUCTION**

Plaintiffs are not entitled to summary judgment, first and foremost, because their claims are moot.  *See* Fed. Defs.' Statement of Points & Authorities 11–16, ECF No. 110-2 ("Fed. Defs.' MSJ Mem.").  There is no longer any Unaccompanied Children ("UC") provider agency in Dallas-Fort Worth, Texas, where Plaintiffs live, and there is now an Unaccompanied Refugee Minor ("URM") provider agency, Upbring, in that area that will place foster children with same-sex couples.  Furthermore, Federal Defendants have instituted a "Consortium" under which a third party performs the intake function, such that no prospective foster parent will be turned away because of their sexual orientation.  That Consortium reinforces Federal Defendants' position that all persons, regardless of family status or sexual orientation, should have the opportunity to be foster parents if they satisfy the applicable requirements of State law.  But this point is not the issue in this case, which instead concerns whether a private organization should be cut off in part from serving vulnerable populations in programs in which it has served for decades.

Plaintiffs are wrong that this Consortium is merely "separate but equal" discrimination.  Same-sex and heterosexual applicants alike may be referred to Upbring, which negates any possible inference that the Government is segregating disfavored groups, as in *Plessy* or *Brown*.  Nor does the Consortium represent the government's adoption of any religious belief; to the contrary, under the Consortium, religious beliefs about marriage have no bearing on whether a prospective foster parent can get licensed.  And once licensed, Plaintiffs would be in no worse position than any other prospective foster parent in seeking a URM placement just because of the provider agency to which they were referred.  Plaintiffs no longer have live claims against the UC or URM programs.

On the merits, the Government's actions pass Establishment Clause muster.  Plaintiffs fail to cite the current standard, under which the Court must interpret the Clause by reference to

historical practices and understandings. *Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2428 (2022) (citing *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). The history in this case is clear: The government has long worked with religious organizations, including the United States Conference of Catholic Bishops ("USCCB"), to find foster care placements, given those organizations' experience and expertise. At no time in that history have Federal Defendants crossed the line of religious neutrality in operating the program, or impermissibly delegated inherently governmental functions to any religious organization. Plaintiffs' arguments to the contrary are unavailing.

Finally, Plaintiffs' motion does not address the essential ingredient of state action, which— as Federal Defendants have explained, *see* Fed. Defs.' MSJ Mem. 20–26—dooms any Fifth Amendment claim. But even if Plaintiffs had cognizable Fifth Amendment claims, those would be subject to rational-basis review (not heightened scrutiny) because the government here has merely taken a neutral action "motivated by a permissible purpose of limiting governmental interference with the exercise of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987). So long as such action withstands Establishment Clause review, it should be reviewed under the Fifth Amendment *only* to determine whether there is any rational basis for the action. *Id.* As explained below, Federal Defendants had at least a rational basis for the actions taken here.

For the foregoing reasons and those set forth below, Plaintiffs' motion for summary judgment and memorandum in support, ECF No. 108 ("Pls.' MSJ Mem."), should be denied.

## ARGUMENT

Federal Defendants assume the Court's familiarity with the legal standard and background discussion sections from the Government's opening brief and incorporate those sections by reference herein. In the interest of brevity, the Government addresses the factual background of

this case below only where necessary to respond to the various arguments Plaintiffs raise in their motion for summary judgment.[1]

## I. PLAINTIFFS' CLAIMS ARE MOOT.

To begin, Plaintiffs' motion for summary judgment should be denied because Plaintiffs' claims are moot, as explained in Federal Defendants' opening motion. *See* Fed. Defs.' MSJ Mem. 13–15. In summary, any claim as to the UC program has been mooted by the withdrawal of USCCB from providing long-term foster care ("LTFC") in Dallas-Fort Worth, as well as the establishment of another LTFC provider in that location with no objection to working with same-sex couples. Fed. Defs.' MSJ Mem. 12–13. As for the URM program, those claims are moot as well because (1) there is now a second replacement designee in Texas (Lutheran Immigration and Refugee Service or "LIRS"), which has a subgrantee in Dallas that will work with same-sex foster parents (Upbring); and (2) the two URM provider agencies in Plaintiffs' area have partnered with a third party (U.S. Committee for Refugees and Immigrants or "USCRI") to ensure that no same-sex couple is denied an opportunity to become licensed and receive a URM placement. Fed. Defs.' MSJ Mem. 13–14. Put another way, Federal Defendants have "develop[ed] a system that removes barriers to same-sex couples becoming foster parents and evaluates their eligibility by the same criteria as any heterosexual couple or person." *Marouf v. Azar*, 391 F. Supp. 3d 23, 37 (D.D.C. 2019). As the Court recognized at the motion to dismiss stage, this change to the URM program is sufficient to "make Plaintiffs whole." *See id.*

Although Plaintiffs do not squarely address mootness in their motion, they make several arguments that bear on the question, all of which are without merit.

### A. The Consortium is Not "a 'separate but equal' scheme."

Plaintiffs suggest that the Consortium constitutes "separate but equal" treatment. Pls.' MSJ

---

[1] The Government further addresses with specificity each paragraph of Plaintiffs' Statement of Material Facts in a separate filing submitted herewith.

