**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FATMA MAROUF and BRYN ESPLIN, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-378 (APM) |
| | ) | |
| XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, | ) | Hon. Amit P. Mehta |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT UNITED STATES CONFERENCE OF CATHOLIC BISHOPS'
<u>MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF DR. DAVID M.
BRODZINSKY</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................II

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD .................................................................................................... 3

ARGUMENT ................................................................................................................. 4

    I.    Dr. Brodzinsky is highly qualified to provide relevant and reliable expert testimony. ....... 4

    II.   Dr. Brodzinsky's Evidence Is Relevant. ................................................................. 9

    III.   Dr. Brodzinsky's Testimony Is Accurate and Reliable. ...................................... 14

CONCLUSION............................................................................................................ 19

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Adoption of A.S.*,
    212 Cal.App.4th 188 (Nov. 29, 2012) ................................................................. 12

*\*Ambrosini v. Labarraque*,
    101 F.3d 129 (D.C. Cir. 1996) ............................................................... passim

*Arias v. DynCorp*,
    928 F.Supp.2d 10 (D.D.C. 2013) ......................................................................... 8

*Baehr v. Miike*,
    No. CIV. 91-1394, 1996 WL 694235 (Haw. Cir. Ct. Dec. 3, 1996) ..................... 12

*Carmichael v. West*,
    No. 12-cv-1969, 2015 WL 10568893 (D.D.C. Aug. 31, 2015) ............................. 7

*Crowley v. Perdue*,
    318 F. Supp.3d 277 (D.D.C. 2018) ...................................................................... 6

*D.H. v. Superior Court*,
    No. A139602, 2014 WL 346614 (Cal. Ct. App. Jan. 31, 2014) ........................... 13

*\*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ............................................................................... passim

*DeBoer v. Snyder*,
    973 F. Supp.2d 757 (E.D. Mich. 2014) ........................................................ 11, 12

*Dumont v. Lyon*,
    341 F. Supp.3d 706 (E.D. Mich. 2018) ............................................................... 12

*Fla. Dep't of Child. & Fams. v. Adoption of X.X.G.*,
    45 So.3d 79 (Fla. Dist. Ct. App. 2010) ............................................................... 12

*In re Adoption of Doe*,
    2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008) ................................................. 12

*In re Angelina T*,
    No. A148061, 2016 WL 6208626 (Cal. Ct. App. Oct. 24, 2016) ......................... 13

*In re JN*,
    No. A129824, 2012 WL 555761 (Cal. Ct. App. Feb. 21, 2012) ........................... 13

*Jennifer R.,*
No. A130672, 2011 WL 743093 (Cal. Ct. App. March 3, 2011) ........................................... 13

*Kapche v. Holder,*
677 F.3d 454 (D.C.Cir.2012) ........................................................................................ 17

*Khairkhwa v. Obama,*
793 F.Supp.2d 1 (D.D.C. 2011) .............................................................................. 5, 7, 8

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999) .................................................................................................. 9, 19

*Latta v. Otter,*
771 F.3d 456 (9th Cir. 2004) ........................................................................................ 17

*Lofton v. Kearney,*
157 F.Supp.2d 1372 (S.D. Fla. 2001) ........................................................................ 12

*Mannino v. Int'l Mfg. Co.,*
650 F.2d 846 (6th Cir.1981) ............................................................................................ 8

*Matter of Baby M.,*
525 A.2d 1128 (N.J. Super. Ct. Ch. Div. March 31, 1987) ...................................... 13

*Meister v. Medical Engineering Corp.,*
267 F.3d 1123 ................................................................................................................... 5

*Mendez-Silva v. United States,*
980 F.2d 1482 (D.C. Cir. 1993) .................................................................................... 18

*New Jersey Div. of Youth & Fam. Servs. v. D.P.,*
422 N.J. Super. 583 (App. Div. 2011) ........................................................................ 13

*Rothe Development, Inc. v. Department of Defense,*
107 F. Supp.3d 183 (D.D.C. 2015) ................................................................... 6, 17, 20

*State v. P.H.,*
353 N.J. Super. 527 (App. Div. 2002) ........................................................................ 13

*Tyus v. Urban Search Management,*
102 F.3d 256 (7th Cir. 1996) ........................................................................................ 17

*United States v. Machado–Erazo,*
950 F.Supp.2d 49 (D.D.C. 2013) .................................................................................... 6

*V.C. v. M.J.B.,*
725 A.2d 13 (N.J. Super. Ct. App. Div. March 5, 1999) ........................................ 12

**Rules**

Federal Rule of Evidence 702 ................................................................................ 3, 5, 7, 8

**Other Authorities**

29 Fed. Prac. & Proc. (Evid.) § 6265 ................................................................................ 8

Plaintiffs Fatma Marouf and Bryn Esplin respectfully submit this memorandum in opposition to Defendant United States Conference of Catholic Bishops' Motion to Exclude Expert Report and Testimony of Dr. David Brodzinsky ("USCCB Mot. to Exclude"), submitted by Defendant United States Conference of Catholic Bishops ("USCCB"). Because Dr. Brodzinsky is a highly qualified expert, employing generally accepted methodology, and his expert testimony is both relevant to this case and probative of important questions of law and fact in this matter, Defendant USCCB's motion should be denied.

