**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— )<br>FATMA MAROUF, *et al.*, )<br> )<br>Plaintiffs )<br> )<br>v. )<br> )<br>XAVIER BECERRA, *et al.*, )<br> )<br>Defendants. )<br>———————————————— ) | Civil Action No. 1:18-cv-00378 APM |

**DEFENDANT U.S. CONFERENCE OF CATHOLIC BISHOPS' REPLY**
**IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY**
**OF DR. DAVID M. BRODZINSKY**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 2

I.   DR. BRODZINSKY'S OPINIONS ARE IRRELEVANT ............................................. 2

    A.   The Adoption of the Consortium Makes Dr. Brodzinsky's Opinions Irrelevant ......................................................................................... 3

    B.   Dr. Brodzinsky's Opinions Are Irrelevant Because They Rest on False Premises ................................................................................... 4

    C.   Dr. Brodzinsky's Opinions on the Merits of Same-Sex Parenting Are Irrelevant ............................................................................................... 7

II.   DR. BRODZINSKY'S OPINIONS ARE UNRELIABLE ........................................... 7

    A.   Dr. Brodzinsky's Opinions Are Wholly Divorced from the Facts of the Case ................................................................................................... 7

    B.   Dr. Brodzinsky's Individual Opinions Are Unreliable ............................... 8

        1.   Plaintiffs Largely Concede That Three of Dr. Brodzinsky's Opinions Are Unreliable ................................................................. 9

        2.   Dr. Brodzinsky's Opinion That Forcing USCCB Out of the Programs Will Not Reduce the Availability of Foster Families Is Unreliable ................. 10

III.  DR. BRODZINSKY IS UNQUALIFIED TO OPINE ON THE EFFECTS OF EXCLUDING USCCB ........................................................................................... 14

CONCLUSION ................................................................................................................. 15

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ciomber v. Coop. Plus, Inc.*,
   527 F.3d 635 (7th Cir. 2008) ...........................................................................10, 11

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993).................................................................................................2

*Day v. D.C. Dep't of Consumer & Regul. Affs.*,
   191 F. Supp. 2d 154 (D.D.C. 2002).....................................................................7, 9

*Dome Pat., L.P. v. Rea*,
   59 F. Supp. 3d 52 (D.D.C. 2014) ...........................................................................14

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021).........................................................................................1, 13

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
   843 F.3d 958 (D.C. Cir. 2016) ...............................................................................14

*Harris v. CitiMortgage, Inc.*,
   878 F. Supp. 2d 154 (D.D.C. 2012) ..........................................................................9

*Henkel v. Varner*,
   138 F.2d 934 (D.C. Cir. 1943) ...............................................................................14

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)........................................................................................8

*Moore v. GNC, Holdings, Inc.*,
   No. 12-61703-CIV, 2014 WL 12684287 (S.D. Fla. Jan. 24, 2014)........................10

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
   606 F.3d 262 (6th Cir. 2010) .................................................................................11

OTHER AUTHORITIES

Fed. R. Civ. P. 26...................................................................................................10, 11

Fed. R. Civ. P. 37..........................................................................................................10

*Fed. R. Evid. 702 ...........................................................................................7, 8, 12, 14

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ...........................................6

## INTRODUCTION

As in their summary judgment briefing, Plaintiffs steadfastly refuse to acknowledge that the facts on the ground have overtaken their case.  With the implementation of the consortium, all qualified same-sex couples in the Dallas-Fort Worth area have the opportunity to serve as foster parents via the Unaccompanied Refugee Minor Program ("URM Program").  This renders irrelevant Dr. Brodzinsky's testimony, which concerns the effects of excluding same-sex couples.  Moreover, in discussing these effects, Dr. Brodzinsky assumes both that there is a shortage of foster parents and that allowing USCCB to participate in the URM program somehow will cut off children from families that would best serve their needs.  Because both premises are indisputably false, Dr. Brodzinsky's opinions are irrelevant for this reason also.

Dr. Brodzinsky's opinions are also unreliable.  In its motion, USCCB identified four opinions that were unsupported, contradictory, and inconsistent with the facts of the case.  Plaintiffs do not even attempt to defend three of them.  That leaves only Dr. Brodzinsky's claim that forcing USCCB out of the programs will not reduce the number of foster families available.  As the Supreme Court has recognized, this claim is facially implausible.  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021).  And Plaintiffs' efforts to defend it only underscore its lack of support.  Unable to find any supporting evidence in Dr. Brodzinsky's report—which was expressly based on the *absence* of evidence—Plaintiffs rely solely on his deposition testimony.  That is procedurally improper, and even if it were not, the "evidence" involved is largely anecdotal.

