UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **FATMA MAROUF**, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 18-cv-00378 (APM) |
| **ALEX M. AZAR, II**, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION**

**I.**

The Department of Health and Human Services ("HHS") oversees the Unaccompanied Refugee Minor Program ("URM Program"), which provides foster care and other services to minors who enter the country as refugees. To operate the program, HHS relies on private non-profit agencies. HHS provides grants to such entities to cover administrative and other program costs. Defendant U.S. Conference of Catholic Bishops ("USCCB") is one such grantee.

Plaintiffs Fatma Marouf and Bryn Esplin are a same-sex, married couple that live in Fort Worth, Texas. They wish to become foster parents to an unaccompanied refugee child. In February 2017, Plaintiffs sought out information about foster care programs from Catholic Charities of Fort Worth, a sub-grantee of USCCB. Catholic Charities of Fort Worth, however, declined to process Plaintiffs' application upon learning that they were a same-sex couple. Catholic Charities would not work with Plaintiffs because of the organization's religious belief that children should be raised within what they deem to be a traditional family structure of a heterosexual, married couple.

Plaintiffs then brought this action, asserting violations of the Establishment Clause and the Equal Protection Clause, as well as a deprivation of substantive due process. The court granted Defendants' Motions to Dismiss in part, agreeing with Defendants that no Plaintiff had taxpayer standing to assert a violation of the Establishment Clause. The court determined, however, that Plaintiffs Marouf and Esplin had sufficiently pleaded individual standing to pursue all three causes of action and allowed this case to move forward to discovery.

Now before the court are the parties' cross-motions for summary judgment. *See* Defs.' Mots. for Summ. J., ECF Nos. 106, 109, and 110; Pls.' Mots. for Summ. J., ECF Nos. 107 and 108. As explained below, the court will enter judgment in favor of Defendants on the grounds that Plaintiffs' claims are moot.[1]

## II.

### A.

The federal URM Program is administered through the Office of Refugee Resettlement ("ORR"), a sub-agency of HHS. Pls.' Consented Mot. to File Under Seal, ECF No. 113, Pls.' Resp. to Federal Defs.' Stmt. of Undisputed Material Facts in Supp. of MSJ [hereinafter Pls.' Response to Facts], ECF No. 113-1, ¶¶ 2, 11. Through the URM Program, ORR is "authorized to issue grants to, and contract with . . . private non-profit agencies to manage the initial resettlement of, and provide resettlement assistance to, refugees admitted to the United States." *Id.* ¶ 11. As relevant here, grantees' services can include "foster care maintenance payments and services and

---

[1] Plaintiffs also originally sought to become foster parents under a related program, the Unaccompanied Alien Children Program ("UC Program"), but likewise were denied participation through the USCCB sub-grantee because of their status as a same-sex couple. The parties now concede that Plaintiffs' participation in the UC Program is no longer at issue. Pls.' Consented Mot. to File Under Seal, ECF No. 113, Mem. of Law in Support of Pls.' Opp'n to Defs.' MSJs [hereinafter Pls.' Opp'n], ECF No. 113-1, at 8 n.6. Because USCCB and its sub-grantee no longer receive funds for the UC Program, the court cannot grant prospective relief as to that program; therefore, all parties agree that Plaintiffs' claims are now moot insofar as they sought relief with respect to the UC Program. *Id.*; Def. USCCB's Mot. for Summ. J., ECF No. 106, Def. USCCB Mem. of P & A in Supp. of its Mot. for Summ. J., ECF No. 106-1, at 14.

health care." *Id.* ¶ 15. Persons who wish to become foster parents through the URM Program apply for state licensure through ORR's grantees and sub-grantees. *Id.* ¶ 21.