Mem. 11 (quoting Marouf Decl. ¶ 20, ECF No. 108-3 at 6–7).  That term harks, of course, to the infamous *Plessy v. Ferguson* case, overruled by *Brown v. Board of Education*, 347 U.S. 483, 492 (1954).  In *Plessy*, the Supreme Court had upheld race-based segregation in railcars on the theory that such accommodations were "separate but equal."  *Id.* at 490–91.  In *Brown*, the Court struck down race-based segregation in public classrooms, recognizing that "separate but equal" is a fallacy.  *Id.* at 494–95.

The Consortium bears no resemblance to the railcars in *Plessy* or the classrooms in *Brown*.  There is no segregation of foster parents in the program under review.  An LGBT foster parent in Dallas who was referred to Upbring would find him/herself among many—and likely a majority of—heterosexual parents.  Thus, the Consortium does not "segregate same-sex couples from other applicants," Pls.' MSJ Mem. 9, 10, 24.  Nor, for the same reason, does it signify any sort of status-based denigration; any prospective foster parent might be referred to Upbring, whether single or in an opposite-sex or same-sex relationship.  In short, the Consortium intake approach does not foster any sort of separation among foster parents on the basis of sexual orientation.[2]

Second, the Consortium does not create an unequal system for LGBT prospective foster parents.  The first step for any prospective foster parent, whatever child-placing agency they are working with, is to get licensed with the State.  Thus, all parents in Dallas-Fort Worth, whether referred to Catholic Charities of Dallas ("CCD") or Upbring, will take the exact same next step in pursuing licensure through the State of Texas.  Moreover, Upbring has already shown itself able to assist parents with getting licensed.  Fed. Defs.' SUMF ¶ 97, ECF No. 110-3.

Nor do Dallas-Fort Worth prospective foster parents in same-sex marriages face an unequal

---

[2] Plaintiffs' suggestion that USCRI receives federal funds "to perform . . . segregation," Pls.' MSJ Mem. 10 (citing Pls.' SUMF ¶¶ 94–95), is thus without merit.  USCRI will receive funding to administer USCRI's "URM Foster Parent Intake" program, *i.e.*, the Consortium.  Pls.' MSJ Ex. 44 at HHS_SUPP_000015.  The description of that budget proposal, *id.* at HHS_SUPP_000020, makes clear that there is no mention or description of "segregating" anyone for any reason.

prospect of receiving a URM foster placement once they have achieved State licensure. While there is no guarantee that any licensed foster parent—in any agency's pool—will receive a placement, those licensed through Upbring are *no less eligible* than their counterparts at CCD to receive a placement. Ex. D, 2d Mullooly 30(b)(6) Dep. 111:23–112:3 ("[Q.] Is the sole family in the Upbring pool any less likely to receive a placement simply because they are in a smaller pool than their counterparts in the CCD pool? A. No."). Federal Defendants corrected Plaintiffs' misimpression of this process, and were unequivocal on this point, at the second 30(b)(6) deposition. *See generally id.* at 106:19–112:5.

Plaintiffs nonetheless contend that Upbring is an inferior child placing agency to CCD, asserting that "[a]s a new subgrantee . . . Upbring lacks the capacity to process applicants on the same scale that CCD enjoys and, thus, is not similarly situated to CCD." Pls.' MSJ Mem. 9 (citing Pls.' SUMF ¶ 102). Plaintiffs are mistaken; the evidence at summary judgment does not show any lack of capacity at Upbring going forward. Plaintiffs argue that Upbring "has not yet served any foster children, and is still working to hire staff and license foster parents." Pls.' SUMF ¶ 102. Plaintiffs also argue that "CCD's budgeting, funding, and staffing are more robust than Upbring's." *Id.* ¶ 106. But the Government was clear—in testimony that Plaintiffs omitted from their statement and transcript excerpts—that a lower current funding level does not constrain Upbring from hiring more staff or caring for more children. *See* Ex. D, 2d Mullooly 30(b)(6) Dep. 115:18–116:18. That is because Office of Refugee Resettlement ("ORR") funding levels can rise to meet demand from a grantee, rather than functioning as a cap that constrains the grantee's activities. For example:

> If all of a sudden [Upbring] [is] able to license ten foster families and they get ten kids or they accept ten kids, they may come to us with a new budget estimate with a different figure, a higher figure, saying we actually think we're going to need now this amount of money for this year.

*Id.* at 114:21–115:3.  Moreover, whether or not Upbring's URM program is ultimately smaller than CCD's is irrelevant because the only question is whether Upbring can process *Plaintiffs'* applications.  If so, then Plaintiffs would be on par with all the licensed parents in CCD's pool—even if that pool is larger.  *See* Ex. D, 2d Mullooly 30(b)(6) Dep. 111:23–112:3. And Upbring has already proved itself capable of getting foster parents licensed.  Fed. Defs.' SUMF ¶ 97; *accord* Pls.' SUMF ¶ 103.

Upbring offers Plaintiffs every opportunity to foster a URM child that CCD would. Plaintiffs simply have not applied.

### B.     The Consortium Does Not Cause or Compound Any Constitutional Violation.

For the reasons explained above and at length in the Government's opening brief, Federal Defendants have "ma[d]e Plaintiffs whole" by "remov[ing] barriers to same-sex couples becoming foster parents," and seeing to it that Plaintiffs are evaluated "by the same criteria as any heterosexual couple or person," *Marouf*, 391 F. Supp. 3d at 37.  Plaintiffs argue to the contrary, asserting that the Consortium has actually *compounded* the problem.  Pls.' MSJ Mem. 9–11, 24. Those arguments are without merit.