## **INTRODUCTION**

Defendant USCCB fails to identify any legitimate basis to exclude Dr. Brodzinsky's expert testimony. Dr. Brodzinsky, a developmental, clinical, and forensic psychologist whose primary focus is research and scholarship concerning child welfare, adoption, and foster care, provided expert testimony concerning professional standards for inclusion of qualified families in the child welfare system, and the impact on children and families that can result when the federal government authorizes a private child-placement agency to administer a federal child welfare program in a manner that excludes same-sex couples based on the agency's religious belief that same-sex couples should not be foster parents. Ex. 1, Expert Report of David M. Brodzinsky, Ph.D., ("Brodzinsky Rep."). He provided scientific evidence to support five conclusions relevant to this case:

A. Professional child welfare standards provide for the inclusion of all qualified foster and adoptive families so as to best serve the needs of children. *Id* ¶¶21-31.

B. Children in the foster care system are harmed when there are not enough families to meet their needs. *Id* ¶¶32-35.

C. Permitting private child placement agencies, funded by and acting on behalf of the federal government, to turn away same-sex couples can reduce family placement options for children in the child welfare system, thereby undermining their long-term well-being. *Id* ¶¶36-42.

1

D.  Permitting private agencies that administer federal foster care programs to turn away same-sex couples could result in additional negative consequences for LGBTQ youth in the foster care system. *Id* ¶¶43-45.

E.  Enforcing nondiscrimination provisions in federally-funded contracts with or grants to private child placement agencies would not reduce the availability of families for children in the foster care system. *Id* ¶¶46-47.

Dr. Brodzinsky based his opinions on more than 40 years of research, clinical consultation, training, and forensic experience in child development, family psychology, and child welfare, in addition to his own professional experience, which includes direct clinical involvement and supervisory experience with hundreds of foster and adoptive families, including many headed by lesbian, gay, bisexual, and transgender ("LGBT") parents, the supervision of multiple child welfare programs that address the needs and trauma of LGBT and questioning (collectively, "LGBTQ") youth in foster care and foster and adoptive families, and his work as a consultant to hundreds of public and private adoption agencies and child welfare agencies in the United States and internationally. *Id.* ¶¶5-20. He also relied upon data published by state and federal agencies, in addition to research and scholarly writings (including peer-reviewed publications, books, book chapters, technical reports, journal articles, and policy briefs) in the areas of child development, family psychology, and child welfare, and consultation with fellow social scientists and child welfare professionals. *Id.* ¶20; Ex. 2, Tr. of Dep. of David M. Brodzinsky, ("Brodzinsky Dep.") 10:20-11:7; 21:21-22:2; 34:3-35:15; 40:17-41:1. Dr. Brodzinsky's testimony is probative of Federal Defendants' failure to adhere to generally applicable and accepted child welfare standards, and disregard for the best interests of the children in their care, which is relevant to Federal Defendants' claimed justifications for operating federal child welfare programs in a manner that discriminates against same-sex couples and burdens their right to marry. Rule 702 provides no basis for excluding Dr. Brodzinsky's testimony. He is qualified to testify as an expert, his testimony is both relevant and probative of issues in this case, and the methodology he employs is

that which is typically used by social scientists and clinicians in the field of child welfare and related disciplines of developmental, clinical, and forensic psychology.

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  According to Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
> Fed. R. Evid. 702.

Courts employ a two-part test to determine the admissibility of expert testimony under Rule 702, examining whether it is both reliable and relevant. *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996). Under the reliability prong, courts may consider: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the method's known or potential rate of error; and 4) whether the theory or technique finds general acceptance in the relevant scientific community. *Id..*, citing *Daubert*, 509 U.S. at 593-94. However, the inquiry is a "flexible one," and none of the factors discussed is necessarily applicable in every case or dispositive; nor are the four factors exhaustive. *Id.* Although the proponents of the evidence bear the burden to prove that the expert testimony is reliable by a preponderance of the evidence, *Meister v. Medical Engineering Corp.*, 267 F.3d 1123, 1127 n. 9 (D.C. Cir. 2001), "[i]n general, Rule 702 has been interpreted to favor admissibility." *Khairkhwa v. Obama,* 793 F.Supp.2d 1, 10 (D.D.C. 2011) (citing *Daubert,* 509 U.S. at 587; Fed. R. Evid. 702 Advisory Committee's note ("A review of the

3

caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.")).

Under the relevance prong, the court must consider whether the expert testimony is sufficiently tied to the facts of the case that it will aid in understanding those facts. *Ambrosini*, 101 F.3d at 133. This factor asks simply whether the testimony will assist the court in understanding the evidence, and not whether it could resolve the ultimate issue at trial. *Id.* at 135-36. "The presumption under the Rules is that expert testimony is admissible once a proponent makes the requisite threshold showing; further disputes go to weight, not admissibility." *Rothe Development, Inc. v. Department of Defense*, 107 F. Supp.3d 183, 197 (D.D.C. 2015), citing *United States v. Machado–Erazo,* 950 F.Supp.2d 49, 52 (D.D.C. 2013). Additionally, courts exercise particular caution when deciding whether to exclude expert testimony at the summary judgment stage. *Crowley v. Perdue*, 318 F. Supp.3d 277, 292 (D.D.C. 2018), citing *Carmichael v. West*, No. 12-cv-1969, 2015 WL 10568893, \*7 (D.D.C. Aug. 31, 2015).