Finally, Plaintiffs are unable to show that Dr. Brodzinsky is qualified to testify on the effect of forcing USCCB out of the URM Program.  Plaintiffs go to great lengths to establish Dr. Brodzinsky's credentials generally as a psychologist, but they make no effort to show he has

expertise on the social-scientific question of how the URM Program would absorb the blow of

losing half its foster-placement infrastructure overnight.

## BACKGROUND

Dr. Brodzinsky's Expert Report, Dkt. 108-38 ("Report"), contains five primary opinions:

- Opinion "A": "Professional child welfare standards provide for the inclusion of all qualified foster and adoptive families so as to best serve the needs of children." Report at 6.

- Opinion "B": "Children in the foster care system are harmed when there are not enough families to meet their needs." Report at 12.

- Opinion "C": "Permitting private child placement agencies, funded by and acting on behalf of the federal government, to turn away same-sex couples can reduce family placement options for children in the child welfare system, thereby undermining their long-term well-being." Report at 16.

- Opinion "D": "Permitting private agencies that administer federal foster care programs to turn away same-sex couples could result in additional negative consequences for LGBTQ youth in the foster care system." Report at 21.

- Opinion "E": "Enforcing nondiscrimination provisions in Federally-funded contracts with or grants to private child placement agencies would not reduce the availability of families for children in the foster care system." Report at 23.

USCCB has moved for exclusion of all five opinions under *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and applicable case law.


## ARGUMENT

### I.    DR. BRODZINSKY'S OPINIONS ARE IRRELEVANT.

Dr. Brodzinsky's opinions are irrelevant both because of the implementation of the

consortium and because they rest on factual assumptions that conflict with the undisputed facts of

this case.

A. **The Adoption of the Consortium Makes Dr. Brodzinsky's Opinions Irrelevant.**

As USCCB explained, the fact pattern at issue in this litigation no longer bears any resemblance to the scenario Dr. Brodzinsky was retained to address.  Dkt. 117-1 ("MTE") 9–10.  Specifically, Dr. Brodzinsky's opinions concern the effects and consequences of excluding same-sex couples from foster-care programs.  *See id.*  But with the implementation of the consortium, "all prospective foster parents in the Dallas-Fort Worth area have the opportunity to work with a URM provider."  Dkt. 106-2 ("USCCB SUMF") ¶ 60; MTE 5–6, 9–10; Dkt. 106-1 ("USCCB MSJ") 7–9, 12–16; Dkt. 126 ("USCCB MSJ Reply") 2–9.[1]  That being the case, Dr. Brodzinsky's opinions no longer have any bearing on any live issue in the case.

In response, Plaintiffs cast about for ways in which Dr. Brodzinsky's opinions might still be relevant in light of the consortium.  None are persuasive.

*First*, Plaintiffs claim Dr. Brodzinsky's opinions are relevant because the consortium imposes a cognizable stigmatic injury on them.  Dkt. 128 ("Pls.' Opp.") 9–10.  As USCCB explained in its summary judgment briefing, it does not.  Dkt. 115 ("USCCB Opp. to Pls.' MSJ") 9–17; USCCB MSJ Reply 2–9.  But even if it did, that would not make Dr. Brodzinsky's opinions relevant.  Plaintiffs may object (despite their earlier representations) to the *manner* in which the consortium guarantees same-sex couples the opportunity to foster, but it still guarantees them the opportunity to foster.  Thus, Dr. Brodzinsky's opinions on the effect of excluding same-sex couples cannot be relevant.

*Second*, Plaintiffs claim that Dr. Brodzinsky's opinions are relevant because they speak to Federal Defendants' supposed "failure to adhere to generally applicable and accepted child welfare

---

[1] Any opinion related to the Unaccompanied Alien Children Program ("UC Program"), is also irrelevant, as Plaintiffs no longer seek relief as to that program.  *See* USCCB MSJ Reply 2.

standards, and disregard for the best interests of the children in its care." Opp. 11. But that begs the question. Even under Dr. Brodzinsky's own definition, Federal Defendants would violate child welfare standards only if they excluded prospective same sex foster parents or denied children access to families that would best serve their needs. But as USCCB has explained, both the consortium model and the national placement network discussed below ensure neither scenario comes to pass. MTE 5–6, 9–10, 12–13.