USCCB is a faith-based organization that has served as a URM Program provider since the program's inception in 1980. *Id.* ¶ 33. USCCB is one of only two grantees funded to resettle URMs from oversees, and ORR "relies heavily" on USCCB to administer a variety of programs. *Id.* ¶¶ 34–35. USCCB's application to serve as a provider expressly stated that it would not undertake any programmatic activities that were contrary to the "authentic teachings of the Catholic church." *Id.* ¶ 69. As pertinent here, USCCB has overseen the administration of the URM Program in the state of Texas since 2017. *Id.* ¶¶ 33, 59.

In February 2017, Plaintiffs approached a USCCB sub-grantee, Catholic Charities of Fort Worth, to serve as foster parents. *Id.* ¶¶ 38–40. At the time, the USCCB sub-grantee was the sole URM provider in Texas. *See Id.* ¶ 42. Catholic Charities of Fort Worth advised Plaintiffs that the organization would not work with them because of its religious beliefs about same-sex marriage. *Id.* A year later, Plaintiffs filed this suit. *See* Compl., ECF No. 1.

B.

Since Plaintiffs filed this action, HHS has made material changes to the URM Program in Texas. Effective June 2020, the government approved a second URM Program provider in Texas—the Lutheran Immigration and Refugee Service, whose sub-grantee Upbring has no objection to licensing same-sex couples as foster parents. Pls.' Response to Facts ¶¶ 82–84, 87. Further, the government established a third-party intake process in the Dallas-Fort Worth area (called the "Consortium") whereby a third-party—the U.S. Committee for Refugees and Immigrants ("USCRI")—performs an intake function for the two URM Program provider agencies: USCCB's sub-grantee (now, Catholic Charities of Dallas) and Upbring. *Id.* ¶¶ 88–89. Now, all potential applicants must go to the same entity—USCRI—to start the process of

3

becoming foster parents. USCRI in turn refers the potential foster parents to a URM provider agency—again, USCCB's sub-grantee or Upbring. *Id.* ¶ 91.

Plaintiffs say that these changes are not enough to remedy their injuries. According to Plaintiff Marouf, the Consortium "does not remedy the stigma, rejection, and humiliation that [Plaintiffs] felt when turned away by [USCCB's subgrantee]," as it "sounds like a thinly veiled attempt by the federal government to fashion a 'separate but equal' scheme, where same-sex couples are shunted through one door, while heterosexual couples are invited to apply through another." Pls.' Mot. for Summ. J., ECF No. 108, Decl. of Fatma Marouf, ECF No. 108-3, ¶ 20. Further, Plaintiff Marouf states that she and her wife "fear that the newly created consortium . . . will not provide [them] with the same opportunities to foster a child," as Upbring is a newer organization that "is still trying to put together its staffing and has licensed only one family since the Consortium was created, and that family has yet to receive placement of a child," while USCCB's sub-grantee has licensed various families. *Id.* ¶ 21. Plaintiffs believe that Upbring "is not an equal partner" and that the new system "diminishes not only [their] marriage but also [their] chance of becoming foster parents." *Id.* As a result, Plaintiffs have not applied to become foster parents despite the program changes. Mem. of Law in Supp. of Pls.' Opp'n to Defs.' Mot. for Summ. J., ECF No. 114 [hereinafter Pls.' Opp'n], Decl. of Fatma Marouf in Support of Pls.' Opp'n to Defs.' Mot. for Summ. J., ECF No. 114-2, ¶ 5.

### III.

Defendants contend that the fundamental changes made to the URM Program in Texas have mooted Plaintiffs' claims. "At all stages of litigation, a plaintiff must maintain a personal interest in the dispute." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). "[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case

4

generally is moot." *Id.* Thus, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (citation omitted).

The court holds that this matter is now moot for two reasons. First, the URM Program has been modified in the *precise manner* Plaintiffs previously represented to the court would cure their injuries. They are thus judicially estopped from demanding greater relief. And second, the greater relief that Plaintiffs seem to demand—either forcing USCCB to work with same-sex couples or removing USCCB from the URM Program—is not relief the court can legally award.