Plaintiffs argue that Federal Defendants "have now adopted USCCB's religious beliefs as a determinant of government decision-making."  Pls.' MSJ Mem. 9.  But the very existence of the Consortium, which ensures that no applicant will be denied the opportunity to be a foster parent on the ground of sexual orientation, belies any suggestion that religious beliefs are determining who may, and may not, foster a child through the URM program in Dallas-Fort Worth.  *See* Fed. Defs.' SUMF ¶¶ 93–94, 98.

Plaintiffs emphasize that it is still "possible," by Federal Defendants' alleged admission, that Plaintiffs would get turned away again.  Pls.' MSJ Mem. 10 (citing Pls.' SUMF ¶ 107 (citing Pls.' MSJ Ex. 32, 2d Mullooly 30(b)(6) Dep. 105:17–23)).  But even if it were theoretically

possible that a same-sex couple applicant might be mistakenly referred to CCD,[3] that does not undermine how the Consortium fundamentally works.  In short, the Consortium ensures that being in a same-sex relationship does not prevent a couple from being referred to a URM provider agency; the government is aware of no barriers to same-sex parents fostering URM children in Dallas-Fort Worth; and the government is aware of no barriers pertaining to Plaintiffs, specifically.  Ex. D, 2d Mullooly 30(b)(6) Dep. at 117:8–118:3.  This description is reinforced by the documents produced.  *E.g.*, Fed. Defs.' SUMF ¶¶ 93–94 (citing Ex. DD, HHS_SUPP_000079 (reflecting that USCRI had "discussed with USCCB and LIRS any restrictions that their sub-recipients may have for working with a prospective foster parent," and that based on those discussions, USCRI had "not identified any scenario where a prospective foster parent would not have the opportunity to work with a URM provider agency to determine their eligibility to be licensed under state guidelines.")).  And on the speculative chance that a prospective foster parent is referred to an agency that would not work with the parent, he or she would be referred back to USCRI and ultimately to the other provider.  Ex. D, 2d Mullooly 30(b)(6) Dep. 87:19–88:5.  In short, Plaintiffs' suggestion that "the Consortium does nothing to alter the landscape," Pls.' MSJ Mem. 25 n.10, is wrong.  The remote possibility of a glitch in the Consortium's referral process—which would not ultimately deny anyone the chance to foster a child—does not save Plaintiffs' URM claims from mootness dismissal.

Finally, Plaintiffs' suggestion that the Consortium grants "blanket prospective waivers" to its members against taking any action inconsistent with their religious beliefs is unavailing for two reasons.  *See* Pls.' MSJ Mem. 10, 11, 31, 37.  First, the only religious belief at issue in this case is that which kept Catholic Charities of Fort Worth (CCFW) from working with Plaintiffs.  The

---

[3] Ex. D, 2d Mullooly 30(b)(6) Dep. Tr. 91:23–92:12 (answering repeated inquiries regarding what is "possible" by stating that "I don't think the Government can say it's not possible").

Consortium ensures that that belief will no longer prevent Plaintiffs from fostering a URM child.[4]
Second, Plaintiffs have provided no evidence that any Consortium member has any other religious
belief that would prevent any foster parent from fostering a URM child.  Plaintiffs have not even
suggested what such a belief may be.  This is irrelevant speculation.

*      *      *

Far from perpetuating an unconstitutional scheme, the Consortium is consonant with what
Plaintiffs indicated would be an acceptable path forward for this program when pressed at an
earlier stage of this litigation.  For example, citing a discussion with Plaintiffs' counsel at the
motion to dismiss hearing, the Court explained in its motion to dismiss opinion that Plaintiffs do
not seek to strip USCCB of its funding or compel USCCB to place children in a manner contrary
to its religious beliefs.  *See Marouf*, 391 F. Supp. 3d at 36 n.2.  And even more directly, at the
motion to dismiss hearing, Plaintiffs' counsel described as acceptable the creation of a "screening
process" for prospective foster parents to which any couple would be directed, regardless of family
status.  Tr. of Oral Argument at 57:1–4, 58:15–25, 60:12–61:5 (Nov. 30, 2018), ECF No. 80.  At
that time, Plaintiffs seemed to be of the view that this would obviate the need for USCCB to act
contrary to its religious convictions by directly placing children with same-sex couples.  *See id.*
On this point, the Court should adopt Plaintiffs' prior position—the Consortium has redressed their
alleged injuries and the claims in this lawsuit are therefore moot.

## II.   PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE MERITS.

### A.   Plaintiffs' Establishment Clause Claim Fails.

Plaintiffs contend that they are entitled to summary judgment on their Establishment
Clause claim, contending that the Government has violated the Clause in two ways: by (1)

---

[4] In truth, Plaintiffs could have pursued fostering a child *three years* ago, when Federal Defendants
apprised them of a UC provider in their area that did not object to working with same-sex foster
parents. *See* Fed. Defs.' SUMF ¶¶ 76–78.

"delegating governmental functions to USCCB without establishing and maintaining adequate safeguards" as to USCCB's operations and (2) "benefiting religion in a manner that results in significant harms to third parties."  Pls.' MSJ Mem. 27.  Neither argument has merit.