## ARGUMENT

**I.    Dr. Brodzinsky is highly qualified to provide relevant and reliable expert testimony.**

Multiple courts already have found Dr. Brodzinsky qualified as an expert on precisely the areas of scholarship on which he provides opinions in this case, and have relied on his testimony. Indeed, out of the 650 forensic cases in which he has been involved, and the more than 100 cases in which he has testified as an expert, USCCB could not identify a single court that has held that he is not qualified to opine as an expert. Brodzinsky Rep. ¶12.

"Rule 702 does not specify any particular means for qualifying an expert, requiring only that the witness possess the 'knowledge, skill, experience, training, or education' necessary to 'assist' the trier of fact." *Khairkwa*, 793 F. Supp.2d at 10-11, citing Fed. R. Evid. 702.

The degree of 'knowledge, skill, experience, training, or education' required to qualify an expert witness is only that necessary to insure that the witness's testimony 'assist' the trier of fact. *See Mannino v. Int'l Mfg. Co.,* 650 F.2d 846, 851 (6th Cir.1981) (noting that the weight of the evidence is a matter to be assessed by the trier of fact). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question or even a member of a recognized professional community." 29 FED. PRAC. & PROC. (EVID.) § 6265. "The 'assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree." *Id.*

*Khairkwa*, 793 F. Supp. 2d at 11.

Dr. Brodzinsky possesses the "knowledge, skill, experience, training, or education" necessary to assist the court, *see Arias v. DynCorp,* 928 F.Supp.2d 10, 17 (D.D.C. 2013), and his experience is indisputably "of a kind that others in the field would recognize as acceptable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999). Dr. Brodzinsky has nearly 40 years of experience in the fields of adoption and foster care as a researcher, scholar, clinician, and forensic expert. Brodzinsky Rep. ¶5. He obtained his Ph.D. in developmental psychology from the State University of New York at Buffalo in 1974. *Id.* ¶2; Brodzinsky Dep. at P. 84:20-23. From 1974 to 2006, he served as an Assistant Professor, Associate Professor, and then Full Professor in the Department of Psychology at Rutgers University, where he taught undergraduate and graduate courses in developmental and clinical psychology, conducted research, and supervised doctoral students in clinical and social psychology. Brodzinsky Rep. ¶4. He is a licensed psychologist in the state of California and currently serves as Professor Emeritus of Clinical and Developmental Psychology at Rutgers University. *Id.* ¶¶3-4.

Dr. Brodzinsky has been in private practice as a psychologist for 35 years, with the majority of his clinical work focusing on the mental health needs of adopted and foster children and their families. *Id.* ¶10. Over this period, he has worked with approximately two thousand families who have adopted or fostered children. *Id.* Dr. Brodzinsky also has been a practicing forensic psychologist for 33 years, involved in approximately 650 forensic cases, and testifying over 100

times in 12 different states. *Id.* ¶12. Approximately 45-50 of these forensic cases involved issues related to adoption, fostering, and/or parenting by sexual minority individuals/couples. *Id.* However, he has devoted most of his time over the course of his career to research, scholarship, publication, directing child welfare-related programs, and consultation. Brodzinsky Dep. 85:10-87:10, 87:22-91:6.

Dr. Brodzinsky has authored over 100 publications, including numerous peer-reviewed journal articles, policy papers, book chapters, and six books on adoption and foster care, as well as on other topics in developmental and clinical psychology. Brodzinsky Rep. ¶¶5, 15. He also has reviewed hundreds of articles in these fields submitted for publication to the most prestigious professional journals in developmental and clinical psychology, as well as in child welfare. *Id.* at ¶5. Dr. Brodzinsky has served or is currently serving on the editorial boards of peer-reviewed publications such as Adoption Quarterly, Developmental Child Welfare, Journal of Applied Developmental Psychology, and Youth and Society. *Id.* ¶9. He has given hundreds of conference presentations, professional workshops, medical grand rounds presentations, invited university lectures, and community lectures to mental health professionals, child welfare professionals, legal professionals, and/or the public related to adoption and foster care throughout the United States, Europe, and parts of South America. *Id.* ¶13. Indeed, he delivered a keynote address at a national conference for Catholic Charities. Brodzinsky Dep. 92:20-23; Brodzinsky Rep. at 43.

Dr. Brodzinsky has served as a consultant to hundreds of public and private adoption agencies and child welfare agencies in the United States, Canada, England, Northern Ireland, Wales, Spain, Italy, Holland, Sweden, Norway, Iceland, and Colombia. Brodzinsky Rep. ¶14. Currently, he is a clinical and training consultant for the Center for Adoption Support and

Education in Burtonsville, Maryland, and a research and project consultant for the National Center on Adoption and Permanency in Newton, Massachusetts. *Id.*

From 1986 to 1995, Dr. Brodzinsky directed a program providing clinical services to children adopted from foster care and their families in several counties in northern New Jersey. *Id.* ¶6. For 17 years he served as the Director of the Rutgers Foster Care Counseling Project, a state-funded training and service program focusing on the clinical needs of foster children and their families in central New Jersey. During this period, he trained over 100 doctoral-level psychology students in psychological issues in foster care, adoption, and trauma, and the project served over 700 foster families. *Id.* ¶7.