*Finally*, in a footnote, Plaintiffs pile hypothetical upon hypothetical to assert that Dr. Brodzinsky's opinions are relevant because some children who belatedly identify as LGBT supposedly might have difficulty being placed with a same-sex couple if they are first placed through a USCCB subgrantee. Pls.' Opp. 10 n.1. As an initial matter, Plaintiffs do not have standing to assert the claims of children in the program. USCCB Opp. to Pls.' MSJ 11 n.2. And even assuming the accuracy of the outdated declaration on which Plaintiffs base this assertion, Dkt. 116-1 ("USCCB Resp. to Pls.' SUMF") ¶ 152 & n.6, it is undisputed that if a child requests a service that USCCB or its subgrantees cannot provide (*e.g.*, placement with a same-sex couple), the case will be referred to the government. Dkt. 110-3 ("Fed. Defs.' SUMF") ¶¶ 71–72. Regardless, Dr. Brodzinsky's Report does not provide a reliable basis for concluding that children who consider themselves LGBT are somehow harmed when they are placed with opposite-sex foster parents. MTE 23–24.

**B.    Dr. Brodzinsky's Opinions Are Irrelevant Because They Rest on False Premises.**

Opinions A–D are also independently irrelevant because they rest on two false factual premises about the operation of the URM Program. First, relying on national statistics about foster care generally, Dr. Brodzinsky assumes that USCCB's refusal to recruit same-sex couples contributes to a "dramatic shortage" of available foster parents. Report at 9–10. But this is

contrary to unrebutted testimony that no such shortage exists in the program at issue.  MTE 11–12.  Second, Dr. Brodzinsky assumes that "children in the care of" USCCB's subgrantees may be denied access to the family that would have best served their needs because of USCCB's refusal to accept same-sex couples.  Report at 16.  This assumption fails to account for the consortium and the government's national network of URM providers.  Any provider across the country can identify a suitable family for a child, and the provider takes custody only after identifying a family and receiving the government's approval.  MTE 12–13.

As an initial matter, Plaintiffs do not contest that the consortium and the government's national placement system undermine Dr. Brodzinsky's assumption that children will be denied access to the family that would best serve their needs.  Plaintiffs do insist that there is a shortage of qualified foster parents in the URM Program, Pls.' Opp. 16, but their efforts to substantiate that claim rest on a single, ambiguous answer from the deposition of Kenneth Tota, a deputy director of the Office of Refugee Resettlement ("ORR").  Specifically, after Mr. Tota testified that he had "never had an indication that we did not have enough foster care families available" for the URM Program, Plaintiffs' counsel asked, "But it *could* just as equally also be the case where you *would* not have enough foster families available; correct?"  MTE Ex. I, Transcript of Deposition of Kenneth Tota (Sept. 28, 2020) ("Tota Dep.") at 179:2–7 (emphases added).  Mr. Tota responded, "It's possible."  *Id.* at 179:11.  That noncommittal response to a poorly-worded question is far too slender a reed to show that the URM Program is facing a "dramatic shortage" of foster parents.  Report at 9–10, 12–16.[2]

---

[2] "MTE Ex." citations are to exhibits filed with the Declaration of David T. Raimer, Dkt. No. 117-2, and the supplemental declaration filed with this Reply.

To begin, the wording of this follow-up question was ambiguous: it is unclear whether counsel was asking if there might *in fact* be a shortage of families presently or in the recent past or whether he was asking if it was *in principle* possible that there could be a shortage someday.  If anything, the use of the term "would" suggests the latter.  *See Would*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ("used in auxiliary function … to express a contingency or possibility").  Counsel for the Federal Defendants and USCCB promptly objected to the form of this question, but Plaintiffs' counsel did not reword it.  Tota Dep. at 179:8–10.