## A.

Plaintiffs previously told the court that they were not seeking a remedy that would disqualify USCCB from continuing to serve as a grantee. In opposition to Defendants' Motion to Dismiss, Plaintiffs said that they "would have no objection if, in administering the URM and UC programs, Federal Defendants were to accommodate USCCB's religious doctrine *so long as* they were to do so in a manner that does not restrict placement options based on religious considerations unrelated to child welfare, or stigmatize and demean lesbian, gay, bisexual, or transgender ("LGBT") applicants or youth in federal care." Pls.' Opp'n to MTD, ECF No. 34, at 2. They also stated that "Defendants incorrectly assert that the relief that Plaintiffs are requesting would *necessarily* force USCCB to administer the URM and UC programs in a manner that violates its religious doctrine. This is not Plaintiffs' objective." *Id.* at 10–11. "In other words," they assured the court, "Plaintiffs do *not* demand that USCCB necessarily render the determination as to Fatma and Bryn's eligibility to be foster parents, or make the decision to place a child with Fatma and Bryn. If Federal Defendants can administer the URM and UC programs in a constitutionally compliant manner while *also* accommodating the religious views of URM and UC grantees—and relief can be fashioned to accomplish this—Plaintiffs do not object." *Id.* at 11. Ultimately,

5

Plaintiffs said "Federal Defendants may accommodate USCCB's religious objections to fulfilling the terms of the grants *so long as* they do so in a manner that does not ultimately restrict placement options based solely on USCCB's religious doctrine and does not impose materially unequal burdens, stigma, or indignity on religiously disfavored applicants relative to favored ones." *Id.*

Then, at the hearing on Defendants' motions, Plaintiffs took the position that the very changes that the Federal Defendants have made to the URM Program in Texas would be satisfactory. Plaintiffs emphasized that they were "not asking that the government remove all of its funding to USCCB." Oral Arg. Tr., Nov. 30, 2018, ECF No. 80, at 46, 53. When asked what alternative solution would remedy their harm, Plaintiffs answered that the "government could take over the application process and process—create a screening process, and then provide applicants with where to—with options of where to go to be able to foster a child." *Id.* at 57. They would no longer be harmed, Plaintiffs said, if the government or a third-party administered the screening process that all applicants would go through even if the screener then referred the applicants to the appropriate provider. *Id.* at 58, 62 ("So the government can take over [the screening] process or someone else can take over that process."). In this scenario, USCCB would also be able to continue in the program and would not be asked to work with same-sex couples. *Id.* at 60.

Plaintiffs now say that the third-party screening model that they advocated for does not remedy their ongoing harm. According to them, "[t]hat married same-sex couples who are referred to Upbring can access the Program does not remedy the stigma stemming from the segregation of such couples for differential treatment in the first instance—which discourages married same-sex couples like Plaintiffs from proceeding at all." Pls.' Reply in Support of Pls.' Mot. for Summ. J., ECF No. 125, at 3.

6

But Plaintiffs said just the opposite at the motion-to-dismiss stage. Then, they argued that, "[i]f HHS provided the screening process, for example . . . and any couple could walk in that door, no matter who they are, and have their application processed[,] HHS can then determine where that couple is sent. But there's no stigmatization or treatment of that individual as inferior merely because of the same-sex character of their marriage." Oral Arg. Tr., Nov. 30, 2018, at 60–61. Plaintiffs continued, "[s]o whoever is administering the application process needs to be accepting all applicants equally, no matter who they are, what sex, what sexual orientation." *Id.* at 61. Their only objection was that a USCCB sub-grantee could not perform the initial screening. "So the government can take over [the initial screening] process or someone else can take over that process. . . . But it can't be Catholic Charities if they're not willing to provide equal treatment to any couple who's walking through their door." *Id.* at 62.