### 1. Plaintiffs' arguments are inconsistent with governing standards recently articulated by the Supreme Court.

To begin, Plaintiffs fail to cite the current standard for Establishment Clause claims, which was articulated in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022).  As explained in the Government's motion for summary judgment, that case held that courts "must" interpret the Establishment Clause "by 'reference to historical practices and understandings,'" with the Court instructing that the line "between the permissible and the impermissible has to accor[d] with history and faithfully reflect the understanding of the Founding Fathers."  *Id.* at 2428 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).   Under that standard, ORR's longstanding, religiously neutral relationship with USCCB readily passes First Amendment scrutiny.  *See* Fed. Defs.' MSJ Mem. 16–19.

Plaintiffs' position is incompatible with this test, as shown by the one passage of *Kennedy* that Plaintiffs do cite in their motion, where the Court explained that the Free Exercise and Establishment Clauses "have 'complementary' purposes, not warring ones where one Clause is always sure to prevail over the other.'"  *Id.* at 2426; *see also* Pls.' MSJ Mem. 25 (quoting same). The problem for Plaintiffs is that their position (that USCCB's participation in this program violates the Establishment Clause) is in tension with the Supreme Court's recent Free Exercise jurisprudence.  For example, in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), the Supreme Court held that it violated the Free Exercise Clause for the City of Philadelphia to exclude from its foster care system a Catholic child-placing agency solely on account of the agency's opposition to certifying same-sex couples as foster parents.  *Id.* at 1882.  The Court explained that the child-placing agency in question "[did] not seek to impose [its] beliefs on anyone else" even where it

declined to work with same-sex couples as foster parents. *Id.* Similarly here, USCCB does not seek to impose its beliefs but rather seeks only an accommodation to allow it to deliver secular services in a manner consistent with its religious beliefs.

Federal Defendants do not mean to say that the imposition of non-discrimination requirements on a religiously affiliated grantee necessarily violates either the Free Exercise Clause or Religious Freedom Restoration Act—and *Fulton* does not hold otherwise. *See id.* (explaining that the City in that case had failed to "offer[]" any "compelling reason why it ha[d] a particular interest" in enforcing the non-discrimination requirement at issue in that case). Instead, the point is that after *Fulton*, Plaintiffs' argument that the Government violates the *Establishment* Clause by working with a grantee that declines to work with same-sex couples is severely undermined. *See Locke v. Davey*, 540 U.S. 712, 719 (2004) (explaining that there is "play in the joints" between the Establishment Clause and Free Exercise Clause such that state action may be "permitted by the former but not required by the latter"). Plaintiffs protest that *Fulton* is inapposite, asserting among other things that "there was no evidence in *Fulton* that any person had been excluded, turned away, or otherwise harmed by a child welfare agency." Pls.' MSJ Mem. at 35. But although "[n]o same-sex couple ha[d] ever sought certification from [Catholic Social Services]," it was undisputed that the agency would refuse to certify any same-sex married couple that sought licensure and would instead refer such a couple to another agency in the City's foster system. *Fulton*, 141 S. Ct. at 1875. The Court was well aware of the stakes: that the Catholic agency in that case would not, if allowed to contract with the City, certify same-sex couples for foster parenting.

## 2. ORR has not caused any impermissible delegation of governmental powers to USCCB.

Plaintiffs argue that ORR's relationship with USCCB effects an impermissible "fusion of governmental and religious functions" by delegating important governmental powers to USCCB without establishing adequate safeguards to ensure that USCCB "wield[s]" that power "only in a

secular, neutral, and nonideological manner." Pls.' MSJ Mem. 28–29. Plaintiffs rely on two principal Supreme Court cases for this argument—*Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), and *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994). Plaintiffs' invocation of this line of authority, whatever its currency in light of *Kennedy*, fails for multiple reasons.

To begin, no governmental power of the sort contemplated by *Larkin* and *Grumet* has in fact been delegated here, where USCCB's sub-grantees simply exercise the ordinary role of a child-placing agency in recruiting foster parents, rather than some core political or regulatory function. The latter kind of governmental power was the premise for both *Larkin* and *Grumet*. *See Larkin*, 459 U.S. at 122 (explaining that the power to veto liquor license applications is "ordinarily vested in agencies of government" and constitutes a "substantial government power[]"); *Grumet*, 512 U.S. at 709–10 (statute "delegate[d] a power this Court has said 'ranks at the very apex of the function of a State'" (citation omitted)). In contrast, the care of unaccompanied and orphaned children has historically been the responsibility of private, including religious, organizations. *See* Fed. Defs.' MSJ Mem. 4–6 (recounting the decades-long history of faith-based organizations assisting with resettlement of refugees and refugee children specifically); *Fulton*, 141 S. Ct. at 1885 (Alito, J., concurring) (describing the dominant role played by private groups, and the limited role of state and local governments, in caring for orphaned and foster children until the 20th century).

Plaintiffs in any event interpret *Larkin* and *Grumet* far more expansively than their reasoning permits. As explained by the *Grumet* Court, those cases stand for the proposition that the government may not "deliberately delegate discretionary power to an individual, institution, or community *on the ground of religious identity*." *Grumet*, 512 U.S. at 699 (emphasis added). In that circumstance—where in essence a "religious test" is applied to determining whether political

power is wielded by an entity or community—there is an impermissible "fusion" of government and religion.  *Id.* at 702; *see also Larkin*, 459 U.S. at 117 (evaluating statute that gave churches and schools authority to veto applications for liquor licenses in their physical vicinity).  In contrast, the rule of *Larkin* and *Grumet* is not implicated where religious entities are selected to assist the Government "on principles neutral to religion, to individuals whose religious identities are incidental to their receipt of civic authority."  *Grumet*, 512 U.S. at 699; *see also Harkness v. Sec'y of the Navy*, 858 F.3d 437, 450 (6th Cir. 2017) (same).  The evidence here shows that ORR selected USCCB as a replacement designee in the URM program and a grantee in the UC program for reasons having nothing to do with religion.  Fed. Defs.' SUMF ¶¶ 46–47, 62–65.  USCCB is a grantee of ORR because of its expertise in delivering care to vulnerable children, not because of its religious character.