From 1996 to 2006, Dr. Brodzinsky served on the Board of Directors of the Donaldson Adoption Institute in New York City, an internationally known non-profit organization focusing on policy analysis, research, education, and advocacy in the fields of adoption and foster care. *Id.* ¶8. From 2006 through 2014, he served as Research Director for the Institute, and in this capacity, he created the Modern Adoptive Families Project, a nationwide survey of adoptive parents focusing on the experiences and outcomes of different types of adoptive families, including those headed by sexual minority individuals/couples. *Id.* To date, 10 empirical articles or technical reports have been published from this dataset, with additional ones in preparation. *Id.* From 2008 to 2016, he was a clinical supervisor for A Home Within, a non-profit organization in the San Francisco Bay area providing pro bono clinical services to foster children and their families.

Numerous courts have relied upon Dr. Brodzinsky's testimony concerning child welfare standards and social science findings concerning parenting by same-sex couples, adoption, foster care, and the impact of discrimination and trauma in the child welfare system on children and families. For example, in *DeBoer v. Snyder*, 973 F. Supp.2d 757 (E.D. Mich. 2014), a district court

found Dr. Brodzinsky's expert testimony at trial to be "fully credible" and gave it "considerable weight" in a case in which same-sex couples challenged the constitutionality of Michigan's marriage ban. In *DeBoer*, Dr. Brodzinsky offered expert opinions concerning the well-being of children of lesbian and gay-headed households and adoptive families, the well-being of children in households headed by comparable different-sex couples, and the impact on children and families of discrimination. *DeBoer v. Snyder*, No. 12-CV-10285, 2013 WL 12182272 (E.D. Mich. Oct. 16, 2013).

In *Baehr v. Miike*, No. CIV. 91-1394, 1996 WL 694235, *10–11 (Haw. Cir. Ct. Dec. 3, 1996), a challenge to Hawai'i's ban on marriage for same-sex couples, Dr. Brodzinsky testified as to the social science concerning parenting by same-sex couples, the adjustment of children in households headed by same-sex couples and different-sex couples, and the impact of marriage discrimination on children and families. Again, the court found Dr. Brodzinsky to be well-qualified and "especially credible." *Id*.

In *Fla. Dep't of Child. & Fams. v. Adoption of X.X.G.*, 45 So.3d 79 (Fla. Dist. Ct. App. 2010), Dr. Brodzinsky presented expert testimony in a constitutional challenge to Florida's ban on adoption by LGBT prospective parents, on which both lower and appellate courts relied. *See*, *also*, *In re Adoption of Doe*, 2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008); *Lofton v. Kearney*, 157 F.Supp.2d 1372 (S.D. Fla. 2001), *aff'd sub nom. Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804 (11th Cir. 2004). Likewise, in *V.C. v. M.J.B.*, 725 A.2d 13 (N.J. Super. Ct. App. Div. March 5, 1999), *aff'd*, *V.C. v. M.J.B.*, 748 A.2d 539 (N.J. 2006), courts accepted Dr. Brodzinsky as an "expert in the area of adoptions, developmental psychology, mental health of children, the effects of foster care and systematic trauma on children," and other areas. He also testified as to similar issues in *Adoption of A.S.*, 212 Cal.App.4th 188 (Nov. 29, 2012). And in lawsuits involving

closely related issues to the instant case, *Dumont v. Lyon*, 341 F. Supp.3d 706 (E.D. Mich. 2018) and *Catholic Charities of the Diocese of Springfield-in-Illinois, et al. v. State of Illinois, et al.*, No. 11-MR-254 (Sangamon Cnty Cir. Ct. Aug. 8, 2011), Dr. Brodzinsky provided expert opinions on the impact of discrimination against prospective foster parents by faith-based child welfare agencies on foster children and families, and his expertise went unchallenged.

Additional courts have accepted Dr. Brodzinsky as an expert and relied on his clinical and forensic opinions concerning particular individuals, often involving the impact of adoption and foster care, or the impact of discriminatory laws on particular families. See, e.g., *In re Angelina T*, No. A148061, 2016 WL 6208626 (Cal. Ct. App. Oct. 24, 2016); *D.H. v. Superior Court*, No. A139602, 2014 WL 346614 *4 (Cal. Ct. App. Jan. 31, 2014); *In re JN*, No. A129824, 2012 WL 555761 *3 (Cal. Ct. App. Feb. 21, 2012); *New Jersey Div. of Youth & Fam. Servs. v. D.P.*, 422 N.J. Super. 583 (App. Div. 2011); *Jennifer R.,* No. A130672, 2011 WL 743093 *6 (Cal. Ct. App. March 3, 2011); *State v. P.H.*, 353 N.J. Super. 527 (App. Div. 2002), *aff'd,* 178 N.J. 378 (2004); *Matter of Baby M.*, 525 A.2d 1128, 1154 (N.J. Super. Ct. Ch. Div. March 31, 1987).