More importantly, later in the deposition, Mr. Tota made clear that he was "not aware of a shortage of foster care parents" in the URM program or the state of Texas, and he affirmatively testified that "we have appropriate capacity for the referrals we're seeking at this time."  *Id.* at 270:13–25.  That testimony is corroborated by that of Krystin Peck, who oversaw USCCB's foster-care programs at the time of the incident that gave rise to this suit.  She likewise testified that she was unaware of any shortage of qualified foster parents in the URM program during her time at USCCB.  MTE Ex. D, Transcript of Deposition of Krystin Peck (Oct. 2, 2020) ("Peck Dep.") at 138:7–23.  And while the UC Program is no longer at issue in this litigation, given the often overlapping pools of foster parents in the URM and UC programs, it strains credulity to suggest that the URM Program would be experiencing a shortage in foster parents at the same time the UC Program had "more capacity for foster placement than … children that need … long-term foster placement."  MTE Ex. B, Transcript of Deposition of Jallyn Sualog (Aug. 26, 2020) ("Sualog Dep.") at 56:6–13.  Plaintiffs' citation to evidence that is either inapplicable or outside the relevant time period for this litigation does not alter this conclusion.  *Compare* Pls.' Opp. 16 (citing HHS13133, HHS03493, and Devlin Decl.), *with* USCCB Resp. to Pls.' SUMF ¶¶ 14, 152 & n.6.

C.      **Dr. Brodzinsky's Opinions on the Merits of Same-Sex Parenting Are Irrelevant.**

USCCB also explained that Dr. Brodzinsky's discussion of the merits of same-sex parenting are irrelevant because neither USCCB nor the Federal Defendants have put that subject at issue. *See* MTE 13–14. Plaintiffs do not contest this point, thus conceding these opinions are inadmissible. *See Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002).

## II.     DR. BRODZINSKY'S OPINIONS ARE UNRELIABLE.

Dr. Brodzinsky's opinions are unreliable as a general matter because they are wholly divorced from the facts of the case. His individual opinions are also unreliable because they are unsupported, contradictory, and inconsistent with the facts of the case.

A.      **Dr. Brodzinsky's Opinions Are Wholly Divorced from the Facts of the Case.**

To be admissible, expert testimony must be "the product of reliable principles and methods." Fed. R. Evid. 702(c). But that is not all. As USCCB explained, the expert must also have "reliably applied the principles and methods to the facts of the case." *Id.* 702(d). Here, Dr. Brodzinsky did not even purport to apply his methodology to the facts. He appears to be entirely unfamiliar with the operation of the URM Program and with USCCB's role within it. Worse still, he produced his Report before the creation of the consortium, meaning his analysis has nothing at all to say on this critical development. MTE 15–18. His opinions must therefore be excluded.

In response, Plaintiffs emphasize that Dr. Brodzinsky's methodology is reliable and that disagreement with an expert's conclusions is not a basis for excluding his testimony. Pls.' Opp. 14–15. But those arguments omit the critical intermediate step—application. Rule 702 "specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the

facts of the case." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.  Indeed, "*any* step that renders the analysis unreliable … renders the expert's testimony inadmissible," including a step that "*merely misapplies [a reliable] methodology.*"  *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).  Even testimony "on general principles" must "'fit' the facts of the case."  *Id.*  Dr. Brodzinsky's opinions manifestly do not.  They analyze the impact of excluding same-sex couples from the foster care system, but the exclusion of same-sex couples is no longer an issue in this litigation.

Plaintiffs also argue that, unlike a lay witness, "an expert may offer testimony relevant to whether the government has satisfied a legal standard without evaluating particular litigants."  Pls.' Opp. 15.  That is of course true.  If Plaintiffs asked Dr. Brodzinsky to opine, for example, on the psychological impact of the consortium on same-sex couples, he would not be barred from doing so just because he lacks direct personal experience of its operations.  But that is not in fact the subject of Dr. Brodzinsky's report.  Dr. Brodzinsky has instead opined on issues that are either uncontested or unrelated to how the URM Program actually operates.[3]

### B.      Dr. Brodzinsky's Individual Opinions Are Unreliable.

In its motion to exclude, USCCB challenged four of Dr. Brodzinsky's individual opinions as unreliable.  MTE 18–29.  For the most part, Plaintiffs do not even try to defend three of them, and its defense of the fourth falls short on several levels.