The court holds that Plaintiffs are judicially estopped from claiming that the newly created Consortium system does not remedy their injuries. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). "This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id.* (citation omitted). Its purpose is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749–50 (citation omitted).

Judicial estoppel is equitable in nature, and the Supreme Court has said that there is no "exhaustive formula for determining applicability of judicial estoppel." *Id.* at 751.

7

> Nevertheless, the Court has set forth three key factors that "inform the decision" whether "the balance of equities" favors applying the doctrine in a particular case: (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 733 (D.C. Cir. 2019) (quoting *New Hampshire*, 532 U.S. at 750–51). Each of these factors weighs in favor of applying judicial estoppel here.

*First*, as already discussed, Plaintiffs' current position that the URM Program changes in Texas do not remedy their stigmatic injury is "clearly inconsistent" with their earlier position.

*Second*, this court relied in part on Plaintiffs' position on remedies in finding that they had individual standing at the motion-to-dismiss stage. Specifically, the court distinguished this case from the D.C. Circuit's decision in *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412 (D.C. Cir. 1994), a case on which Defendants had heavily relied. *See Marouf v. Azar*, 391 F. Supp. 3d 23, 36 (D.D.C. 2019). The court explained:

> [U]nlike the plaintiffs in *Freedom Republican[s]* who called on the FEC to adopt regulations to force the party to alter its nominating process, Plaintiffs here do not seek to use the levers of federal power to change USCCB's position on same-sex marriage. Instead, they seek injunctive relief requiring the Federal Defendants to ensure that they may apply to be foster or adoptive parents under the URM Program or the UC Program without disfavoring them based on their sexual orientation. Thus, *they seek a change to the federal program itself*, not USCCB's views on same-sex marriage.

*Id.* (emphasis added); *see id.* at 36 n.2 (observing that Plaintiffs had "backed off" demands made in the complaint's prayer for relief). Having persuaded the court that it could award the programmatic relief they sought, Plaintiffs must stand by their earlier representations.

8

*Third*, permitting Plaintiffs to change course at this stage would be fundamentally unfair. Federal Defendants did precisely what Plaintiffs asked of them: they approved a grantee in Texas that would work with same-sex couples like Plaintiffs and restructured the URM Program so that Plaintiffs, like heterosexual couples, would be screened by a single source. Plaintiffs cannot now claim that they are dissatisfied with the very solution they proposed.

Plaintiffs now attempt to recast their prior position, asserting that it has been "grossly mischaracterize[d]." Pls.' Opp'n to Defs.' Mots. for Summ. J., ECF No. 113-1, at 12 n.8. But they do not point to any statements made during the motion-to-dismiss stage that conveyed the view that the type of third-party screening system now in place would be an unacceptable solution. They identify only representations made during a later status conference held on May 15, 2019, as support for their current position. *Id.* During that hearing, Plaintiffs said that they would be satisfied if a grantee other than USCCB sub-grantee both screened applicants *and* processed licenses for all couples. Status Conference Tr., May 15, 2019, at 11–16. Plaintiffs did not, however, withdraw or contradict their earlier position that a common screening system, as is now in place, would extinguish their stigmatic injuries.

Plaintiffs offer three additional arguments for why this case is not moot. First, they contend that they still suffer unequal treatment under the Consortium system because same-sex couples necessarily will be referred to Upbring, "a new subgrantee with significantly less capacity for screening, training, licensure, and support for placements." Pls.' Opp'n at 11. Plaintiffs, however, previously disclaimed this concern. They represented to the court that they would be willing to move forward with an "alternative provider," even understanding that "this is new itself and treats them differently as a result. And . . . [Plaintiffs] would be willing to do that because it is just as important to them that they access the system through a system that is not, does not present the

9

constitutional concerns they have alleged." Status Conference Tr., May 15, 2019, at 10. In any event, Plaintiffs' present concerns are entirely speculative. To be sure, Upbring is a new provider. But other than its newness, Plaintiffs have not offered any concrete evidence that would suggest that they are less likely to be qualified as foster parents by Upbring or that Upbring would provide materially inferior services or support if they were to become foster parents. *See* Fed. Defs.' Consent Mot. for Leave to File Under Seal, ECF No. 119, Fed. Defs.' Resp. to Pls.' Stmt. of Material Facts Not in Dispute, ECF No. 119-1, ¶¶ 102–106. Plaintiffs must offer more than conclusory assertions of Upbring's supposed inferiority to demonstrate continued injury.