Moreover, USCCB's activities as a UC and URM grantee are not remotely "standardless" such that this case would be analogous to *Larkin* or *Grumet*.  The rule of those cases applies only where power is delegated to a religious entity in a "standardless" fashion, such that they may use that power to promote "explicitly religious goals."  *Larkin*, 459 U.S. at 125.  But here, USCCB's activities are subject to numerous secular standards.  For example, in the URM program, USCCB and its affiliates are required to follow state law regarding licensing and approval of prospective foster parents and to "develop an appropriate plan for the care and supervision of each unaccompanied child."  Fed. Defs.' MSJ Ex. B at 37, ECF No. 111-2.  USCCB is also obligated to follow various terms and conditions of its federal grants, "which govern how a grantee may run its grant program, including limits on allowable costs, eligibility, and reporting requirements."  *Id.*  Those terms and conditions include HHS regulations forbidding organizations from using direct federal financial assistance to "engage in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization)."  45

C.F.R. § 87.3(b).  This case is therefore akin to *In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012), where the Court of Appeals rejected a *Larkin*-based argument for lack of a standardless delegation of authority.  The court reasoned, *inter alia*, that a scheme whereby Navy chaplains played a role in making promotion decisions was not standardless where "Congress and the Secretary of the Navy have articulated secular, neutral standards to guide selection board members in evaluating candidates for promotion."  *Id.* at 1179.

### 3.     ORR has not created impermissible religious accommodation.

Plaintiffs further argue that ORR's relationship with USCCB fails the Establishment Clause's test for religious accommodations.  Pls.' MSJ Mem. 32–38.  Plaintiffs are wrong.  The Government "may (and sometimes must) accommodate religious practices" without violating the Establishment Clause, and the limits of permissible state accommodation "are by no means co-extensive with the noninterference mandated by the Free Exercise Clause."  *Amos*, 483 U.S. at 334.  "There is ample room under the Establishment Clause for benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference."  *Id.*  The Consortium does just that, by accommodating USCCB's religious beliefs while ensuring that all persons may be considered as prospective foster parents, those beliefs notwithstanding.

Plaintiffs nevertheless argue that any governmental accommodation of religion fails unless it "lift[s] *substantial*, government-imposed burdens on the exercise of religion."  Pls.' MSJ Mem. 32 (emphasis added).  Plaintiffs' support for this purported rule is *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), which expressly stated that "the concept of accommodation plainly ha[d] no relevance" to the case and which involved the display of a crèche at a government building, not any attempt to lift burdens on religious exercise.  *Id.* at 613 n.59.  Thus, it can hardly be said that the Court articulated any Establishment Clause rule regarding religious accommodations in *County of Allegheny*.  Other cases Plaintiffs cite are even further

afield.  Despite Plaintiffs' citation of it, *Estate of Thornton v. Caldor*, 472 U.S. 703 (1985), had nothing to say about whether accommodations of religion may or must involve the lifting of a substantial burden on religious practice.  *Compare* Pls.' MSJ Mem. 33 (citing *Caldor*, 472 U.S. at 709–10) *with Caldor*, 472 U.S. at 709–10.  And the *Texas Monthly* opinion cited by Plaintiffs was not an opinion of the Court and thus cannot supersede *Amos* or otherwise establish some new test for evaluation of religious accommodations.  *See Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) (plurality op.).  Finally, all of the foregoing is of doubtful currency in light of the Supreme Court's recent decision in *Kennedy*, including its rejection of *Lemon*.

Plaintiffs next argue that an accommodation violates the Religion Clauses if it "would shift costs, harms, or other burdens to nonbeneficiaries."  Pls.' MSJ Mem. 34.  But that argument finds no footing in the facts of this case.  Federal Defendants largely addressed these points in the section of this brief regarding mootness—explaining, for example, why there is no evidence to support Plaintiffs' contention that USCCB's status as a grantee reduces placement options.   Federal Defendants refer the Court to that section except to address two additional points.

First, Plaintiffs erroneously invoke purported harms to URM children in support of their Establishment Clause claim.  Pls.' MSJ Mem. 36.  Plaintiffs lack standing to assert the legal rights of these unidentified individuals to which they have demonstrated no relationship or any hindrance to these individuals asserting their own rights.  *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (recognizing a narrow exception permitting parties to invoke the rights of third parties where they can show a "close relationship with the person who possesses the right" and a "hindrance to the possessor's ability to protect his own interests"); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (general rule is that a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Second, Plaintiffs are wrong that Federal Defendants "do not contest the significant harm

to Program children" arising from USCCB's participation in this program.  USCCB provides expert services as a grantee in the UC and URM programs and its efforts are beneficial to the populations that ORR serves through these programs.  *See, e.g.*, Ex. A, Tota Dep. 256:6–10 (answering "Yes" to question whether "USCCB helped improve the lives of vulnerable children through its role" as replacement designee in Texas).  At the same time, Federal Defendants believe that all people, regardless of family status or sexual orientation, should have an opportunity to be foster parents and that it is beneficial for the "pool of potential Program foster parents [to] include[] married same-sex couples."  Pls.' MSJ Mem. 36.  Consistent with those views, ORR has funded both UC and URM providers in Dallas-Fort Worth that have no objection to working with same-sex couples.  And ORR has set up an intake screening function through a third-party agency, which further diminishes any burden arising from USCCB's religious beliefs.