In light of Dr. Brodzinsky's "significant stature and expertise," *Ambrosini*, 101 F.3d at 140, his related research and peer-reviewed publications, his clinical experience, his consultative work for private and public entities, and his skills and experience gleaned from directing child welfare programs that address the needs and trauma of LGBTQ youth in foster care and foster and adoptive families, Dr. Brodzinsky is eminently qualified to testify as an expert on these issues.

## II.     Dr. Brodzinsky's Evidence Is Relevant.

USCCB also seeks to preclude Dr. Brodzinsky's testimony on the theory that it is not relevant. First, USCCB argues that the Consortium arrangement in the Dallas-Fort Worth area moots Plaintiffs' claims and remedies the harms to which Plaintiffs have been subjected, rendering his opinion unnecessary. For the reasons described in Plaintiffs' Memorandum of Law in Support

of Plaintiff's Motion For Summary Judgment and Plaintiffs' Memorandum of Law in Opposition

to Defendants' Motion for Summary Judgment, the Consortium exacerbates the harms caused by

Federal Defendants' conduct, and Plaintiffs' claims therefore are not moot.[1] Pls.' Mem. of Law in

Supp. of Pls.' Mot. for Summ. J., ("Pls.' MSJ Mem.") at 8-11, ECF No. 107-1; Pls.' Mem. of Law

in Supp. of Pls.' Opp'n. to Defs.' Mot. for Summ. J., ("Pls.' Opp'n Mem.") at 8-13, ECF No. 113-

1.

Second, USCCB claims that because Dr. Brodzinsky addresses child welfare standards and

the harms from excluding same-sex couples from foster programs "generally," rather than solely

in the URM program in the Dallas-Fort Worth area, his evidence is irrelevant. USCCB's Mot. to

Exclude at 1, 8-10. Specifically, USCCB attacks as irrelevant Dr. Brodzinsky's testimony that: 1)

the refusal to recruit same-sex couples contributes to a shortage of available foster parents

---

[1] Additionally, Dr. Brodzinsky's testimony is relevant to USCCB's and Federal Defendants' mootness claim itself, because his testimony concerning the impact on children of government-sanctioned discrimination against same-sex couples who wish to apply to be foster parents is applicable to the Court's analysis of the constitutional deficiencies of the Consortium. Regardless of Federal Defendants' role in making an initial placement decision for a particular URM youth, once an agency has assumed conservatorship of a given URM youth, and a placement breaks down, the agency seeks an alternative foster family for the child *within its own network*. Pls.' Mot. for Summ. J. at Ex. E, Declaration of Catelyn Devlin ("Devlin Decl.") ¶¶11, 15, 24-25, ECF No. 108-05. Federal Defendants' Consortium arrangement continues to sanction USCCB's sub-grantee's categorical exclusion of same-sex couples from its network, thereby limiting a child's placement options in the event of a placement breakdown in ways that can be contrary to the child's best interests. See Brodzinsky Rep. at ¶¶21-37, 43-45. As Dr. Brodzinsky explains, a same-sex couple may provide the preferred foster home for a particular child, which can be particularly true for LGBTQ youth who are overrepresented in foster care generally, and among refugees fleeing oppression. *Id.* at ¶¶21-37, 43-45. LGBTQ youth may not reveal their identities until after their initial placement; likewise, they may not express the desire for an affirming foster family while in a refugee camp abroad. *Id.* at ¶43-45; Brodzinsky Dep. 54:11-56:7. Because the majority of URM youth age out of the program at age 21, and their placements are lengthy in duration, placement disruptions can and do occur. Devlin Decl. at ¶¶24-25. Because Dr. Brodzinsky's evidence assists in demonstrating how the Consortium works against the best interests of children, this evidence is relevant to the Court's consideration of the Consortium's constitutional deficiencies.

nationally; 2) well-established professional standards in the field of child welfare promote practices that welcome all capable prospective foster and adoptive parents regardless of race, religion, marital status, gender, disability, or sexual orientation; 3) exclusion of same-sex couples as foster parents by USCCB's subgrantees could cause "children in the care of th[ose] agenc[ies to] lose out on the family that would have best served their needs;" and 4) no evidence suggests that when child placement agencies have chosen to discontinue their foster care and adoption services because they had religious objections to complying with nondiscrimination requirements to accept all qualified families, this caused a reduction in the number of families available for children in the foster care system or otherwise impaired the government's ability to meet the needs of children in its care. USCCB's Mot. to Exclude at 10-18. However, Dr. Brodzinsky's testimony on these points is probative of Federal Defendants' failure to adhere to generally applicable and accepted child welfare standards, and disregard for the best interests of the children in its care. This evidence is therefore relevant to the adequacy of Federal Defendants' justifications for operating federal child welfare programs in a manner that discriminates and impinges on fundamental liberty interests. In other words, this evidence goes to Federal Defendants' failure to meet their burden of demonstrating that administering federal programs in this manner is even rationally related to a legitimate government interest, let alone narrowly tailored to the compelling one required. *See* Pls.' MSJ Mem. at 11-15; 21-25. That Federal Defendants' conduct works directly against the interests of children is relevant to the issues before the Court.