---

[3] Plaintiffs further argue that USCCB cannot contest the use of nationwide generalizations when USCCB itself relies on nationwide generalizations.  Pls.' Opp. 11–12.  Although USCCB did rely on nationwide factual assertions to attack the reliability of Dr. Brodzinsky's opinions, it did so explicitly in the alternative, asserting as its primary objection that such generalizations divorced from the facts of the case are irrelevant.  *See* MTE 25 n.5 ("As USCCB has explained, the scope of this case is limited to the Dallas-Fort Worth area.  USCCB raises these facts because Dr. Brodzinsky frames his Report at a national level." (citations omitted)).

### 1.    Plaintiffs Largely Concede That Three of Dr. Brodzinsky's Opinions Are Unreliable.

Plaintiffs largely do not respond to USCCB's challenges to the reliability of three of Dr. Brodzinsky's opinions.  Again, "[i]f a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded." *Day*, 191 F. Supp. 2d at 159; *see Harris v. CitiMortgage, Inc.*, 878 F. Supp. 2d 154, 163 (D.D.C. 2012) (collecting cases).  To the extent Plaintiffs fail to respond, they have conceded that these opinions are inadmissible.

*First* is Dr. Brodzinsky's claim that accommodating USCCB's religious beliefs will harm children because it will either contribute to a shortage of available foster families or prevent certain children from being placed with the best family for them.  Report at 9–10, 16–21.  As explained above, there is no shortage of available foster parents in the URM Program.  *Supra* pp. 4–6. Moreover, Dr. Brodzinsky provides no evidence that merely allowing USCCB to participate in the programs somehow deters significant numbers of same-sex couples from participating through other providers.  MTE 19.  And he fails to consider the loss of foster families that would result from excluding USCCB from the program.  *Id.* at 20.  Plaintiffs do not contest the latter two points.

*Second* is Dr. Brodzinsky's opinion that same-sex couples will be deterred from participating or unable to find alternate providers.  Report at 18–20.  Again, Dr. Brodzinsky cited no evidence for his deterrence theory.  MTE 21.  He was entirely unaware that there are two alternative providers in the Dallas-Fort Worth area—BCFS and Upbring—willing to place children with same-sex couples.  *Id.* at 21–22.  And naturally, he did not take into account the consortium, which postdates his Report.  *Id.* at 22.  Plaintiffs offer no response to these points.

*Third* is Dr. Brodzinsky's view that accommodating USCCB "could result in additional negative consequences for LGBTQ youth."  Report at 21–23.  Dr. Brodzinsky provided no evidence that children who identify as LGBTQ are overrepresented *in the URM Program*.  MTE

22.  He provided no basis for concluding that USCCB would fail to meet the needs of *children* who identify as LGBTQ, whom USCCB are committed to serving, just because it objects to placing children with same-sex *parents*.  *Id.* at 23.  And he offered no evidence to support his claim that opposite-sex couples are worse equipped than same-sex couples to care for children who identify as LGBTQ.  *Id.* at 23–24.  Here too, Plaintiffs do not contest any of USCCB's arguments.

### 2. Dr. Brodzinsky's Opinion That Forcing USCCB Out of the Programs Will Not Reduce the Availability of Foster Families Is Unreliable.

Dr. Brodzinsky claims that excluding USCCB would not reduce the number of families available to foster.  Report at 23–24.  But he did not consider that removing USCCB would eliminate half the capacity of the URM Program overnight, as well the USCCB's unique expertise and historical knowledge.  MTE 25.  He based his opinion solely on the *absence* of contrary evidence, not the existence of affirmative evidence.  *Id.* at 25–27.  He had no knowledge of the capabilities of the possible alternative providers that could replace USCCB.  *Id.* at 27–28.  And he did not identify any expert methodology by which he came to his opinion.  *Id.* at 28–29.

For their part, Plaintiffs can find nothing in Dr. Brodzinsky's report to substantiate his opinion, instead relying on snippets from his deposition and "other evidence" from another witness's deposition testimony.  Pls.' 17–18.  This will not do.  An expert witness's "*report* must contain … the basis and reasons for" his opinions as well as "the facts or data considered … in forming them."  Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii) (emphasis added).  A party may not use expert testimony that does not comply with these requirements.  *Id.* 37(c)(1).  A "primary goal" of Rule 26(a)(2) is "'to shorten or decrease the need for expert depositions.'"  *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008).  When expert depositions are needed, the Rule ensures that the opposing party has the "notice" needed to adequately "prepare for the deposition."  *Moore v. GNC, Holdings, Inc.*, No. 12-61703-CIV, 2014 WL 12684287, at *3 (S.D. Fla. Jan. 24, 2014).  Hence

"Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." *Ciomber*, 527 F.3d at 642; *accord R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010).  To admit Dr. Brodzinsky's testimony, Plaintiffs must be able to establish its reliability from the contents of his expert report.  This, they cannot do.