Next, Plaintiffs argue that their case remains live because the Consortium could steer them back to USCCB's grantee, "only to experience again the very same discriminatory rejection as in 2017." Pls.' Opp'n at 11. But such speculative future injury cannot sustain their claims. Plaintiffs have not shown, for example, that the Consortium has referred other same-sex couples to the USCCB grantee, thereby establishing some risk of future injury. There must be "something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

Finally, Plaintiffs maintain that their cause is not moot because Federal Defendants could rescind the Consortium system at any time. Pls.' Opp'n at 20. Plaintiffs have not, however, given the court any reason to think that they "'remain under a constant threat' that government officials will use their power to reinstate the challenged restrictions." *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (citation omitted). To the contrary, as Federal Defendants point out, they have "spent the better part of a year" and hundreds of thousands of dollars "overseeing the Consortium's implementation and satisfying themselves that the Consortium will pose no barriers to any same-sex couple's efforts to foster a child through the URM program." Fed. Defs.' Reply in Support of

Their Mot. for Summ. J., ECF No. 124, at 5. This is not a case where a change is likely to arise without any prior notice. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Plaintiffs' claims are moot.

## V.

In their moving papers, Plaintiffs largely avoid defining the precise remedy that they seek. They do, however, without any discussion, suggest two dramatic steps: (1) ordering Federal Defendants to ensure that Plaintiffs would be considered as foster parents through USCCB, irrespective of its religious views on same-sex marriage; and (2) prohibiting Federal Defendants from awarding grants to USCCB to administer the URM Program because of its religious views on same-sex marriage. *See* Pls.' Unopposed Mot. to File Under Seal, ECF No. 107, Pls.' Mot. for Summ. J., ECF No. 107-1, at 3. Plaintiffs previously disavowed that they would seek either remedy. *See Marouf*, 391 F. Supp. 3d at 36 n.2. And probably for good reason: the court cannot compel either.

The Supreme Court has "never suggested that the government may discriminate against religion when acting in its managerial role." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021). In *Fulton*, the Supreme Court held that the Free Exercise Clause required the City of Philadelphia to *accommodate a Catholic social services group* that the City had excluded from its public funding of private foster-care agencies because the group would not place children with same-sex couples. The Supreme Court ordered the City to allow the Catholic group to participate in the foster-care program. *See id.* at 1881–82. To be sure, much of the rationale of *Fulton* rested on the City's lack of a compelling reason to withhold an exception to its anti-discrimination policy for the Catholic group, as the contract permitted. *See id.* But this court cannot imagine that the Supreme Court would sanction what Plaintiffs propose here as a remedy: ordering the federal government to make as a condition of a religious organization's participation in a federal program

11

that it violate its sincerely held religious beliefs on same-sex marriage.  *Cf. 303 Creative LLC v. Elenis*, __ S. Ct. __, 2023 WL 4277208 (2023).

## VI.

For the foregoing reasons, Defendants' Motions for Summary Judgment, ECF Nos. 106, 109, and 110, are granted, and Plaintiffs' Motions for Summary Judgment, ECF Nos. 107 and 108, are denied.  Further, USCCB's Motion to Exclude Expert Report and Testimony, ECF No. 117, is denied as moot.  A separate final order accompanies this Memorandum Opinion.

Dated:  July 7, 2023

Amit P. Mehta
United States District Court Judge