Rather than establishing that religious accommodations cannot impose *any* burdens on third parties, the Supreme Court teaches that religious accommodations must appropriately balance the benefits and burdens of any such accommodations.  Thus, a statute or policy that automatically privileges religious concerns over secular interests in all circumstances may run afoul of the Establishment Clause.  *See Estate of Thornton*, 472 U.S. at 708–10 (striking down a statute in which "religious concerns automatically control[led] over all secular interests" and that took "no account of the convenience or interests" of third parties).  By contrast, a statute that "appropriately balance[s]" religious and secular considerations will be upheld against Establishment Clause challenge.  *See Cutter v. Wilkinson*, 544 U.S. 709, 722–23 (2005) (upholding RLUIPA because it treated all religions equally and adopted an "appropriately balanced" test in regard to considerations of religious and secular interests).  The current structure of the URM program in Dallas-Fort Worth—including the existence of Upbring as a provider open to all and USCRI as an intake organization to which all are directed—is far from a scenario that fails to appropriately

balance the interests of religious and secular interests.

### B.    Plaintiffs' Fifth Amendment Claims Fail.

Plaintiffs further argue that they are entitled to summary judgment on their claims pursuant to the Fifth Amendment, because the Government's actions allegedly violate the Amendment's equal protection and due process guarantees, whether analyzed under heightened scrutiny or the rational basis standard.  Pls.' MSJ Mem. 16–25.  But as an initial matter, Plaintiffs' claim under the Fifth Amendment cannot succeed because, as Federal Defendants have explained in their motion for summary judgment,  Plaintiffs do not challenge state action.  *See* Fed. Defs.' MSJ Mem. 20–26.  Plaintiffs will presumably address that argument in their opposition, and Federal Defendants will reply in turn.  If the Court ultimately agrees that USCCB's actions are not state actions, then the Court need not reach the merits of these claims.

Should the Court reach the merits, however, Federal Defendants are still entitled to summary judgment.

### 1.    Plaintiffs' claims are subject to rational-basis review.

Plaintiffs' Fifth Amendment claims are subject to rational-basis review for the basic reason that their claims concern an alleged Government establishment of religion through accommodation of a religious organization's beliefs.  In that context, the Supreme Court holds that attendant equal-protection and due-process claims are subject to rational basis review.

First, as to equal protection, the Supreme Court explained in *Amos*, that a neutral government action "motivated by a permissible purpose of limiting governmental interference with the exercise of religion" should be judged under the rational basis test, not strict scrutiny, so long as it withstands Establishment Clause review.  483 U.S. at 339.  The Court so held over arguments that Congress had trenched upon a fundamental right by drawing distinctions in law on religious grounds.  *See id.*  The Court upheld Title VII's exemption of religious organizations from the

prohibition against religious discrimination in employment, reasoning that the Government does not endorse an entity's religious beliefs through such neutral efforts at accommodation. *See id.* at 337 & n.15 (rejecting claim that Title VII exemption "conveys a message of governmental endorsement of religious discrimination" or that the Government had thereby "advanced religion through its own activities and influence").

The same analysis applies here. The premise of this lawsuit is not any Government policy against foster parenting by same-sex couples; to the contrary, the Government has established a mechanism to ensure that same-sex couples in Dallas-Fort Worth will have an equal opportunity to be foster parents in these programs. Rather, the case is rooted in the Government's decision to retain the assistance of an expert private entity that has decades of experience with the program in question and to accommodate that entity's religious beliefs. The Government's accommodative efforts are subject to the test of the Establishment Clause, a test the Government passes, *see supra*. But *Amos* teaches that the Government is not then subject to strict scrutiny under the Equal Protection Clause by virtue of its neutral efforts at accommodation. Were it otherwise, the plaintiffs in *Amos* should have prevailed in obtaining strict scrutiny review. The Supreme Court nonetheless explained that rational basis review applied. The same is true here.

Similar considerations govern Plaintiffs' substantive due-process claim. The Supreme Court has explained that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). The specific claim at issue here—an alleged establishment of religion that has resulted in discrimination against the Plaintiffs by a private religious charity—is covered by a "specific constitutional provision"—the First Amendment's Establishment Clause. Plaintiffs' substantive due process claim should therefore be reviewed

under Establishment Clause standards and, otherwise, under rational basis review.

Plaintiffs devote several pages to arguing that heightened scrutiny applies. Pls.' MSJ Mem. 16–20. But this case does not involve discrimination on the basis of sexual orientation by the Government. Plaintiffs fail to reckon with the particular circumstances presented by this lawsuit, which arises not from a Government policy infringing fundamental rights but, rather, a neutral effort to retain the services of an expert entity—along with others—by accommodating that entity's private religious beliefs. In such circumstances, only rational basis review applies.