Moreover, USCCB and Federal Defendants *themselves* rely repeatedly on contrary assertions and assumptions about these four points. Plaintiffs are entitled to rebut their assertions with scientific evidence. For example, USCCB seeks to preclude Dr. Brodzinsky's report on the ground that it is insufficiently tied to the URM program in the Dallas-Fort Worth area, even though

11

USCCB repeatedly argues without evidentiary support that remedying Plaintiffs' claims would jeopardize the well-being of "the thousands of refugee children served by USCCB every day" in its various programs nationwide. USCCB's Mem. in Opp'n to Pls.' Mot. Summ. J., ("USCCB's Opp'n Mem.") at 4-5, 18, ECF. No. 115; USCCB's Mem. in Supp. of Defs.' Mot. Summ. J., ("USCCB's MSJ Mem.") at 44, ECF No. 106-01. Federal Defendants similarly rely on erroneous nationwide assumptions, urging the Court to "reach the commonsense conclusion" that enforcing nondiscrimination requirements would reduce placement options nationwide, and that "[a]voiding those results thus provides more than a rational basis for allowing USCCB to continue as one of two URM replacement designees in Texas." Fed. Defs.' Opp'n to Pls.' Mot. Summ. J., ("Fed. Defs.' Opp'n") at 22; Fed. Defs.' Statement of P. & A. ("Fed. Defs.' P.& A.") at 28-29, ECF No. 110-02.

Dr. Brodzinsky's testimony refutes these claims. Brodzinsky Rep. ¶¶46-47. For example, Dr. Brodzinsky's evidence establishes, among other things, that when child placement agencies previously have chosen to discontinue their foster care and adoption services over religious objections to complying with nondiscrimination requirements, there were smooth transitions to alternative providers, and he observed no reduction in the number of families available for children in the foster care system or other impairments to the government's ability to meet the needs of the children in its care. *Id*; Brodzinsky Dep. at 39:20-41:6. In reaching these conclusions, he relied upon child welfare literature, more than 40 years of clinical professional experience and research scholarship, qualitative information, consultations with fellow child welfare professionals, scholars, and foster care and adoption organizations and agencies across the country and internationally, in addition to calculations involving publicly available data from the Adoption

Foster Care Analysis and Reporting System ("AFCARS").[2] Brodzinsky Dep. at 10:20-11:7; 21:21-22:2; 34:3-35:15; 40:17-41:1. USCCB cannot label as "irrelevant" an expert's evidence-based conclusion that contradicts both its own unsupported assertions, and the assertions on which Federal Defendants rely.

Lastly, USCCB critiques Dr. Brodzinsky's failure to conduct a clinical psychological evaluation of Plaintiffs or review discovery and other materials specific to their experiences in this case. USCCB's Mot. to Exclude at 16-17. This was not Dr. Brodzinsky's assignment. He was retained "to prepare a written expert report in this case relating to professional standards for inclusion of qualified families in the child welfare system, and the impact on children and families that can result when a private child-placement agency that contracts with or receives a grant from the Federal government excludes same-sex couples based on the agency's religious belief that this group of individuals should not be foster parents." Brodzinsky Rep. ¶1. His testimony provides expert evidence relevant to the legal standard applied by the Court. "[I]t is clear beyond cavil that an expert may give "his 'opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied[.]'" *Rothe Development, Inc.*, 107 F.Supp.3d at 200, quoting *Kapche v. Holder,* 677 F.3d 454, 464 (D.C.Cir.2012). In resolving questions such as the adequacy of governmental justifications for discriminatory schemes, numerous courts have relied upon comparable expert testimony concerning social science research that assists the trier of fact. *See*, *e.g.*, *Latta v. Otter*, 771 F.3d 456, 469-70 (9th Cir. 2014) (relying on expert's testimony that allowing same-sex couples to marry would not harm or even affect the marriages of different-sex couples in refuting alleged justification for marriage exclusion); *Tyus v. Urban Search*

---

[2] AFCARS data include statistics on child welfare placements across the country compiled by the Children's Bureau, a subdivision of Defendants Administration for Children and Families and Department of Health and Human Services.

*Management*, 102 F.3d 256, 263 (7th Cir. 1996) (holding that trial court improperly excluded social scientist's expert testimony relevant to legal standard). In short, all of USCCB's arguments on the relevance of Dr. Brodzinsky's testimony lack merit.

### III.    Dr. Brodzinsky's Testimony Is Accurate and Reliable.

Dr. Brodzinsky's conclusions were premised on conventional methods and generally accepted methodology, including review of detailed literature, peer-reviewed publications, and his own decades of social science research and clinical and forensic experience. "When the underlying basis or methods of an expert's opinion are of a type reasonably relied upon by the experts in the field, the court must allow the opinion to be assessed by the factfinder—even if the opinion reaches a novel conclusion." *Mendez-Silva v. United States*, 980 F.2d 1482, 1485 (D.C. Cir. 1993).

"Widespread acceptance can be an important factor in ruling particular evidence admissible." *Daubert*, 509 U.S. at 594. "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id* at 594-5. Publication of a particular expert's findings is unnecessary providing that there is nothing unconventional or improper about the expert's methodology in his field. *Ambrosini*, 101 F.3d at 136.