As an initial matter, none of the "evidence" Plaintiffs cite from Dr. Brodzinsky's deposition formed the basis of his opinion for the simple reason that his report was expressly based on the *absence* of evidence.  MTE 25.  Plaintiffs now claim the opinion rests on Dr. Brodzinsky's supposed research on the closure of Catholic Charities-affiliated adoption agencies in Illinois, Boston, and Washington, D.C.  Pls.' Opp. 17–18.  But Dr. Brodzinsky was explicit that he had not conducted "*any* research regarding any Catholic Charities organization" until "after" he had completed his "work on this case."  MTE Ex. J, Transcript of Deposition of David Brodzinsky (Nov. 20, 2020) ("Dep.") 34:22–25 (emphasis added).  Nor was his deposition testimony an attempt to amend his report to provide support for his opinion: Dr. Brodzinsky was clear that, with one unrelated exception, he had no "corrections" to make and nothing "else to add or change to [his] report or [his] opinions."  *Id.* at 9:18–20, 10:5–8.

In any event, even it had formed the basis of Dr. Brodzinsky's opinion, none of the evidence Plaintiffs cite renders it reliable.  Specifically Plaintiffs point to five supposed bases for the opinion.

*First*, Plaintiffs claim Dr. Brodzinsky "reviewed qualitative literature and research" on the Illinois, Boston, and D.C. closures.  Pls.' Opp. 17.  But although Dr. Brodzinsky apparently "review[ed]" some "documents" and "qualitative information" about the Illinois, Boston, and D.C. closures, he did not identify what these documents were or what they said that informed his opinion.  Dep. 34:25–35:6, 39:24–40:3.

11

*Second*, Plaintiffs claim Dr. Brodzinsky "drew upon his own experience working with agencies that had ceased providing services." Pls.' Opp. 17. But Dr. Brodzinsky mentions no such experience. At most, he mentions that, in his "own experience," he has "been aware of agencies that have closed for various reasons" and that "generally" a smooth transition has followed. Dep. 137:1–5. The relevant "experience" appears to be nothing more than having heard news from time to time. And in any event, this brief statement falls far short of what is required to base an expert opinion on experience—namely, an explanation of "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

*Third*, Plaintiffs claim Dr. Brodzinsky "consulted scholars …, including Professors Nelson Tebbe … and Netta Barack-Corren." Pls.' Opp. 17. But Dr. Brodzinsky never said he consulted these two professors or any other scholars or even that he had read their work. Instead, he said that an unnamed "colleague" provided him some "information … having to do with" the research of Professors Tebbe and Barack-Corren and that this "information" cited something related to Catholic Charities. Dep. 35:7–15. As to what this "information" was and what it said, the record is silent.

*Fourth*, Plaintiffs claim Dr. Brodzinsky "consulted with" child agency workers in Boston, Illinois, and D.C. Pls.' Opp. 17. But Dr. Brodzinsky never conducted a formal or systematic "consultation." He testified only that he "stayed pretty much in connection with" agency workers in Illinois and is "very connected with the professionals around the country." Dep. 40:11–41:1. In other words, he "heard" anecdotes from friends. *Id.* at 40:22. That is hardly "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). But even if it were, Dr.

Brodzinsky again failed to provide the detail necessary to show that these anecdotes were a sufficient basis for his opinion.

*Finally*, Plaintiffs note that Dr. Brodzinsky reviewed data from Illinois, which he claimed showed no decrease in placements after Catholic Charities ceased to perform adoption placements.[4]  Pls.' Opp. 17–18.  But the sum total of Dr. Brodzinsky's analysis is that the number of placements did not go down.  Dep. 135:12–136:8.  He did not consider what other factors may have affected the number of placements, what efforts Illinois undertook to replace Catholic Charities, and how readily available alternative providers were.  Nor did he consider whether similar conditions would obtain in Dallas-Fort Worth or whether there were any relevant differences between foster placement and adoption placement.  His opinion was not the product of a rigorous application of expertise to data, but a crude inference of *post hoc ergo propter hoc*.