### 2. Federal Defendants' actions easily survive rational-basis review.

Plaintiffs argue that Federal Defendants' actions cannot survive even rational-basis review. Pls.' MSJ Mem. 21–25. None of their arguments has merit.

First, this case does not involve "discrimination against a disfavored class for its own sake." Pls.' MSJ Mem. 22. Plaintiffs adduce no evidence that Federal Defendants selected USCCB *so that* it would discriminate against same-sex couples, or that USCCB's selection was intended to oppress same-sex foster parents. Federal Defendants have not exhibited any "animosity toward" same-sex parents. *Contra* Pls.' MSJ Mem. 22 (quoting *Romer v. Evans*, 517 U.S. 620, 631–36 (1996)).[5] Quite the reverse is true. Fed. Defs.' SUMF ¶¶ 88–98 (recounting efforts to establish Consortium).

---

[5] In *Romer*, an amendment to Colorado's constitution "made a general announcement that gays and lesbians shall not have any particular protections from the law." *Id.* at 635. So sweeping a proclamation raised the "inevitable inference that the disadvantage [was] born of animosity toward the class of persons affected. *Id.* at 634. Federal Defendants have done nothing of the sort here.

The Court in *Romer* also noted the "absence of precedent for Amendment 2," which was relevant because "discriminations of an *unusual* character especially suggest careful consideration…" *Id.* at 633 (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37–38 (1928) (emphasis added)). Put another way: "It is not within our constitutional tradition to enact laws of this sort." *Id.* But as detailed in Federal Defendants' Establishment Clause argument, there is nothing unusual or non-traditional about providing foster-care grants to Catholic charities or other faith-based organizations. *Supra.* To the contrary, such organizations have served these programs since their inception. *See* Fed. Defs.' SUMF ¶¶ 22–37.

Second, Federal Defendants have not undermined their interest in child welfare or Congress's intent under the URM or UC programs. *See* Pls.' MSJ Mem. 22–23. Plaintiffs face a heavy burden in making this argument: the rational basis standard dictates that government policy is subject to a "strong presumption of validity" and it must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). It is Plaintiffs' burden to show the absence of any such rational basis by "negat[ing] every conceivable basis that might support" the challenged act. *See id.* at 315.

Plaintiffs fall short of meeting their burden. USCCB is "one of the premier providers" among foster-care agencies that work with the government under the URM program, Fed. Defs.' SUMF ¶ 35, and has participated in that program since its inception, *id.* ¶ 33. It is one of only two national resettlement agencies authorized to place unaccompanied refugee minors into URM programs, *id.* ¶ 34, and administers "a host of programs" for ORR, *id.* ¶ 35. Given USCCB's lengthy track record and performance, it was more than rational for ORR to believe that selecting USCCB as one of two replacement designees in Texas would be in the best interests of the URM children themselves. *See* Fed. Defs.' SUMF ¶ 62 (detailing the factors considered by ORR when selecting USCCB as replacement designee in Texas).

Plaintiffs counter that "there is no valid child welfare justification for a scheme that excludes a class of prospective Program foster parents for a reason wholly unrelated to (and in fact destructive of) child welfare." Pls.' MSJ Mem. 22. But the URM program, whether in Texas or throughout the Nation, does not exclude a class of prospective foster parents in this fashion. Indeed, Plaintiffs fail to acknowledge that LIRS and its subgrantees also participate in the URM program—including where Plaintiffs live—and have no objection to working with same-sex parents. Thus, Federal Defendants' "scheme" does not "exclude[]" Plaintiffs from the pool of

possible placements for URM children.

And there is a rational reason for allowing USCCB to continue as one of two URM replacement designees in Texas, notwithstanding USCCB's unwillingness to work with same-sex foster parents: its decades-long experience with providing quality care to thousands of children in need. *See* USCCB App. 2, Canny Decl. ¶ 3, ECF No. 106-3; USCCB App. 237, Kuennen Dep. 31:3–8 (USCCB has served unaccompanied immigrant children for decades); USCCB App. 2, Canny Decl. ¶ 4 (USCCB is one of the largest refugee-resettlement agencies in the world); USCCB App. 150, Peck Dep 132:13–16 ("USCCB is known nationally, and I would say internationally, as being experts on migrating children and really setting a high bar for quality of services."); *id.* at 136:12–14 (USCCB has more than 225 subcontractors providing services to children across the United States); *id.* at 135:19–23 (Ms. Peck estimates that USCCB served "thousands" of children during her tenure).

Ironically, it is Plaintiffs' proposal that would undermine child-welfare interests in the URM program.[6]  To exclude USCCB would wreak havoc on the URM system.  USCCB is one of only two resettlement agencies that work with the State Department for direct placements of children coming from overseas; removing USCCB from that work would cut "half of the government's national capacity to serve URMs."  USCCB App. 151, Peck Dep. 133:7–8. USCCB's affiliates operate URM provider agencies across the country; any holding that the Constitution requires excluding Catholic grantees would shutter all of those agencies and deprive ORR of "the largest network of placement options for unaccompanied children."  USCCB App. 152, Peck Dep. 134:23–24.  USCCB is also "uniquely able" to respond to particular requests from ORR—*e.g.*, to place a particular child with a family member in a certain area of the country.  *Id.*

---

[6] Federal Defendants stressed in their motion that any injunctive relief should be narrowly tailored to remedy the harms to the Plaintiffs at bar.  But as Federal Defendants candidly acknowledged, *any* finding that working with Catholic charities is unconstitutional could have consequences beyond the URM program in Dallas-Fort Worth.  Fed. Defs.' MSJ Mem. 28–29.