USCCB fails to identify any way in which Dr. Brodzinsky's methodology and opinions lack widespread acceptance. To the contrary, his opinions are consistent with the standards and position statements promulgated by the Child Welfare League of America, with position statements issued by the nation's leading medical and mental health professional organizations, and with the conclusions of numerous peer-reviewed publications. Brodzinsky Rep. ¶¶23-25.

USCCB's principal complaint appears to be with two of Dr. Brodzinsky's *conclusions*, and not his methodology: 1) there is a shortage of potential foster parents; and 2) enforcing nondiscrimination provisions in federally-funded grants would not reduce the availability of families for children in the foster care system. As to the shortage of foster parents, Dr. Brodzinsky based his conclusions on published sources, including his own scholarship. *Id.* ¶¶21-42. USCCB does not question the reliability of any of these sources or their methodology. Instead, USCCB repeats its complaint that Dr. Brodzinsky opines on the child welfare system and related social science generally, without having examined Plaintiffs or conducted research concerning whether a shortage of foster parents exists in the Dallas-Fort Worth URM Program specifically. USCCB Mot. to Exclude at 21-24. As explained above, USCCB fails to acknowledge that an expert may offer testimony relevant to whether the government has satisfied a legal standard without evaluating particular litigants. Further, "[u]nlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," because an expert is assumed to have a reliable basis in the knowledge and experience of his discipline. *See Daubert*, 509 U.S. at 592 (cleaned up); see also *Kumho Tire Co., Ltd.,* 526 U.S. at 147-8 (testimonial latitude extends to all expert witnesses—not just "scientific" ones).[3]

---

[3] USCCB also attacks Dr. Brodzinsky's report on the ground that it contains conclusions in common with an expert report he submitted in another case concerning a constitutional challenge to the use of religious criteria by a child welfare agency to exclude same-sex couples from applying to be foster parents. USCCB's Mot. to Exclude at 17-18, citing *Dumont v. Lyon*, No. 2:17-cv-13080 (E.D. Mich.), ECF No. 23-2 (filed July 24, 2019). The similarities of his opinions demonstrate nothing more than the reliability, stability, and general acceptance of the underlying empirical research, the volume of which increases over time with new scholarship, research, and publications, but whose conclusions are not expected to alter dramatically absent revolutionary new developments in the field. As USCCB admits, Dr. Brodzinsky's assignment in *Dumont* was "[v]ery similar to this particular case," USCCB's Mot. to Exclude at 17, and involved summarizing

Rather than disputing Dr. Brodzinsky's methods, knowledge of his discipline, or sources, USCCB argues that the Court should preclude his testimony concerning a shortage of potential foster parents as unreliable, pointing to the self-serving testimony of Defendants' witnesses that purportedly contradicts it. USCCB's Mot. to Exclude at 11. Specifically, USCCB points to the testimony of Federal Defendants' representative for the URM program, who stated in a deposition, "There -- it could be, but we've -- I've never had an indication that we did not have enough foster care families available." Raimer Decl. Ex. C, ("Tota Dep.") at 179:2-4, ECF No. 117-2. However, USCCB conveniently omits the follow-up exchange from Mr. Tota's deposition:

> Q:    But it could just as equally also be the case where you would not have enough foster families available; correct?
>
> A:    It's possible.

*Id.* at 179:5-11. Thus, the statements of Federal Defendants' representative for the URM program do not dispute the evidence of a national shortage of foster parents—they represent solely the ignorance of federal URM officials concerning whether such a shortage exists.

Notably, Dr. Brodzinsky's testimony concerning a shortage is consistent with other undisputed evidence in the summary judgment record establishing a shortage of foster parents in Texas within federal child welfare programs, due in part to the difficulty of finding, recruiting, and training foster parent applicants. Pls.' Mot. for Summ. J., Ex 2, at HHS13133, ECF No. 107-03; *see also*, e.g., Pls.' Mot. for Summ. J., Ex. 9, at HHS03493, ECF No. 107-06; *see, also,* Devlin Decl. ¶17, ECF No. 108-05 (describing a severe shortage of foster parents in the Dallas-Fort Worth area for URM program youth).

---

relevant social science literature and standards relevant to child welfare in order to inform the legal standards applied by the court. It was not to deliver analysis specific to a particular plaintiff's mental state.

Further, even if the statements of Defendants' witnesses about the abundance of potential available foster parents were sufficient to create a factual dispute (they are not), such a dispute is not a basis for precluding testimony from a qualified expert who relies on generally accepted methodology. "The presumption under the Rules is that expert testimony is admissible once a proponent makes the requisite threshold showing; further disputes go to weight, not admissibility." *Rothe Development, Inc.*, 107 F. Supp.3d at 197.