Thus, even if it were proper to consider Dr. Brodzinsky's deposition testimony, his opinion would still be unreliable.  And given the facially implausible nature of Dr. Brodzinsky's opinion, the dearth of supporting evidence and analysis is particularly unacceptable.  *See Fulton*, 141 S. Ct. at 1882 ("If anything, including [Catholic Social Services] in the program seems likely to increase, not reduce, the number of available foster parents.").

Additionally, to the extent Dr. Brodzinsky did rely on concrete evidence, his analysis did not meaningfully differ from a layperson's.  Dr. Brodzinsky read some documents (although he does not say what they were), heard some anecdotes, and saw some numbers from Illinois allegedly showing that placements in that one location did not decrease after Catholic Charities ceased operations there.  But any layperson could draw inferences from those purported facts.  And where

---

[4] Plaintiffs also claim Dr. Brodzinsky reviewed data from Boston, but he never cited any statistics from Boston in his deposition testimony.

the jury is "just as well qualified to draw the necessary conclusions" from the evidence as the expert witness, "it is improper to use opinion evidence for the purpose." *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016) (quoting *Henkel v. Varner*, 138 F.2d 934, 935 (D.C. Cir. 1943)).

## III.  DR. BRODZINSKY IS UNQUALIFIED TO OPINE ON THE EFFECTS OF EXCLUDING USCCB.

Dr. Brodzinsky is not qualified to testify on the likely effect of forcing religious foster care agencies to choose between dropping out of the program or violating their religious convictions regarding same-sex foster couples.  Expert testimony "must be grounded in an accepted body of learning or experience *in the expert's field*."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment (emphasis added).  The expert may not testify on matters outside "the scope of [his] expertise."  *Dome Pat., L.P. v. Rea*, 59 F. Supp. 3d 52, 57 n.5 (D.D.C. 2014).  Although Dr. Brodzinsky is a psychologist, the effect of forcing USCCB out of the URM Program is not a question of psychology.  It is a question of social science requiring analysis of the ability of alternative providers to transfer or replace families presently in the USCCB network and to operate in the absence of the decades of experience provided by USCCB.  Nothing in the record indicates Dr. Brodzinsky has this kind of expertise.

Plaintiffs go to great lengths to show that Dr. Brodzinsky is a qualified psychologist.  Pls.' Opp. 4–7.  Fair enough, but they make no effort to show that psychology provides any useful tools to predict how barring USCCB from the URM Program would affect the number of available foster providers.  Likewise, Plaintiffs cite a string of cases where courts have permitted Dr. Brodzinsky to testify, but all of them involved testimony on the psychological effect of some policy or practice on children or parents.  *Id.* at 7–9.  Despite their voluminous citations, Plaintiffs do not identify a single case where Dr. Brodzinsky has testified even generally on how the number of foster

providers would be affected by excluding a subset of providers, much less what would happen in the unique context of the URM Program.

## CONCLUSION

For the foregoing reasons, the expert testimony and report of Dr. David M. Brodzinsky should be excluded.

Dated: November 2, 2022                              Respectfully submitted,


                                                     */s/ David T. Raimer.*
                                                     David T. Raimer (DC ID #994558)
                                                     Anthony J. Dick (DC ID #1015585)
                                                     JONES DAY
                                                     51 Louisiana Ave. NW
                                                     Washington, DC, 20001-2113
                                                     Tel.: 202-879-3939
                                                     Fax: 202-626-1700
                                                     dtraimer@jonesday.com
                                                     ajdick@jonesday.com

                                                     *Leon F. DeJulius, Jr. (PA ID #90383)
                                                     *John D. Goetz (PA ID #47759)
                                                     JONES DAY
                                                     500 Grant Street, Suite 4500
                                                     Pittsburgh, PA 15219-2514
                                                     Tel.: 412-391-3939
                                                     Fax: 412-394-7959
                                                     lfdejulius@jonesday.com
                                                     jdgoetz@jonesday.com

                                                     *Counsel for Defendant United States*
                                                     *Conference of Catholic Bishops*

                                                     *Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2022, I electronically filed the foregoing Reply and supporting documents with the Clerk of the Court using the Court's CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to the parties indicated on the electronic filing receipt.

*/s/ David T. Raimer*
David T Raimer

*Counsel for Defendant United States*
*Conference of Catholic Bishops*