at 134:8–15.  Moreover, as to existing placements, eliminating USCCB and its affiliates would portend drastic consequences for URM children and the foster parents with whom they have already been placed.[7]  Those families rely on URM funding for medical assistance, educational assistance, training vouchers, and maintenance payments (which covers food, clothing, and other basic essentials).[8]

Plaintiffs' proffered expert has opined at length on the general harms caused by decreasing the pool of available foster parents.  *See generally* Pls.' SUMF ¶¶ 136–41.  Those harms are all predicated on the assumption that there are more placement options when USCCB is *excluded* from the URM program than when it is *included*.  That proposition was not supported by any evidence and in particular no evidence specific to the specialized URM and UC foster care programs.  Instead, Dr. Brodzinsky merely "suspect[ed]" that wherever a Catholic agency closed, "an agency or consortium of agencies would work with and pick up, you know, the programs." Ex. C, Brodzinsky Dep. 134:4-7.  That was based on two examples—one in Illinois, one in Boston—where Dr. Brodzinsky portrayed a "smooth" transition in the wake of a Catholic agency's closing.  *Id.* at 135:14.  This was based on Dr. Brodzinsky's "own analysis," which he admitted "is not in the [expert] report."  *Id.* at 135:15–15.  And that analysis was of adoption, not foster care—even though Dr. Brodzinsky summarily equated the two with no elaboration.  *Id.* at 135:17–19 ("[T]he issue would be parallel in my view.").

When ultimately pressed on his opinion that excluding USCCB *would not* reduce placement options, Dr. Brodzinsky abandoned that opinion.  *See id.* at 136:15–21 (Dr. Brodzinsky

---

[7] These children are in the conservatorship of the URM provider agency with which they have been placed. Were that agency excluded from the program, it is not at all certain that the children could be re-placed with a different agency—especially if *all* affiliates of USCCB must withdraw.

[8] For a complete list of services available to URM children, see ORR, *Unaccompanied Refugee Minors Program*, *available at* https://www.acf.hhs.gov/orr/programs/refugees/urm (last visited Sep. 8, 2022).

admitting, with respect to CCD's hypothetical withdrawal from the Dallas-Fort Worth area, that he "can't opine on something that hasn't happened"); *id.* at 136:23–137:1 (Dr. Brodzinsky admitting that he cannot offer any such opinion on a national scale, should USCCB hypothetically withdraw from the programs writ large).  Notwithstanding that Plaintiffs continue to cite the opinion in their Statement of Undisputed Material Facts, *see* Pls.' SUMF ¶ 132, that opinion has been effectively withdrawn by its own proponent.  And in any event, the opinions Dr. Brodzinsky offered in 2020 have even less weight today, where significant events such as the creation of the Consortium have substantially changed the factual context of this case.

Absent concrete evidence to the contrary, the Court should reach the commonsense conclusion that eliminating USCCB from the URM program in Dallas-Fort Worth (and the numerous foster parents in CCD's network, to say nothing of the thousands of eligible foster parents in USCCB's networks nationwide) would *reduce* placement options where these unaccompanied immigrant populations are served by a highly select group of providers with unique programmatic expertise in working with such populations.  Avoiding those results thus provides more than a rational basis for allowing USCCB to continue as one of two URM replacement designees in Texas.

Finally, Federal Defendants have not "irrationally departed from their own policies."  Pls.' MSJ Mem. 23–24.  USCCB and other faith-based entities have worked with the Government, including ORR, for decades in providing care and custody to refugees and unaccompanied children.  *See* Fed. Defs.' MSJ Mem. 4–6.  Moreover, Plaintiffs' argument is inapposite to their claim in light of the applicable standard of review—the rational basis test—which requires Plaintiffs to negate every conceivable basis supporting the Government's actions.  Plaintiffs instead appear to be borrowing a concept from Administrative Procedure Act litigation, specifically the rule that where an agency takes action inconsistent with prior policy, it must

demonstrate recognition of the policy change and articulate a rationale for the change. *See, e.g.*, *FCC v. Fox Television Stations*, 556 U.S. 502, 514–15 (2009).  This is not APA litigation and Federal Defendants are not subject to record review or procedural requirements imposed by that statute.  Instead, under the rational basis test for Constitutional claims, Government action should be upheld if any rational basis could support it, even a hypothetical one not necessarily relied upon by the agency. *Beach Commc'ns*, 508 U.S. at 314–15 (plaintiff has "the burden 'to negative every conceivable basis which might support" the challenged action without regard to "whether the conceived reason for the challenged distinction actually motivated the legislature").

## CONCLUSION

For the foregoing reasons, Plaintiffs are not entitled to summary judgment on their claims.


Dated:  September 14, 2022               Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         MICHELLE BENNETT
                                         Assistant Branch Director

                                         /s/ *James Powers*
                                         JAMES R. POWERS (TX Bar No. 24092989)
                                         JASON LYNCH
                                         Trial Attorneys
                                         Federal Programs Branch
                                         U.S. Department of Justice, Civil Division
                                         1100 L Street, NW
                                         Washington, DC 20005
                                         Telephone:  (202) 353-0543
                                         Email:  james.r.powers@usdoj.gov

                                         *Counsel for Federal Defendants*