As to Dr. Brodzinsky's second conclusion whose reliability USCCB challenges—namely, that enforcing nondiscrimination provisions in federally-funded grants would not reduce the availability of families for children in the foster care system—Dr. Brodzinsky explained his sources and methods at length. He reviewed qualitative literature and research concerning decisions by Catholic child welfare entities in Illinois, Boston, and Washington, D.C. to close their foster or adoption programs as a result of religious objections to licensing same-sex couples. Brodzinsky Dep. at 34:25-35:15; 39:20-40:3. He also drew upon his own experience working with agencies that had ceased providing services, and accomplished a smooth transition moving their caseloads to another agency. *Id* at 39:20-40:19; 137:1-6. He consulted scholars who had conducted relevant research on these questions, including Professors Nelson Tebbe (Cornell Law School) and Netta Barack-Corren (Hebrew University, Israel). *Id* at 35:7-15. Moreover, because Dr. Brodzinsky had contributed expert testimony in litigation brought by Catholic Charities in connection with the closure of their program in Illinois, *id.* at 40:17-41:6, he remained connected to child welfare professionals in Illinois knowledgeable about the transition. He consulted with them in addition to professionals in Boston, and Washington, D.C. *Id.* Finally, he reviewed AFCARS data from Illinois and Boston concerning the number of adoption placements that occurred before and subsequent to the transitions. *Id* at 10:20-25, 39:24-41:6, 135:12-136:8. As a

result of this research, he concluded that there were smooth transitions to other agencies after Catholic agencies ceased providing services, and he found no evidence that these transitions led to a failure to recruit foster and adoptive families. *Id* at 135:12-136:14. To the contrary, the AFCARS data indicates that the number of adoption placements *increased* in Illinois after Catholic Charities exited and transitioned its services to another provider, and remained steady in Boston. *Id.* at 135:20-136:1. As he explained, the caseworkers from agencies such as Catholic Charities generally went on to work for new agencies, taking their caseloads with them. *Id* at 41:2-6*.*

Indeed, other evidence is consistent with Dr. Brodzinsky's conclusions about the ability of agencies to transition their caseload without disruption. When Catholic Charities Fort Worth ("CCFW") transitioned its URM and UAC Programs to Catholic Charities Dallas ("CCD"), CCFW turned over its files and office space to CCD, which assumed leases on group homes previously operated by CCFW, and CCD offered positions to all of the staff who worked in the federal foster care programs at CCFW, the vast majority of whom accepted. Pls.' Mot. for Summ. J., Decl. A, Choe Decl. Ex. 17 ("Springer Dep.") at 122:15-123:24, ECF No. 108-16. Indeed, to the extent that a transition from one provider to another creates a disruption, including a potential loss of foster capacity, USCCB and Federal Defendants could have provided evidence of such a supposed impact from the significant transitions in the URM and UC programs in recent years—the departure of the State of Texas from the URM program statewide, the departure of USCCB from the UC program in the Dallas-Fort Worth area, and the transition of the URM program from CCFW to CCD—to support their contentions regarding impacts on Program children if USCCB's role changed. They provided none. USCCB's critique of the reliability of Dr. Brodzinsky's opinion lacks merit.

## **CONCLUSION**

For the foregoing reasons, Defendant USCCB's Motion to Exclude Expert Report and testimony of Dr. David M. Brodzinsky should be denied.

Dated: October 19, 2022                   Respectfully submitted,

By: /s/ *Camilla B. Taylor*
Camilla B. Taylor (pro hac vice)
**LAMBDA LEGAL DEFENSE AND**
**EDUCATION FUND, INC.**
65 E. Wacker Pl. Ste. 2000
Chicago, IL 60601-7245
Telephone: (312) 663-4413
ctaylor@lambdalegal.org

Karen L. Loewy (DC Bar No. 1722185)
**LAMBDA LEGAL DEFENSE AND**
**EDUCATION FUND, INC.**
1776 K Street, N.W. 8th Floor
Washington, D.C. 20006-2304
Telephone: (202) 804-6245
kloewy@lambdalegal.org

Richard B. Katskee (D.C. Bar No. 474250)
Kenneth D. Upton, Jr. (D.C. Bar No. 1658621)
**AMERICANS UNITED FOR**
**SEPARATION OF CHURCH AND**
**STATE**
1310 L Street, N.W., Suite 200
Washington, D.C. 20005
Telephone: (202) 898-2133
katskee@au.org
upton@au.org

Kenneth Y. Choe (pro hac vice)
Jessica L. Ellsworth (D.C. Bar No. 484170)
James A. Huang (pro hac vice)
Michael D. Gendall (D.C. Bar No. 1029790)
Brendan C. Quinn (D.C. Bar No. 1616841)
Katherine Culora (D.C. Bar No. 1671154)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109
Telephone: (202) 637-5600

Facsimile: (202) 637-5910
ken.choe@hoganlovells.com
jessica.ellsworth@hoganlovells.com
james.huang@hoganlovells.com
mike.gendall@hoganlovells.com
brendan.quinn@hoganlovells.com
katherine.culora@hoganlovells.com

Russell A. Welch (pro hac vice)
**HOGAN LOVELLS US LLP**
609 Main Street, Suite 4200
Houston, TX 77002
Telephone: (713) 632-1437
Facsimile: (713) 632-1401
russell.welch@hoganlovells.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 19, 2022, a true and correct copy of the foregoing document was filed using the Court's CM/ECF System, which will serve all counsel of record.

By: <u>/s/ *Camilla B. Taylor*         </u>

Camilla B. Taylor (pro hac vice)